Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------x

AUDREY (SHEBBY) D'ONOFRIO,

    Plaintiff,

vs.                     Case No. 06-687 JDB
                        Judge John D. Bates

SFX SPORTS GROUP, INC.,
et al.,

    Defendants.

---------------------------x

                Bethesda, Maryland

                February 21, 2007

Deposition of

           JOE SHANNON

called for oral examination by counsel for Plaintiff, pursuant to notice, held at the law offices of David E. Schreiber, 4550 Montgomery Avenue, Suite 760N, Bethesda, Maryland, beginning at 11:32 a.m., before Lynell C.S. Abbott, Shorthand Reporter and Notary Public in and for the State of Maryland, when were present on behalf of the respective parties:

9ac3ee6f-ab3d-4253-820b-24fc65d79c9c

Page 2

## APPEARANCES

On Behalf of Plaintiff:
Law Office of David E. Schreiber
By: David E. Schreiber, Esq.
4550 Montgomery Avenue, Suite 760N
Bethesda, Maryland 20814
(301) 951-1530

On Behalf of Defendants:
Baker & Hostetler
By: Johnine P. Barnes, Esq.
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C. 20036-5304
(202) 861-1633
   and
Donna K. Schneider, Esq.
Clear Channel
200 East Basse Road
San Antonio, Texas 78209
(210) 832-3468

Page 3

Also Present:
Audrey (Shebby) D'Onofrio
Douglas Bond

## CONTENTS

EXAMINATIONS
JOE SHANNON                              PAGE
  BY MR. SCHREIBER                          4

EXHIBITS
MARKED FOR IDENTIFICATION                PAGE
AND ATTACHED:

JS Exhibits:
  No. 1                   10
  No. 2                   22

Page 4

## PROCEEDINGS
- - - -

--Whereupon
        JOE SHANNON
a witness, called for examination, having first
duly sworn (or affirmed), was examined and
testified as follows:
        *********
        EXAMINATION
BY MR. SCHREIBER:
    Q.  Would you tell us all, please, your
full name, and your business address.
    A.  Joe Shannon. J-o-e, S-h-a-n-n-o-n.
Business address, 20880 Stone Oak Boulevard,
San Antonio, Texas, 78258.
    Q.  By whom are you employed?
    A.  Clear Channel.
    Q.  There are a number of Clear Channels.
Can you give us the specific corporation that you
are employed by?
    A.  No, I cannot.  Clear Channel

Page 5

Corporate.
    Q.  That's all you know?
    A.  Yes, sir.
    Q.  Clear Channel Corporate, okay.  And
what do you do for Clear Channel Corporate?
    A.  I am the Chief Technology Officer.
    Q.  Can you tell us what that means?
    A.  I am responsible for infrastructure,
enterprise systems, common purpose systems.
    Q.  How many people work for you?
    A.  210 are in the department.
    Q.  And you are the head of the
department.
    A.  Second.
    Q.  You're second, oh.  So you're the
Chief Technology Officer.  To whom do you report?
    A.  Chief Information Officer.
    Q.  And who is that?
    A.  David Wilson.
    Q.  Is he an officer of the corporation,
do you know?
    A.  I'm not sure.

Page 18

1  Q. Moving forward.
2  A. Moving forward, over the next week
3 or so I determined that we had quite a bit of
4 Ms. D'Onofrio's e-mail.
5  Q. Counsel was kind enough to send over
6 to us, it arrived this morning, counsel said they
7 tried last night, a disk. Well, it's not a disk
8 actually. There's two disks. There's two disks
9 that were sent over. The first disk, I didn't
10 even see the first one. DEF 1 through 28379 and
11 then 28544 through 46656. And then the second
12 disk has 28380 DEF and then 28543.
13     So I'm estimating from the numbering
14 here that there are some 46,656 e-mails on here.
15 Is that correct?
16  A. I don't know. I did not create those.
17  Q. Who created these?
18  A. I don't know.
19  Q. You were just telling me about
20 locating e-mails.
21  A. Yes, sir.
22  Q. How did you locate e-mails sometime

Page 19

1 between February 7th and February 21st?
2  A. I searched our archiving system.
3  Q. And what kind of archiving system is
4 maintained?
5  A. It's a Legato.
6  Q. Spell that.
7  A. L-e-g-a-t-o.
8  Q. L-e-g-a-t-o. Is that a brand name?
9  A. That is a brand name; company name,
10 also.
11  Q. And that is the system that you,
12 meaning Clear Channel, uses to archive all
13 e-mails?
14     MS. BARNES: Objection.
15     THE WITNESS: Selected users' e-mails.
16     BY MR. SCHREIBER:
17  Q. And how is one, a user, selected to be
18 archived?
19  A. My Legal Department gives me that
20 list.
21  Q. And how often does the Legal
22 Department give you a list? Weekly? Monthly?

Page 20

1 Yearly? Daily?
2  A. It varies, depending on lawsuits.
3  Q. I see. Did you get anything from the
4 Legal Department regarding this lawsuit, D'Onofrio
5 versus Clear Channel -- but SFX in particular --
6 with respect to this archiving?
7     MS. BARNES: Objection.
8     THE WITNESS: Just in February of '07.
9     BY MR. SCHREIBER:
10  Q. Do you know if anybody in your IT unit
11 received any notification of retention of any
12 electronic data or documents, e-mails, et cetera,
13 beginning as of October 6th, 2005 through February
14 7th, 2007?
15  A. I am not aware of anybody in IT
16 receiving such a document.
17  Q. You were employed as of October 2005
18 by Clear Channel in the position that you are
19 currently in?
20  A. Yes, sir.
21  Q. You are telling me that you are not
22 aware that the Legal Department of Clear Channel

Page 21

1 advised your department at any time, until
2 February 7th of this year when you became
3 involved, of a pending legal action against
4 Clear Channel or any subsidiary. Is that your
5 testimony?
6     MS. BARNES: Objection.
7     THE WITNESS: That is my testimony.
8     BY MR. SCHREIBER:
9  Q. Is it possible that if the Legal
10 Department had notified the IT Department, I'll
11 use "IT" to describe your department, if they had
12 so advised IT that you might not have known about
13 it?
14  A. That is possible.
15  Q. Is it likely?
16  A. Can you rephrase the question?
17  Q. If Clear Channel's Legal Department
18 had notified the IT Department, your department,
19 that there was a need for retention of documents
20 based upon a pending claim, would your department
21 have a record of that?
22  A. Yes, sir.

Page 22

1  Q. And even if you were not aware of it,
2 that record would still be in existence?
3  A. Not necessarily.
4  Q. Why not?
5  A. That record probably comes through
6 e-mail the majority of the time, and people have
7 to maintain their mailbox and determine what is
8 pertinent to their business and what is not under
9 a certain storage limit. So whether somebody
10 kept an e-mail from '05 to '07 would be really
11 depending on that person.
12  Q. Do you know a Vanessa Villaneuva in
13 the Legal Department of Clear Channel?
14      MS. BARNES: Objection.
15      THE WITNESS: The name is familiar. I
16 do not know her.
17      MR. SCHREIBER: Okay. Let's mark this
18 as Exhibit 2.
19      (Thereupon, Deposition Exhibit Number
20 2 was marked for identification.)
21      BY MR. SCHREIBER:
22  Q. This is a copy of a letter of October

Page 23

1 6, 2005 to Kimberly Wray, Director of Human
2 Resources Services of Clear Channel. It's from
3 me. Are you familiar with this letter?
4  A. No, sir.
5  Q. Do you know Ms. Wray?
6  A. Yes, sir.
7  Q. Has she ever advised you or anybody in
8 your department, to your knowledge, of a pending
9 claim by Ms. D'Onofrio, married name Shebby,
10 against Clear Channel or SFX?
11  A. Not to my knowledge.
12  Q. So as you sit here today is it your
13 testimony that the first time you knew of this
14 claim or this case is early February of this year?
15  A. Yes, sir.
16  Q. Do you know if anybody in your
17 department made any attempt between October 6,
18 2005 and early February 2007 to determine whether
19 there were any e-mails or electronic documents
20 or data available to Clear Channel or SFX with
21 respect to any request for documents or data?
22  A. Yes, sir.

Page 24

1  Q. You do know that.
2  A. Yes, sir.
3  Q. And what do you know?
4  A. October time frame, September time
5 frame '06.
6  Q. September/October '06. Tell me what
7 you know.
8  A. There were searches done against the
9 Legato system.
10  Q. Who did the searches?
11  A. John Cavender.
12  Q. Spell that, please.
13  A. C-a-v-e-n-d-e-r? I believe.
14  Q. I'm looking up. I'm thinking it's
15 close but maybe not a cigar.
16      And who is John Cavender?
17  A. He is a security principal for Clear
18 Channel.
19  Q. Security principal?
20  A. Yes, sir.
21  Q. And what does that mean?
22  A. His responsibilities are maintaining

Page 25

1 the different applications we have, the security
2 base around them, keeping the bad guys out,
3 keeping the good guys in.
4  Q. Where do I fit into that?
5  A. Good guy.
6  Q. Thank you. Nobody said that to me in
7 a deposition in so long I can't remember.
8      So he searched back in September/
9 October. Do you know what he found, if anything?
10  A. He found nothing.
11  Q. And what did he search actually other
12 than the Legato system?
13  A. The current e-mail system and the
14 current Legato system.
15  Q. When you say current, what does that
16 mean?
17  A. Current, as of September/October '06.
18  Q. Would his search have taken him back
19 looking for material beginning 2004, for instance?
20  A. If anything existed, yes, sir.
21  Q. And did he indicate in writing or
22 electronically by e-mail, et cetera, that he did

Page 26

1  not find anything?
2     A.  Yes, sir.
3     Q.  And who did he communicate that to?
4     A.  I believe it was to General Counsel
5  of Live Nation.
6     Q.  And who is that person?
7     A.  Richard Munisteri.
8     Q.  Any help on that one?
9        MR. SCHREIBER:  Do you know how to
10 spell it, Ms. Schneider?
11       MS. BARNES:  M-u-n-i-s-t-e-r-i.
12       BY MR. SCHREIBER:
13    Q.  Do you know if he did the search at
14 the request of Mr. Munisteri?
15    A.  Yes, sir.
16    Q.  Did that request come through you?
17    A.  No, sir.
18    Q.  Is he superior to you or inferior to
19 you?
20    A.  He is one of my employees.
21    Q.  So the request went directly to him,
22 not through you.

Page 27

1     A.  That is correct.
2     Q.  Did you see this e-mail traffic when
3  the request was made to him?
4     A.  No, sir.
5     Q.  Did you see his response when he said
6  he found nothing?
7     A.  No, sir.
8     Q.  When did you see this response?
9     A.  Around the February 7th, 8th time
10 frame of this month.
11    Q.  So a search was begun by you recently.
12    A.  Yes, sir.
13    Q.  And did anybody else actively assist
14 you beginning February 7th in your review or
15 search of this material?
16    A.  Yes, sir.
17    Q.  Who else was helping you?
18    A.  John Cavender.
19    Q.  Same person.
20    A.  Same person.
21    Q.  Anybody else?
22    A.  No, sir.

Page 28

1     Q.  And did this search occur in
2  San Antonio?
3     A.  Yes, sir.
4     Q.  Is that where the archives are kept?
5     A.  Yes, sir.
6     Q.  You started to tell me before a little
7  bit about policies and procedures.  In particular
8  in September of 2005, was there a retention policy
9  in place for Clear Channel as well as SFX and Live
10 Nation with respect to electronic material?
11    A.  Can you be more specific when you say
12 electronic material?
13    Q.  E-mails, documents, spreadsheets,
14 contracts, memoranda, things that are generated on
15 a computer.
16    A.  No, unless it was e-mail for a person
17 currently under litigation.
18    Q.  So they would have had to file suit
19 at that point, not just noticed a claim by letter,
20 let's say.  You are saying it had to actually be
21 in litigation for them to retain the e-mail, for
22 instance?

Page 29

1     A.  I have no idea what phase of
2  litigation a case is in.
3     Q.  Well, how do you characterize the word
4  "litigation" that you just used?  What does it
5  mean corporately?
6     A.  To me it means, we have a litigation
7  e-mail server.  And when we get notification
8  from our Legal Department that XYZ employee or
9  ex-employee needs to be put on the litigation
10 server, that's about the extent of the contact I
11 receive, not the reason why or what phase of the
12 case it's in or even if there is a case.
13    Q.  Do you know when Ms. D'Onofrio was put
14 on this list, this litigation server list?
15       MS. BARNES:  Objection.
16       THE WITNESS:  I do now.
17       BY MR. SCHREIBER:
18    Q.  Tell me what you know.
19    A.  August 2004.
20    Q.  August of 2004 Ms. D'Onofrio was put
21 on a list.  Was there any information regarding
22 why she was on a list about potential -- was it a

Page 30

1  potential litigation or an actual litigation that
2  she was on?
3      MS. BARNES: Objection.
4      THE WITNESS: There was a, I don't
5  know if it was potential or actual. There was a
6  case against Clear Channel that put over 11,000
7  people onto this system in August of '04.
8      BY MR. SCHREIBER:
9   Q.  And she was one of them.
10  A.  Apparently.
11  Q.  Do you know what this case was about?
12  A.  Yes, sir.
13  Q.  What was it about?
14     MS. BARNES: Objection.
15     BY MR. SCHREIBER:
16  Q.  You may answer.
17     MS. BARNES: Well, let's go off the
18  record for a second.
19     MR. SCHREIBER: I don't know what you
20  are about to tell me. It will go back on the
21  record once you tell me.
22     (Discussion off the record.)

Page 31

1      BY MR. SCHREIBER:
2   Q.  Ms. Barnes has made reference to an
3  unrelated matter, government investigation, that
4  had caused 11,000 people to be put on this list.
5  It's called a litigation list or litigation
6  server?
7   A.  Yes, sir.
8   Q.  We don't need to go into the specifics
9  of it, but am I correct to understand that Ms.
10 D'Onofrio as one of these many people, all of her
11 e-mails had been saved going forward from August
12 of 2004 through the present?
13  A.  Through exiting the company, yes, sir.
14  Q.  Okay. So they were saved and are
15 still in existence.
16  A.  Yes, sir.
17  Q.  And that is the basis for these two
18 disks with some 46,000 items on them. Is that
19 correct?
20  A.  I am assuming. Those disks are not
21 mine.
22  Q.  Who created those disks?

Page 32

1   A.  I don't know.
2   Q.  You have no idea. Were they done
3  through your IT Department?
4   A.  No, sir.
5   Q.  Would it have been Mr. Cavender? No?
6   A.  I don't believe so. We don't have a
7  printing mechanism --
8      MS. BARNES: I think for the record
9  the disks were produced by counsel as discovery
10 production.
11     BY MR. SCHREIBER:
12  Q.  The material that are on these disks,
13 all these e-mails, were they located by you and
14 Mr. Cavender?
15  A.  Yes, sir. They were located by
16 Mr. Cavender.
17  Q.  Mr. Cavender. And when he located
18 this material, do you know what he did with it?
19  A.  Burned it to a DVD.
20  Q.  One or two? Because we have two here
21 for some reason.
22  A.  I believe he got it all on one DVD and

Page 33

1  sent that to counsel.
2   Q.  When was that?
3   A.  February 10th, 11th, 12th, that time
4  frame. I'm not sure of the exact date that it
5  went out.
6   Q.  Aside from just e-mails that
7  Ms. D'Onofrio was a party to, and I gather that's
8  what has been produced, some 46,000, that she is a
9  party to an e-mail -- is that how the criteria
10 went?
11  A.  Anything that was sent to or from
12 Ms. D'Onofrio.
13  Q.  Has your department been made aware
14 of the fact that aside from those kinds of
15 communications there were requests for other kinds
16 of communications, not directly including her but
17 about certain topics or issues that have to do
18 with the claims in this case? Has that ever been
19 communicated to the IT Department?
20     MS. BARNES: Objection; beyond the
21 scope.
22     BY MR. SCHREIBER:

Page 34

1  Q. You may answer.
2  A. Can you rephrase the question?
3  Q. Has your IT Department -- I use that
4  phrase. Hopefully, we're communicating well.
5  A. That works.
6  Q. Has your department ever received
7  information that there has been a request not
8  just for e-mails that were either directed to
9  or from Ms. D'Onofrio but from other people about
10 certain issues or topics in this case, including
11 discussions about Ms. D'Onofrio, has that ever
12 been communicated to the IT Department?
13    MS. BARNES: Continued objection.
14    THE WITNESS: As far as this case,
15 no, sir.
16    BY MR. SCHREIBER:
17 Q. So if as an example Ms. D'Onofrio had
18 requested a larger salary, which is an issue in
19 this case, and that issue had been discussed
20 between two other individuals, that particular
21 communication by e-mail wouldn't be included in
22 the material that you or your department produced

Page 35

1  for us. Is that correct?
2  A. No, sir, not unless she was either
3  carbon-copied, blind-copied or on the "To" line.
4  Q. On the what line?
5  A. "To."
6  Q. "To" line, I see.
7  A. "To," yes.
8  Q. So if one were to go into your
9  archive system and request information that
10 had as its parameters certain topics, let's say
11 "compensation," "title," "vice president," those
12 kinds of words, would that kind of information be
13 retrievable by a forensic investigator?
14 A. Yes, sir.
15 Q. There were 11,000 people involved
16 in this other unrelated matter. How many people,
17 going back to August of 2004, were employed by
18 Clear Channel or its related entities at that
19 time?
20    MS. BARNES: Objection.
21    THE WITNESS: To the best of my
22 knowledge, more than 35,000.

Page 36

1     BY MR. SCHREIBER:
2  Q. So this was not quite a third of the
3  employees of Clear Channel or its subsidiaries or
4  related entities that were put on this list. Is
5  that correct?
6  A. Yes, sir.
7     MS. BARNES: Continued objection.
8  Allow me to object.
9     BY MR. SCHREIBER:
10 Q. If we were to propose certain names
11 with respect to our forensic inquiry, would that
12 list be available to sort of cross-index with
13 these names to determine easily whether or not
14 material from this particular archive would be
15 available? If I gave you Joe Smith's name, easy
16 to come up with whether or not he's on the list,
17 right?
18 A. I can search the Legato system for Joe
19 Smith. I don't have any means of telling you if
20 he was one of the original 11,000.
21 Q. Okay.
22 A. He may have been added for later

Page 37

1  cases. He may have been taken off for cases that
2  had been resolved or situations that had been
3  resolved.
4  Q. Other than this 11,000 employee
5  matter, was there a retention policy in place
6  other than that particular situation by Clear
7  Channel and subsidiaries or related entities?
8  A. Can you be more specific?
9  Q. Obviously there was a retention policy
10 for this particular case that counsel has told us
11 about.
12 A. Yes, sir.
13 Q. Other than that case, did Clear
14 Channel have a retention policy for electronically
15 stored material, data, from, let's use the time
16 frame 2003 going forward?
17    MS. BARNES: Objection; asked and
18 answered.
19    THE WITNESS: Just for e-mail.
20    BY MR. SCHREIBER:
21 Q. Just for e-mail. So e-mails going
22 back let's say to 2003 would have generally been

Page 46

1  Q. How about anybody else's department?
2  A. They may have contacted the market
3  that she was employed with.
4  Q. SFX was her immediate employer, so to
5  speak. Are you aware of that?
6  A. SFX, Sports.
7  Q. Yes.
8  A. Yes, sir.
9  Q. You were aware that's where she
10 worked.
11 A. Yes, sir.
12 Q. Who is the IT person on site at SFX?
13 A. I do not believe there is one.
14 Q. Was there one?
15 A. No, sir.
16 Q. Do you know a Mr. Mason?
17 A. I do know a Mr. Mason.
18 Q. Gene Mason?
19 A. Yes, sir.
20 Q. Does he not handle the IT material or
21 matters for SFX?
22 A. I thought he was general manager.

Page 47

1  Maybe I'm wrong, but I do not believe he is
2  designated as the IT person.
3  Q. To your knowledge then, no one is
4  designated as an IT person in SFX?
5  A. We have regional IT engineers that
6  manage regions of the country.
7  Q. "We" meaning Clear Channel.
8  A. Clear Channel, yes, sir.
9  Q. Who was the regional person, let's
10 go back to September of '05, who was the regional
11 person that handled the area that included SFX?
12 A. John Sis.
13 Q. S-i-s?
14 A. S-i-s.
15 Q. And to your knowledge, did Mr. Sis
16 make any investigation of the local data, to use
17 your phrase, regarding Ms. D'Onofrio?
18 A. Not to my knowledge.
19 Q. Do you know if anybody has actually
20 looked at her computer?
21 A. Yes, sir, I do.
22 Q. And who was that?

Page 48

1  A. Eugene Mason, Mr. Mason.
2  Q. And when did Gene - -- we'll use Gene.
3  When did Mr. Mason first look through or at or
4  inquire of her computer or her hard drive, do you
5  know?
6  A. From my knowledge, it was spring/
7  summer of '06. He tried to copy the data off
8  any existing data off of her local hard drive,
9  experiencing great difficulties as the hard drive
10 had failed, trying to resurrect it, tried to
11 restore the operating system which would have been
12 MicroSoft XP, I am assuming, and to no success.
13 Q. So if that was the spring or summer
14 of '06, can you tell us whether or not anybody
15 else used Ms. D'Onofrio's computer from the time
16 of her termination in late September until Mr.
17 Mason did his investigation?
18 A. To the best of my knowledge, no, sir,
19 no one used it.
20 Q. So the computer just sat there?
21 A. Yes, sir.
22 Q. And that computer is still available?

Page 49

1  A. I do not believe it is available.
2  Q. What happened --
3  A. To the best of my knowledge.
4  Q. What happened to her computer?
5  A. I believe it was scrapped.
6  Q. And when was that computer scrapped?
7  A. Summer of '06 when it was determined
8  it was no longer breathing, in an IT term.
9  Q. So between September of '05 and
10 sometime in the spring or summer of '06, to your
11 knowledge, did anybody ever at any time use
12 Ms. D'Onofrio's computer subsequent to her
13 termination?
14 A. To the best of my knowledge, no.
15 Q. The Outlook system -- the calendar
16 that was used, is it an Outlook system that SFX
17 employees used?
18 A. Yes, it's part of the mail system.
19 Q. Was that data retained normally?
20 Other than the e-mail data, was the calendar data
21 retained?
22 A. No, sir.

13 (Pages 46 to 49)

9ac3ee6f-ab3d-4253-820b-24fc65d79c9c

Page 50

1  Q. Would that be resident on the hard
2  drive or on some other server, the calendar?
3  A. It's resident on the Exchange system
4  that sits in San Antonio for active employees.
5  Q. So if she was using her Outlook
6  calendar, in essence, she would be working off
7  of a system in San Antonio, not one in her office.
8  A. That is correct.
9  Q. Would a copy of her calendar at any
10 time be on her hard drive in her office?
11 A. If the individual archives to a PST
12 file, their calendar items, their e-mail items,
13 their contact items, that would be on the local
14 hard drive or could be on a local file server
15 depending on where they put that PST file.
16 Q. Did anybody attempt to determine
17 whether any of the Outlook calendar material was
18 available on any document retention system at
19 Clear Channel for Ms. D'Onofrio?
20 A. Other than recovering stuff off the
21 server from her public share.
22 Q. What stuff are you referring to off of

Page 51

1  public share?
2  A. I have not seen the documents but I'm
3  assuming anything she stored on her H drive was on
4  the local server.
5  Q. What is the H drive?
6  A. Most people, I won't say all, but most
7  people in most markets will have a local file
8  server that is managed locally, whether it's by a
9  regional IT person or by a contract IT person,
10 that we will usually advise the local markets to
11 store their documents, documents Excel, documents
12 PowerPoint, documents out on this file server
13 versus storing them on their local C drives for
14 the very reason that Mr. Mason ran into in the
15 summer of '06, spring of '06, hard drives fail.
16 Q. Are you aware whether or not Ms.
17 D'Onofrio's data, material was stored on an H
18 drive going back some years, let's say 2003?
19 A. I am not relevant to the dates of
20 the data because I haven't seen it, but there was
21 data there.
22 Q. You don't know what the data is,

Page 52

1  though.
2  A. No, sir.
3  Q. Did you produce it for counsel?
4  A. I did not.
5  Q. Did somebody in your office?
6  A. I believe so, yes, sir.
7  Q. Would that have been Mr. Cavender?
8  A. I believe it was Mr. Mason.
9  Q. Mr. Mason produced some documents.
10 Have you talked to Mr. Mason about what he found
11 or what he produced?
12 A. I have not talked to him about what
13 he found other than he did find stuff.
14 Q. Has he commemorated what he found
15 in writing or electronically, to your knowledge,
16 either by a list or e-mail saying, "Guess what I
17 found," something along those lines?
18     MS. BARNES: Objection.
19     THE WITNESS: To my knowledge or to
20 me, no.
21     BY MR. SCHREIBER:
22 Q. So the company is not aware of any

Page 53

1  communication by Mr. Mason as to these other kinds
2  of documents that he found. Is that true?
3     MS. BARNES: Objection.
4     THE WITNESS: If he has had
5  communication with counsel, I have not been privy
6  to that.
7     BY MR. SCHREIBER:
8  Q. And the documents you are talking
9  about are like Word, Excel, spreadsheets, things
10 like that, not e-mails.
11 A. That is correct, unless there was a
12 PST file there that they have put up there.
13     (Recess taken.)
14     BY MR. SCHREIBER:
15 Q. In light of the sensitivity that you
16 attach to the SEC investigation, I do need to know
17 a few more things but we'll seal this portion of
18 the deposition if there is any concern about it.
19 It won't be released publicly, certainly.
20     MS. BARNES: I'm still going to object
21 to the fact that it's beyond the scope and I may
22 instruct him not to answer. It's beyond the scope