1           IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF COLUMBIA

2

    - - - - - - - - - - - - - - - - x

3

AUDREY D'ONOFRIO                     :

4

            Plaintiff                :

5

vs.                                  :   No. 06-687

6

SFX SPORTS GROUP, INC.,              :

7   ET AL.

8           Defendants               :

9   - - - - - - - - - - - - - - - - x

10                  March 1, 2007

11                  Washington, D.C.

12  DEPOSITION OF:

13                  AUDREY D'ONOFRIO

14      was called for examination by counsel for the

15  Defendants, pursuant to notice, taken at Baker &

16  Hostetler, 1050 Connecticut Avenue, N.W, Suite 1100,

17  Washington, D.C., commencing at 10:12 a.m., before

18  Misty Klapper, a Notary Public in and for the District

19  of Columbia, when were present on behalf of the

20  respective parties:

21

22

Page 135

1    Q.   Who told you that you would have the
2  title of vice president?
3    A.   I told you a variety of people told me
4  that.
5    Q.   And those persons' names would be?
6    A.   Robert Urbach.
7    Q.   Bob Urbach told you that you would have
8  the title vice president?
9    A.   He did.
10    Q.   And when did he tell you that?
11    A.   A variety of times.
12    Q.   Who else told you?
13    A.   Bud Martin.
14    Q.   What was Mr. Martin's title?
15    A.   He is executive vice president, senior
16  vice president.
17    Q.   And what division?
18    A.   Golf.
19    Q.   And who else told you that you'd have the
20  title vice president?
21    A.   Who told me -- can you say it
22  specifically?

Page 136

1    Q.   That you would have the title of vice
2  president.
3    A.   Those were the two who told me when I
4  came back.
5    Q.   When you began your employment in 2002
6  with SFX, what position were you offered?
7    A.   Senior director.
8    Q.   And what position did you take?
9    A.   Senior director.
10    Q.   When did Mr. Urbach tell you that you
11  would have the title of vice president?
12    A.   Prior to me taking the position.
13    Q.   Prior to you taking the position of
14  senior director?
15    A.   He did.
16    Q.   Did you request that position at that
17  time?
18    A.   We discussed it at length.
19    Q.   But you didn't get the title of VP,
20  correct?
21    A.   Not at that time.
22    Q.   You were employed with SFX in 2002 as

Page 137

1  senior director, correct?
2    A.   Correct.
3    Q.   And if Mr. Urbach says that he never had
4  these conversations with you regarding you obtaining
5  the title of vice president, is he mistaken?
6    MR. SCHREIBER: Objection.
7    THE WITNESS: He would be mistaken.
8    (Thereupon, D'Onofrio Deposition Exhibit
9    Number 9 was marked for identification.)
10    MR. SCHREIBER: Can we go off the record
11  a second?
12    (Thereupon, a discussion was had off the
13    record.)
14    BY MS. BARNES:
15    Q.   Before we -- and I apologize, I'm getting
16  ready to go back now.  Before we get to what has been
17  marked as D'Onofrio Exhibit 9, which I handed you, you
18  said you also had conversations with Mr. Urbach
19  regarding your compensation.
20    What conversations did you have with
21  Mr. Urbach?
22    A.   I had various conversations about it.

Page 138

1    Q.   Okay.  And what did you speak with
2  Mr. Urbach about your compensation?
3    A.   To be paid better.
4    Q.   What did you tell him you felt that you
5  should be paid?
6    A.   I didn't tell him a specific dollar
7  figure.
8    Q.   So what did you request from him?
9    A.   I requested that my job title be
10  identified correctly and that I be paid commensurate
11  with my predecessor.
12    Q.   And who was your predecessor?
13    A.   Howard Schacter.
14    Q.   What position did Mr. Schacter hold?
15    A.   At that time I don't know what his
16  position held.
17    Q.   Was Mr. Schacter ever a senior director
18  of communications?
19    A.   No, not that I'm aware of.
20    Q.   You reported to Mr. Schacter when you
21  were employed in --
22    A.   He was one of two people I reported to.

Page 187

1    Q.   To what position?
2    A.   Who knows.  Possibilities are limitless,
3  aren't they?
4    Q.   Is there a specific position that you
5  should have been considered for that you weren't
6  considered for?
7    A.   Well, I didn't get to be senior vice
8  president because I didn't get to vice president.
9    Q.   Okay.  And you would have been vice
10  president of what?
11    A.   Communications.
12    Q.   Was there someone who was vice president
13  of communications?
14    A.   Howard Schacter.
15    Q.   I'm sorry, was there someone who was vice
16  president of communications during your employment
17  with SFX in 2002?
18    A.   There was a variety of people.
19    Q.   That were vice presidents of
20  communications?
21    A.   Not in the sports group.  I was the
22  highest ranking public relations person within the

Page 188

1  sports group.
2    Q.   So what position would you have -- strike
3  that.
4        What position of not having the title of
5  vice president did that hinder you from obtaining?
6    A.   Again, I'll answer the question, we don't
7  know.  We don't know, because I was never given that
8  opportunity, was I?
9    Q.   During your employment in 2001 -- strike
10  that.
11        During your employment with SFX from 2000
12  to 2001, what were Howard Schacter's job
13  responsibilities and duties, to the extent you knew?
14    A.   He was in charge of internal and external
15  communications for the company.
16    Q.   And that entailed what?
17    A.   It entailed -- I think we already,
18  actually, went over this earlier in the deposition.
19        MR. SCHREIBER:  Well, she's entitled to
20  ask the question.
21        THE WITNESS:  Okay.
22        MR. SCHREIBER:  Can I just ask for a

Page 189

1  clarification?  When you say within the company,
2  because there's --
3        MS. BARNES:  If she doesn't understand
4  it, she can ask me a question.
5        THE WITNESS:  I don't understand it,
6  because I feel like didn't we go over this.
7        BY MS. BARNES:
8    Q.   What were his responsibilities for
9  internal and external communications within --
10    A.   When he -- are you referring to
11        MR. SCHREIBER:  Let her finish the
12  question.
13        THE WITNESS:  Sorry.
14        BY MS. BARNES:
15    Q.   What were his responsibilities being in
16  control of external and internal communications in the
17  company?
18        MR. SCHREIBER:  May I just ask which
19  company you're referring to?
20        MS. BARNES:  I think she said within the
21  company, and maybe she didn't, but I'm referring to
22  whatever company she's referring to.

Page 190

1        MR. SCHREIBER:  SFX Sports Group?
2        THE WITNESS:  Is that what you're
3  referring to, because that's what I'm answering
4  within, SFX Sports Group?
5        BY MS. BARNES:
6    Q.   Okay, within SFX Sports Group.
7    A.   At the time he was with SFX Sports Group,
8  I took over his position shortly after I came to the
9  company -- I can't say now -- within a few months.
10  For the short time I was there and what I gleaned, I
11  know that he was in charge of internal and external
12  communications.  He did press releases.  He advised
13  executives on, you know, public relations.  That's the
14  sort of stuff that he did.
15    Q.   What did he -- what were his job
16  responsibilities at the time that he was your direct
17  supervisor?
18    A.   At the time when he -- when I first was
19  there, he was in charge of public relations for the
20  company.  And I was not.  I was a step under that.
21  Then he took another job and I was promoted to his
22  position.

Page 191

1    Q.    Okay. What job did he take?
2    A.    He took a job as head of public relations
3    for all of SFX Entertainment.
4    Q.    At the time that you worked under Howard
5    Schacter, what were the distinguishing
6    responsibilities between you all's positions?
7    A.    Remember, I had two jobs. So which job
8    are you referring to?
9    Q.    At the time when you worked under Howard
10   Schacter.
11   A.    I worked under Howard Schacter for two
12   different positions, remember. When I first came to
13   the company --
14        MR. SCHREIBER: I don't think counsel
15   remembers, so you're going to have to be explicit.
16        BY MS. BARNES:
17   Q.    What two different positions?
18   A.    When I first came to the company, I had
19   one position. And then Howard was promoted to head of
20   public relations for SFX Entertainment and I was
21   promoted to his position as head of PR for the sports
22   group.

Page 192

1    Q.    What position did you hold when you first
2    came to SFX?
3    A.    When I was first coming to SFX group, my
4    position was going to be in public relations, working
5    on value added marketing campaigns for the consulting
6    group. That was the primary focus of my position.
7    Q.    And how long were you -- what was your
8    title at that time?
9    A.    Senior director.
10   Q.    And how long did you perform these
11   functions as senior director?
12   A.    Very shortly, because I was promoted.
13   Q.    And you were promoted to what position?
14   A.    I was head of public relations for the
15   sports group. That position was a vice president,
16   which is one of the reasons why we're here today,
17   because I didn't get that title.
18   Q.    Did someone tell you that you were
19   promoted?
20   A.    Yes.
21   Q.    Who told you you were promoted?
22   A.    Howard told me. Bill Allard told me.

Page 193

1    Q.    You worked with Bill Allard during your
2    employment from 2000 to 2001?
3    A.    I did.
4    Q.    What was Bill Allard's position at that
5    time?
6    A.    He was COO of the company.
7    Q.    And Bill told you you were promoted?
8    A.    Yes.
9    Q.    Did he tell you verbally?
10   A.    Yes.
11   Q.    Did they send out an announcement, press
12   release, saying that you had been promoted?
13   A.    You know, they asked about it, but I
14   declined.
15   Q.    And why did you decline?
16   A.    It's not my style.
17   Q.    Wouldn't people knowing that you had been
18   promoted help you with your progression in the
19   company?
20   A.    You know, as I've gotten more senior in
21   what I do, I kind of feel that a lot of times when
22   people send out press releases on their promotion it's

Page 194

1    kind of -- it just seems like you're sort of bragging.
2    Q.    And this wouldn't have been a help in
3    your progression at the company?
4    A.    A lot of times when people look at that
5    stuff they kind of laugh, but a lot of people love it,
6    so, you know, to each --
7        MR. SCHREIBER: There's no question.
8        THE WITNESS: Sorry.
9        BY MS. BARNES:
10   Q.    Other than the instances that we went
11   over, were there any other instances that you deemed
12   to be a hostile work environment while you were
13   employed at SFX from 2002 forward?
14   A.    I don't recall at this time.
15   Q.    I'm going to direct your attention to
16   paragraph 20.
17   A.    On which page?
18   Q.    On page nine.
19        MR. SCHREIBER: Of Exhibit 10?
20        MS. BARNES: I'm sorry, of D'Onofrio
21   Exhibit 10, yes, you're correct.
22        THE WITNESS: Paragraph 20 did you say?

Misty Klapper & Associates
703-780-9559

1              UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF COLUMBIA

2

3       --------------------------------

4    AUDREY (SHEBBY) D'ONOFRIO,

5              Plaintiff,

6       v.                                Case No:

                                        06-687 JDB

7    SFX SPORTS GROUP, INC., et al.,      Judge John

                                        D. Bates

8              Defendants.

9       ------------------------------------

10                        Monday, April 23, 2007

11                        Washington, D.C.

12   Deposition of:

13                   GENE S. MASON

14   called for examination by counsel for the

15   Plaintiff, pursuant to Notice, taken at the law

16   offices of David E. Schreiber, P.C., Suite 760N,

17   4550 Montgomery Avenue, Bethesda, Maryland  20814,

18   beginning at 9:36 a.m., before Lu Anne Dawson,

19   Notary Public in and for the District of Columbia,

20   when were present on behalf of the respective

21   parties:

22

Page 14

1  for this conversation, or conversations?
2     A.   I think it was actually a conference
3  call.
4     Q.   Do you know who was on the conference
5  call besides yourself and Mr. Shannon?
6     A.   Johnine.
7     Q.   Anybody else?
8     A.   I don't remember who else.  I think
9  there was one or two other people.
10    Q.   As you sit here today, you don't know
11  when at all this conversation took place, whether
12  it was a month or two ago or 12 months ago?
13    A.   It wasn't in 2007.
14    Q.   Not in 2007.  And the other person or
15  persons, you can't tell us who participated in
16  that call?
17    A.   Other than Johnine, I don't remember
18  who was on the call.
19    Q.   But there were some other people?
20    A.   I think there were one or two other
21  people.
22    Q.   What was that call about?

Page 15

1     A.   The --
2        MS. BARNES:  Objection.
3        BY MR. SCHREIBER:
4     Q.   You may speak.
5        MS. BARNES:  No, because it's
6  privileged.
7        MR. SCHREIBER:  I have no idea that it
8  is privileged.
9        MS. BARNES:  I'm telling you it's
10  privileged.  If I'm talking to him --
11       MR. SCHREIBER:  No.  There's two other
12  people, unknown people.  We have no idea who they
13  are, and I can't say --
14       MS. BARNES:  I can attest to you that
15  it is privileged.
16       MR. SCHREIBER:  You don't want to
17  testify.
18       MS. BARNES:  I'm going to instruct him
19  not to answer because I know it is privileged.
20       BY MR. SCHREIBER:
21    Q.   Did you make notes of that meeting?
22    A.   No.

Page 16

1     Q.   Did anybody take any of the
2  conversation down stenographically, to your
3  knowledge?
4     A.   I do not know.
5     Q.   Did anybody else tell you that they
6  were making notes of that meeting?
7     A.   No.
8     Q.   Were you asked at any time to retrieve
9  documents in the D'Onofrio case?
10    A.   Yes.
11    Q.   When was that?
12    A.   Last year, summer sometime.
13    Q.   Who asked you to retrieve documents?
14    A.   Dan Rosier.
15    Q.   When did he ask you to do that last
16  summer?
17    A.   Sometime last summer.  I couldn't give
18  you an exact date.
19    Q.   How about an approximate date?
20    A.   Sometime between June and August.
21    Q.   Did you actually retrieve documents?
22    A.   Yes.

Page 17

1     Q.   Where did you retrieve documents from?
2     A.   The server that's located in our
3  offices.
4     Q.   What documents did you retrieve?
5     A.   Audrey's PST file.
6     Q.   And you retrieved this file sometime
7  last summer off of the server in D.C.; is that
8  correct?
9     A.   Yes.
10    Q.   What was in this file, if you know?
11    A.   It was empty.
12    Q.   It was empty?  Do you have a copy of
13  what it was that you obtained from the server?
14    A.   It's still there.
15    Q.   When you copied it, you said you
16  copied it or you retrieved it, what did you place
17  it on or how did you mechanically do that?
18    A.   I copied it to CD.
19    Q.   Where is that CD?
20    A.   I don't know.  I sent it to Dan.
21    Q.   Did you send it by letter?
22    A.   Federal Express.

Page 98

1    MS. BARNES: Objection.
2    THE WITNESS: I don't know.
3    BY MR. SCHREIBER:
4    Q.   Is it just for people in Washington
5  at SFX?
6    MS. BARNES: Objection.
7    THE WITNESS: No.
8    BY MR. SCHREIBER:
9    Q.   Who else does she do HR work for?
10    MS. BARNES: Objection.
11    THE WITNESS: I don't know.
12    BY MR. SCHREIBER:
13    Q.   If it is not just SFX in D.C., which
14  is a relatively small group, I gather, does she do
15  it for other Live Nation entities?
16    MS. BARNES: Objection.
17    THE WITNESS: Yes.
18    BY MR. SCHREIBER:
19    Q.   And who would she do it for; do you
20  know?
21    MS. BARNES: Objection.
22    THE WITNESS: I don't know --

Page 99

1    MS. BARNES: Asked and answered.
2    THE WITNESS: -- specifically.
3    BY MR. SCHREIBER:
4    Q.   Generally?
5    MS. BARNES: Objection. Asked and
6  answered.
7    THE WITNESS: Other Live Nation
8  entities.
9    BY MR. SCHREIBER:
10    Q.   But you couldn't give us names?
11    MS. BARNES: Objection.
12    THE WITNESS: No.
13    BY MR. SCHREIBER:
14    Q.   You know Julie Kennedy, do you not?
15    A.   Yes.
16    Q.   You have talked to her about this
17  case, haven't you?
18    MS. BARNES: Objection.
19    THE WITNESS: I don't recall. I don't
20  think so.
21    BY MR. SCHREIBER:
22    Q.   What is her job?

Page 100

1    MS. BARNES: Objection.
2    THE WITNESS: I don't know her
3  specific title.
4    BY MR. SCHREIBER:
5    Q.   Who does she work for?
6    MS. BARNES: Objection.
7    THE WITNESS: Russell Wallach.
8    BY MR. SCHREIBER:
9    Q.   Is that a Live Nation organization?
10    A.   Yes.
11    Q.   Who is Russell Wallach?
12    A.   I don't know his specific title. He
13  sells sponsorships and marketing for Live Nation.
14    Q.   And she works under him?
15    A.   Yes.
16    Q.   Where is she located?
17    A.   Washington, D.C. office.
18    Q.   Is she a vice president?
19    MS. BARNES: Objection.
20    THE WITNESS: I don't know her title.
21    BY MR. SCHREIBER:
22    Q.   When you began searching for documents

Page 101

1  at Mr. Rosier's request and he having indicated to
2  you that there was some litigation, I gather, what
3  was the first thing that you did? Where did you
4  go to? Did you go to the server? Did you go to
5  your own computer? Take me through the steps of
6  what you did back in the summer, we'll call it,
7  the summer of '06.
8    A.   I looked in Audrey's folder on the
9  server.
10    Q.   And that folder you said was a PST
11  folder?
12    A.   No. There's a PST file inside her
13  folder.
14    Q.   And that was empty, right?
15    A.   I didn't find that out until later.
16    Q.   Until how much later?
17    A.   I don't know. A week. Maybe more,
18  because the file was over 500 megs.
19    Q.   It was 500 megs but it was empty, it
20  had nothing in it?
21    A.   Yes.
22    Q.   Can you tell us in your estimation as

Page 102

1    a person with some computer background why this
2    file with 500 megs was empty?
3        MS. BARNES: Objection.
4        THE WITNESS: Why it was empty?
5        BY MR. SCHREIBER:
6        Q.   Yes. There is nothing in it and it
7    showed that it had 500 megs of information.
8        MS. BARNES: Objection.
9        BY MR. SCHREIBER:
10       Q.   That was the size?
11       A.   Somebody went through and deleted all
12   the e-mails that was in it.
13       Q.   Where was this PST file located? Can
14   you give us a location within the computer setup
15   in your office? Is it --
16       A.   Office.
17       Q.   It's on a server. Is it on a
18   particular drive or a particular location? As I
19   look at a map of your computer system, can you
20   give me some location where it might be so if I
21   had somebody come in and look at this, I could
22   say, Go look at the whatever.

Page 103

1        MS. BARNES: Objection. Let him ask
2    you a question.
3        BY MR. SCHREIBER:
4        Q.   Where is it? That's my question.
5        A.   It's inside the user's folder, inside
6    -- I don't know what the specific --- Audrey's
7    folder on users, inside a folder called Outlook
8    PST, maybe. I don't know the specific name of
9    that folder.
10       Q.   The Outlook is a calendar and things
11   like that aside from just e-mails; isn't that
12   correct?
13       A.   Yes.
14       Q.   Were you able to look at her calendar
15   when you went into that file?
16       A.   I didn't look.
17       Q.   You weren't looking to copy or
18   retrieve a copy of her calendar?
19       A.   No.
20       Q.   You weren't asked to do that?
21       A.   No.
22       Q.   When you found that someone, your

Page 104

1    words, deleted all the e-mails, what action, if
2    any, did you take?
3        A.   None.
4        Q.   Did you communicate this to anybody?
5        A.   Actually, Dan was the one that told me
6    that it was empty.
7        Q.   Because he had gotten it from you, you
8    had not looked at it, and he said it was empty?
9        A.   Correct.
10       Q.   And that was about a week later?
11       A.   Could have been two.
12       Q.   What was your reaction when you heard
13   from Dan that it was empty?
14       MS. BARNES: Objection.
15       BY MR. SCHREIBER:
16       Q.   Did you have a reaction?
17       MS. BARNES: Objection.
18       THE WITNESS: I went and looked in the
19   file to make sure what I sent him didn't somehow
20   get corrupted.
21       BY MR. SCHREIBER:
22       Q.   And I gather you determined for

Page 105

1    yourself that the file was empty.
2        MS. BARNES: Objection.
3        THE WITNESS: Yes. There were no
4    e-mails.
5        BY MR. SCHREIBER:
6        Q.   Did you attempt to determine who the
7    person or persons would have been who apparently
8    deleted all these e-mails?
9        A.   No. I wouldn't know how to do that.
10       Q.   Is there anybody within the
11   organization or even outside the organization
12   who could have determined who had done this?
13       A.   I don't know.
14       Q.   Well, given your computer background,
15   are you familiar with companies that are able to
16   forensically retrieve data?
17       MS. BARNES: Objection.
18       THE WITNESS: No.
19       BY MR. SCHREIBER:
20       Q.   You don't know about companies that
21   are able to do this?
22       A.   No.

Page 126

1  conversation that happened outside of the
2  computer. That's all I'm saying.
3      I'm allowing him to answer, but I want
4  the record to reflect to the extent that it deals
5  with something other than the computer, I'm not
6  waiving the privilege. The privilege is not
7  waived.
8      MR. SCHREIBER: So you have a
9  selective waiver for this witness, I would say.
10      MS. BARNES: It's, I'm allowing the
11  information to come out because you want the
12  information.
13      MR. SCHREIBER: I want all the
14  information. It's not what I want. It's what
15  you're doing.
16      BY MR. SCHREIBER:
17  Q.   Why don't we go back here a little
18  bit. When you had this conference call that you
19  are now telling us about that Mr. Shannon was
20  giving you this information or you're giving Mr.
21  Shannon -- excuse me -- the information, did you
22  have any notes that you took with respect to the

Page 127

1  computer issue?
2  A.   No.
3  Q.   Have you ever written it down anywhere
4  or given anything to anybody concerning what
5  occurred with this computer?
6  A.   I don't think so, no.
7  Q.   Have you ever given a statement to
8  your counsel, whether it's in-house or outside
9  counsel, concerning what happened with trying to
10  retrieve the data?
11      MS. BARNES: Objection. Are you
12  asking him about something privileged?
13      MR. SCHREIBER: I just want to
14  ascertain that there is a privilege. Here's my
15  problem, Ms. Barnes. I have repeatedly asked for
16  many months for a privilege log. I have never
17  gotten one item.
18      So I want to at least explore whether
19  there really is a privilege. If there is a
20  document, then I will let the judge make the call
21  on it. I just want to know if there's a document.
22      MS. BARNES: Well, for the record,

Page 128

1  this would not be in a privilege log, because a
2  privilege log only goes to the extent that it's a
3  response to any discovery requests that you have
4  made --
5      MR. SCHREIBER: I have asked about --
6      MS. BARNES: No. No. There --
7      MR. SCHREIBER: -- the logs of this
8  material.
9      MS. BARNES: There have been no
10  interrogatories or document requests specifically
11  with respect to the issue that you have with
12  respect to electronic communications.
13      So I want the record to reflect that
14  we have also asked you to produce that for us so
15  that we could respond and so that you would have
16  one, and we have not received that.
17      MR. SCHREIBER: Tell that one to Judge
18  Bates.
19      MS. BARNES: Well, we will.
20      BY MR. SCHREIBER:
21  Q.   I'm going to ask this witness now
22  without going beyond what is in the document,

Page 129

1  is there a document in existence in which you
2  indicate what occurred with respect to the loss
3  of this computer? Did you ever commemorate that
4  in any fashion, in writing, electronically or
5  otherwise?
6  A.   Did I create a document?
7  Q.   Yes.
8  A.   No. I don't think so. I think I just
9  talked about it on the call.
10  Q.   Did anybody give you any written
11  feedback or notes, electronically or otherwise,
12  commemorating what you have told them? Have you
13  had a chance to review any such document as to
14  what transpired with respect to the loss of the
15  computer?
16  A.   No.
17  Q.   How about with respect to anything
18  else that you have knowledge of regarding this
19  case, i.e., the other retrievals. Have you
20  reviewed any documents from anybody else who
21  was taking notes of your statements?
22  A.   No.

Page 158

1  respect to, let's say, Ms. D'Onofrio, where would
2  you retain that correspondence or communication?
3  Would there be any specific area that you would
4  locate that request in, be it electronically or
5  physically?
6      A.   Yes.
7      Q.   Where would that be?
8      A.   I would have created a separate folder
9  in my outlook PST with her name on it.
10     Q.   Is there such a folder?
11     A.   Yes.
12     Q.   And what is in that folder?
13     A.   E-mails.
14     Q.   Her e-mails?
15     A.   Her e-mails? No.
16     Q.   Or e-mails to you regarding retaining
17 certain information; is that correct?
18     A.   No. It would be any e-mails that
19 somebody sent to me about the matter concerning
20 Audrey or any e-mails I've sent out.
21     Q.   I don't necessarily need it this
22 moment to know what's in the e-mails, but can you

Page 159

1  tell me whose e-mails would be in there, or
2  correspondence?
3      A.   If somebody sent me an e-mail, that
4  would be in there, and if I sent out an e-mail,
5  like replying to somebody's e-mail, that would be
6  in there.
7      Q.   So Ms. Barnes's e-mails would be in
8  there, correct?
9      A.   Yes.
10     Q.   Anybody else besides Ms. Barnes or
11 people at Baker & Hostetler?
12     A.   Richard Munisteri.
13     Q.   Okay.
14     A.   I think I have John Cavender's e-mails
15 in there. Without looking at the list of To:
16 From: --
17     Q.   And these can easily be reproduced,
18 other than the correspondence with counsel; is
19 that correct?
20     A.   Yes.
21     Q.   So you have Mr. Cavender. Is Mr. Sis
22 in there?

Page 160

1      A.   I don't know. I'd have to go through
2  and look.
3      Q.   Mr. Shannon?
4      A.   Probably. Off the top of my head, I
5  have listed the people. The rest is easy enough.
6  I just sort by who it's to or who it's from.
7           MR. SCHREIBER: This is another
8  request we are going to make as to other than
9  counsel. We would like copies of this gentleman's
10 e-mails as they pertain to Ms. D'Onofrio's matter.
11          MS. BARNES: Again, my response is
12 I'll take the request under advisement and get
13 back with you.
14          MR. SCHREIBER: They seem to sort of
15 go off into the netherworld sometimes.
16          MS. BARNES: Well, maybe if you would
17 put them in writing.
18          MR. SCHREIBER: I've done that, so I
19 don't know where my letters wind up, but we'll
20 focus on that shortly.
21          BY MR. SCHREIBER:
22     Q.   Just to reiterate, other than reading

Page 161

1  the news, you didn't know anything about the need
2  to retain any information or e-mails regarding the
3  Department of Justice investigation?
4      A.   Correct.
5      Q.   What was that investigation about?
6           MS. BARNES: Objection.
7           THE WITNESS: I don't know.
8           BY MR. SCHREIBER:
9      Q.   Well, you read the article but you
10 don't know what it was about?
11     A.   I would have skimmed the article
12 because it was something to do with the company if
13 somebody showed it to me, but it wouldn't have
14 mattered what it was about.
15     Q.   Did it indicate that e-mails or
16 documents, et cetera, had to be retained as a
17 result of this investigation?
18          MS. BARNES: Objection.
19          THE WITNESS: All I remember is that
20 whatever article I read said that there was an
21 investigation into something that had to do with
22 SFX. I think it was SFX. SFX or Clear Channel,

1          UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLUMBIA

3     ---------------------------x

4     AUDREY (SHEBBY) D'ONOFRIO,

5               Plaintiff,

6         vs.                    Case No. 06-687 JDB

                                 Judge John D. Bates

7     SFX SPORTS GROUP, INC.,

      et al.,

8

               Defendants.

9     ---------------------------x

10                         Bethesda, Maryland

11                         February 21, 2007

      Deposition of

12                    JOE SHANNON

13    called for oral examination by counsel for

14    Plaintiff, pursuant to notice, held at the law

15    offices of David E. Schreiber, 4550 Montgomery

16    Avenue, Suite 760N, Bethesda, Maryland, beginning

17    at 11:32 a.m., before Lynell C.S. Abbott,

18    Shorthand Reporter and Notary Public in and for

19    the State of Maryland, when were present on behalf

20    of the respective parties:

21

22

Page 74

1   done with Ms. D'Onofrio's PC, local PC.
2      Q.  Well, tell me exactly what Mr. Mason
3   told you.
4      A.  I believe we covered it earlier, but
5   I'll go over it again.
6      Q.  I don't know if we did it in detail
7   enough. I want to make sure that I didn't
8   misunderstand anything.
9      A.  From what I know, he tried to boot
10  up the machine.
11     Q.  And this is sometime spring or summer.
12     A.  Spring or summer of '06.
13     Q.  And did he tell you why he tried to
14  boot it up? What prompted that?
15     A.  To determine if there was any data on
16  there.
17     Q.  Why did he want to know -- did he tell
18  you why he wanted to know if there was data on
19  there?
20     MS. BARNES: Objection.
21     THE WITNESS: He did not.
22     BY MR. SCHREIBER:

Page 75

1      Q.  Did he indicate that he had been
2   requested by anybody to do this?
3      A.  He did not indicate that to me, no.
4      Q.  Did you make any notes of this
5   conversation, by the way?
6      A.  No, sir.
7      Q.  So there's nothing in writing,
8   electronically or otherwise, that commemorates
9   this conversation.
10     A.  It was just a voice call.
11     Q.  So he was looking for data. What else
12  did he specifically talk to you about?
13     A.  That the machine did not boot up.
14  It was apparent that it had hard drive failures.
15  He tried receding the hard drive, so basically
16  unplugging it from the cable, plugging it back in;
17  tried receding the memory, plugging that memory
18  back in to try to get the machine to go past post,
19  which is initial boot. The machine would not do
20  that.
21      He tried to put in the Windows XP
22  Operating System boot CD to see if he could boot

Page 76

1   off of that, to see if he could get the image of
2   the hard drive presentable, and that failed also.
3   And from that point he told me that he scrapped
4   the machine.
5      Q.  How much time did he spend trying to
6   do this?
7      A.  He did not say.
8      Q.  Did he tell you that he knew that
9   there was litigation pending currently?
10     MS. BARNES: Objection.
11     THE WITNESS: We did not discuss that.
12     BY MR. SCHREIBER:
13     Q.  Did you tell him at all that there was
14  litigation pending, to your knowledge, when you
15  spoke with him?
16     MS. BARNES: Objection.
17     THE WITNESS: No, sir, we did not
18  discuss that.
19     BY MR. SCHREIBER:
20     Q.  Did he tell you how he scrapped this
21  machine? What did he actually do with it?
22     A.  He did not describe to me what

Page 77

1   "scrapped" means. So I don't know what he did
2   with it.
3      Q.  Did you discuss the fact that even
4   though he couldn't retrieve the data there are
5   companies such as Kroll who have capabilities
6   to at times at least retrieve data from hard
7   drives, et cetera, servers, which have apparently
8   failed?
9      A.  No, sir, we did not discuss that.
10     Q.  Are you aware of that fact that there
11  are companies who have that kind of capability
12  beyond just maybe Mr. Mason, for instance, or even
13  yourself, I don't know --
14     MS. BARNES: Objection.
15     BY MR. SCHREIBER:
16     Q.  -- to obtain or to retrieve that kind
17  of data?
18     MS. BARNES: Objection.
19     THE WITNESS: I am aware of companies
20  claiming they have that ability. I personally
21  have not been involved in any success or failure
22  of that type of forensic recovery.

Page 102

1    A.   No, sir.
2    Q.   Is that a list that you can compile
3  and provide to me later?
4    A.   No, sir.
5    Q.   There is no such list?
6    A.   Not that I'm aware of.
7    Q.   Would you know of the information that
8  could be provided pursuant to such a list? Can
9  you list for me backup sets?
10    A.   I can list for you the five days of
11  e-mail, those type of logs we have.
12    Q.   And is that a document that would be
13  easily available to provide to us?
14    A.   Easily? No.
15    Q.   Why? What's the problem?
16         MS. BARNES: Objection.
17         THE WITNESS: Determining where those
18  tapes are, determining what's on those tapes.
19         BY MR. SCHREIBER:
20    Q.   This is the Iron Mountain people would
21  have to do this for you?
22    A.   Well, they'd have to bring the tapes

Page 103

1  back to me.
2    Q.   And this would only be the last five
3  days' worth.
4    A.   Five days for e-mail, and then
5  financials are kept differently.
6    Q.   And they go back how far?
7    A.   I believe financials go back eight
8  years. Most of that is paper.
9    Q.   They're not kept electronically?
10    A.   Some of it is. But to the best of my
11  knowledge, we have lots of paper.
12    Q.   How about the HR, how long is that
13  maintained?
14         MS. BARNES: Objection.
15  Electronically?
16         MR. SCHREIBER: He said it was
17  maintained electronically before.
18         THE WITNESS: Yes. To the best of
19  my knowledge we still have all active HR data
20  in-house.
21         BY SCHREIBER:
22    Q.   What does that mean, all active HR?

Page 104

1  Would somebody like Ms. D'Onofrio who was fired a
2  year and a half ago be in that data?
3    A.   To the best of my knowledge, yes.
4    Q.   So her complete HR file is stored
5  electronically, is that what you are telling me?
6    A.   You need to tell me what you mean by
7  complete.
8    Q.   Well, you told me that all HR material
9  is stored electronically. There were three areas
10  that you listed for me: E-mail, financials, and
11  HR, when we were talking about data, et cetera,
12  for backups. So I'm trying to find out from you
13  what you meant by HR.
14    A.   The HR data I was talking about would
15  be Name, Social Security Number, Hiring Date,
16  Business Unit, Payroll Information. If it's
17  anything -- documents from HR, I wouldn't think
18  would be in there.
19    Q.   What kind of payroll information is
20  maintained?
21    A.   I haven't seen the system because I
22  don't have access to it. But I'm going to assume

Page 105

1  salary. That's how paychecks are cut.
2    Q.   So if a person was employed four years
3  her salary history should be there?
4         MS. BARNES: Objection.
5         BY MR. SCHREIBER:
6    Q.   Do you know?
7    A.   I don't know if history is there or
8  not. I'm going to hope that current is because
9  that's how I get paid.
10    Q.   But going back a number of years, when
11  you say that HR information is maintained, one of
12  which is salary, do you have any knowledge whether
13  or not prior salary history -- let's say somebody
14  was given a pay increase or a bonus or whatever --
15  would be contained in the HR data that is stored?
16    A.   I'm not sure what types of data or
17  content of data is stored in the HR system.
18    Q.   We would have to talk to an HR person
19  to find that out, I gather.
20    A.   Yes, sir.
21    Q.   Like the director of HR.
22         MS. BARNES: Objection.

Page 114

1  compensation. This information should include
2  all forms of correspondence, including, but not
3  limited to, internal memoranda and e-mails and
4  should specifically include, but also not be
5  limited to, e-mails sent on this subject between
6  and among Ms. D'Onofrio and Michael Principe,
7  Peter Hughes, Robert Urbach, William Bud Martin,
8  Barbara Bissett, Jeff Lewis, Dan Rosier, Ken
9  Meyerson, and all other employees of SFX Sports
10 Group.
11      So we have received nothing from SFX
12 or Live Nation or Clear Channel. So at some point
13 in time, depending upon what's in here at least,
14 and I'm pointing to the 46,000 e-mails that only
15 Ms. D'Onofrio shows up on, we're going to be
16 looking at e-mails with search parameters that
17 will limit to some extent the subject matter with
18 these other people, among them, between them, et
19 cetera, not just including Ms. D'Onofrio.
20      BY MR. SCHREIBER:
21      Q.   Would we do that in San Antonio was
22 the original question. I'm assuming that's where

Page 115

1  this material is resident, the 11,000 or so
2  people. So if we wanted to go through it we would
3  have to go to San Antonio to look at something
4  like that, for instance. Correct?
5      A.   I'm not sure how to answer this
6  question.
7      Q.   Okay. Let me try it again for you
8  then. I don't want it to be difficult. We've read
9  to you the request which asks for e-mails and
10 other documents among a whole group of people,
11 having to do with title or compensation. To find
12 this, because nobody has produced any of this, our
13 people would have to actually do it in San
14 Antonio. Is that a fair statement?
15      A.   Depending on the type of data that
16 they are looking for.
17      Q.   It's e-mail traffic mostly unless
18 there's memos.
19      A.   And memos and documents and stuff like
20 that would have to be done in the local markets.
21 Any e-mail data if it exists, we can normally find
22 it from San Antonio, burn it to a DVD, give it to

Page 116

1  legal counsel; you search it any way you want to
2  search it to determine.
3      Q.   Did anybody ask your IT Department to
4  search for this type of e-mail information with
5  those names, to your knowledge?
6      A.   Not to my knowledge.
7      Q.   You gave us on these CD's, documents
8  that show up in Adobe PDF files. Are you aware of
9  that?
10      A.   No, sir.
11      Q.   Is there any other format that SFX,
12 Clear Channel, Live Nation, et cetera, keeps their
13 e-mails in that makes them more searchable than
14 just, you know, 46,000 documents?
15      A.   The way it left our office was in a
16 PST file.
17      Q.   And that's not the same as looking at
18 it in an Adobe format, is it?
19      A.   I'm not sure. I wouldn't think so.
20      Q.   So the PST file was for some reason
21 converted into an Adobe format which is not really
22 searchable, is it?

Page 117

1      MS. BARNES: Objection.
2      THE WITNESS: Adobe can be searched
3  with the right tools.
4      BY MR. SCHREIBER:
5      Q.   What kind of tools do you need?
6      A.   Adobe Acrobat.
7      Q.   So if I type in, you know, "Joe," I'm
8  able to go through 46,000 documents and pull out
9  "Joe," but I got to go from document to document
10 to document, right? And I got to sort of sit
11 there?
12      Just let him answer. Don't, please.
13      A.   To the best of my knowledge using the
14 reader products of Adobe, depending on how the
15 files are locked down, which that's going to be
16 depending on who created them, will determine what
17 your access to that document is.
18      Q.   Do you know if these documents are
19 locked down in any fashion?
20      A.   I have no idea.
21      Q.   Well, who created the documents that
22 showed up on this?

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3      ---------------------------------

4   AUDREY (SHEBBY) D'ONOFRIO,

5              Plaintiff,

6            v.                            Case No:

                                           06-687 JDB

7   SFX SPORTS GROUP, INC., et al.,        Judge John

                                           D. Bates

8            Defendants.

9      ------------------------------------

10                          Thursday, April 26, 2007

11                          Washington, D.C.

12  Deposition of:

13                   ALAKA B. WILLIAMS

14  called for examination by counsel for the

15  Plaintiff, pursuant to Notice, taken at the law

16  offices of David E. Schreiber, P.C., Suite 760N,

17  4550 Montgomery Avenue, Bethesda, Maryland 20814,

18  beginning at 10:07 a.m., before Lu Anne Dawson,

19  Notary Public in and for the State of Maryland,

20  when were present on behalf of the respective

21  parties:

22

Page 6

1  know. While there is a question pending, you
2  cannot discuss matters with Ms. Barnes. You are
3  allowed to step out of the room if there is no
4  question pending to speak with her. Is she here
5  today in any special capacity for you?
6      A.   Is Ms. Barnes here in any special
7  capacity?
8      Q.   Yes.
9      A.   I'm not sure I understand the
10 question.
11     Q.   Have you retained her as your
12 attorney, for instance?
13     A.   She's representing the company.
14     Q.   But she is not your personal attorney?
15     A.   She is not.
16     MS. BARNES: For the record, I don't
17 think you are asking something she understands.
18 I'm representing her here as an employee of Live
19 Nation. And she doesn't understand that, so you
20 are asking her --
21     MR. SCHREIBER: I don't know what she
22 understands. It's not a legal question, just a

Page 7

1  question.
2      BY MR. SCHREIBER:
3      Q.   Do you have any different
4  understanding than what I just asked you?
5      A.   I think now that she has clarified
6  that she is representing me as a representative
7  of the company.
8      Q.   Have you had an opportunity to meet
9  with Ms. Barnes before today?
10     A.   Yes.
11     Q.   On how many occasions?
12     A.   When you say meet, do you mean on the
13 phone, personally or otherwise?
14     Q.   Both.
15     A.   On the phone, three times, perhaps.
16 Personally, this would be the third time.
17     Q.   When is the first time you spoke with
18 her, phone or in person? It doesn't matter.
19     A.   On the phone, the first time I spoke
20 with her was on the phone. Roughly a year ago,
21 but I can't say to be exact.
22     Q.   So you are indicating roughly April

Page 8

1  of 2006?
2      MS. BARNES: Objection.
3  Mischaracterizing her testimony.
4      MR. SCHREIBER: That's a year ago.
5      BY MR. SCHREIBER:
6      Q.   Is that your --
7      MS. BARNES: She didn't say April
8  2006.
9      MR. SCHREIBER: Roughly a year ago.
10 It's April 2007.
11     MS. BARNES: Well, it could be March
12 2006.
13     MR. SCHREIBER: I said roughly.
14     MS. BARNES: She said roughly.
15     BY MR. SCHREIBER:
16     Q.   Is it March or April or May; do you
17 have a recollection?
18     A.   I have no recollection. That's
19 roughly.
20     Q.   Did you make notes of the meeting or
21 of the conversation?
22     A.   No.

Page 9

1      Q.   Have you ever made notes of any
2  conversations with Ms. Barnes?
3      A.   No.
4      Q.   Never? You haven't written down
5  anything?
6      A.   If she has requested information from
7  me, I've sent items back. If there's a date, for
8  example, if she says, You're going to be --
9      MS. BARNES: Objection. This is
10 privileged. Don't answer that.
11     THE WITNESS: Okay.
12     MS. BARNES: He is asking you --
13     MR. SCHREIBER: I don't believe it is.
14 She is not --
15     MS. BARNES: It is privileged, and I'm
16 instructing you not to answer him with respect to
17 any conversations that we had.
18     He can ask you about dates, he can ask
19 you when, he can ask you if you have notes. Do
20 not inform him regarding any conversations that we
21 have. They are privileged.
22     MR. SCHREIBER: Ms. Barnes, just so

Page 10

1   you understand, conversations that defense counsel
2   might have with various employees are not within
3   the certain zone of responsibility in the case --
4           MS. BARNES:  And I understand that,
5   and she is.
6           MR. SCHREIBER:  She is not.
7           MS. BARNES:  She is.
8           MR. SCHREIBER:  She should be a
9   Defendant in this case, possibly?  Am I --
10          MS. BARNES:  No.  She's in the
11  management circle and that would be within --
12          MR. SCHREIBER:  You think she's in
13  the management circle?
14          MS. BARNES:  I know she's in the
15  management circle, and our conversations are
16  privileged.
17          MR. SCHREIBER:  Well, can you tell
18  us who else might be in this circle so that we
19  don't have any further problems.
20          MS. BARNES:  When we finish with her
21  deposition, we can discuss it.
22          MR. SCHREIBER:  Why don't you just

Page 11

1   give me an indication since you haven't really
2   told us about witnesses, who you believe --
3           MS. BARNES:  We're in the middle of
4   a deposition.
5           MR. SCHREIBER:  I know.  I know.  But
6   I --
7           MS. BARNES:  And we can talk about
8   that now.
9           MR. SCHREIBER:  I don't want to go
10  off --
11          MS. BARNES:  It's not relevant to her
12  deposition.
13          MR. SCHREIBER:  It certainly is.
14          MS. BARNES:  I've made my statement
15  with respect to her deposition and --
16          MR. SCHREIBER:  I realize what you
17  have said, but my point is a little different than
18  yours.
19          BY MR. SCHREIBER:
20      Q.   Frankly, I don't think you are in that
21  circle, so to speak, and I don't think there is
22  any attachment at least a year or so ago to any

Page 12

1   conversations that you had with Ms. Barnes.
2           Tell me the type of things that you
3   have sent to her, memos, letters, notes, what
4   types of things?
5           MS. BARNES:  Objection.
6           Don't answer that.  We can move on.
7           BY MR. SCHREIBER:
8      Q.   Have you supplied documents to the
9   counsel, any documents in this case?
10          MS. BARNES:  You can answer that.
11          THE WITNESS:  Yes.
12          BY MR. SCHREIBER:
13     Q.   What documents?
14          MS. BARNES:  Objection.  She is not
15  going to answer that.
16          MR. SCHREIBER:  She is not going to
17  answer what documents she has supplied?
18          MS. BARNES:  Are you asking with
19  respect to maybe discovery that has been produced?
20          MR. SCHREIBER:  Certainly.
21          MS. BARNES:  Well, then, if that's
22  what you're asking, then that's the question to

Page 13

1   ask.
2           MR. SCHREIBER:  Don't tell me how to
3   ask questions.  It was a very simple question, and
4   you're making it more difficult.
5           MS. BARNES:  Well, then I'm going to
6   object to the way the question was asked.
7           MR. SCHREIBER:  Okay.
8           MS. BARNES:  And then if you want to
9   -- and I'm going to instruct her not to answer
10  that question, because the way that question is
11  asked may seek privileged information.
12          MR. SCHREIBER:  I doubt it.  Why don't
13  you just --
14          MS. BARNES:  Well, I'm instructing her
15  not to answer the question.
16          MR. SCHREIBER:  Fine.  We'll just keep
17  notes on this.
18          MS. BARNES:  It will be on the record.
19          MR. SCHREIBER:  No.  No.  I'm asking
20  Gene to keep a running tally on what we're not
21  getting.
22          BY MR. SCHREIBER:

Page 14

1    Q.   You have collected documents in this
2   case.  What documents have you collected with
3   respect to Ms. D'Onofrio's claims against Clear
4   Channel, SFX or Live Nation?
5        MS. BARNES:  Continued objection.
6        BY MR. SCHREIBER:
7    Q.  You may answer.
8        MS. BARNES:  No.  She's not going to
9   answer.
10        MR. SCHREIBER:  You're going down a
11   slippery slope here.
12        MS. BARNES:  Well, David, you're
13   asking her a question that she may -- you said
14   generally with respect to her claims.
15        MR. SCHREIBER:  That's right.
16        MS. BARNES:  And that could be
17   something that may be privileged, something that
18   may not have been produced in discovery.
19        MR. SCHREIBER:  You have sat with her.
20   That's right, and you haven't produced a privilege
21   log, which is another problem that you have, which
22   will be addressed.

Page 15

1        MS. BARNES:  We'll address it.
2        MR. SCHREIBER:  No.  You're about a
3   year late on that.
4        MS. BARNES:  No, we're not, David, but
5   we'll address it.
6        BY MR. SCHREIBER:
7    Q.  Let's try your education.  That can't
8   be too objectionable to counsel.
9        MS. BARNES:  No.
10        BY MR. SCHREIBER:
11    Q.  What is your background, ma'am?
12    A.  I have a degree from James Madison
13   University, Bachelor of Science in Communications
14   and Public Relations.
15    Q.  When did you get that?
16    A.  May of 1995.
17    Q.  Where did you grow up?
18    A.  Reston, Virginia.
19    Q.  Do you have any other degrees other
20   than from James Madison?
21    A.  I have my certification in Human
22   Resources, which is a P, as in Paul, HR, PHR.

Page 16

1    Q.   Where did you get that?
2    A.   You actually get it through the Human
3   Resources Certification Institute.
4    Q.   Where are they located?
5    A.   The location specifically, I'm not
6   sure.
7    Q.   Is this an on-line type of thing?
8    A.   No, it's not.  You have to sit for a
9   test.
10    Q.   Where did you sit for the test?
11    A.   At University of Maryland.
12    Q.   Where did you take your courses?
13    A.   George Mason.
14    Q.   When did you receive this
15   certification?
16    A.   In December of 2002.
17    Q.   You started working for your current
18   employer as of when?
19    A.   April 18, 2005.
20    Q.   When you started, what was your
21   position?
22    A.   Regional Employee Relations

Page 17

1   Specialist.
2    Q.   For which region, southern region?
3    A.   Southeast.
4    Q.   Southeast.  What did you do for the
5   years before you went to work for Clear Channel
6   Entertainment?
7    A.   I was with KinderCare Learning Centers
8   as a Regional HR Manager for the Eastern Region.
9   I was there for seven years.  I was also a
10   Recruiter prior to being promoted to the Regional
11   HR Manager position.  Prior to that, I worked for
12   Wang Federal.
13    Q.   Wang?
14    A.   Uh-huh, W-a-n-g, Federal.  They're a
15   computer corporation as an Employee Relations
16   Specialist.  I was there for two years.
17    Q.   So your position with KinderCare was
18   what exactly?  What did they call you?
19    A.   Regional Human Resources Manager.
20    Q.   Is that the same position that you
21   took with Clear Channel, Regional Human Relations
22   Manager?

Page 158

1    Q.   Yes.
2    A.   Not much more.
3    Q.   Well, do you have any notes about any
4  of the times that she reported to you about her
5  medical condition?
6    A.   I don't.
7    Q.   Do you normally keep notes for anybody
8  who reports any sort of medical condition to you
9  as the HR person?
10    A.   We do not.
11    Q.   Is that a policy of your company not
12  to keep notes?
13    A.   It's not a policy.
14    Q.   Well, why don't you keep notes, then?
15  Is there any particular reason, if there is no
16  policy, why you don't write these things down?
17    A.   Well, what we're responsible for doing
18  is if a person requests disability paperwork,
19  Family Medical Leave paperwork or any other
20  paperwork related to Workers' Comp injuries,
21  something that requires them to be hospitalized,
22  we provide them with a packet upon request.

Page 159

1    Q.   But you don't keep notes of any calls
2  or statements to you about certain problems?
3    A.   Not about the statements regarding.
4  I mean, if someone calls us and we make a note,
5  Audrey called, but in terms of the specifics as to
6  conditions and discomfort, no, we don't.
7    Q.   Well, do you have those notes that
8  Audrey called? Did you ever keep any of those
9  notes?
10    A.   I believe I have in my planner the
11  date that she came in.
12    Q.   Okay.
13    MR. SCHREIBER:  We would like that
14  produced.
15    Make a note of that. This is
16  something that we had asked for previously.
17    MS. BARNES:  I'm asking her, What do
18  you have?
19    THE WITNESS:  Just a note from the
20  date that she came in to state that she was going
21  to go to the doctor.
22    BY MR. SCHREIBER:

Page 160

1    Q.   And that would be August?
2    A.   The end of August.
3    Q.   Do you have any other notes on your
4  planner about anything having to do with Audrey,
5  whether it's about pregnancy, anything?
6    A.   The only other notes would be the date
7  that we were supposed to meet when she had to
8  leave. She called me back from her cell phone.
9  I have her name and cell phone number.
10    Q.   Okay.
11    A.   From the 26th.
12    Q.   Do you keep any notes on your planner
13  regarding any of these conversations that you had
14  with Kimberly Wray or any of these other people?
15    A.   I don't. We store our appointments
16  and conference calls in Outlook.
17    Q.   And do you keep that?
18    A.   Not after it's expired, no.
19    Q.   Well, how do you know that it's
20  expired?
21    A.   I can just scroll back throughout.
22  I mean, I'm sure it might be there on the server,

Page 161

1  but I can scroll back throughout.
2    Q.   Oh, it's on the server. Where is your
3  server?
4    A.   I don't know where our server is.
5    Q.   Did you ever indicate to anybody that
6  you wanted to go back and look at your Outlook
7  that is saved on the server to determine dates
8  or information that might be important to this
9  case?
10    A.   I've never requested that.
11    Q.   And nobody has ever talked to you
12  about getting any Outlook information?
13    A.   No one has ever spoken to me about
14  that.
15    MR. SCHREIBER:  I think that would
16  have been an item to be produced, Ms. Barnes,
17  from --
18    MS. BARNES:  What, from her Outlook?
19    MR. SCHREIBER:  Absolutely. If she
20  has no recollection and can't tell me date or any
21  of this information.
22    MS. BARNES:  There is nothing in the

Page 162

1   requests and interrogatories that request anything
2   with respect to any meeting that Alaka Williams or
3   Kimberly Wray had.
4           MR. SCHREIBER: If it had to do with
5   my client, I wanted e-mails or any document, and
6   this is a document, and this is a fair request.
7   This should have been certainly --
8           MS. BARNES: Well, David, I don't --
9           MR. SCHREIBER: This goes to the
10  business plan. This goes to -- there is no
11  communication that we have gotten that would have
12  suggested this, and I think it is a fair request.
13          MS. BARNES: Well, I think that I
14  would want to see to what request you argue that
15  that is responsive to and to the extent that it is
16  relevant.
17          MR. SCHREIBER: Oh, it's very
18  relevant.
19          MS. BARNES: We can discuss it being
20  produced, but I don't think it's responsive to any
21  request that you have sent, but we can discuss
22  that after the deposition.

Page 163

1           MR. SCHREIBER: We can discuss it
2   after the break, actually, because I want this on
3   record and I'm not going to take the time now.
4           It's quarter of 1:00. Why don't we
5   take a break. You can get some lunch.
6           MS. BARNES: Are you done with your
7   line of questioning on this?
8           MR. SCHREIBER: It depends on where we
9   go with this. I may come back to it. I may not,
10  but I'm going to take a break now because this is
11  almost three hours and I think it's appropriate
12  that we not overtax the witness. You may not feel
13  any stress, but I would guess this is not the
14  easiest thing for you.
15          MS. BARNES: My client will tell me
16  when she need a break. I trust that she will.
17          MR. SCHREIBER: Well, guess what. I'm
18  taking the break now and we will come back. How
19  much time do you need for lunch?
20          We can go off.
21          (Thereupon, at 12:44 p.m., a luncheon
22  recess was taken.)

Page 164

1           A F T E R N O O N   S E S S I O N.
2                   1:56 p.m.
3           BY MR. SCHREIBER:
4       Q.  I guess when we last were here we were
5   going through the e-mails. We are going to be
6   talking about your Outlook, your planner. On the
7   conference calls that you were telling us about,
8   and I think Mr. Mays was one of them, especially
9   company wide, they do transcripts of those, don't
10  they?
11          MS. BARNES: Objection.
12          THE WITNESS: I believe there is a
13  webcast, a live webcast that's available on the
14  Intranet for a certain period of time.
15          BY MR. SCHREIBER:
16      Q.  How long?
17      A.  I don't know.
18          MR. SCHREIBER: That would be another
19  item that we would like you to address. If there
20  is such a thing as a webcast or something that can
21  be reproduced for us --
22          MS. BARNES: Of what?

Page 165

1           MR. SCHREIBER: Of this conference
2   call having to do with the business
3   reorganization.
4           MS. BARNES: I don't think you asked
5   her that.
6           MR. SCHREIBER: I wanted everything
7   having to do with the business reorganization.
8           MS. BARNES: No. I'm saying I don't,
9   what I'm saying is, you are saying it as if it
10  exists, and I'm saying her testimony does not
11  evidence that it exists.
12          MR. SCHREIBER: I realize what her
13  testimony is. I am just saying, if it is there,
14  and we don't know if it's still in existence or
15  how long they have saved it want for, we would
16  like it produced, because it is obviously germane
17  to the issue of the business reorganization, what
18  he said or didn't say, whether --
19          MS. BARNES: But I still go back to,
20  are you presuming that something exists? Because
21  she has not testified that it exists.
22          MR. SCHREIBER: I am presuming, based

Page 182

1    BY MR. SCHREIBER:
2    Q.    Just the Sports department for the
3    moment, yes.
4    A.    I was not asked to produce that.
5    Q.    How about beyond just Sports, SFX
6    Sports Group?
7         Did anybody ask you to do --
8         MS. BARNES:  Well --
9         BY MR. SCHREIBER:
10    Q.    -- an analysis of promotions to vice
11    president in Live Nation, for instance?
12         MS. BARNES:  I just want to for the
13    record object to this line of questioning.  If you
14    want to ask her if she has knowledge with respect
15    to those persons, then you can ask her that, but
16    this line of questioning is going down and I'm
17    going into instruct her not to answer to the
18    extent --
19         MR. SCHREIBER:  Why is that?
20         MS. BARNES:  To the extent that your
21    question may call for privileged communications,
22    you can ask her what she knows and that's the

Page 183

1    appropriate way to get information out, but to ask
2    her if someone asked her to do something calls for
3    maybe possible communications between counsel --
4         MR. SCHREIBER:  We don't know that.
5         MS. BARNES:  -- and I just don't want
6    to go down this road.
7         MR. SCHREIBER:  I realize you don't,
8    because you haven't produced the information,
9    which is going to be the subject in part of the
10    motion, but --
11         MS. BARNES:  I tend to object to that
12    because I think there has been something that has
13    been produced.
14         MR. SCHREIBER:  Not along those lines.
15         MS. BARNES:  Well, I think there is.
16    I think when you go through the documents, you'll
17    see it.  But for the record --
18         MR. SCHREIBER:  What documents?
19         MS. BARNES:  For the --
20         MR. SCHREIBER:  The most recent ones?
21         MS. BARNES:  For the record --
22         MR. SCHREIBER:  The ones that are

Page 184

1    dated --
2         MS. BARNES:  For the record, I'm
3    objecting to this line of questioning.  If he
4    wants to ask her about her knowledge, she will
5    answer questions --
6         MR. SCHREIBER:  I know how to ask the
7    question.
8         MS. BARNES:  -- with regard to that
9    knowledge.
10         MR. SCHREIBER:  Are you directing her
11    not to answer my question?
12         MS. BARNES:  To the extent that you
13    ask her a question that may call for
14    communications with counsel --
15         MR. SCHREIBER:  I have no idea whether
16    it calls for anything.  I'm just trying to find
17    out, did anybody ask you to determine who got
18    promoted to vice president, let's say, within Live
19    Nation within the period 2003 to 2005?
20    A.    I have not been asked to produce that.
21         MR. SCHREIBER:  And counsel would
22    represent that there something in the letter that

Page 185

1    was recently delivered to us?
2         MS. BARNES:  I didn't say that.  I did
3    not say that, so do not misquote me.
4         MR. SCHREIBER:  Oh, okay.
5         MS. BARNES:  And I'm not representing
6    anything on the record except for --
7         MR. SCHREIBER:  I bet you're not.
8         MS. BARNES:  -- that she is not going
9    to answer anything that's communicated to counsel.
10    If you want to deal with something else outside of
11    the deposition, we can do it then.
12         MR. SCHREIBER:  I know you don't want
13    your words appearing on paper.
14         Just for the record, we received
15    something on Monday.  The cover letter,
16    unfortunately, is dated February 20th, 2007.
17    It appears that the mail from downtown takes a
18    couple months.  I assume that that must be a typo.
19         MS. BARNES:  I don't know.  I haven't
20    seen what you have.
21         MR. SCHREIBER:  This is your letter,
22    Johnine.

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA

2

   AUDREY (SHEBBY) D'ONOFRIO    )
3              Plaintiff         )
                                 )
4  VS.                           )  Case No.:  06-687 JDB
                                 )  Judge John D. Bates
5  SFX SPORTS GROUP, INC,        )
   et al.                        )
6              Defendants        )

7

8  **************************************************

9              THE ORAL DEPOSITION OF

10                 KIMBERLY WRAY

11                  MAY 9, 2007

12                   DUPLICATE

13 **************************************************

14

15             THE ORAL DEPOSITION OF KIMBERLY

16 WRAY, produced as a witness at the instance of the

17 Plaintiff and duly sworn, was taken in the

18 above-styled and numbered cause on the 9th day of

19 May, 2007 from 9:10 a.m. to 12:30 p.m., before JULIE

20 VERASTEGUI, CSR in and for the State of Texas,

21 reported by stenographic and computer-aided

22 transcription at Hoffman Reporting & Video Service,

23 206 East Locust, San Antonio, Texas 78212, pursuant

24 to the Federal Rules of Civil Procedure and the

25 provisions stated on the record or attached hereto.

Page 46

1   A. No.
2   Q. No. Okay. Have any of the people from
3   Clear Channel, Live Nation or SFX asked you to find
4   any electronic mail other than what you have told us
5   about already? For instance, the IT people.
6   Forget -- Forget some of the people that you
7   mentioned.
8        Has anybody from IT come to you and
9   said, "We're looking for electronic mail having to
10  do with Audrey D'Onofrio"?
11  A. No.
12  Q. Okay. Are you aware that in 2004 Clear
13  Channel was told to archive some 11,000 employees'
14  e-mails as a result of the Department of Justice
15  investigation?
16      MS. BARNES: Objection.
17      THE WITNESS: Not that I recall. I
18  heard of it. I wasn't involved in it, so I don't
19  know --
20  Q. (By Mr. Schreiber) The investigation,
21  you're not involved in it?
22  A. No.
23  Q. So if I told you that some 11,000 employees
24  under the Clear Channel umbrella -- I can't tell you
25  which divisions, et cetera, it specif --

Page 47

1   specifically involved. But we were told 11,000
2   peoples' e-mails as a result of this investigation
3   are archived with a system called Legato.
4   A. Correct.
5   Q. Have you ever heard of that?
6   A. Yes.
7   Q. Okay. How did you come to hear that?
8   A. Mentioned in meetings.
9   Q. What meetings?
10  A. It would have been with the attorneys.
11  Q. Now, attorneys --
12  A. Employment attorneys, in -- in-house
13  counsel.
14  Q. In reference to this case? Or something
15  else?
16  A. No. No, not this case. Like -- Like I
17  said, we would --
18      MS. BARNES: Well, don't testify to
19  anything that you may have discussed, even though it
20  doesn't involve this case. I don't want you to
21  waiver privilege that may be raised in another
22  matter.
23      MR. SCHREIBER: Well, I don't know
24  what other matter you're referring to. I'm just
25  trying to get some sense of this. Again, for

Page 48

1   purposes of our record, we have never gotten
2   anything that has to do with privileges in this
3   case.
4       MS. BARNES: Well, I'm talking
5   about any privilege that may be with respect to any
6   other matter. I mean, she's testified that she has
7   learned of it through meetings with in-house
8   counsel.
9       MR. SCHREIBER: Well, I'm just
10  trying to find out about the -- the archiving, not
11  about the other cases.
12  Q. (By Mr. Schreiber) I just want to know what
13  you know about the archiving involving this
14  material.
15      MS. BARNES: Right.
16  Q. (By Mr. Schreiber) Tell us what you
17  understood happened.
18  A. In regular meetings that we have with the
19  employment attorneys -- the employee relation
20  specialist and the employment attorneys, it was
21  brought up that this is a process that is going to
22  be done.
23      I don't know -- So I've heard of
24  Legato. I know what it does, but I don't know
25  anything about the Department of Justice

Page 49

1   investigation or who they were putting on the
2   Legato. It was not what I was involved with.
3   Q. The meetings you are referring to -- You
4   have regular meetings, I believe you said. When did
5   this occur? What year?
6   A. It's an ongoing.
7   Q. Okay. When did it start?
8   A. 2001.
9   Q. It started in 2001?
10  A. Yes.
11  Q. And am I to understand these meetings had
12  to do with the retention of certain e-mails?
13  A. No. They were im -- what we call ER
14  meetings, just dealing with employment, new laws
15  that are coming out, what's going on in each others'
16  areas, because we work so closely with the
17  employment attorneys. It was more of status -- or
18  more update meetings.
19  Q. Okay. I'm only interested in the retention
20  of e-mails or electronic data. Let's expand beyond
21  just e-mails. Electronic material. When did you
22  start having meetings about saving, archiving this
23  material?
24  A. We did not have meetings specifically about
25  that.

Page 50

1    Q.  Didn't mean specifically.  As part of
2  whatever the meetings were, whether they were
3  wide-ranging or not, if the topic came up, I want to
4  know when it first came up.
5    A.  I don't recall then.
6    Q.  Before Audrey D'Onofrio was terminated,
7  correct, in September 2005?
8        MS. BARNES: Objection.
9        THE WITNESS:  I don't recall.
10    Q.  (By Mr. Schreiber) You can't pinpoint with
11  any --
12    A.  Not when we --
13    Q.  Not -- Not a year even?
14        MS. BARNES: Objection.
15        THE WITNESS:  No.
16    Q.  (By Mr. Schreiber) And your Outlook
17  wouldn't reflect, again, any meetings such as
18  meeting with ER counsel, et cetera, to just
19  generally discuss things?  That wouldn't help you?
20        MS. BARNES: Objection.
21        THE WITNESS:  These meetings would
22  be every two weeks, sometimes every month.  So since
23  2001, I don't recall when that would have been
24  brought up.  It would have been a passing comment,
25  nothing -- details given to us.

Page 51

1    Q.  (By Mr. Schreiber) Well, tell me about the
2  passing comment.  What was the comment about in
3  regard to saving, archiving, retaining this type of
4  electronic material?
5        MS. BARNES: Continued objection.
6        Do not testify as to anything that
7  they said to you.  You can testify to your
8  knowledge.
9    Q.  (By Mr. Schreiber) This isn't about any
10  particular case.  I just want to know what the
11  policy was so that we can get an idea of what was
12  going on with respect to retaining material.
13    A.  My understanding was the policy was being
14  created between IT and Legal.
15    Q.  Okay.  And for what reason?  What were
16  they -- Why did they have to retain this material?
17    A.  I don't know.  I was not involved in what
18  brought that up -- or what brought that on.
19    Q.  You don't know if it was the Department of
20  Justice investigation or --
21    A.  No.
22    Q.  -- some other case?
23        MS. BARNES: Objection.
24        THE WITNESS:  Correct.
25    Q.  (By Mr. Schreiber) Okay.  Was there a

Page 52

1  written document created with respect to the
2  responsibilities or the obligations to retain or
3  archive this type of material --
4        MS. BARNES: Continue objection.
5    Q.  (By Mr. Schreiber) -- to your knowledge?
6    A.  I don't know.
7    Q.  Nobody ever told you that, that there's a
8  written policy somewhere about this?
9    A.  No.
10    Q.  The complaint in this case, you said, I
11  believe, you read this at some point?
12    A.  Correct.
13    Q.  Okay.  And why did you read it?
14    A.  It was given to me, and my name was in it.
15    Q.  Okay.  Who gave it to you?
16    A.  Vanessa Villanueva.
17    Q.  Okay.  And do you know why it was given to
18  you other than the fact that your name was in it?
19        MS. BARNES: Objection.
20        THE WITNESS:  No.
21    Q.  (By Mr. Schreiber) Okay.  Did you
22  communicate with Ms. Villanueva regarding any of the
23  contents or substance of the complaint?
24        MS. BARNES: Objection.  She's not
25  going to answer that.

Page 53

1        MR. SCHREIBER:  I'm not asking
2  about it.  I'm trying to find out if there really is
3  privilege.  And I've been saying this for a year
4  now, that you've never put it --
5        MS. BARNES:  But you don't put a
6  privilege law for communications.
7        MR. SCHREIBER:  Yes, you do --
8        MS. BARNES:  No.  No, not --
9        MR. SCHREIBER:  -- especially if
10  it's in writing.
11        MS. BARNES:  -- not if it's verbal.
12        MR. SCHREIBER:  I don't -- I
13  haven't even gotten there because you object.
14        MS. BARNES:  Well, you're -- you're
15  asking her did she discuss something with Vanessa.
16        Answer yes or no, and do not
17  discuss the contents.
18        THE WITNESS:  Yes.
19    Q.  (By Mr. Schreiber) Okay.  And was there
20  ever anything in writing between you and
21  Ms. Villanueva regarding the substance of the
22  complaint?
23    A.  No.
24    Q.  You've never sent her anything in writing?
25    A.  No.

14 (Pages 50 to 53)

Page 86

1   pregnant. Is that what you're telling me?
2      A.  That's what I recall, yes.
3      Q.  Okay.  And then, nevertheless, you sent her
4   this e-mail, along with others, at 4:27 on that
5   Friday, and attaching to it the list that says,
6   "Will not be terminated," even after you found out
7   that she's pregnant.  Is that your testimony?
8      A.  Correct.
9      Q.  And then after that occurs, still knowing
10  that she was pregnant, between that Friday afternoon
11  and that Saturday morning, you put her on the list
12  to be terminated.  Is that what you're telling me
13  today?
14          MS. BARNES:  Objection.
15          THE WITNESS:  Correct.
16     Q.  (By Mr. Schreiber) Now, tell me what
17  happened between 4:27 on Friday the 16th and
18  9:26 a.m. on the 17th that caused you to make this
19  change?
20     A.  I would have received direction from
21  Dan Rosier --
22     Q.  Okay.
23     A.  -- to make the change.
24     Q.  Okay.  And what document did you get from
25  Dan Rosier that said, "Put her on the list"?

Page 87

1      A.  It was -- It was either an e-mail, or it
2   would have been a verbal conversation.
3      Q.  Now, you must have told Dan Rosier that
4   Audrey's pregnant, communicated that?
5      A.  Once he told me that he wanted her on the
6   list.
7      Q.  Okay.  And he -- Did you make any notes of
8   this conversation?
9      A.  No.  I don't have any.
10     Q.  Well, it's not whether you have it; it's
11  whether you ever wrote it.
12     A.  No.  Oh, no.
13     Q.  Nothing electronically or otherwise
14  commemorates or corroborates any of these
15  conversations, particularly this one with
16  Dan Rosier, where you tell him she's pregnant and he
17  still says, "Fire her"?
18     A.  Correct.
19     Q.  Okay.  What time did you have this
20  conversation on Friday after 4:27 p.m.?
21          MS. BARNES:  Objection.
22          THE WITNESS:  I don't recall.
23     Q.  (By Mr. Schreiber) When did you have the
24  conversation -- What part of the day would it have
25  been with Williams when you found out that she was

Page 88

1   pregnant?  Was it the morning, the afternoon,
2   whatever day it might have been?
3      A.  I would -- I don't remember.
4      Q.  So sometime after 4:27 that Friday evening,
5   you called Dan Rosier.  Is that your testimony?
6      A.  Or --
7          MS. BARNES:  Objection.
8      Q.  (By Mr. Schreiber) Or -- Or he called you?
9      A.  Possibly, or an e-mail.  I don't --
10     Q.  But we don't have that e-mail either, do
11  we?
12     A.  I don't.
13     Q.  You haven't seen it, and nobody's showed it
14  to you, have they?
15     A.  Correct.
16     Q.  Did you ask to see that e-mail possibly to
17  help refresh your recollection in this case?
18          MS. BARNES:  Objection.
19          THE WITNESS:  I -- I don't know who
20  I would have asked.  No.
21     Q.  (By Mr. Schreiber) Counsel, legal counsel,
22  Dan Rosier, anybody?
23     A.  No.
24     Q.  So he knows that she's pregnant.  You know
25  that she's pregnant.  You then have this

Page 89

1   conversation this late afternoon, early evening.
2   Tell me exactly what the two of you talked about.
3      A.  Again, I don't recall if we had a
4   conversation or if it was e-mailed.  When I found
5   out that she was going to be put on the list, we did
6   verbally talk, and I told him that she is pregnant.
7   His response was that Michael Rapino and him have
8   decided they were going to be getting rid of the --
9   the entire PR function and that was going to be
10  outsourced outside the company.
11     Q.  Wow.  Outsourced.  Okay.  That's the first
12  time we've heard that.  Now, the outsourcing that he
13  just told you about, what did he say about that, if
14  anything?
15     A.  That was it.
16     Q.  Did he discuss the cost of doing something
17  like this?
18     A.  No.  He would not have done that with me.
19     Q.  Okay.  And you didn't raise the cost of
20  whether it was cheaper to keep somebody in-house
21  versus hiring a PR firm?
22     A.  No.
23          MS. BARNES:  Objection.
24     Q.  (By Mr. Schreiber) Okay.  Did you ever come
25  to find out what PR firm supposedly was hired?

HOFFMAN REPORTING & VIDEO SERVICE
SAN ANTONIO / DALLAS / HOUSTON

Page 146

1    MS. BARNES: Continue objection.
2    THE WITNESS: I don't re -- I don't
3  know of any specific policy. My understanding with
4  the IT Group is, after a certain period, when
5  someone is terminated -- I don't know what that
6  period is -- then it -- We can't keep them forever,
7  so they are removed; they are -- I don't know
8  what -- what IT does with them, but it's not on our
9  server anymore because of the space issue.
10    Q. (By Mr. Schreiber) Last summer, did you
11  have conversations with Dan Rosier about this case?
12    A. Last summer, as in '06?
13    Q. As in '06.
14    A. No.
15    Q. Did he ask you to do anything with respect
16  to the complaint that was filed against the
17  defendants in this case?
18    A. No. I have not talked with him since the
19  spinoff.
20    Q. Okay. Did Alaka Williams ever tell you
21  that she apologized to Audrey for firing her?
22    MS. BARNES: Objection.
23    THE WITNESS: No.
24    Q. (By Mr. Schreiber) Did she tell you
25  anything about how she handled the firing?

Page 147

1    A. I don't recall. If she did, there wasn't
2  anything that I -- I would -- I remember from it. I
3  mean, there wasn't any big reaction or big problem
4  that came up with it. I don't recall if I had that
5  conversation with her or not.
6    Q. How was the severance package determined if
7  they wanted to offer a terminated employee?
8    A. If she was not -- If Audrey was not under
9  contract -- And she wasn't -- it is determined based
10  on years of service; two years for the -- two weeks
11  for the first year and one week for every year after
12  that.
13    Q. At what levels were people under contract?
14    MS. BARNES: Objection.
15    THE WITNESS: I don't know.
16    Q. (By Mr. Schreiber) Would a vice president
17  have a contract?
18    MS. BARNES: Objection.
19    THE WITNESS: Not -- Not
20  necessarily.
21    Q. (By Mr. Schreiber) Do you know if
22  Howard Schacter had a contract?
23    A. I don't know.
24    (Deposition Exhibit No. 4 was
25  marked.)

Page 148

1    Q. (By Mr. Schreiber) Exhibit 4, Ms. Wray, is
2  a document, SFX271, produced to us. This is not
3  your handwriting; is that correct?
4    A. Correct.
5    Q. Actually, we're told that it's probably
6  Julie Kennedy's handwriting. This indicates that
7  his annual salary is $180,000. And below that, it
8  starts, "per employment agreement." Has anybody in
9  your organization tried to obtain or find an
10  employment agreement that Mr. Schacter had?
11    MS. BARNES: Objection.
12    THE WITNESS: I don't know.
13    Q. (By Mr. Schreiber) Has anybody asked you,
14  to your knowledge, of trying to locate this supposed
15  employment agreement?
16    A. No. We did not keep Entertainment's
17  employment agreements in San Antonio.
18    Q. Who did?
19    A. They were maintained in Houston.
20    Q. I see. So who in Houston would have,
21  possibly, Mr. Schacter's agreement?
22    A. I am not sure of the person who maintained
23  it. It possibly could have -- It could have been
24  Kimberly Bowron.
25    Q. Spell that, would you?

Page 149

1    A. Last name is B-O-W-R-O-N.
2    Q. And the people in Houston, what group is
3  that, what organization?
4    A. The -- They were with Entertainment. That
5  was their -- That originally was their main
6  corporate office.
7    Q. Uh-huh. Okay. And so Kimberly Bowron,
8  what would her title have been?
9    A. I don't recall. She -- It changed many
10  times. I don't --
11    Q. What did she do?
12    A. When I first started in 2001, she was the
13  HR director for Clear Channel Entertainment.
14    Q. And were you above her at that point?
15    A. We were equals.
16    Q. Okay.
17    A. In 2003, she moved out of the HR position,
18  and then I started managing the Entertainment Group.
19    Q. And so she would have been the person most
20  likely to have retained this agreement? That's
21  where it would be if it was anywhere?
22    A. Correct. She was -- She was the point
23  person, when anybody wanted to do an employment
24  agreement, to help put that together, get the
25  approvals needed by the other people in

Page 150

1   Entertainment, the other executives that needed to
2   approve, and she would have our Legal Department
3   draft it, but she would maintain it.
4       Q.  So given your experience, wouldn't the
5   Legal Department have a copy of this agreement also?
6           MS. BARNES:  Objection.
7           THE WITNESS:  Not necessarily.
8   There -- We -- We did not always know who had
9   employment agreements and who didn't.  There were
10  times they would use their own attorneys.  Sometimes
11  they would use an outside attorney to do employment
12  agreements.
13      Q.  (By Mr. Schreiber) "They," meaning who?
14      A.  They -- Entertainment.  Kimberly Bowron in
15  the Houston group.
16      Q.  Might not use the in-house lawyers; they
17  might go to somebody else, like to Baker &
18  Hostetler?
19          MS. BARNES:  Objection.
20          THE WITNESS:  I don't know.
21      Q.  (By Mr. Schreiber) Or it would be a Texas
22  firm?
23      A.  I don't know.
24      Q.  So as far as you're concerned, you've not
25  heard of anybody requesting Howard Schacter's

Page 151

1   employment agreement in conjunction to this case?
2       A.  No.
3       Q.  And last set of questions.  Going back to
4   what I was asking before.  How -- At what level does
5   somebody get an employment contract as opposed to
6   just a handshake, so to speak, or an at will?
7           MS. BARNES:  Objection.
8       Q.  (By Mr. Schreiber) How is that determined?
9           MS. BARNES:  Continue objection.
10          THE WITNESS:  There's no set
11  criteria on that.
12      Q.  (By Mr. Schreiber) Nothing written again,
13  if I'm guessing right?
14      A.  Correct.
15          MS. BARNES:  Objection.
16      Q.  (By Mr. Schreiber) Has anybody told you
17  that David Falk had a hand in -- in any of the
18  issuing regarding either -- well, regarding Audrey's
19  termination?
20          MS. BARNES:  Objection.
21          THE WITNESS:  No.  I don't know who
22  that is.
23      Q.  (By Mr. Schreiber) You don't know -- You
24  don't know who David Falk is?
25      A.  No.

Page 152

1       Q.  Mr. Rosier has not mentioned his name to
2   you?
3           MS. BARNES:  Objection.
4       Q.  (By Mr. Schreiber) No?
5       A.  No.
6       Q.  Okay.  I think that ends it for me.
7           You have the right to sign this and
8   read it before you accept it.  I always urge people
9   to do that, and I think Ms. Barnes agrees with me.
10  So we don't want you to waive the signature.
11          You can make minor corrections.
12  You can make a wholesale correction.  And you and I
13  get to sit again.  I don't know where at this point,
14  but, you know, we do it again, at least in a limited
15  fashion.
16          So have any questions of me?
17      A.  No.
18      Q.  No?  Okay.  Thank you, Ms. Wray.
19      A.  Thank you.
20          (Deposition concluded at 12:30
21  p.m.)
22                  -o0o-
23
24
25

Page 153

1           CHANGES AND SIGNATURE
2   WITNESS NAME: _____  DATE OF DEPOSITION: _____
3   PAGE   LINE   CHANGE   REASON FOR CHANGE
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

39 (Pages 150 to 153)