UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

AUDREY (SHEBBY) D'ONOFRIO,         )
                                   )
           Plaintiff,              )
                                   )
    vs.                            ) CASE NO.: 06-687 JDB
                                   )
SFX SPORTS GROUP, INC., et al.,    )
                                   )
           Defendants.             )
                                   )

DEPOSITION OF : DANIEL ROSIER
TAKEN BY      : DAVID E. SCHREIBER, ESQUIRE
Commencing    : 10:49 a.m.

Location      : 12100 Wilshire Boulevard Suite 1500

                Los Angeles, California

Day, Date     : Tuesday, May 22, 2007

Reported by   : DEE ANN JOHNSON, C.S.R. NO. 8279

Pursuant to   : Notice

Original to   : DAVID E. SCHREIBER, ESQUIRE

Pages 1 - 181

Job No. 105808

```
 1   Q   Yes, sir.
 2   A   I don't recall.
 3   Q   Well, it says, "Attached is the updated Sports
 4   Group terms. Plan on term date 9/22/05 except for the DC
 5   term date may be 9/21/05," and it has a little box below
 6   it for Sports elim.
 7           See that?
 8   A   Yes.
 9   Q   And then below that is "Lakes/Lynn," and then
10   it's, "Most likely it will just be you two doing the
11   terms - no one from Sports. I am waiting for
12   confirmation via e-mail from Bryan."
13           Now, Bryan would be who --
14       MS. BARNES: Objection.
15   Q   BY MR. SCHREIBER: -- do you know?
16   A   Bryan Perez.
17   Q   Right. Because he was copied on the 9/13
18   e-mail that you sent to Kimberly Wray.
19           Who is Bryan Perez, or who was Brian Perez?
20   A   Who was Brian Perez at this point in time?
21   Q   No. As of 9/13/05 or 9/16/05. Who is he?
22       MS. BARNES: I'm sure he was the same person.
23   Are talking about what position he held?
24       MR. SCHREIBER: Yes.
25       MS. BARNES: Okay.
```

```
 1       THE WITNESS: That's what the document says.
 2   Q   BY MR. SCHREIBER: Now, do you have any
 3   document, as of September 16, 2005 at 4:27 p.m. or
 4   earlier, that says something different about Audrey
 5   D'Onofrio, that she was to be terminated?
 6   A   Any document earlier than 9/16?
 7   Q   2005, at 4:27 p.m., that says Audrey will be
 8   terminated, contrary to what's written here on this
 9   document.
10   A   I would think besides mine that's on the to be
11   determined list, my worksheet, I -- I can't speak to
12   someone else's --
13   Q   All right. But this is the woman whom you're
14   communicating with, Ms. Wray, to act on your behalf;
15   correct?
16       MS. BARNES: Objection.
17       THE WITNESS: I sent her an e-mail of the
18   proposed term list, yes.
19   Q   BY MR. SCHREIBER: But as of that particular
20   time, Audrey was not to be terminated, according to
21   Ms. Wray; correct?
22   A   According to this document, that is correct.
23   Q   Well, Ms. Wray wrote the document; correct?
24   A   That, I do not know.
25       MS. BARNES: Objection.
```

```
 1       THE WITNESS: I believe, I don't know his exact
 2   title, but he worked in our business development for --
 3   let me see -- I get the -- CCE, Clear Channel
 4   Entertainment.
 5   Q   BY MR. SCHREIBER: Now, the next page, 91, of
 6   this exhibit, it says, "Updated as of 9/16/05," and
 7   there's two sections. The bottom section says, "will not
 8   be terminated."
 9           Do you see that?
10   A   Yes.
11   Q   And do you see Audrey D'Onofrio's name in that
12   section?
13   A   Yes.
14   Q   And the two pages, 92 and 93, are, I gather,
15   portions of that same spreadsheet. Do you see that, and
16   can -- can you confirm that?
17   A   I don't know.
18   Q   Okay. Now, on September 16th, according to
19   Kimberly Wray and at least this exhibit, Ms. D'Onofrio is
20   not to be terminated; is that correct?
21       MS. BARNES: Objection.
22   Q   BY MR. SCHREIBER: That's what the document
23   said; correct?
24   A   That's what the document --
25       MS. BARNES: Continued objection.
```

```
 1   Q   BY MR. SCHREIBER: You don't know that? She's
 2   never told you that?
 3   A   Not that I'm aware of.
 4   Q   You've seen this document before, haven't you?
 5       MS. BARNES: Objection. Asked and answered.
 6       THE WITNESS: Not that I'm aware of.
 7   Q   BY MR. SCHREIBER: You don't think you've ever
 8   seen this e-mail or this spreadsheet before?
 9   A   This particular spreadsheet? No, I can't tell
10   you if I've seen it. Did I -- have I seen spreadsheets
11   like this spreadsheet? I'm sure I have, but I don't -- I
12   can't say if I saw this particular one.
13   Q   Well --
14   A   I was not copied on the 9/16 e-mail. So I'm
15   assuming, based on that fact, that it's --
16   Q   Well, subsequent to September 16th at
17   4:27 p.m., did you speak with Kimberly Wray at any time
18   about Audrey D'Onofrio?
19   A   After September 16th?
20   Q   At 4:27 p.m. Did you speak with Ms. Wray about
21   Audrey D'Onofrio with regard to anything?
22   A   After that time period --
23   Q   Up until that moment in time, the date, again,
24   Friday, September 16, 2005, 4:27 p.m., after that moment
25   in time, did you speak with her, Kimberly Wray, about
```

```
 1  Audrey D'Onofrio?
 2     A    After September 16th?  Yes.
 3     Q    At that -- 4:27 is the operative moment.  Could
 4  have been 4:28, could have been 5:03.  Anytime that day
 5  or subsequent, did you speak with her?
 6     A    I spoke with Kimberly Wray after
 7  September 16th.
 8     Q    When?
 9     A    What time?
10     Q    Yes.
11     A    What day?
12     Q    What day?  What time?
13     A    I -- somewhere between this date and the final
14  list being put together, I'm sure I talked to her.
15     Q    Do you have a recollection, sir?  Other than
16  the fact that you're sure you did, do you remember
17  actually having this conversation?
18     A    I don't recall the exact conversation, but
19  again --
20     Q    I don't need exact.  Tell me what you talked
21  about.  If you remember.  I don't want you to make it up.
22  I just want you to tell me what you know.
23     A    Anything that -- from -- after 9/16, September
24  16th, talking about people who should be on the
25  termination list and who should not be on the termination
```

```
 1  list.
 2     Q    What did you talk about with respect to Audrey
 3  with Kimberly Wray?
 4     A    Told her to put her on the list.
 5     Q    Okay.  And according to your list on the 13th,
 6  she was under consideration, or words to that effect.
 7  Let's see what you said, actually.
 8          Potential eliminated positions.  That's on the
 9  13th.  According to this, Kimberly Wray writes -- excuse
10  me -- "will not be terminated."  And that's at 4:27 on
11  the 16th.
12          And then, it would seem, if you look at 94 in
13  that series, at 9:26 a.m. on Saturday, September 17th,
14  she writes to Alaka Williams, Lynn Mahoney, Jacquie
15  Fraser-Smith, Subject: Updated list, here's an updated
16  list as of this morning - Audrey D. Was added.  That is
17  the only change.
18          Is this the first time you saw that one?
19     A    I believe so.
20     Q    Now, when did you talk to Ms. Wray about
21  Ms. D'Onofrio between 4:27 p.m. on that Friday and
22  9:26 a.m. on that Saturday?
23     A    I don't recall.
24     Q    What did you talk to her about, do you
25  remember?
```

```
 1     A    Again, who should be on or off the list.
 2     Q    Did she not tell you information about
 3  Ms. D'Onofrio?
 4     A    I don't recall that discussion.  We talked
 5  about who goes on and who's off the -- it was just a list
 6  of names.
 7     Q    She told you, sir, that Audrey was pregnant,
 8  didn't she?
 9          MS. BARNES:  Objection.
10          THE WITNESS:  Not that I recall, no.
11     Q    BY MR. SCHREIBER:  So if Ms. Wray testified
12  that she told you, is she wrong?
13     A    I don't know.  She could be.
14     Q    If Alaka Williams said that she told Kimberly
15  Wray that Audrey was pregnant before the 16th, are you
16  disputing that?
17     A    I don't know.
18          MS. BARNES:  Objection.
19     Q    BY MR. SCHREIBER:  So as you sit here today,
20  sir, you're telling us that you have no recollection of
21  knowing that Audrey was pregnant on the 16th of
22  September 2005?  Is that your testimony today?
23     A    On that date?  No, I did not know that Audrey
24  was pregnant.
25     Q    So when -- at what point did you find out,
```

```
 1  supposedly, that she was pregnant?  What's your
 2  recollection today?
 3     A    My recollection --
 4          MS. BARNES:  Objection.  Go ahead.
 5          THE WITNESS:  My recollection is after the
 6  separations took place.
 7     Q    BY MR. SCHREIBER:  After the 26th?
 8     A    I believe so.  That's my reco -- recollection.
 9  But again, it's -- I don't know anything -- I mean, I
10  don't -- there's no reason to -- it's not a matter of
11  issue.  I don't --
12     Q    What's not an issue?
13     A    That I don't know what -- if I knew after she
14  was terminated or separated that she was pregnant.
15     Q    You don't think it has anything to do with
16  anything.  Is that what you're trying to tell me?
17     A    I'm saying that we restructured our groups,
18  that's correct.
19     Q    And so as you sit here today, your testimony
20  under oath is that when you made this call, you didn't
21  know she was pregnant?
22     A    I don't recall knowing that, that's correct.
23     Q    It's what -- it's interesting how you say it.
24  You don't recall.  I want you to tell me whether you knew
25  it or you didn't know.
```

```
 1   Q    When did he announce this?
 2   A    There was discussions the entire time about his
 3   potential depart -- departure.  He had an out in his
 4   contract.  So --
 5   Q    Well, my question still is --
 6        MS. BARNES:  Well -- but let him finish his
 7   answer.
 8        MR. SCHREIBER:  Well, I -- we may be digressing
 9   a little bit.  I'm just trying to find out who he told
10   before he did it.
11   Q    BY MR. SCHREIBER:  Who above you?  If it's
12   Mr. Tellem, that's fine.  If it's --
13   A    Bryan Perez would be.  I'm not sure he directly
14   is above -- above me.  He was working with -- again, he's
15   a corporate person working for Rapino.
16   Q    Okay.
17   A    There really was no other executive management
18   within the Sports Group that I would go to and --
19   Q    Are you telling me that as part of the -- the
20   way that you were going to do this, that you didn't
21   directly discuss this with Michael Rapino that you were
22   going to eliminate the public relations function?
23   A    We didn't get into those details, again,
24   because the PR is not a material piece of the business.
25   So I didn't think there was a requirement to go
```

```
 1   Q    Okay.  And when you sent this to Bryan Perez,
 2   D'Onofrio appears as a potential eliminated position;
 3   correct?
 4   A    That is correct.
 5   Q    Did you, at any time after this September 13th
 6   e-mail, send something to Perez that says, "I've
 7   eliminated Audrey D'Onofrio or her position"?
 8   A    I believe I spoke to Mr. Perez.
 9   Q    When did you speak to Perez?
10   A    Somewhere between the 9/13 e-mail and the
11   separation date.
12   Q    Well, that's 9/26, but the decision is made on
13   the 16th or the 17th, according to these e-mails.  Did
14   you talk to Perez between the 13th and, let's say, the
15   16th/17th?
16   A    Again, I would assume yes, since Audrey is on
17   the list of separations.
18   Q    Are you telling me that Mr. Perez said that it
19   was okay to eliminate her and her position?
20   A    I think, as the executive for the Sports Group,
21   he was leaving that decision up to me on the individual
22   basis.
23   Q    From --
24   A    So from his --
25   Q    It was your call?  That's all I'm trying to
```

```
 1   through -- again, we didn't go through a list of names,
 2   no, not with Mr. Rapino.
 3   Q    But you did it with Mr. Perez?
 4   A    I provided Mr. Perez the list of names.
 5   Q    The list of names of people that would be
 6   eliminated or positions eliminated?
 7   A    The positions that we were restructuring, yes.
 8   Q    And you did this when, sir?
 9   A    I believe in mid-September.
10   Q    So, again, you're referring to September 13th
11   e-mail.  Look at Exhibit 5, Bates stamped 100, where you
12   say, based on discussions with Michael Rapino, potential
13   eliminated positions within Sports.
14   A    Which document?  Exhibit 5 --
15   Q    Look at Bates stamped 100 and then 101.  This
16   is what you're referring to when you say you communicated
17   with him?
18   A    With Mr. Perez --
19   Q    Right.
20   A    -- that is correct.
21   Q    And when you referred to the fact that you had
22   discussions last week with Michael Rapino, you're telling
23   me that you didn't specifically discuss eliminating
24   Ms. D'Onofrio's position with him?
25   A    I didn't discuss any positions with Mr. Rapino.
```

```
 1   find out.
 2   A    That is correct.
 3   Q    It was your decision to terminate her.  True?
 4   A    Correct.
 5   Q    And you're telling us, still, today that you
 6   didn't know that she was pregnant; correct?
 7   A    I did not -- I don't recall knowing her status,
 8   if she was pregnant or not.
 9   Q    And you do admit that you knew that she was
10   asking about a better title and more compensation.  You
11   knew that was occurring sometime during 2005, at least;
12   correct?
13        MS. BARNES:  Objection.
14        THE WITNESS:  I don't know if it was in 2005.
15   I don't know.
16   Q    BY MR. SCHREIBER:  You can't say when, but you
17   knew that she was asking for it; correct?
18   A    I'd heard that.
19   Q    And you weren't about to give her more
20   compensation or a better title, were you?
21        MS. BARNES:  Objection.
22        THE WITNESS:  No.
23   Q    BY MR. SCHREIBER:  Somebody came to you and
24   said, "Audrey wants more money and wants a better title,"
25   and am I correct to understand you said "No"?
```

```
 1   A   It wouldn't have been my decision.
 2   Q   Why not?
 3   A   It would have been between her direct
 4  supervisor and the CEO.
 5   Q   And her direct supervisor would be Peter
 6  Hughes --
 7   A   Peter --
 8   Q   -- at some point?
 9   A   Peter was, that's correct.
10   Q   And the CEO was who?
11   A   Depends, again, what --
12   Q   In 2005, let's say.
13   A   It would have been Arn Tellem.
14   Q   Did you ever talk to Arn Tellem about whether
15  or not Audrey should have been made a vice president or
16  have a better title and have a better compensation
17  package?
18   A   No.
19   Q   Do you know if he knew that she wanted this?
20   A   I don't know.
21   Q   So the decision to terminate her wasn't
22  Mr. Tellem's decision. Am I correct to understand that?
23   A   The decision itself?
24   Q   Yes.
25   A   At the time of the restructure, no, that's --
```

```
 1  questions or --
 2       MS. BARNES:  I think I may have. Let me talk
 3  to Richard real quick.
 4       MR. SCHREIBER:  Why don't we take a moment.
 5       THE VIDEOGRAPHER:  Going off the record at 4:00
 6  now.
 7       (A brief recess was taken.)
 8       THE VIDEOGRAPHER:  Going back on the record at
 9  4:05 p.m.
10
11            EXAMINATION
12  BY MS. BARNES:
13   Q   The -- what's been marked as Rosier Exhibit
14  No. 5, if you could look at SFX100 and 101. The list of
15  persons, it says for current positions slated for
16  elimination and potential eliminated positions. Do you
17  see where I'm referring to?
18   A   Yes.
19   Q   Audrey D'Onofrio -- is Audrey D'Onofrio on the
20  potential eliminated positions list?
21   A   Yes, she is.
22   Q   Why was she taken off of that list?
23   A   Off of the potential list?
24   Q   Yes.
25   A   At the initial time of the restructuring or the
```

```
 1  that's correct, it was not his decision.
 2   Q   It wasn't Mr. Perez's; correct?
 3   A   That's correct.
 4   Q   It wasn't Mr. Rapino's; correct?
 5   A   That's correct.
 6   Q   It wasn't Kimberly Wray's decision, was it?
 7   A   That's correct, was not.
 8   Q   It wasn't Alaka Williams' decision; correct?
 9   A   That is correct.
10   Q   It was your decision; correct?
11   A   Yes.
12   Q   Your call.
13       A short indulgence.
14       Are you aware that anybody ever told Audrey
15  D'Onofrio that they would outsource her position if she
16  continued to request a better title and more
17  compensation?
18   A   No.
19       MR. SCHREIBER:  Okay. I think I'm just about
20  completed. One last ministerial item. We've added you
21  as a defendant. It's my obligation to present you with a
22  copy of a summons and a complaint and which I'll do right
23  now. And that officially makes you a party, subject to
24  whatever counsel decides to do.
25       I am now finished with my portion. Do you have
```

```
 1  discussions, I had concerns internally because of Arn
 2  Tellem's resignation, and as part of the restructuring
 3  itself, if that in and of itself would cause a overall PR
 4  issue for the remaining Sports Group. And so if -- if it
 5  was an issue, who within Sports could handle a true PR
 6  activity, who could answer calls about the group itself
 7  and Arn leaving and the restructuring itself.
 8   Q   Did that -- did Audrey being placed on the list
 9  occur after Arn Tellem left?
10   A   After Arn -- Arn, I believe, left after the
11  elimination or the restructuring happened.
12   Q   Now, the persons who were -- are listed as
13  being terminated, can you tell me if you have knowledge
14  of what position they held and why that position was
15  eliminated?
16   A   The re -- yes. The restructuring really looked
17  at --
18   Q   I'm sorry. I want you -- no. I want you to go
19  through each individual person on the list.
20   A   Okay. Peter -- Peter Hughes, he was, at the
21  time, acting in the head of our marketing -- oversight
22  for marketing in the PR division, and we eliminated those
23  divisions as part of the restructuring. He was the --
24  again, the executive vice president in charge of those
25  two respective groups of which we restructured.
```