```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2

    AUDREY (SHEBBY) D'ONOFRIO    )
 3           Plaintiff            )
                                  )
 4   VS.                          ) Case No.:  06-687 JDB
                                  ) Judge John D. Bates
 5   SFX SPORTS GROUP, INC,       )
     et al.                       )
 6           Defendants           )

 7

 8   *********************************************************
 9               THE ORAL DEPOSITION OF
10                  KIMBERLY WRAY
11                  MAY 9, 2007
12                   DUPLICATE
13   *********************************************************
14
15              THE ORAL DEPOSITION OF KIMBERLY
16   WRAY, produced as a witness at the instance of the
17   Plaintiff and duly sworn, was taken in the
18   above-styled and numbered cause on the 9th day of
19   May, 2007 from 9:10 a.m. to 12:30 p.m., before JULIE
20   VERASTEGUI, CSR in and for the State of Texas,
21   reported by stenographic and computer-aided
22   transcription at Hoffman Reporting & Video Service,
23   206 East Locust, San Antonio, Texas 78212, pursuant
24   to the Federal Rules of Civil Procedure and the
25   provisions stated on the record or attached hereto.
```

Page 74

1  Ms. Villanueva, Ms. Maloney and Ms. Williams.
2  Updated sports term is the subject.
3      And it says, "Attached is the
4  updated Sports Group terms. Plan on term date 9/22,
5  except for D.C. folks; term date may be 9/21/05."
6  The second page -- And we're not sure why exactly it
7  was produced except it's Ms. Fraser-Smith's copy of
8  it. It's the same document. And it says below the
9  last line, "D'Onofrio assistant not on list." You
10 wrote this, I gather.
11     A. Correct.
12     Q. Okay. And then at 3:51 is the updated as
13 of 9/16/05 list. And if you'll look at 3:51 in
14 particular, "Will not be terminated" lists
15 Audrey D'Onofrio. Do you see that?
16     A. Yes.
17     Q. Okay. And that's a list that was given to
18 you or created by you. Which one?
19     A. I created it in the spreadsheet. The list
20 of names were given to me by Dan Rosier.
21     Q. Okay. And the statement, "will not be
22 terminated" is your statement?
23     A. That's my wording, correct.
24     Q. Okay. And was that communicated to you by
25 Mr. Rosier?

Page 75

1      A. What Mr. Rosier communicated to me is that
2  there were some that were pending on making
3  decisions on.
4      Q. Okay. But the list indicates that -- above
5  that line, those are the people -- And it doesn't
6  read very well -- I'm assuming this means these are
7  people that will be terminated, the top portion; is
8  that correct?
9      A. Correct.
10     Q. And the bottom portion is the people that
11 will not be terminated, correct?
12         MS. BARNES: Object.
13     Q. (By Mr. Schreiber) That's what you've
14 written?
15         MS. BARNES: Objection. Document
16 speaks for itself.
17         THE WITNESS: The -- The four that
18 are on the bottom are ones that at that point when I
19 sent this had not been decided on. I used the "will
20 not be terminated." That was my wording.
21     Q. (By Mr. Schreiber) Okay. Where did you get
22 this information from again? Mr. Rosier?
23     A. Correct.
24     Q. And how did he present it to you? Was it
25 by e-mail?

Page 76

1      A. Yes.
2      Q. And when did he send you an e-mail?
3      A. I don't know the exact date. It would have
4  been prior to this by a day, maybe the same day. I
5  don't recall.
6      Q. And did he give you a list of names in that
7  e-mail?
8      A. Yes.
9      Q. The next document that was presented to
10 us -- or e-mail -- Excuse me -- begins at 3:54. And
11 it's from you to Williams, Maloney, Fraser-Smith,
12 and it says, "Updated list." And it's Saturday,
13 September 17th at 9:26 a.m. that you sent this. Is
14 that an accurate representation of what's on this
15 document?
16     A. Correct.
17     Q. And it reads simply, "Here is an updated
18 list as of this morning. Audrey D. was added. That
19 is the only change." Do you see what you've written
20 there?
21     A. Correct.
22     Q. Now, the conversation that you told us
23 about before with Alaka Williams, the first one
24 where she said Audrey is pregnant, occurred after
25 the e-mail that was sent just previously that began

Page 77

1  at 3:49 and 3:50 when you sent the -- the list where
2  Audrey was not to be terminated, at least according
3  to the way it -- it was written.
4          You had the conversation after you
5  sent this e-mail to her; is that correct?
6          MS. BARNES: Objection.
7          What e-mail?
8      Q. (By Mr. Schreiber) You had a conversation,
9  you told us some time ago, with Williams regarding
10 the fact that she told you Audrey was pregnant. You
11 didn't remember much of it, but you remembered she
12 told you she was pregnant, correct?
13     A. Correct.
14     Q. That came about as a result of the e-mail
15 beginning on 3:49, September 16th that you sent to
16 her. She -- She called you or you spoke as a result
17 of this e-mail --
18         MS. BARNES: Ob --
19     Q. (By Mr. Schreiber) -- correct?
20         MS. BARNES: Objection.
21         THE WITNESS: No. That
22 conversation would have taken place as a result of
23 Dan Rosier's e-mail to me.
24     Q. (By Mr. Schreiber) Okay. But you hadn't
25 sent anything to Williams until the 16th, right?

20 (Pages 74 to 77)

Page 86

1  pregnant. Is that what you're telling me?
2     A.  That's what I recall, yes.
3     Q.  Okay. And then, nevertheless, you sent her
4  this e-mail, along with others, at 4:27 on that
5  Friday, and attaching to it the list that says,
6  "Will not be terminated," even after you found out
7  that she's pregnant. Is that your testimony?
8     A.  Correct.
9     Q.  And then after that occurs, still knowing
10 that she was pregnant, between that Friday afternoon
11 and that Saturday morning, you put her on the list
12 to be terminated. Is that what you're telling me
13 today?
14          MS. BARNES: Objection.
15          THE WITNESS: Correct.
16    Q.  (By Mr. Schreiber) Now, tell me what
17 happened between 4:27 on Friday the 16th and
18 9:26 a.m. on the 17th that caused you to make this
19 change?
20    A.  I would have received direction from
21 Dan Rosier --
22    Q.  Okay.
23    A.  -- to make the change.
24    Q.  Okay. And what document did you get from
25 Dan Rosier that said, "Put her on the list"?

Page 87

1     A.  It was -- It was either an e-mail, or it
2  would have been a verbal conversation.
3     Q.  Now, you must have told Dan Rosier that
4  Audrey's pregnant, communicated that?
5     A.  Once he told me that he wanted her on the
6  list.
7     Q.  Okay. And he -- Did you make any notes of
8  this conversation?
9     A.  No. I don't have any.
10    Q.  Well, it's not whether you have it; it's
11 whether you ever wrote it.
12    A.  No. Oh, no.
13    Q.  Nothing electronically or otherwise
14 commemorates or corroborates any of these
15 conversations, particularly this one with
16 Dan Rosier, where you tell him she's pregnant and he
17 still says, "Fire her"?
18    A.  Correct.
19    Q.  Okay. What time did you have this
20 conversation on Friday after 4:27 p.m.?
21          MS. BARNES: Objection.
22          THE WITNESS: I don't recall.
23    Q.  (By Mr. Schreiber) When did you have the
24 conversation -- What part of the day would it have
25 been with Williams when you found out that she was

Page 88

1  pregnant? Was it the morning, the afternoon,
2  whatever day it might have been?
3     A.  I would -- I don't remember.
4     Q.  So sometime after 4:27 that Friday evening,
5  you called Dan Rosier. Is that your testimony?
6     A.  Or --
7          MS. BARNES: Objection.
8     Q.  (By Mr. Schreiber) Or -- Or he called you?
9     A.  Possibly, or an e-mail. I don't --
10    Q.  But we don't have that e-mail either, do
11 we?
12    A.  I don't.
13    Q.  You haven't seen it, and nobody's showed it
14 to you, have they?
15    A.  Correct.
16    Q.  Did you ask to see that e-mail possibly to
17 help refresh your recollection in this case?
18          MS. BARNES: Objection.
19          THE WITNESS: I -- I don't know who
20 I would have asked. No.
21    Q.  (By Mr. Schreiber) Counsel, legal counsel,
22 Dan Rosier, anybody?
23    A.  No.
24    Q.  So he knows that she's pregnant. You know
25 that she's pregnant. You then have this

Page 89

1  conversation this late afternoon, early evening.
2  Tell me exactly what the two of you talked about.
3     A.  Again, I don't recall if we had a
4  conversation or if it was e-mailed. When I found
5  out that she was going to be put on the list, we did
6  verbally talk, and I told him that she is pregnant.
7  His response was that Michael Rapino and him have
8  decided they were going to be getting rid of the --
9  the entire PR function and that was going to be
10 outsourced outside the company.
11    Q.  Wow. Outsourced. Okay. That's the first
12 time we've heard that. Now, the outsourcing that he
13 just told you about, what did he say about that, if
14 anything?
15    A.  That was it.
16    Q.  Did he discuss the cost of doing something
17 like this?
18    A.  No. He would not have done that with me.
19    Q.  Okay. And you didn't raise the cost of
20 whether it was cheaper to keep somebody in-house
21 versus hiring a PR firm?
22    A.  No.
23          MS. BARNES: Objection.
24    Q.  (By Mr. Schreiber) Okay. Did you ever come
25 to find out what PR firm supposedly was hired?

23 (Pages 86 to 89)

Page 102

1  employees bring a doctor's note in before they even
2  ask for the paperwork.
3      Q.  But that's not a regulation. You don't
4  have a written policy about that, do you?
5      A.  No, but it happens.
6      Q.  A lot of things happen, but my point is,
7  you don't have a policy -- a written policy that
8  says --
9      A.  Correct.
10     Q.  -- "Bring me a doctor's note before I give
11 you the paperwork," correct?
12     A.  Correct.
13     Q.  So you understood, did you not, that once
14 she's terminated, she can't get FMLA, correct?
15         MS. BARNES: Objection.
16         THE WITNESS: Correct.
17     Q.  (By Mr. Schreiber) So if she didn't get the
18 paperwork completed before you terminated her, she's
19 out of luck. You knew that, didn't you?
20         MS. BARNES: Objection.
21         THE WITNESS: No. Either way, we
22 were still going to be needing to terminate her.
23     Q.  (By Mr. Schreiber) True. But if she was
24 entitled to certain benefits under disability as
25 opposed to FMLA, you do have a disability policy

Page 103

1  also. She had to be an employee in order to get
2  that, correct?
3          MS. BARNES: Objection.
4          THE WITNESS: Incorrect.
5      Q.  (By Mr. Schreiber) Not correct?
6      A.  No.
7      Q.  What did I say wrong?
8      A.  There's a difference between short-term
9  disability and FMLA.
10     Q.  Right.
11     A.  And if the doctor would state that she is
12 disabled and gives a date to the insurance
13 company -- Not to us, but to Cigna -- they make the
14 determination and grant disability.
15     Q.  All right. And if she had gotten that in
16 before she was terminated, she could have been
17 considered for that, correct?
18     A.  She could --
19         MS. BARNES: Objection.
20         THE WITNESS: She could have gotten
21 it in afterwards if her disability date was stated
22 by the doctor prior to her termination date.
23     Q.  (By Mr. Schreiber) I see. So Williams
24 never told you that she sent the paperwork, did she?
25         MS. BARNES: Objection.

Page 104

1          THE WITNESS: I'm sorry. Which
2  paperwork?
3      Q.  (By Mr. Schreiber) For either disability or
4  FMLA -- short-term disability or FMLA.
5      A.  For short-term disability, we don't deal
6  with any of the paperwork. We wouldn't know if the
7  employee called Cigna and made a claim or not.
8      Q.  Well, you know Williams was going to give
9  her the paperwork but she didn't come in the week
10 before. Do you remember that conversation with
11 Williams?
12         MS. BARNES: Objection.
13         THE WITNESS: Correct. And I'm
14 assuming that's FMLA paperwork.
15     Q.  (By Mr. Schreiber) Well, you don't know,
16 though?
17     A.  Well, because we don't have short-term
18 disability paperwork.
19     Q.  How would the employee know how to file?
20     A.  They are given those instructions. It's on
21 our intranet. It's in the policy that Cigna gives
22 them when they purchase the short-term disability.
23     Q.  Okay. So do you remember discussing with
24 Ms. Williams the fact that Fed Ex-ing the paperwork
25 to Ms. D'Onofrio or just letting her come in? It

Page 105

1  doesn't have to be Fed Ex. It can be whatever.
2      A.  I don't recall the conversation, if that
3  was included or not.
4      Q.  Now, we were told that one other person was
5  pregnant was terminated that summer; is that
6  correct --
7          MS. BARNES: Objection.
8      Q.  (By Mr. Schreiber) -- within Clear Channel
9  Entertainment?
10         MS. BARNES: Objection.
11         THE WITNESS: Say that again. I'm
12 sorry.
13     Q.  (By Mr. Schreiber) We were told that
14 somebody within Clear Channel Entertainment in the
15 summer of 2005 who was pregnant was terminated. Is
16 that true?
17         MS. BARNES: Objection.
18         THE WITNESS: Possibly.
19     Q.  (By Mr. Schreiber) You don't know?
20     A.  We did 250 terminations in about a month
21 and a half, two months. That was only with
22 Entertainment. I handled terminations with all the
23 other divisions too, so I just don't recall that.
24     Q.  Okay.
25         MS. BARNES: Can we go off the

Page 106

1  record for a second?
2         (Off the record.)
3     Q.  (By Mr. Schreiber) Before Ms. D'Onofrio was
4  terminated, did you have any conversations with
5  Julie Kennedy about terminations?
6     A.  What is the time period with Julie Kennedy
7  you're referring to?
8     Q.  Summer of 2005 through September.
9     A.  No.
10    Q.  Have you ever had conversations regarding
11 these terminations with Julie Kennedy at any time?
12    A.  Yes.
13    Q.  When?
14    A.  She -- She was part of the HR -- Clear
15 Channel Entertainment HR Group. Then she took a
16 different role outside the HR Group. So I would
17 have conversations with her regarding either
18 employees under her that she was wanting to
19 terminate for performance reasons at some point
20 between -- any time -- I mean, in '05. I don't
21 believe it was in relation to the eliminations.
22    Q.  I want to go back a bit to that
23 conversation with Mr. Rosier late afternoon, evening
24 of the 16th of September. Just so I'm clear, before
25 that evening, he never had said, "Fire

Page 107

1  Audrey D'Onofrio," true --
2         MS. BARNES: Objection.
3     Q.  (By Mr. Schreiber) -- or, "Terminate her"?
4     A.  Not that I recall, because of what the
5  documents say.
6     Q.  Now, did he tell you what happened between,
7  let's say, the 13th and the 16th that made him
8  decide to terminate her and, as you put it, use
9  outsourcing for public relations?
10    A.  No.
11    Q.  Did he ever tell you who he spoke with that
12 would have brought him to the conclusion to put her
13 on the list?
14    A.  No.
15    Q.  Did he say it was about money?
16    A.  No.
17    Q.  Did he say she was a poor worker?
18    A.  It wasn't about performance, no.
19    Q.  As you sit here today, do you remember
20 anything about why he all of a sudden decided to get
21 rid of public relations?
22        MS. BARNES: Objection.
23        THE WITNESS: Only that it was the
24 direction that Michael Rapino wanted to go.
25    Q.  (By Mr. Schreiber) And that was the first

Page 108

1  time he had told you at least that that was the
2  direction that Michael Rapino wanted to go. Is that
3  true?
4         MS. BARNES: Objection.
5         THE WITNESS: From what I recall,
6  yes.
7     Q.  (By Mr. Schreiber) Okay. He -- Nobody had
8  told you that that was the direction they wanted to
9  go until that -- we'll call it, the evening of the
10 16th of September. Fair comment? Fair statement?
11        MS. BARNES: Objection.
12        THE WITNESS: Right. They wouldn't
13 have told me.
14    Q.  (By Mr. Schreiber) Okay. Did you not say
15 anything about the fact that, given her pregnancy,
16 this may be, to use your word, a risk factor?
17    A.  Say that question again.
18    Q.  Did you not discuss with Rosier the fact
19 that because Audrey was pregnant this might not fall
20 into one of those risk factor categories?
21    A.  Yes, I did.
22    Q.  What did you tell him?
23    A.  Basically that I've been made aware she's
24 pregnant and that creates a -- a risk in terminating
25 her.

Page 109

1     Q.  What's the risk? Did you tell him?
2     A.  The fact that she's pregnant.
3     Q.  Well, what's going to happen as a result of
4  terminating somebody who's pregnant under these
5  circumstances? Did you say?
6         MS. BARNES: Objection.
7         THE WITNESS: I don't recall if I
8  did. I mean, we would have discussed it. I -- He
9  went back and told me, "The reason that we're
10 eliminating her is because Michael is -- Michael
11 Rapino is wanting to get rid of the public relations
12 area."
13    Q.  (By Mr. Schreiber) Did he say when Rapino
14 made that decision or that statement?
15    A.  No, but the way this process was going is
16 that each -- like a Dan Rosier -- There was 15 to 17
17 different divisions under Entertainment. Each of
18 the head of those divisions were having discussions
19 with Michael Rapino and creating a list and
20 discussing what the direction of that division was
21 going to go. Some of the divisions were going away
22 completely.
23        So those discussions were ongoing.
24 I was not part of them. I don't know when they
25 occurred. When they had come up with the list

28 (Pages 106 to 109)

HOFFMAN REPORTING & VIDEO SERVICE
SAN ANTONIO / DALLAS / HOUSTON