UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AUDREY (SHEBBY) D'ONOFRIO    :
                                    :
               Plaintiff        :
                                    :
      v.                        :    Case No.: 06-687 JDB/JMF
                                    :
                                    :
SFX SPORTS GROUP, INC., et. al.    :
                                    :
           Defendants  :
............................................................:

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

The Plaintiff, **AUDREY (SHEBBY) D'ONOFRIO,** by and through her undersigned

counsel, **David E. Schreiber, Esq.**, states to this court as follows:

**PARTIES**

1.    Plaintiff, Audrey (Shebby) D'Onofrio, (hereinafter, at times, "Plaintiff" or "Ms.

D'Onofrio") is currently a resident of the Commonwealth of Virginia, previously was

a resident of the District of Columbia, at all times relevant herein and was an

employee of SFX Sports Group, Inc. and/or Clear Channel Communications, Inc.

2.    Defendant, SFX Sports Group, Inc., (hereinafter, at times, "SFX") is a corporation

organized and existing under the laws of the State of Delaware, with its principal

offices in the District of Columbia, and does business in the District of Columbia.

It is currently a wholly owned subsidiary of Live Nation, Inc.  At times, it has done

business as "Clear Channel Entertainment".

3.    Defendant,  CLEAR CHANNEL COMMUNICATIONS, INC. (hereinafter, at times,

"Clear Channel"), is a corporation organized and existing under the laws of the State

1

of Texas, with its principal place of business at 200 Basse Road, San Antonio, TX 78209. It was the parent of SFX Sports Group, Inc. during the course of events described herein. The current parent of SFX Sports Group, Inc. is Defendant, LIVE NATION INC., a corporation organized and existing under the laws of the State of Delaware. Subsequent to the events and claims described herein, Clear Channel became Live Nation, Inc. through a tax free exchange of stock involving its subsidiary, CEE Spinco, Inc., a Delaware corporation. All defendant corporations are named as parties since the ownership and operation of all defendant corporations includes overlapping or common directors, officers and executives, at least in part, such that the claims noted herein may be attributable to those individuals in a variety of their capacities.

4.    Defendants, DAN ROSIER, former Chief Financial Officer for Defendant, SFX Sports Group, Inc and KIMBERLEY WRAY, head of Human Resources, of Clear Channel Communications, Inc. are noted by Defendants in their "limited" discovery responses as responsible and/or involved in the discriminatory actions, etc., noted herein.

5.    In this action, the Plaintiff challenges the discriminatory actions of the Defendants, her unequal compensation, her diminished corporate title and stature, their retaliation against her for her protected activities and her wrongful termination from the position of Senior Director of Public Relations for Defendant, SFX Sports Group, Inc.

6.     Ms. D'Onofrio, the Plaintiff, who was highly qualified for the position she held, and was highly effective in that position, suffered discrimination and disparate treatment

2

based upon her gender in that she was not fairly compensated, having been paid less than the Defendants' male employees who worked in the same or similar positions with similar duties and who performed similar amounts of work. Defendants further discriminated and treated Ms. D'Onofrio in a disparate manner based on her gender, by virtue of her being pregnant, her perceived disability as a result thereof, and by subjecting her to a hostile work environment, all of which culminated in Defendants' termination of Ms. D'Onofrio. Ms. D'Onofrio complained repeatedly to her superiors about her treatment, the unequal pay, and the hostility shown toward her. As a result of her protected activities, the Defendants retaliated by firing her. Ms. D'Onofrio seeks, among other relief, back pay and front pay (based upon a salary equal to a male employee(s) who were in her position), compensatory and punitive damages and a permanent injunction/specific performance, including reinstating her to her employment, retroactively changing her job title to Vice President of Public Relations, and compensating her at a salary commensurate with her position.

**JURISDICTION AND VENUE**:

7.    This Court has jurisdiction of this action pursuant to 11 D.C. Code §921, the District of Columbia Human Rights Act, Title 2, Chapter 14 and the D.C. Family Medical Leave Act, 32 D.C. Code §510. Diversity jurisdiction also obtains pursuant to 28 U.S.C. §1332, by virtue of the removal of this action to this Court from the Superior Court of the District of Columbia pursuant to 28 U.S.C. §1441 and §1446. The jurisdiction of the Equal Pay Act claim arises under 29 U.S.C. 216(b). Jurisdiction over the individual defendants, Wray and Rosier, is also predicated upon D.C. Code

3

§ 13-423(a)(1), the so-called D.C. Long Arm Statute.

8.    Venue is properly laid in the District of Columbia because, among other reasons, the Plaintiff's claims arise from events and occurrences that principally occurred in this location/district.

## STATEMENT OF FACTS:

9.    In May 2000, Audrey (Shebby) D'Onofrio  was hired as the Senior Director of Public Relations at SFX Sports Group, Inc., by Bill Allard (Chief Operating Officer) and Howard Schacter (Vice President of Public Relations).  At that time, Ms. D'Onofrio was told that Mr. Schacter  may be moving to the "Entertainment" branch of SFX, and if he did, that she would be promoted to his position.

10.    A few months later, Mr. Schacter  was moved to the "Entertainment" branch of the company and  Ms. D'Onofrio ascended to Mr. Schacter 's former role, but she was not given the corresponding change in title nor an equivalent salary.  Mr. Schacter made it clear to Ms. D'Onofrio that he was not comfortable with her having the same job title/position as him, that being Vice President, despite the fact that he no longer worked at SFX Sports, Group, Inc.  However, even after Mr. Schacter  was subsequently made a Senior Vice President,  Ms. D'Onofrio  was still not given the title of Vice President nor was she given an equivalent salary.

11.    In September 2000, Ms. D'Onofrio went to a Clear Channel (the parent of SFX) executive retreat in Florida as the only woman from SFX.  Ms. D'Onofrio was excluded from nightly activities and important meetings.  Ms. D'Onofrio was humiliated by their treatment, but continued to ask to be included in meetings, with much resistance from SFX executives.  Frequently, the nightly activities included

4

going to "strip clubs", which the executives claimed was why she was not allowed to attend.  Typically, 10-15 people (department heads) were invited to attend this annual retreat.  After expressing displeasure with her treatment at the conference, Ms. D'Onofrio was never invited again.  Additionally, Ms.  D'Onofrio was excluded from the company's quarterly meetings, and other important corporate meetings, in which her predecessor, Mr. Schacter, was regularly included.

12.     In the Summer of 2001,  Ms. D'Onofrio raised serious ethical concerns she had with then SFX Chairman and CEO, David Falk, regarding an upcoming publicity campaign for the Sporting News's list of most powerful people in sports.  This resulted in a serious disagreement between Ms. D'Onofrio and Mr. Falk.

13.     Shortly after the disagreement with Mr. Falk SFX was reorganized and Mr. Allard was terminated.  At this time Ms. D'Onofrio was informed that her position was to be eliminated.  Upon information and belief, Ms. D'Onofrio avers that the decision to eliminate her position was in retaliation for her "disagreement" with Mr. Falk.  Ms. D'Onofrio was offered a position working for Mr. Schacter in New York, to work with him in the Entertainment branch of the company as a "promotion".  Ms. D'Onofrio declined Mr. Schacter 's offer, which angered him.  After declining the offer, she was retained for 30 days and was given two-and-a-half months severance pay with additional insurance coverage.  Ms. D'Onofrio spent those last 30 days finishing up all of her projects and giving agents instructions on how to handle their clients' public relations without her.

14.     After leaving SFX, Ms. D'Onofrio was continually contacted by SFX agents for help with public relations matters.   Ms. D'Onofrio  essentially was performing the same

job from home but with no compensation.  Within a few months of departing, Ms.

D'Onofrio was told by members of SFX management that SFX wanted her back, but

that Mr. Schacter was opposed.  Several months later, in 2002, and after Mr. Falk

took on a more ceremonial position at the company, Robert Urbach, then an SFX

Executive Vice President, contacted Ms. D'Onofrio and asked her to return to the

company in her former capacity.  Ms. D'Onofrio was told that if she returned, she

would not be required to report to, or even communicate with, Mr. Schacter.  Upon

information and belief, Mr. Schacter tried to prevent her return, but an offer was

extended to her.  However, prior to her return, Ms. D'Onofrio wished to clarify her

position and salary.  Ms. D'Onofrio was ultimately told by Mr. Urbach that if she

"played ball," the title would be changed in a few months to Vice President, with a

commensurate increase in salary.  Ms. D'Onofrio accepted the offer to return based

upon that understanding.    Shortly after her return to SFX, Ms. D'Onofrio once again

pressed the salary and title issue, requesting to be a Vice President, but she was

told that some of the men in the office would be unhappy since they did not receive

promotions that year.[1]  Ms. D'Onofrio persisted, saying that it would not be a

promotion, only assigning the correct title to her position.

15.    After Ms. D'Onofrio was rehired, she continued to raise the issue of her

compensation and title.  Subsequent to her return the terms of the "understanding"

upon which she relied for her return were "modified".  She was told that the

compensation and tile change was "in the works" and to be patient.  She was further

---

[1]During Ms. D'Onofrio 's tenure at SFX, several men were promoted while she
remained stagnant in the same position.

told that if she could accomplish different public relations milestones, she would receive the salary and title change, but these promises also went unfulfilled, despite achieving such milestones.  At one point, Mr. Urbach, her direct supervisor, informed her that he submitted the paperwork for her title and salary increase, but again, upper management did not act on his recommendation and there was never any change in her compensation or title.

16.    In December 2004, Mr. Urbach left SFX, so Ms. D'Onofrio asked her new supervisor, Peter Hughes, about her compensation and title, and he said he would "look into it".  Ms. D'Onofrio also approached SFX's Corporate Counsel, Michael Principe, about the salary and title issue, expressing that she could even be satisfied *at that time* with simply the title change and no corresponding increase in salary (which she believed would come about as a result of the title change).  He said that he would talk to Arn Tellem, Chief Executive Officer and President, when he visited Mr. Tellem at his Los Angeles office during the Spring of 2005, and that it should not be a problem.  Once again, however, no change was ever made to Ms. D'Onofrio 's compensation or title.

17.    In March 2005, Ms. D'Onofrio did not receive a bonus, which she had received previously during each year of her employment, despite the fact that she was told she would receive one.  Ms. D'Onofrio had more than satisfactorily completed another significant year of work and was even nominated for a company wide performance award.  Mr. Principe told her that the company forgot to inform her that she would not receive a bonus; that only employees with bonuses written in their contracts would be eligible.

18.     In August 2005, Ms. D'Onofrio informed Alaka Williams, the Human Resources Manager at Clear Channel who was assigned to SFX Sports Group, Inc., that she was pregnant. Some weeks later, Ms. D'Onofrio again spoke to Ms. Williams about her pregnancy and her resulting medical condition. Ms. D'Onofrio was having a difficult pregnancy and was experiencing several serious medical issues. Ms. D'Onofrio also made several other SFX and Clear Channel executives aware of her pregnancy related problems at various times during August and September, 2005. Ms. D'Onofrio informed Ms. Williams that her OB/GYN, Dr. Patricia Bannon, thought it was in her best interest to go on disability as her medical issues made working unsafe. In light of her physician's advice, Ms. D'Onofrio asked Ms. Williams, on or about September 22nd or 23rd, 2005, to provide the necessary disability paperwork for her to complete, in order to go on disability.

19.     The following Monday, September 26, 2005, Ms. D'Onofrio had a conversation with Jeff Newman, the SFX Events Director, about whether or not she intended to return to the company after her pregnancy. This conversation took place on the sidewalk in front of the SFX Sports Group offices. Ms. D'Onofrio assured Mr. Newman that she intended to return to work after her pregnancy. While this conversation was taking place, Ms. Williams walked by and asked if Ms. D'Onofrio was planning on returning to the office later that day. Ms. D'Onofrio stated that she would return after lunch and then asked if Ms. Williams had the disability paperwork available. Ms. Williams said she had the paperwork and that she would bring it to Ms. D'Onofrio 's office. Ms. D'Onofrio then went to lunch, but, as a consequence of her pregnancy, began feeling ill and decided to go home for the day. Ms. D'Onofrio left

8

Ms. Williams a message indicating that she had to go home due to illness, but that Ms. Williams could still leave the paperwork on her desk.

20. Later that afternoon, Ms. D'Onofrio received a voice-mail message from Ms. Williams, asking her to return to the office immediately to discuss the disability paperwork.  Ms. D'Onofrio attempted to reach Ms. Williams by phone, but was unsuccessful.  Ms. Williams then called back about 20 minutes later, with Kimberly Wray, the head of Clear Channel Human Resources, also on the phone.  They told her that due to changes in the company, there was no longer a need for a public relations function, such that her position was to be eliminated effective that day. Upon information and belief, Ms. Wray was directed by Dan Rosier, then Chief Financial Officer of SFX, to indicate to Ms. D"Onofrio that she was part of a planned reduction in force which eliminated her position.  That statement was false.  Ms. Williams and Ms. Wray told Ms. D'Onofrio that they were sending her a severance package via overnight delivery.  When Ms. D'Onofrio requested that they explain the severance package further, Ms. Williams and Ms. Wray offered to read portions of the severance package over the telephone.  She was told that she the terms of the package stated that she would receive $10,800.00, minus taxes and no additional insurance coverage, if she agreed not to sue.  Ms. D'Onofrio did not comment any further on the severance package, but asked if they wanted her to finish her current projects, and they said that they would let her know if they did.  Ms. Williams and Ms. Wray never called to discuss having Ms. D'Onofrio finish any existing project.

21. Immediately after her phone conversation with Ms. Williams and Ms. Wray, Ms. D'Onofrio called Kenneth Meyerson, the President of SFX Tennis, and informed him

9

of her termination.  Mr. Meyerson said he was shocked and had no idea that terminating her position was included in any changes to the company.  (SFX had planned on changing some of its departments, but Public Relations was never included in that plan.)  Mr. Meyerson also expressed concern as to how the public relations function for his clients would be served in light of Ms. D'Onofrio's departure.

22.    Immediately after her telephone conversation with Mr. Meyerson,  Ms. D'Onofrio called Bud Martin, a Principal of SFX Golf, and informed him of her termination.  He, too, was shocked and had no idea that her position was to be eliminated.

23.    After her phone conversation with Mr. Martin, Ms. D'Onofrio received a call from her assistant, Tim Yowpa, who told her that he had been let go from the company because it purportedly did not have a need for a public relations function anymore.

24.    Ms. D'Onofrio  then called Mr. Newman, the SFX Events Director, to inform him of her termination.  He told her that he had no idea that she was to be terminated and that he thought she had done a great job.  In addition, Mr. Newman was concerned about one of his events on which Ms. D'Onofrio was working, and he asked her if she would consider consulting for him.  Ms. D'Onofrio said that she would think about it and would try to help him on the event.

25.    On the night of September 26, 2005, Ms. D'Onofrio received a call from John Kim, an SFX Baseball agent, who also said he had recently heard about her termination and was sorry.  He, too, had no prior knowledge that Ms. D'Onofrio was to be terminated.

26.    From Tuesday morning, September 27, 2005, through Thursday morning,

September 29, 2005, Ms. D'Onofrio attempted to call Ms. Williams or anyone in Ms. Williams' office at Clear Channel. Ms. D'Onofrio never received a return call from anyone at Human Resources at Clear Channel during that period of time.

27. On Thursday, September 29, 2005, Ms. Williams finally called Ms. D'Onofrio after she had left another message that day. Ms. D'Onofrio indicated that she wanted to come to the office to retrieve her personal belongings. They agreed that Ms. D'Onofrio could do so on Friday, September 29, 2005. Ms. D'Onofrio came in that Friday, packed up her office, and said goodbye to former co-workers and also showed Ms. Williams the locations of various public relations files, records and related materials.

28. On September 29, 2005, Mr. Newman contacted Ms. D'Onofrio about consulting on one of his tennis events, on which she had been working. He also indicated his displeasure with her sudden and unexpected termination. Ms. D'Onofrio said that she would consider the consulting assignment, provided that it had been approved by SFX Sports and Clear Channel. Mr. Newman later informed her that Dan Rosier, the SFX Controller (Chief Financial Officer who directed Ms. Wray to terminate Plaintiff's employment), was aware of the situation and said it was agreeable. However, due to medical concerns, Ms. D'Onofrio ultimately declined Mr. Newman's proposed consulting assignment.

29. On Tuesday, October 27, 2005, Clear Channel issued a press release, stating that although Mr. Tellem was leaving the company in December, 2005, SFX would continue business with the current divisional management team. Although the press release also stated that SFX had laid off various underperforming units, Public

11

Relations had never been considered an underperforming unit and was not even a "for profit" area of the company.

30.    During the week of Ms. D'Onofrio's termination, SFX had changed the contact name on her written press releases to that of Lowell Taub, one of the company's agents. Although all of the releases had been written before Ms. D'Onofrio was terminated, Mr. Taub subsequently was listed as the company's public relations contact.  Mr. Taub's name was removed from the press releases and the web site as the public relations contact after SFX was notified that Ms. D'Onofrio rejected their proposed severance package and had retained legal counsel.   Upon information and belief, Ms. D'Onofrio's position has been taken over by various individuals/employees at SFX since the company's principal function is the promotion of professional athletes by way of various marketing and public relations strategies.

30A.   D'Onofrio sues the Individual Defendants because, through discovery, they were identified as individuals who were responsible for the discriminatory and retaliatory acts alleged in the original Amended Complaint.  Am. Compl. ¶ 4.  In particular, as of 4:27 p.m. on Friday, September 16, 2005, D'Onofrio's employment was not going to be terminated.  Rosier and Wray subsequently had a telephone conversation in which they discussed D'Onofrio's pregnancy and her termination.  After Rosier and Wray's conversation, on the morning of Saturday, September 17, 2005, D'Onofrio's name was placed on the termination list.

30B.   Rosier admitted that he was the individual who decided to terminate D'Onofrio's employment in the District of Columbia.  Wray also admitted her involvement in D'Onofrio's termination.

30C.    With respect to FMLA (at times noted as "disability"), Wray testified that she did not want to know about D'Onofrio's pregnancy, and that Alaka Williams (Wray's subordinate) did not tell Wray that D'Onofrio was asking for any type of medical leave prior to her termination.    However, Julie Ann Kennedy, currently Vice President of Employee Development for Live Nation, Inc., testified that Wray instructed Alaka Williams not to give D'Onofrio the disability paperwork she requested prior to her termination.

**COUNT I**
**(DISCRIMINATION BASED ON PREGNANCY)**

31.    Plaintiff repeats the allegations contained in paragraphs 1 through 30 as though set forth fully and at length herein.

32.    This action arises under the District of Columbia Human Rights Act, Title 2, Chapter 14, Subchapter I, § 2-1401.05 (b), which states as follows:

Women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and this requirement shall include, but not be limited to, a requirement that an employer must treat an employee temporarily unable to perform the functions of her job because of her pregnancy-related condition in the same manner as it treats other temporarily disabled employees.

Further, D.C. Code 2001, § 2-1402.11(a)(1) states as follows:

It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, disability, matriculation, or political affiliation of any individual:

(1) *By an employer.* – To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotions; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee.

13

33.    Defendants, as well as through their agents, servants and/or employees, violated the District of Columbia Human Rights Act in that they terminated and discriminated against Plaintiff, Ms. D'Onofrio,  because of her pregnancy as well as her request to go on disability as a result of her pregnancy and her pregnancy-related medical conditions.   Ms. D'Onofrio was pregnant, was qualified for her position, was adversely affected by the decision to terminate her, which was directly related to her pregnancy, her position remained open and/or was filled by others with less relevant experience who were not pregnant.

34.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered loss of income and other employment benefits, mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering, and damage to her personal and professional reputation justifying an award including, but not limited to, reinstatement to her position, reinstatement of her seniority rights, lost income (back and front pay at an appropriate salary), interest on lost income, restoration of lost benefits, compensatory and punitive damages.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT II
## (DISCRIMINATION BASED ON GENDER)

35.    Plaintiff repeats the allegations contained in paragraphs 1 through 34 as though set forth fully and at length herein.

36.    This action arises under the District of Columbia Human Rights Act, Title 2, Chapter

14

14, Subchapter II, Part B, § 2-1402.11(a)(1), which states as follows:

It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, disability, matriculation, or political affiliation of any individual:

    (1) *By an employer.* – To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotions; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee.

37.    Defendants, as well as through their agents, servants and/or employees, violated the District of Columbia Human Rights Act in that they terminated Ms. D'Onofrio and discriminated against the Plaintiff, by virtue of her gender in that as a woman, she repeatedly requested and was denied a change in her compensation package equal that of similarly situated and/or performing males, a change in her title from Senior Director to Vice President, to accurately reflect the quality of work she performed while other, similarly-situated male employees, received promotions with corresponding changes in job titles and compensation; Plaintiff was not paid an equivalent salary equal to similarly-situated male employees in the Defendant organization; Plaintiff was subjected to disparate treatment with respect to opportunities within the Defendant organization in that she was excluded from conferences, meetings, retreats and the like, which were necessary for her to succeed and advance in Defendant's organization; and Plaintiff was subjected to a continuous severe or pervasive hostile work environment.  Ms. D'Onofrio was a member of a protected class (female), was qualified for the job from which she was terminated, the termination occurred despite her employment qualifications, and the

termination was based upon the characteristic that placed her in the protected class. Her employer had no bona fide reason for her termination.

38.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered loss of income and other employment benefits, together with mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering, and damage to her personal and professional reputation justifying an award including, but not limited to, reinstatement to her position, reinstatement of her seniority rights, reclassification of her position to that commensurate with its responsibility (Vice President), lost income (back and front pay at an appropriate salary), interest on lost income, restoration of lost benefits, compensatory and punitive damages.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT III
## (DISCRIMINATION BASED ON DISABILITY)

39.    Plaintiff repeats the allegations contained in paragraphs 1 through 38 as though set forth fully and at length herein.

40.    This action arises under the District of Columbia Human Rights Act, Title 2, Chapter 14, Subchapter II, Part B, § 2-1402.11(a)(1), which states as follows:

It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, disability, matriculation, or political affiliation of any individual:
(1) *By an employer.* – To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotions; or to limit, segregate, or classify his employees in any way which

16

would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee.

41. Defendants, as well as through their agents, servants and/or employees, violated this section of the District of Columbia Human Rights Act in that they terminated and discriminated against Plaintiff by virtue of regarding her as disabled by virtue of her request to go on short term disability leave due to her pregnancy and pregnancy-related medical conditions, despite her willingness and ability to perform her job responsibilities and functions from home, when her pregnancy related medical conditions prevented her from working from her office.

42. As a direct and proximate result of Defendants' actions, Plaintiff has suffered loss of income and other employment benefits, together with mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering, and damage to her personal and professional reputation justifying an award including, but not limited to, reinstatement to her position, reinstatement of her seniority rights, reclassification of her position to that commensurate with its responsibility (Vice President), lost income (back and front pay at an appropriate salary), interest on lost income, restoration of lost benefits, compensatory and punitive damages.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT IV
### (UNEQUAL PAY)

43. Plaintiff repeats the allegations contained in paragraphs 1 through 42 as though set forth fully and at length herein.

17

44.     This action arises under the Equal Pay Act, 29 U.S.C.A. § 206(d)(1), which states

as follows:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

45.     Defendants, as well as through their agents, servants and employees, violated the

Equal Pay Act in that they discriminated against Plaintiff by refusing to give her the

correct job title (and corresponding compensation) of Vice President for the nature,

quantity, and quality of her work while paying greater salaries to and/or promoting

similarly-situated male employees, who did not perform a higher quantity or quality

of work, to higher positions, such as Vice President, with the corresponding

increases in salary.  Additionally, Plaintiff's predecessor as Vice President of Public

Relations was compensated more than her despite the fact that she performed the

responsibilities and functions of the position at a higher level.

46.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered loss

of income and other employment benefits, together with mental anguish, emotional

distress, personal humiliation, indignity, embarrassment, inconvenience, stigma,

pain and suffering, and damage to her personal and professional reputation

justifying an award including, but not limited to, reinstatement to her position,

reinstatement of her seniority rights, reclassification of her position to that commensurate with its responsibility (Vice President), lost income (back and front pay at an appropriate salary), interest on lost income, restoration of lost benefits, compensatory and punitive damages.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT V
## (RETALIATION)

47.   Plaintiff repeats the allegations contained in paragraphs 1 through 46 as though set forth fully and at length herein.

48.   Ms. D'Onofrio repeatedly complained about the Defendants' actions toward her, including but not limited to their hostility, their gender discrimination, and her unequal pay and job title, which constituted protected activity. Furthermore, Ms. D'Onofrio engaged in protected activity by virtue of her request for short term disability leave due to her medical condition arising out of her pregnancy. As a result of her protected activities, Defendants wrongfully terminated Plaintiff because of her pregnancy, her gender, her pregnancy-related medical conditions, and because of her continual requests to receive the compensation and appropriate job title for the quantity and quality of her work, under the pretext of restructuring SFX. Although there had been plans to restructure unrelated divisions or portions of SFX, particularly in its New York City office, Public Relations, Plaintiff's area of responsibility, was never included in those plans.

49.   As a direct and proximate result of Defendants' retaliatory actions, Plaintiff has

suffered loss of income and other employment benefits, together with mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering, and damage to her personal and professional reputation justifying an award including, but not limited to, reinstatement to her position, reinstatement of her seniority rights, reclassification of her position to that commensurate with its responsibility (Vice President), lost income (back and front pay), interest on lost income, restoration of lost benefits, compensatory and punitive damages.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT VI
## (D.C. FAMILY MEDICAL LEAVE ACT VIOLATION)

50. Plaintiff repeats the allegations contained in paragraphs 1 through 49 as though set forth fully and at length herein.

51. Ms. D'Onofrio is a member of a protected class under the D.C. Family Medical Leave Act (hereinafter "DC FMLA") and has been employed by the employer (SFX) for more than one year and had worked in excess of 1,000 hours in the previous year. (§32-501)

52. Ms. D'Onofrio's request for time off due to complications involving her pregnancy qualified as a serious health condition under the DC FMLA. Ms. D'Onofrio gave her employer reasonable notice as required under the law. (§32-502(f) and (g)(1), 503(c)(1))

53. Under the DC FMLA Ms. D'Onofrio was entitled to medical leave as long as she was

unable to perform her job functions.

54.    Defendants wrongful termination of Ms. D'Onofrio was a violation of the DC FMLA (§32-507) by virtue of the following language: " (a) It shall be unlawful for any person to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided by this chapter."

55.    Said termination was in retaliation for asserting her rights und the DC FMLA.

56.    Ms. D'Onofrio is entitled to damages pursuant to §32-509(b)(6) for back pay and benefits, liquidated damages or "Consequential damages not to exceed an amount equal to 3 times the amount determined under subparagraph (A) of this paragraph plus any medical expenses not covered by the health insurance of the employee".

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## RELIEF

WHEREFORE, the premises considered, the Plaintiff, **AUDREY (SHEBBY) D'ONOFRIO,** demands judgment against the Defendants, jointly, severally, and individually, such that the Court enter:

a.    A permanent injunction (specific performance) requiring the Defendants to reinstate her to her prior position, to now be known as Vice President of Public Relations instead of Senior Director of Public Relations, to retroactively change Ms. D'Onofrio's personnel file to reflect her job title as Vice President of Public Relations instead of Senior Director of Public Relations, with seniority rights, from a date to be determined by the trial of this matter;

21

b.      Award to Plaintiff and against Defendants lost income (both back pay - up to 3 years from the date of filing of this action, and front pay, at an appropriate salary) and other employment benefits;

c.      Award to Plaintiff and against Defendants compensatory damages;

d.      Award to Plaintiff and against Defendants punitive damages;

e.      Award to Plaintiff and against Defendants pre-judgment and post-judgment interest;

f.      Award to the Plaintiff damages under the DC FMLA, §32-509(b)(6, )as noted above:

g.      Award to Plaintiff and against Defendants attorneys' fees, costs and disbursements associated with prosecution of this action; and

h.      Award to Plaintiff such additional relief as justice may require.


I, **AUDREY (SHEBBY) D'ONOFRIO**, do hereby solemnly declare and affirm under the penalties of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

_____/s/_____
Audrey (Shebby) D'Onofrio

22

Respectfully submitted,

DAVID E. SCHREIBER, P.C.


By:_____/s/_____
David E. Schreiber, Esq., #152082
4550 Montgomery Avenue, Suite 760N
Bethesda, Maryland 20814
(301) 951-1530
Counsel for Plaintiff


## DEMAND FOR JURY TRIAL

The Plaintiff demands a jury trial in this action.


_____/s/_____
David E. Schreiber, Esq.


C:\MyFiles\CLIENTS\Shebby\Pleadings\Complaint-Answers\2nd Amended Complaint.wpd

23