# EXHIBIT 1

# In The Matter Of:

*Audrey (Shebby) D'Onofrio  v.*
*SFX Sports Group, Inc., et al.*

---

*Alaka B. Williams*
*April 26, 2007*

---

*Gagliardi Reporting Company*
*P.O. Box 7306*
*Arlington, VA  22207*
*(703) 243-4333*

*Original File 0426WIL.V1, 298 Pages*
*Min-U-Script® File ID: 0015746556*

**Word Index included with this Min-U-Script®**

Page 1

[1]       UNITED STATES DISTRICT COURT
[2]       FOR THE DISTRICT OF COLUMBIA
[3]
[4] AUDREY (SHEBBY) D'ONOFRIO,
[5]       Plaintiff,
[6]       v.              Case No:
                          06-687 JDB
[7] SFX SPORTS GROUP, INC., et al.,     Judge John
                          D. Bates
[8]       Defendants.
[9]
[10]            Thursday, April 26, 2007
[11]            Washington, D.C.
[12] Deposition of:
[13]      ALAKA B. WILLIAMS
[14] called for examination by counsel for the
[15] Plaintiff, pursuant to Notice, taken at the law
[16] offices of David E. Schreiber, P.C., Suite 760N,
[17] 4550 Montgomery Avenue, Bethesda, Maryland 20814,
[18] beginning at 10:07 a.m., before Lu Anne Dawson,
[19] Notary Public in and for the State of Maryland,
[20] when were present on behalf of the respective
[21] parties:
[22]

Page 2

[1] APPEARANCES:
[2]
[3] FOR THE PLAINTIFF:
[4] DAVID E. SCHREIBER, ESQ.
[5] EUGENE OLIVER, LAW CLERK
[6] David E. Schreiber, P.C.
[7] Suite 760N
[8] 4550 Montgomery Avenue
[9] Bethesda, Maryland 20814
[10] (301) 951-1530
[11]
[12] FOR THE DEFENDANTS:
[13] JOHNINE P. BARNES, ESQ.
[14] Baker & Hostetler, LLP
[15] Washington Square
[16] Suite 1100
[17] 1050 Connecticut Avenue, N.W.
[18] Washington, D.C. 20026-5304
[19] (202) 861-1633
[20] Fax (202) 861-1783
[21]
[22] ALSO PRESENT: AUDREY D'ONOFRIO

Page 3

[1]            CONTENTS
[2] Witness:                    Page:
[3] ALAKA B. WILLIAMS
[4]    Examination by Mr. Schreiber     4
[5]    Examination by Ms. Barnes      —
[6]
[7]
[8]      EXHIBITS
[9] Marked for identification:       Page:
[10] WILLIAMS DEPOSITION EXHIBIT NO.
[11]    No. 1           24
[12]    No. 2           40
[13]    No. 3           66
[14]    No. 4           78
[15]    No. 5           94
[16]    No. 6           132
[17]    No. 7           138
[18]    No. 8           178
[19]    No. 9           187
[20]    No. 10          290
[21]
[22]

Page 4

[1]            PROCEEDINGS
[2]
[3]
[4]    Thereupon,
[5] ALAKA B. WILLIAMS
[6] was called for examination by counsel for the
[7] Plaintiff and, after being sworn by the Notary,
[8] was examined and testified as follows:
[9]            EXAMINATION
[10]           BY MR. SCHREIBER:
[11]    Q: Ms. Williams, I'm David Schreiber. We
[12] are here for your deposition today. I represent
[13] Audrey D'Onofrio Shebby. Have you ever had a
[14] deposition?
[15]    A: No.
[16]    Q: Let's get your full name, residence or
[17] business address, whatever you want to give us, so
[18] we know exactly who you are.
[19]    A: Alaka —
[20]    MS. BARNES: Give your business
[21] address.
[22]    THE WITNESS: Okay — Bradley,

Page 277

[1] **MS. BARNES:** Clear Channel who?
[2] **MR. SCHREIBER:** Clear Channel
[3] Communications, whomever it is, because it's a
[4] wonderful umbrella that they have created.
[5]               **BY MR. SCHREIBER:**
[6] **Q:** But Clear Channel and any subsidiary
[7] of Clear Channel, if you get fired, you're locked
[8] out of your computer, true?
[9] **MS. BARNES:** I'm going to continue to
[10] object.
[11] **MR. SCHREIBER:** Okay, fine.
[12] **MS. BARNES:** To the extent that you
[13] want to depose a corporate representative for
[14] Clear Channel Communications, you can.
[15] **MR. SCHREIBER:** We'll get to that.
[16] **MS. BARNES:** You can ask her about her
[17] personal knowledge.
[18] **MR. SCHREIBER:** She knows that.
[19] **MS. BARNES:** But not about —
[20] **MR. SCHREIBER:** She's not answering on
[21] behalf of Clear Channel. I can agree to that.
[22]               **BY MR. SCHREIBER:**

Page 278

[1] **Q:** But Ms. Williams —
[2] **MS. BARNES:** But you're asking her as
[3] if she is.
[4] **MR. SCHREIBER:** I'm asking her what
[5] she knows.
[6]               **BY MR. SCHREIBER:**
[7] **Q:** Isn't it, in fact, true that you know
[8] that when you get terminated, because you are HR,
[9] they're locked out.
[10] **MS. BARNES:** Objection.
[11] **THE WITNESS:** What happens is an
[12] employee's terminated. We send an e-mail that
[13] says terminate VPN access and —
[14]               **BY MR. SCHREIBER:**
[15] **Q:** Which access?
[16] **A:** VPN, which is where you are able to
[17] log into our network from external places.
[18] **Q:** Right.
[19] **A:** — and terminate the e-mail address.
[20] So what happens is we send an e-mail directly
[21] after the termination, for the most part, unless
[22] it's like mass terms, there's a lot going on. We

Page 279

[1] say, Please terminate this e-mail account.
[2] It then goes to Clear Channel, the
[3] help desk and someone there terminates it. So I
[4] don't know if it's an immediate lock-out or how it
[5] works, but it happens rather quickly.
[6] **Q:** When did you inform the help desk, if
[7] you will, to lock her out or eliminate her e-mail
[8] address or whatever it is that you did?
[9] **A:** That afternoon.
[10] **Q:** After you spoke with her or before?
[11] **A:** After I spoke with her.
[12] Just to clarify, we don't do it before
[13] we speak with the individual.
[14] **Q:** And so as of the afternoon of the
[15] 26th, a Monday, she was out of the system?
[16] **MS. BARNES:** Objection.
[17]               **BY MR. SCHREIBER:**
[18] **Q:** Correct?
[19] **A:** They had been notified to terminate
[20] the e-mail.
[21] **Q:** So she was allowed to come in on
[22] Friday briefly to pick up whatever personal

Page 280

[1] belongings she had?
[2] **A:** Yes.
[3] **Q:** She came in five, ten minutes,
[4] whatever it was and she was gone; is that it?
[5] **MS. BARNES:** Objection.
[6] **THE WITNESS:** I don't know the extent
[7] of —
[8]               **BY MR. SCHREIBER:**
[9] **Q:** You were with her?
[10] **A:** I was with her, yeah. She came in
[11] with her husband. You know, we don't rush people.
[12] **Q:** You didn't keep a watch on her?
[13] **A:** I didn't.
[14] **Q:** And that was it. Okay.
[15] Are you aware that she showed you
[16] the location of various Public Relations files,
[17] records and other related material?
[18] **MS. BARNES:** Objection.
[19]               **BY MR. SCHREIBER:**
[20] **Q:** Just so that people knew where things
[21] were?
[22] **MS. BARNES:** Objection.

Case 1:06-cv-00687-JDB-JMF   Document 73-4   Filed 04/16/2008   Page 5 of 5

Audrey (Shebby) D'Onorio v.
SFX Sports Group, Inc., et al.
Alara B. Williams
April 26, 2007

Page 281

[1] THE WITNESS: That she showed me
[2] specifically?
[3]                BY MR. SCHREIBER:
[4] Q: Yes.
[5] A: What we have, the way that it's
[6] set up, we have by the person's name, by the
[7] department, et cetera.
[8]    And even at that point, I said, If
[9] you want to take some, you know, pictures of your
[10] resume, we allow people that opportunity to take
[11] those things.
[12] Q: But she showed you where some of these
[13] files and things were?
[14] A: Yeah.
[15] MS. BARNES: Objection. Let me
[16] object.
[17]                BY MR. SCHREIBER:
[18] Q: You can answer.
[19] A: I believe, you know, I remember her
[20] saying, Here is my Audrey file.
[21] Q: She was helpful, in other words?
[22] A: Yes.

Page 282

[1] Q: You didn't have any words with her?
[2] It wasn't acrimonious from your standpoint or her
[3] standpoint?
[4] A: I didn't believe that it was. I mean,
[5] it was as professional as it could be, given the
[6] circumstances. It was a tough situation.
[7] Q: You were telling us that Clear Channel
[8] Entertainment became Live Nation at some point?
[9] A: Correct.
[10] Q: Do you have any knowledge concerning
[11] retention of computer files or documents with
[12] respect to Live Nation's metamorphosis from Clear
[13] Channel Entertainment? Did anything change in
[14] terms of retention of files?
[15] MS. BARNES: Objection.
[16] THE WITNESS: I don't have any
[17] knowledge of that.
[18]                BY MR. SCHREIBER:
[19] Q: When some of these divisions were spun
[20] off, sold or whatever, do you know what happened
[21] to any of the files or materials that were
[22] associated with those divisions?

Page 283

[1] MS. BARNES: Continuing objection.
[2] THE WITNESS: I don't know what
[3] happened specifically.
[4]                BY MR. SCHREIBER:
[5] Q: You fired Eric Wold that day?
[6] A: Eric Wold was terminated that day, as
[7] well.
[8] Q: Is it correct that he was quite upset
[9] at his termination?
[10] MS. BARNES: Objection.
[11] THE WITNESS: Quite upset anymore than
[12] anyone else or —
[13]                BY MR. SCHREIBER:
[14] Q: I don't know about anybody else. Was
[15] he upset?
[16] A: I don't think any employee was not
[17] upset by the news that they were given.
[18] Q: And he was locked out that day, also,
[19] his e-mail access, same as Audrey?
[20] MS. BARNES: Objection.
[21] THE WITNESS: I'm not sure about his
[22] specific e-mail, but the e-mail was sent, so in

Page 284

[1] terms of the day —
[2]                BY MR. SCHREIBER:
[3] Q: That day or the next day, he was gone?
[4] MS. BARNES: Objection.
[5] THE WITNESS: The request —
[6] MS. BARNES: It's not —
[7] MR. SCHREIBER: It's okay. You have
[8] made your objection. Let the lady answer, please.
[9] MS. BARNES: Well, I want you to stop
[10] mischaracterizing her testimony.
[11] MR. SCHREIBER: I'm not
[12] mischaracterizing. I'm just trying to get an
[13] answer.
[14]                BY MR. SCHREIBER:
[15] Q: Was it that day or the next day,
[16] approximately, when the e-mail was gone and he was
[17] no longer accessible to the system?
[18] MS. BARNES: Continued objection.
[19] THE WITNESS: Again, the e-mails were
[20] sent that day and it's sent to the Clear Channel
[21] Help Desk. They terminate it relatively quickly.
[22]                BY MR. SCHREIBER: