# EXHIBIT 2

1

1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

2

3     ----------------------------------

4     AUDREY (SHEBBY) D'ONOFRIO,                **COPY**

5              Plaintiff,

6        v.                                 Case No:
                                            06-687 JDB
7     SFX SPORTS GROUP, INC., et al.,       Judge John
                                            D. Bates
8              Defendants.

9     ----------------------------------

10                        Monday, April 23, 2007

11                        Washington, D.C.

12    Deposition of:

13             **GENE S. MASON**

14    called for examination by counsel for the

15    Plaintiff, pursuant to Notice, taken at the law

16    offices of David E. Schreiber, P.C., Suite 760N,

17    4550 Montgomery Avenue, Bethesda, Maryland  20814,

18    beginning at 9:36 a.m., before Lu Anne Dawson,

19    Notary Public in and for the District of Columbia,

20    when were present on behalf of the respective

21    parties:

22

2

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4    DAVID E. SCHREIBER, ESQ.

 5    David E. Schreiber, P.C.

 6    Suite 760N

 7    4550 Montgomery Avenue

 8    Bethesda, Maryland   20814

 9    (301) 951-1530

10

11    FOR THE DEFENDANTS:

12    JOHNINE P. BARNES, ESQ.

13    Baker & Hostetler, LLP

14    Washington Square

15    Suite 1100

16    1050 Connecticut Avenue, N.W.

17    Washington, D.C.  20026-5304

18    (202) 861-1633

19    Fax (202) 861-1783

20    E-mail:  Jbarnes@bakerlaw.com

21

22    ALSO PRESENT:  AUDREY D'ONOFRIO
```

3

1                    C O N T E N T S

2

3    Witness:                              Page:

4    GENE S. MASON

5         Examination by Mr. Schreiber        4

6         Examination by Ms. Barnes          ---

7

8

9

10

11                   E X H I B I T S

12

13   Marked for identification:            Page:

14   MASON DEPOSITION EXHIBIT NO.

15              No. 1                          4

16

17

18

19         (Exhibit retained by counsel.)

20

21

22

GAGLIARDI REPORTING COMPANY
(703) 243-4333

4

```
 1                P R O C E E D I N G S

 2                 -      -      -      -

 3

 4              (Thereupon, Mason Deposition Exhibit

 5     Number 1 was marked for identification.)

 6

 7     Thereupon,

 8                  GENE S. MASON

 9     was called for examination by counsel for the

10     Plaintiff and, after being sworn by the Notary,

11     was examined and testified as follows:

12                      EXAMINATION

13              BY MR. SCHREIBER:

14         Q.     Good morning.  I'm David Schreiber.  I

15     represent Audrey D'Onofrio.  The case is D'Onofrio

16     versus SFX, Clear Channel, Live Nation, et cetera.

17     It is litigation revolving around some employment

18     issues.

19              You have been asked to come today for

20     a variety of reasons.  For the record, would you

21     tell the reporter your full name and address?

22         A.     Gene Simon Mason.
```

33

1       Q.      You had one conversation where

2  Mr. Rosier indicated that the company was sued

3  for wrongful termination.  Did you ever speak with

4  him on any other occasion about the nature of the

5  lawsuit by Ms. D'Onofrio?

6       A.      On the nature?  No.

7       Q.      How about the substance of it?

8       A.      The only conversation I had with him

9  after that was when he requested the files from

10 her employee folder.

11      Q.      So the conversation about wrongful

12 termination occurred when you were requested to

13 get the PST file?

14      A.      Correct.

15      Q.      And the second time you had a

16 conversation was just to retrieve her personnel

17 folders?

18      A.      Her, the files in her personal folder,

19 yes.

20      Q.      What documents, if any, did you see in

21 there when you did it the second time?  You said

22 there were some spreadsheets, memos, maybe.  Do

34

1    you have any recollection?

2        A.    I don't remember spreadsheets.  I

3    remember there were Word documents and Power Point

4    documents.

5        Q.    How many documents all together were

6    you able to retrieve?

7        A.    I don't know.

8              MS. BARNES:  Objection.

9              THE WITNESS:  Sorry.

10             BY MR. SCHREIBER:

11       Q.    And these were retrieved off of the

12   server?

13       A.    Yes.

14       Q.    Did he not ask you in the summer

15   to retrieve documents off of her computer hard

16   drive?

17             MS. BARNES:  Objection.

18             THE WITNESS:  I don't know if he did

19   or not.  I don't recall.

20             BY MR. SCHREIBER:

21       Q.    He could have, you just don't recall?

22       A.    Correct.

101

1    at Mr. Rosier's request and he having indicated to

2    you that there was some litigation, I gather, what

3    was the first thing that you did?  Where did you

4    go to?  Did you go to the server?  Did you go to

5    your own computer?  Take me through the steps of

6    what you did back in the summer, we'll call it,

7    the summer of '06.

8         A.    I looked in Audrey's folder on the

9    server.

10         Q.    And that folder you said was a PST

11    folder?

12         A.    No.  There's a PST file inside her

13    folder.

14         Q.    And that was empty, right?

15         A.    I didn't find that out until later.

16         Q.    Until how much later?

17         A.    I don't know.  A week.  Maybe more,

18    because the file was over 500 megs.

19         Q.    It was 500 megs but it was empty, it

20    had nothing in it?

21         A.    Yes.

22         Q.    Can you tell us in your estimation as

102

1    a person with some computer background why this

2    file with 500 megs was empty?

3                    MS. BARNES:  Objection.

4                    THE WITNESS:  Why it was empty?

5                    BY MR. SCHREIBER:

6        Q.    Yes.  There is nothing it in and it

7    showed that it had 500 megs of information.

8                    MS. BARNES:  Objection.

9                    BY MR. SCHREIBER:

10       Q.    That was the size?

11       A.    Somebody went through and deleted all

12   the e-mails that was in it.

13       Q.    Where was this PST file located?  Can

14   you give us a location within the computer setup

15   in your office?  Is it --

16       A.    Office.

17       Q.    It's on a server.  Is it on a

18   particular drive or a particular location?  As I

19   look at a map of your computer system, can you

20   give me some location where it might be so if I

21   had somebody come in and look at this, I could

22   say, Go look at the whatever.

115

1    attempting to retrieve information?

2         A.    No.

3         Q.    Where is her computer today?

4         A.    In a landfill somewhere.

5         Q.    And how did it get to a landfill?

6         A.    Probably winter of '05 somebody in the

7    office was having a problem with her computer, so

8    her computer was extra.  I was trying to get a

9    temporary computer for them to use until they got

10   their computer repaired, but her computer wouldn't

11   boot off the hard drive.  I tried to get it to

12   boot off of a system installation disk.

13        Q.    Let's slow down here.

14        A.    Sorry.

15        Q.    I want --

16             MS. BARNES:  Let him finish the

17   question.

18             MR. SCHREIBER:  It was a short

19   question.  I don't want a narrative.

20             BY MR. SCHREIBER:

21        Q.    Let me back you up a bit.

22             Someone --

116

1              MS. BARNES:  Well, I would ask that

2    you let him finish his answer.

3              BY MR. SCHREIBER:

4         Q.    Is there anything else you want?

5    Because I'm going to take you back through this in

6    detail.

7         A.    Why don't I just finish, and then you

8    can --

9         Q.    Okay.  Go ahead.

10        A.    -- take me back.

11        Q.    Go ahead.  Wouldn't boot?

12        A.    Wouldn't boot off the hard drive,

13   wouldn't boot off the system drive, the system CD.

14   I tried to reinstall the system so that I could

15   install Outlook for the person whose machine was

16   down so they could operate their PST files.

17              It wouldn't -- I got it to finally

18   boot off of the system install a CD, but it

19   wouldn't install Outlook.  So at that point, not

20   that day but some time after that, we would have

21   just put a magnet on the outside of the hard drive

22   to make sure there was nothing there and thrown it

117

1   away.

2       Q.    Let's go right back to where you

3   started.  You're telling us that somebody wanted

4   to use her computer in the winter of '05?

5       A.    No.  What I said was somebody's

6   computer was down and I took that computer to

7   replace it.

8       Q.    I see.

9       A.    They didn't care what specific

10  computer they used.  They just needed one to use.

11      Q.    Who was the person who told you that

12  their computer was not working or you found out

13  their computer wasn't --

14      A.    I think it was Russell Wallach.

15      Q.    This is the person that Julie Kennedy

16  works for, correct?

17      A.    Yes.

18      Q.    And when specifically did his computer

19  go down?

20      A.    Whatever the time frame was.

21      Q.    Let's --

22      A.    Fall-winter.  Winter of '05 at some

118

1    point.

2          Q.    How about the spring of '06?

3                MS. BARNES:  Objection.

4                BY MR. SCHREIBER:

5          Q.    Are you telling me in the winter --

6          A.    I think it was winter of '05.

7          Q.    You think so.  How do we know that,

8    sir?  This is an important issue for us.  How are

9    we going to date this?  Tell me.  Do you have a

10   record of this?

11               THE WITNESS:  No, I do not have a

12   record of this.

13               BY MR. SCHREIBER:

14         Q.    Do you know when you threw out the

15   computer?

16         A.    No, I don't have an exact date.

17         Q.    Do you have a general date?

18         A.    Winter of '05.

19         Q.    Do you have any sort of documentation

20   of this computer being scrapped, to use somebody

21   else's word?

22         A.    No.

119

1       Q.    Now, you reported this at some point

2  to somebody in this case that you had sent this to

3  a landfill; is that correct?

4       A.    Yes.

5       Q.    When is the first time that you

6  actually reported this fact to somebody?

7       A.    Probably Dan Rosier, when he asked

8  for the PST file.

9       Q.    And that's the summer of '06?

10      A.    Yes.

11      Q.    So you're telling us today here in

12  this deposition that between sometime in the

13  winter of '05 and the summer of '06, you spoke to

14  no one about throwing out this computer; is that

15  your testimony today?

16      A.    Correct.

17      Q.    Did anybody from the General Counsel's

18  office at Clear Channel or Live Nation contact you

19  prior to the time that you took this action with

20  respect to Ms. D'Onofrio's computer to indicate to

21  you in any fashion to retain any sort of material

22  related to Ms. D'Onofrio's employment?

120

1          A.      Not that I recall, no.

2          Q.      So because you don't recall it, am I

3     to understand that it may have happened and you

4     today just can't recall, or is it more to the

5     point of it didn't happen; do you know?

6                  MS. BARNES:  Objection.  Asked and

7     answered.

8                  BY MR. SCHREIBER:

9          Q.      You may answer.  Do you just not

10    recall having a contact or hearing from somebody?

11         A.      I do not recall hearing from somebody

12    or having a contact.

13         Q.      If it had happened, would you not

14    think that you would remember something like this?

15    Would this not have been an important issue for

16    you?

17                 MS. BARNES:  Objection.

18    Argumentative.

19                 BY MR. SCHREIBER:

20         Q.      You can answer.

21                 MS. BARNES:  To the extent you can

22    answer.

121

1          MR. SCHREIBER:  Counsel, it's always

2     to the extent that anybody can answer.

3          MS. BARNES:  Well, when you ask an

4     objectionable question as you just asked and I'm

5     not instructing him not to answer, which I could

6     instruct him not to answer --

7          MR. SCHREIBER:  No, you can't,

8     counsel.

9          MS. BARNES:  -- then I -- yes, I can,

10    because that is not a proper question.

11         MR. SCHREIBER:  You're wrong.

12         BY MR. SCHREIBER:

13    Q.    Just answer, if you can.  This is a

14    significant situation.  You would remember if

15    somebody indicated to you don't throw something

16    out or don't lose something or keep something?

17         MS. BARNES:  Objection.

18         THE WITNESS:  Can I answer your

19    question now?

20         BY MR. SCHREIBER:

21    Q.    Sure.

22         MS. BARNES:  Yes, you can answer.

122

1        THE WITNESS:  Thank you.

2        If it was prior to getting rid of

3  the computer, I would have probably remembered

4  it.  I don't, still don't recall getting any

5  communication from anybody in the General

6  Counsel's office at Live Nation or Clear Channel

7  to preserve the computer.

8        BY MR. SCHREIBER:

9        Q.    When you say winter of '05, what

10  months are you talking about?  What does that mean

11  to you?

12        A.    Winter of '05 means October, November,

13  December '05.

14        Q.    And when you had a conversation

15  recently, well, did you have a conversation

16  recently with Mr. Shannon regarding disposing of

17  this computer?

18        MS. BARNES:  Objection.

19        THE WITNESS:  Recently?  No.

20        BY MR. SCHREIBER:

21        Q.    Within the last six months?

22        MS. BARNES:  Objection.

123

1              THE WITNESS:  Not in 2007.

2              BY MR. SCHREIBER:

3         Q.    Did you ever talk to Mr. Shannon about

4    the scrapping of this computer?

5              MS. BARNES:  Objection.

6              BY MR. SCHREIBER:

7         Q.    Did you ever tell him what happened?

8         A.    Yes.

9         Q.    And when was that?

10        A.    During the conference call.

11        Q.    The conference call was when?

12        A.    The end of '06.  Summer, fall, winter.

13   Sometime.

14        Q.    This is the conference call when who

15   else is on the line?

16        A.    With Johnine and one or two other

17   people I don't recall.

18        Q.    Were you the person that personally

19   put the magnet to the hard drive to delete data?

20        A.    Yes.

21        Q.    You told Dan Rosier sometime in the

22   summer of '06 that you had scrapped this computer.

142

1          THE WITNESS:  Can you please just ask

2   it as one question?

3          BY MR. SCHREIBER:

4      Q.    Is it true or false that you disposed

5   of this machine in the spring or summer of '06?

6          MS. BARNES:  Objection.

7          THE WITNESS:  False.

8          BY MR. SCHREIBER:

9      Q.    What was the back-up procedure that

10  SFX had for the material that Ms. D'Onofrio would

11  have stored on her hard drive, if at all?  Where

12  was it backed up to?

13     A.    Material stored on the hard drive

14  of her physical machine?  There is no back-up

15  procedure, which is why people are told not to

16  store files on their hard drive.

17     Q.    So there's a server that would act

18  as a storage facility?

19     A.    Yes.

20     Q.    So if she had an H drive, for

21  instance, that connected directly to the server,

22  that's where you would want her or anybody, for

143

1    that matter, to store their data or their

2    documents, correct?

3         A.    Correct.

4              MR. SCHREIBER:  I am reminded it's

5    lunchtime.

6              MS. BARNES:  How much longer do you

7    think you have?

8              MR. SCHREIBER:  We can go off.

9

10             (Thereupon, at 12:10 p.m., a luncheon

11   recess was taken.)

12

13

14

15

16

17

18

19

20

21

22

144

1                    A F T E R N O O N   S E S S I O N

2                                              12:34 p.m.

3              MR. SCHREIBER:  On the record.

4              BY MR. SCHREIBER:

5         Q.    So there was no back-up on individual

6    computers.  Your testimony was you wanted people

7    to back up to the server; is that correct?  That's

8    where we were.

9         A.    No.

10             MS. BARNES:  Objection.

11             BY MR. SCHREIBER:

12        Q.    Tell me what I --

13        A.    My testimony was I wanted people to

14   save to the server.

15        Q.    Okay.  Not back up.

16        A.    Not back up.

17        Q.    Did they use any sort of little

18   plug-in UBS port drives or whatever for copying

19   data at SFX?  Did any people do that?

20        A.    Some people do.

21        Q.    Do you?  Do you use UBS back-up?

22        A.    No.

162

1   because Clear Channel was in this at the time.

2              BY MR. SCHREIBER:

3      Q.    And nobody from the legal department

4   of any of the parents ever informed your office,

5   you or people in your office, to your knowledge,

6   that they had to retain any particular documents,

7   e-mails or anything?

8              MS. BARNES:  Objection.

9              THE WITNESS:  Not that I'm aware of,

10  no.

11             BY MR. SCHREIBER:

12     Q.    When you threw out Ms. D'Onofrio's

13  computer, just to be clear, you never consulted

14  with anybody before you took that action; is that

15  correct?

16     A.    That is correct.

17             MS. BARNES:  Objection.

18             THE WITNESS:  Sorry.

19             BY MR. SCHREIBER:

20     Q.    Did you call Mr. Shannon in

21  mid-February of this year to discuss or bring

22  him up to speed about what had been done with