# EXHIBIT 3

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
---------------------------------X

AUDREY D'ONOFRIO,              Civil Action No. 06-687

        Plaintiff

        v.                          P.M. SESSION

SFX SPORTS GROUP, et al,

        Defendants,
---------------------------------X       Washington, D.C.
                            Friday, April 4, 2008
                            1:45 P.M.


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:
For the Plaintiff:       **David E. Schreiber, Esq.**
                        4550 Montgomery Avenue
                        Suite 760N
                        Bethesda, MD 20814
                        (301) 951-1530

For the Defendant:       **Johnine P. Barnes, Esq.**
                        BAKER & HOSTETLER LLP
                        1050 Connecticut Avenue, NW
                        Suite 1100
                        Washington, DC 20036-5304
                        (202) 861-1633

Court Reporter:          Lisa Walker Griffith, RPR
                        U.S. District Courthouse
                        Room 6507
                        Washington, D.C.  20001
                        (202) 354-3247


Proceedings recorded by mechanical stenography, transcript
produced by computer.

19

1          THE WITNESS:  This is my e-mail, I have seen

2    this.

3    BY MS. BARNES:

4    Q    Okay.  This e-mail was included in the

5    documentation that was provided to you by defendants,

6    correct?

7    A    Yes, I believe so, yes.

8          MR. SCHREIBER:  Point of clarification, can we

9    get the exhibit number that has been identified?

10          MS. BARNES:  Defendant's Exhibit 3.

11          THE COURT:  It is Defendant's Exhibit 3.

12          MR. SCHREIBER:  I'm sorry, thank you.

13    BY MS. BARNES:

14    Q    Ms. D'Onofrio, I've handed you a document that is

15    titled SFX Sports Group Public Relations: Promoting

16    the Live Experience.  Is this the type of PR kit that

17    you were referring to?

18    A    Yes.

19    Q    This is the type of PR kit that you were referring

20    to that you said you did not receive?

21    A    No, I never said that.  If you recall, I said I

22    received some documents that could be useful.  And

23    this is one of them.  And it's very useful because it

24    discusses if you look through it, it basically

25    discusses that I oversee all the public relations and

20

1   the competencies.  So this would definitely be a

2   document that we're going to use.

3   Q    This was produced to you by defendants, correct?

4   A    Yes.  As I said, there were some helpful

5   documents.

6   Q    I don't have a question.

7        I'm handing you what's been marked as

8   Defendant's Exhibit five.  Do you recognize that

9   document?

10  A    I do.

11  Q    Would that document be the type of press release

12  that you described that you --

13  A    I believe this press release, but I'm not a

14  hundred percent sure, I think I turned this over.

15  This was something that I had had, just happened to

16  have around my house.  I turned that in.  So, yes.

17  Q    If I tell you that it was something that was

18  actually produced by defendants, that would be

19  correct, correct?

20  A    I wouldn't say correct because I can't tell you

21  definitively.  I noticed that this is dated 2001.  And

22  according to you, with the Legato hold, you wouldn't

23  be producing anything before 2004.  And this was 2001.

24  In fact, this is from the first time that I worked at

25  SFX.

21

1    Q    But if you reviewed the documentation that was

2    produced to you by defendants, that would be included

3    in that?

4    A    The thing you have to keep in mind, counselor, is

5    how you turned over 60,000 some odd documents.  I did

6    the best to go through everything that I can, but it

7    was in such a difficult format.  Could something have

8    slipped my mind?  Possibly.  That's why I don't want

9    to say definitively.  What I can tell you definitely

10   is I absolutely know this document, I feel comfortable

11   saying that.

12   Q    So you concede that we produced to you some 60,000

13   odd documents, correct?

14   A    In the documents that you produced, some of them,

15   a lot of them were e-mails.  A lot of them were not

16   helpful e-mails.  There were some e-mails.  There were

17   some Power Point presentations.  But they were a

18   fraction of what I did and they were a fraction of my

19   e-mails.

20   Q    So your testimony is that some 60,000 some odd

21   documents were a fraction of the documents you

22   created?

23   A    No, no, I didn't say that.  I said it included

24   e-mails.  Remember what I did, you would get a ton of

25   e-mails every day.  This goes back for a period of

23

1   story.

2   Q   I would like to direct your attention to

3   Defendant's Exhibit two.  Can you identify this

4   document please?

5   A   It looks to me to be an e-mail.

6   Q   Okay.  Do you recognize this as an e-mail from you

7   to you?

8   A   I'm looking at it.  It says from me to me.  So, I

9   am going to assume that it is.  And it looks to be an

10  e-mail that discusses University of Pittsburg, Tim

11  Simpson, a player, Masters.

12  Q   It says "per conversation I outline some of my

13  pictures," correct?

14  A   Correct, yes, it does say that.

15  Q   So it discusses some of your job duties and

16  responsibilities, correct?

17  A   Yes, that's correct.

18  Q   Behind that is also a document that was attached

19  to this e-mail that was from you to you, so it never

20  went to anyone else that says "SFX Sports Group,

21  a general services and capabilities presentation for

22  Audrey D'Onofrio, correct?

23  A   Correct.

24  Q   Is that a presentation that you put together for

25  SFX Sports Group?

1   output as a search by key strokes?

2   A   Yes.   Key strings.

3   Q   I'm sorry, key strings.

4       What is your understanding of Ms. D'Onofrio's

5   placement on the Legato system?

6   A   She was placed on the Legato system as a part of a

7   larger placement of roughly 11,000 employees during a

8   prior lawsuit that Clear Channel was involved with in

9   the mid-2004 timeframe.   She was not involved in that

10  lawsuit.   But it was easier for us to move her on to

11  Legato because of where she was on our e-mail server.

12  It was easier for us to place the entire group of

13  people on the servers rather than go through and

14  specifically pick out who we needed to be on Legato.

15  Q   Now, we've heard testimony that, and there has

16  been evidence introduced, that there are documents

17  predating '04, which is when you just testified

18  Ms. D'Onofrio was placed on Legato.   Can you explain

19  for the Court how that information is found even

20  though she was put on Legato in '04?

21  A   When we placed the approximate 11,000 people on

22  Legato in August of '04, we also imported all of their

23  current mailboxes into Legato.   So, any e-mail that

24  was in the mailbox at that time, whether it was from a

25  day prior to them being placed on Legato or a year,

34

1   even before that, in 2003, or it can go back as far as

2   the mailbox existed, that was imported into Legato

3   also.  So that would explain why we would see some

4   historical e-mail within Legato.

5   Q   The historical e-mail that is in Legato, is that

6   maintained say even if that e-mail was deleted from

7   the actual mailbox?

8   A   Absolutely.  Once it is in Legato there is nothing

9   that the employee can do in their mailbox that will

10  affect Legato.  That message instance will remain in

11  Legato even if it is deleted from the mailbox, the

12  employee's mailbox.

13  Q   We used this chart earlier today.  I can't really

14  recall what A. was.

15          THE COURT:  Mr., A. is the local server.

16  Look at the left-hand of the chart is Ms. D'Onofrio's

17  hard drive.  She sends an e-mail which is a little box

18  to Joe Jones.  As we understand the situation, it goes

19  to the server which is A., the e-mail server, right?

20  That server in turn is copied into Legato

21  automatically.  There is the possibility that Legato

22  itself was backed up on back up tapes.  Is that a fair

23  representation of how the system operates?

24          THE WITNESS:  I am going to differ slightly.

25  There is never an e-mail that actually exists on the

39

BY MS. BARNES:

Q    Any e-mail that she would save on her computer,
any e-mail she would physically take acts to save on
her computer would also be captured on Legato?

A    If that e-mail was in her mailbox at the time that
we imported it into Legato or after the point that we
put her on Legato, then yes.

Q    Now, I want to go back to your searches for
Ms. D'Onofrio.  After you did the searches, what
exactly did you find?

A    I don't recall the amounts, the quantity, but I do
remember there were numerous hits.  I believe I
exported the e-mail that was found into one file, into
a PST format file, and then handed that over to our
Legal Department.

Q    There was testimony today that there was an MSG
file created. Did you create a MSG file or is that
different than a PST?

A    MSG files are message files.  That is the default
native format if you did a file and saved that as
within Outlook, it would want to save it as an MSG
file.  It's just a format of the message itself.  I
never produced any e-mail in that format.

Q    And so, in the e-mail that was produced, you
exported the e-mail, can you just explain the process?

41

1   on, we were also capturing anything she sent and

2   anything she received. So, the key string searches

3   were looking for anything that she sent and anything

4   she received from that range of data that we imported

5   or since she was on Legato.

6   Q   So, is it a fair statement to say that whether

7   or not her computer exists has no bearing on whether

8   e-mail could be recovered regarding Ms. D'Onofrio in

9   this case?

10        MR. SCHREIBER:  Objection.

11        THE COURT:  Say it again please?

12   BY MS. BARNES:

13   Q   Is it a fair statement to say that the existence

14   of Ms. D'Onofrio's computer has no bearing on the

15   retrieval of electronic communication e-mails by her?

16   A   I would say that we have the majority of her

17   e-mail captured in Legato.

18        MS. BARNES:  No further questions at this

19   time, Your Honor.

20                       CROSS EXAMINATION

21   BY MR. SCHREIBER:

22   Q   Good afternoon, sir.  I'm David Schreiber we just

23   met today; didn't we?

24   A   Yes.

25   Q   You were not offered by defendants in this case to

49

1    A    There are some other gentlemen down in San

2  Antonio.   Names are Sam Penley, Robert Eckerly, Jerry

3  McCain.

4    Q    To your knowledge, did any of those people do any

5  searches or data mining or whatever people call it

6  these days, to look for anything having to do with

7  this case?

8    A    Yes.

9    Q    Who?

10   A    Sam Penley.

11   Q    Now, we've not heard Mr. Finley's (sic) name.   Why

12  don't you tell me when Mr. Finley actually did a

13  search for Ms. D'Onofrio's material?

14   A    I'm not aware of any searches for Ms. D'Onofrio's

15  material by Mr. Penley.

16   Q    What did he do then with respect to this matter?

17   A    I believe he looked for other e-mail for people

18  related to this case.

19   Q    What did he find?

20   A    He found e-mail.

21   Q    He did?

22        Who were those people that he found e-mails

23  for?

24   A    That, I don't recall.

25   Q    Will you have to talk to Mr. Finley about that?

63

1   and we asked that from plaintiff's counsel, in no way

2   of agreeing in which form we would produce the

3   electronic information, we produced it from summation.

4   What has not been stated today is that we reproduced

5   the PDF information.  That's the .dat file that he is

6   talking about.  So the PDF file was actually

7   reproduced to plaintiff in the file that, in the form

8   that it was given from Mr. Cavender with the hash

9   marks on it for the notations so that we would know

10  what we produced to plaintiff's counsel.  So, the fact

11  that it was in PDF format really is of no relevance

12  because that information was reproduced as

13  Mr. Cavender stated in his affidavit.

14          THE COURT:  But now I understand the

15  situation.  The point is, why can't we cut to the

16  chase and have Mr. Cavender surrender to Mr. Bond the

17  PST DVDs.  We would eliminate Mr. Bond's problem with

18  this information and we're all in the exact same

19  place.

20          MS. BARNES:  We would have no problem with

21  that, Your Honor.

22          THE COURT:  Mr. Bond, does that make sense?

23          MR. BOND:  Yes, it does, sir.

24          THE COURT:  We're going to take a break.  And

25  maybe when I come back, somebody can explain to me why

69

1  mailbox before they were imported into Legato, those

2  would not be in the Legato system.

3  Q   This happened after she was put on Legato.  I'm

4  saying in October of 2005.  After she is put on

5  Legato, if you do a search in October of 2005, is the

6  search the same if you do the search in February of--

7  A   I understand, I'm sorry.  Yes, it should be the

8  exact same results assuming that the data was all

9  imported into Legato, and we're searching Legato we

10  should have the same net results from our Legato

11  search than we would from a mailbox and a Legato

12  search if that mailbox was still in tact.

13  Q   So, the information is exactly the same?

14  A   Yes.

15        MS. BARNES:  I have no other questions, Your

16  Honor.

17        THE COURT:  You may stand down, sir.

18        MR. SCHREIBER:  May I have just one short

19  question?

20        THE COURT:  Yes.  Go ahead.

21              RECROSS EXAMINATION

22  BY MR. SCHREIBER:

23  Q   Just so I'm clear, you were talking about

24  deleting, possibly deleting files from the mailbox

25  before it got to the Legato.  You took that phrase

73

1    define what entity SFX Basketball is?

2    A    SFX Basketball is the entity that represents

3    professional basketball players.  Right now, the

4    Sports Group consists of SFX Basketball and SFX

5    Financial Services, both housed in D.C.

6    Q    When you say the Sports Group, what is the Sports

7    Group a part of?

8    A    The Sports Group is a part of Live Nation.

9    Q    I want to get back to your other duties that you

10    do outside of your day job.  Can you just in detail

11    explain exactly what is entailed with your management

12    of the technology within the office?

13    A    If people have trouble with their computers I try

14    to assist them to get them solved before they escalate

15    to call the help desk or to call on anybody else.  If

16    they have trouble using the software, I'll attempt to

17    help them.  If they need to copy files or burn a DVD

18    and they don't have a set up on their computers I'll

19    do that.

20    Q    How is it that you came to be the resident I.T.

21    person given your other job?

22    A    We used to have in-house I.T. people.  But they,

23    those positions ended up getting eliminated, and I

24    knew more than anybody else in the office.

25    Q    When you say you help people with their computers,

1    A    Yes.

2    Q    And having access to that file folder would that

3    person be able to alter or modify that folder in any

4    way?

5    A    Yes.

6    Q    I want to bring you to what is at issue in this

7    case specifically the search for electronic

8    communications for Ms. D'Onofrio.  Were you ever

9    requested to search for any electronic communications

10   for Ms. D'Onofrio?

11   A    Yes.

12   Q    When was that request made?

13   A    Spring of '06.

14   Q    In spring of '06 when you made this search, did

15   you search Ms. D'Onofrio's computer for electronic

16   communications?

17   A    No.  I copied her PST file off the server.

18   Q    Why didn't you search her computer?

19   A    Her computer wasn't in the office.  It didn't

20   exist any more.

21   Q    Can you tell the Court the circumstances behind

22   the non-existence of Ms. D'Onofrio's computer at this

23   time?

24   A    Sure.  Some time prior to the end of 2005, Russell

25   Wallach's computer had to go out for service and he

77

1   needed to access his e-mail.  So, I pulled the newest

2   computer that we had to try to redeploy and give him

3   access to his e-mail until his computer came back or

4   he got a new computer.  That happened to be Audrey's

5   computer.  We tried to upgrade to the most recent

6   version of Outlook because the version of Outlook on

7   there was not compatible with what Russell was using.

8   The machine crashed. We made several tries to reformat

9   the machine and reinstall the system and reinstall

10  Outlook so that he could use it.  After two or three

11  tries with that, and it wouldn't boot and it wouldn't

12  reinstall the system, we scrapped the computer.

13  Q   When you say it was the newest, strike that.  How

14  did you know it was Ms. D'Onofrio's computer?

15  A   Generally, what Albert would do is when we pull a

16  computer out of somebody's office who was no longer

17  there, we would put their name on a piece of masking

18  tape and just stick it on the computer so that we

19  could identify what it was.

20  Q   How did you determine that Ms. D'Onofrio's

21  computer was the newest computer?

22  A   She had one of the grade Dell towers which were

23  newer than the desktops that we had. It was just the

24  newest model.

25  Q   Is there a reason why she would have a newer

79

1   A   Because when people copy e-mails off the server

2   because it is getting too big for the server to hold,

3   generally those files end up getting too big for the

4   local machine.  If anything happens to the local

5   machine, those machines are not backed up so it would

6   be lost.  So any PST files that I created for

7   individuals would all be created on the server.

8   Q   You said that you created. Do you create the PST

9   files?

10   A   Generally, if people don't know how to do it

11   themselves.  If they want to do it themselves, I would

12   have told them to create but put them on the server

13   because you know the machine doesn't get that done.

14   Q   When you say you would have told them.  Why would

15   you have told them to save their information on the

16   server?

17   A   Because we have machines that go down because of

18   the age of the machines.  We've never had the newest

19   machines.  Anything saved on a local machine what I

20   tell people is, if the cleaning people hit it with

21   their vacuum cleaner or anything else happens to it,

22   it doesn't get back up.  So whatever was on there

23   would be lost.  So anything you want to keep, save on

24   the server.

25   Q   So is that standard policy that you would tell all

80

1   of the employees to save it on the server?

2   A   Yes.

3         MR. SCHREIBER:  I have an objection, Your

4   Honor, this is very general.

5         THE COURT:  Overruled.

6   BY MS. BARNES:

7   Q   With regard to the PST files again that would be

8   you that would create the PST files?

9   A   Unless the individuals themselves knew how to do

10  it, in most cases I created the PST files.

11  Q   The creation of the PST files is in conjunction

12  with the advice to save information not on the

13  individual computer but to servers?

14  A   Correct.

15  Q   So when you went to look for Ms. D'Onofrio's

16  information on the server, what did you find?

17  A   I found a PST file on the server that was roughly

18  567 megabytes.  I burned it to a CD and sent it to Dan

19  Rosier in L.A.

20  Q   I'm handing you what is marked as Defendant's

21  Exhibit six.  Can you identify this document for the

22  Court please?

23  A   Yes.  This is a screen shot I took this morning of

24  the Outlook PST folder in Audrey D'Onofrio's folder on

25  the user's drive

81

1    Q    Can you just identify on this screen shot where

2    Audrey D'Onofrio's PST folder would be located?

3    A    The file or the folder?

4    Q    On the screen shot.  The folder, I'm sorry.  Where

5    is it of these --

6    A    This is the screen shot of the contents of her

7    Outlook folder.  If you look at the very top it says

8    h:/, that's the user's drive.  It says A. D'Onofrio,

9    that's her individual folder.  It says Outlook PST,

10   that's the folder that held the Outlook PST file.  The

11   actual file itself is the one that is labeled A.D.

12   Q    When you see the file labeled A.D., can you just

13   note for the Court what is denoted, last date modified

14   for that file folder?

15   A    The last date modified is September 21, 2005.

16   Q    Do you know whether or not this date was before or

17   after Ms. D'Onofrio was terminated from SFX Sports?

18   A    It was before.

19          MS. BARNES:  Your Honor, at this time I think

20   this is the last of my exhibits.  I would like to move

21   to have my exhibits admitted into evidence.

22          (Defendant's exhibits 1, 2, 3, 4, 5, and 6 were

23   admitted into evidence.)

24          THE COURT:  Granted.

25

82

1        MR. SCHREIBER:  Your Honor, as to this last

2  exhibit.  May I have the opportunity during cross

3  examination to address it?

4        THE COURT:  You certainly may.  You may move

5  to strike it if cross examination establishes it

6  should be stricken.

7  BY MS. BARNES:

8   Q  How did you come to learn that Ms. D'Onofrio's was

9  PST folder was empty?

10   A  Dan Rosier called me back and told me that the

11  file I sent him didn't have anything in it.

12   Q  So when you copied the file, you never looked to

13  see what the contents of the file were?

14   A  No, I just copied it straight to a CD and sent it

15  off.

16   Q  Did you retrieve any other documentation from

17  Ms. D'Onofrio during your search?

18   A  During the search for Dan Rosier?

19   Q  No, during the search for Dan Rosier, yes?

20   A  No, subsequent to that, I think I copied stuff to

21  give to you.

22   Q  Okay.  Where did you copy that information from?

23   A  I copied the Audrey D'Onofrio's user's folder.

24  And probably the public drive, I think it was PR print

25  and PR temp maybe was another folder.

84

1  Q   Mr. Mason, you are not trained as an I.T. person I

2  gather, you are a finance person?

3  A   Correct.

4  Q   This is something you sort of picked up along the

5  way?

6  A   Yes.

7  Q   Now Dan Rosier is the person that asked you in the

8  spring or summer of 2006 to look for Audrey

9  D'Onofrio's e-mails?

10  A   Yes.

11  Q   Did he ask you to also look for documents at that

12  time?

13  A   No.

14  Q   Did anybody from Clear Channel, Live Nation, legal

15  counsel's office ever speak to you about Audrey

16  D'Onofrio's computer or data or anything left there

17  before Dan Rosier called you?

18  A   No.

19  Q   To your knowledge, did anybody from legal counsel

20  contact anybody at the SFX office in D.C. regarding

21  Audrey D'Onofrio's computer or e-mails or documents?

22  A   I don't know.

23  Q   You've never been told that in other words?

24  Nobody at the office ever said somebody from Legal

25  just called and they want this or they want that?

104

1    Q    And what position do you hold?

2    A    I'm the office manager, I.T. coordinator.

3    Q    In 2005, did you hold that position?

4    A    Yes.

5    Q    In your position of office manager, I.T.

6    coordinator, what duties do you perform?

7    A    In the office management, I take and manage the

8    office from the front desk coverage all the way down

9    to keeping supplies ordered. On the I.T. side, I'm the

10   coordinator for anybody having any computer issues

11   they contact me.  I try to resolve them.  If I can't

12   resolve them then I go to my manager which is Gene

13   Mason.  We try to resolve it together.  If it can't be

14   resolved then we have a regional office.

15   Q    As the I.T. coordinator, did you ever have the

16   opportunity to work with Ms. D'Onofrio while she was

17   employed with SFX Sports Group?

18   A    Not directly.  I worked on her computer on a few

19   occasions.

20   Q    What work did you do on Ms. D'Onofrio's computer?

21   A    I replaced one computer.  Then the other computer,

22   after her employment, we used that computer as a

23   replacement while another computer was being ordered.

24   When we did that, we tried to update the programs on

25   it, the Outlook and the computer crashed.

105

1   Q   I want to go back to, you said you replaced her

2   computer.  Do you recall the circumstances behind your

3   replacing Ms. D'Onofrio's computer?

4   A   It was just an old computer.  Basically, the

5   computer was upgraded to a new computer.

6   Q   Do you recall when that occurred?

7   A   Not off hand. It must have been a couple of

8   months, way before she left.

9        THE COURT:   A couple of months before when,

10  Mr. Doby?

11       THE WITNESS:  A couple of months before she

12  left.

13       THE COURT:  Before she left.  That's the --

14       THE WITNESS:  That's the first computer.

15       THE COURT:  That was replaced?

16       THE WITNESS:  Yes, that was replaced.

17       THE COURT:  The second one was put online and

18  it crashes.

19       THE WITNESS:  Yes.

20       THE COURT:  When it crashes, is she gone?

21       THE WITNESS:  Yes, she had been gone a couple

22  of months.

23  BY MS. BARNES:

24  Q   Can you explain for us the circumstances behind

25  Mr. D'Onofrio's computer crashing, the second

106

1   computer?

2   A   The Outlook on it that wasn't compatible with the

3   Outlook for the employee that we were trying to let

4   use the computer.  So we tried to upgrade the Outlook

5   program.  When we did that, two programs crashed,

6   collided and it crashed the computer.

7   Q   When you say that it crashed, how do you know it

8   was Ms. D'Onofrio's computer that crashed and not

9   someone else's computer that crashed?

10   A   When we take the computers that we aren't using

11   out of the office, we just basically put a name tag on

12   the front of it, and tape it to it so we know who

13   previously had the computer.

14   Q   Why did you select Ms. D'Onofrio's computer as a

15   computer to replace the other employee's computer?

16   A   Generally, we try to use the newest computer

17   that's available.  And the one that is most

18   convenient.

19   Q   After the computer crashed, what did you do with

20   the computer?

21   A   Well we tried to, we installed operating systems.

22   We couldn't do that.  We couldn't get it to turn, any

23   of the programs to run.  So we basically just threw

24   the computer away.

25   Q   Prior to throwing the computer away, do you take