UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------X


AUDREY D'ONOFRIO,          Civil Action No. 06-687

  Plaintiff

          v.                    P.M. SESSION

SFX SPORTS GROUP, et al,

        Defendants,

---------------------------X        Washington, D.C.


                          Friday, April 4, 2008

                              1:45 P.M.



TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE JOHN M. FACCIOLA

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:    David E. Schreiber, Esq.

                      4550 Montgomery Avenue

                      Suite 760N

                      Bethesda, MD 20814

                      (301) 951-1530

Page 2

```
1   For the Defendant:   Johnine P. Barnes, Esq.
2                        BAKER & HOSTETLER LLP
3                        1050 Connecticut Avenue, NW
4                        Suite 1100
5                        Washington, DC 20036-5304
6                        (202) 861-1633
7
8
9   Court Reporter:      Lisa Walker Griffith, RPR
10                        U.S. District Courthouse
11                        Room 6507
12                        Washington, D.C.  20001
13                        (202) 354-3247
14
15  Proceedings recorded by mechanical stenography, transcript
16  produced by computer.
17
18
19
20      PROCEEDINGS – AFTERNOON SESSION
21      THE DEPUTY CLERK:  This is Civil Action
22  06-arc 687.  Audrey Shebby D'Onofrio versus SFX Sports
23  Group, Inc.
24      Please remain seated Court is back in
25  session.
```

Page 3

```
1       THE COURT:  I was asking your counsel if
2   sweet reason had not prevailed.
3       MR. SCHREIBER:  In terms of our discussions?
4       THE COURT:  Yes.
5       MR. SCHREIBER:  Would you like us to, so to
6   speak, report to Your Honor?
7       THE COURT:  Well, it is a settlement
8   discussion.  If you don't wish to, if you can't
9   resolve the thing, you've answered my question.
10      MR. SCHREIBER:  There are a couple of things.
11      Evidently, the defendants do not want
12  Mr. Bond to do this.  They want Mr. Bond and I believe
13  Mr. Cavender to choose somebody else.
14      They further believe --
15      MS. BARNES:  I can speak for my client's
16  side.
17      MR. SCHREIBER:  I'll tell you what my
18  position was and will be.
19      That, first, we prepared to use Mr. Bond to
20  do this since he has some history with this and
21  familiarity.  We feel that the defendant should bear
22  the cost of this at the very least.  Thirdly, the
23  issue of the computer and spoilation is still an
24  outstanding extant issue.  The defendants have a
25  different view point.
```

Page 4

```
1       MS. BARNES:  The defendants want or would
2   like an independent expert to do it because we feel
3   that there has been some, we're concerned about
4   whether or not it would be fair and objective and
5   impartial at the review.
6       We think that if Mr. Bond and Mr. Cavender
7   can come together to choose someone, it's not going to
8   be of any additional cost because Mr. Bond has already
9   testified that he needs to get caught up to speed and
10  learn everything that is going on with the Legato
11  system.
12      So the same way that we would educate
13  Mr. Bond, we would educate an independent person to go
14  and review it also.  So, with respect to any
15  background information, we're not losing any
16  background information.
17      With respect to the costs, we said that we
18  would split the cost for an independent person to come
19  in because it still has not been shown that anything
20  is missing.  And why the defendant should have to bear
21  the cost when plaintiff has not shown what is missing.
22      And our position is that we've produced
23  everything that we have and everything is there.  That
24  we should not have to bear the cost.  But in light of
25  the fact that we want an independent person, we would
```

Page 5

```
1   be willing to split the cost.
2       THE COURT:  Thank you.  You obviously can't
3   resolve it.  Let's proceed.
4   Ms. D'Onofrio.
5       (Audrey D'Onofrio, the plaintiff, having been
6   previously sworn, resumed the stand.)
7   DIRECT EXAMINATION (RESUMED)
8   BY MR. SCHREIBER:
9   Q  Before lunch, Ms. D'Onofrio, we were discussing
10  press releases.  I think we've completed that area.
11  Let me direct your attention to material on your hard
12  drive with respect to Clear Channel Corporate.
13      Was there anything on your hard drive with
14  respect to that topic?
15  A  Yes.
16  Q  What was that?
17  A  Every year, sometimes actually two times a year,
18  there would be a PR summit.  And there would be
19  information and a presentation related to that.  It
20  would be saved on my hard drive.
21  Q  How would that be relevant to any of your claims?
22  A  It also shows that I did work for the corporate
23  parent as well.
24  Q  As you compare yourself to Mr. Schacter, is that
25  an issue?
```

Page 90

1   to Dan Rosier at his request?
2   A   Yes.
3   Q   Then you were told by Mr. Rosier that it was an
4   empty file?
5   A   Correct.
6   Q   Or was it somebody else that told you that it was
7   empty?
8   A   Dan Rosier called me back and said it was empty.
9   Q   Was he upset?
10  A   I don't think he had any special emotion.
11  Q   So, sometime later somebody else asked you for
12  documents; is that correct?  Was that Dan Rosier also?
13  A   Dan Rosier asked me if there were documents.  I
14  don't think he had me copy and send.
15  Q   Were there documents?
16  A   Are there documents?
17  Q   He asked you if there were documents.
18  A   Yes.
19  Q   Did you search and find documents?
20  A   I told him that her employee file was still there,
21  her employee folder on the server.
22  Q   So did you take that employee file and determine
23  if there were documents in it?
24  A   I had already done that to drill down to the
25  Outlook PST folder.  You have to go through the other

Page 91

1   folders, you can see there are documents in them.
2   Q   So there were documents but no e-mails.  Is that
3   what you're trying to tell us?
4   A   There are documents.  The only thing that would
5   have had e-mails was the PST folder.
6   Q   So the documents, did you reproduce that for
7   counsel in this case?
8   A   Yes.
9   Q   When did you do that?
10  A   Most recently, two weeks ago, three weeks ago.
11  Q   Let me get this straight.  They asked you two or
12  three weeks ago to go back and get some more
13  documents?
14  A   They asked me to copy Audrey's folder from the
15  user's drive and PR folders from the public drive.
16  Q   So, the PR folder is still in existence on that
17  server?
18  A   Yes.
19  Q   This is the first time that you have made a copy
20  of it?
21  A   I'm pretty sure, yes.
22  Q   How many documents were there that you copied, do
23  you know?
24  A   No.
25  Q   How big was the file that you copied, do you know?

Page 92

1   A   It was under 765 mgs for everything I copied
2   because it fit on the CD.
3   Q   But you can't tell us how much under, just less
4   than a CD?
5   A   No, I didn't --
6   Q   Now, you were telling us what you generally tell
7   people about retention or saving files or however you
8   were phrasing it, because if you save it to the hard
9   drive you can't be sure that it's not going to be get
10  bumped by the cleaning lady.  Do you remember that
11  testimony?
12  A   Yes, I remember that testimony.
13  Q   You are aware that Audrey saved a lot of material
14  on diskettes in her office; aren't you?
15  A   No.
16  Q   You didn't know that?
17  A   No.
18  Q   You know that she kept a PR file on the server,
19  correct?
20  A   I know she saved documents to the server.  I don't
21  know every folder she kept.
22      You didn't go in as you were doing the
23  search, two or three weeks ago, to determine what the
24  folders were?
25  A   I didn't go in and determine who created the

Page 93

1   documents in the folder, no.
2   Q   But this was something within her portion of the
3   server or the area on the server?
4   A   I copied everything that was in her employee
5   folder on the user's drive.  And I copied things that
6   were in the public side that were PR folders.  But I
7   didn't go in and determine whether she created those
8   documents in the PR folders.
9   Q   Were there any other folders associated with her
10  that you are aware of on that server?
11  A   I wouldn't know which folder she used.
12  Q   So it is conceivable that there are other folders
13  on that server that may have documents in them that
14  relate to Ms. D'Onofrio.  You just don't know?
15  A   Correct.
16  Q   You have not made an effort in some fashion to go
17  search that server to find out if there are such types
18  of documents, true?
19  A   True, I have not.
20  Q   Nobody asked you to do that?
21  A   No.
22  Q   Nobody from legal counsel or outside counsel has
23  ever called you about that, correct?
24  A   No, they just asked me to copy her user's folder
25  and the PR folders.

Page 94

1    Q   You don't have any written records of your
2    correspondence or communications with Mr. Rosier, do
3    you?
4    A   No.
5    Q   So it was just pick up the phone, Dan Rosier says
6    go do this and you did that.  Correct?
7    A   He called me and asked me to copy the PST file.
8    Q   You sent that file back to him by certified or
9    registered mail?
10    A   No.
11    Q   How did you send it?
12    A   I sent it Federal Express.
13    Q   Do you recall in the deposition, I asked you if
14    you had a receipt for sending that Fed Ex to Mr.
15    Rosier so we could determine when you did this?
16    A   Yes.
17    Q   Did you ever find that receipt?
18    A   I never looked for that receipt.
19    Q   Do you recall my asking you to look for that
20    receipt?
21    A   Yes.
22    Q   Thank you.
23        You evidently figured out that Audrey had
24    been fired when you saw that her office was empty.  Is
25    that true?

Page 95

1    A   Yes.
2    Q   You told me earlier that a person by the name of
3    Eric Wold, W. O. L. D., later occupied her office
4    after she was fired, true?
5    A   I think so.
6    Q   You have specific recollection of this Mr. Wold
7    actually occupying that office after she was fired.
8    True?
9    A   I think so, yes.
10    Q   If I told you that the records produced by the
11    defendants in this case indicate that Mr. Wold was
12    terminated at almost exactly the same time as
13    Ms. D'Onofrio would that somehow impact on your
14    recollection, sir?
15    A   I don't think so.  No, because people generally,
16    once people were terminated, wanted to move to the
17    nicer offices.
18    Q   So he couldn't have been terminated irrespective
19    of what has been produced here, correct?
20    A   So he couldn't have what?
21    Q   If he was occupying her office after she was
22    terminated on September 26, thereabouts, no way could
23    Mr. Wold have occupied that office if he had actually
24    been terminated at the same time.  Correct?  He
25    couldn't have moved in there because he is gone?

Page 96

1    A   Correct.
2    Q   You remember him being there, right?
3    A   Yes.
4    Q   So if the records that were produced for us show
5    that he was terminated as of the September 26 time
6    period, are those records wrong?
7    A   No, I was wrong.
8    Q   Then you could be wrong?
9    A   Yes.
10    Q   Is your recollection of all the other events as
11    good as your recollection is of Mr. Wold still being
12    there after he was terminated?
13    A   Better.
14    Q   It's better.  You had a problem with Mr. Wold an
15    actually physical human being, being present but you
16    do remember all these other things.  Is that your
17    testimony today?
18    A   No.  My testimony is if I was wrong about Eric
19    Wold moving into her office does not effect whether I
20    was right about sending Dan Rosier the PST file or
21    anything else.
22    Q   When we took your deposition almost a year ago,
23    you were pretty certain that he was still there.
24    Today, you just told me that you were pretty certain
25    he was still there.

Page 97

1    A   Yes.
2    Q   I'm representing to you that the information we
3    received said he was gone as of that time period.  So,
4    you don't think that means anything in the scheme of
5    things?
6    A   Not for the other testimony.  People changed
7    offices quite a bit there.
8    Q   I see.  You said to me, quite some time ago in
9    that deposition, that her computer is in a landfill.
10    How do you know that?
11    A   Because I assume that when we put it down in the
12    dumpster to go out, it goes to a landfill.
13    Q   How many computers have you thrown out during the
14    course of 2005?
15    A   I have no idea.
16    Q   Was it just Ms. D'Onofrio's or was it more?
17    A   No, it would have been more.
18    Q   But you don't know anything, was it at the same
19    time or different times?
20    A   It would have been over the entire course of the
21    year.  Any time that we ran into a machine that we
22    couldn't format the drive, install a system on, that
23    wouldn't hold the system, or wouldn't operate
24    properly, we would have thrown it away.
25    Q   Did Mr. Rosier tell you in that conversation after

25 (Pages 94 to 97)