1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------X

AUDREY D'ONOFRIO,          Civil Action No. 06-687

          Plaintiff

          v.                    P.M. SESSION

SFX SPORTS GROUP, et al,

          Defendants,

----------------------------X      Washington, D.C.
                              Friday, April 4, 2008
                                  1:45 P.M.


          TRANSCRIPT OF EVIDENTIARY HEARING
      BEFORE THE HONORABLE JOHN M. FACCIOLA
          UNITED STATES MAGISTRATE JUDGE

APPEARANCES:
For the Plaintiff:    **David E. Schreiber, Esq.**
                      4550 Montgomery Avenue
                      Suite 760N
                      Bethesda, MD 20814
                      (301) 951-1530


For the Defendant:    **Johnine P. Barnes, Esq.**
                      BAKER & HOSTETLER LLP
                      1050 Connecticut Avenue, NW
                      Suite 1100
                      Washington, DC 20036-5304
                      (202) 861-1633


Court Reporter:       Lisa Walker Griffith, RPR
                      U.S. District Courthouse
                      Room 6507
                      Washington, D.C.  20001
                      (202) 354-3247


Proceedings recorded by mechanical stenography, transcript
produced by computer.

1               PROCEEDINGS - AFTERNOON SESSION

2               THE DEPUTY CLERK:  This is Civil Action

3   06-are 687.  Audrey Shebby D'Onofrio versus SFX Sports

4   Group, Inc.

5               Please remain seated Court is back in

6   session.

7               THE COURT:  I was asking your counsel if

8   sweet reason had not prevailed.

9               MR. SCHREIBER:  In terms of our discussions?

10              THE COURT:  Yes.

11              MR. SCHREIBER:  Would you like us to, so to

12   speak, report to Your Honor?

13              THE COURT:  Well, it is a settlement

14   discussion.  If you don't wish to, if you can't

15   resolve the thing, you've answered my question.

16              MR. SCHREIBER:  There are a couple of things.

17              Evidently, the defendants do not want

18   Mr. Bond to do this.  They want Mr. Bond and I believe

19   Mr. Cavender to choose somebody else.

20              They further believe --

21              MS. BARNES:  I can speak for my client's

22   side.

23              MR. SCHREIBER:  I'll tell you what my

24   position was and will be.

25              That, first, we prepared to use Mr. Bond to

1   do this since he has some history with this and

2   familiarity.  We feel that the defendant should bear

3   the cost of this at the very least.  Thirdly, the

4   issue of the computer and spoilation is still an

5   outstanding extant issue.  The defendants have a

6   different view point.

7          MS. BARNES:  The defendants want or would

8   like an independent expert to do it because we feel

9   that there has been some, we're concerned about

10  whether or not it would be fair and objective and

11  impartial at the review.

12         We think that if Mr. Bond and Mr. Cavender

13  can come together to choose someone, it's not going to

14  be of any additional cost because Mr. Bond has already

15  testified that he needs to get caught up to speed and

16  learn everything that is going on with the Legato

17  system.

18         So the same way that we would educate

19  Mr. Bond, we would educate an independent person to go

20  and review it also.  So, with respect to any

21  background information, we're not losing any

22  background information.

23         With respect to the costs, we said that we

24  would split the cost for an independent person to come

25  in because it still has not been shown that anything

1   is missing.  And why the defendant should have to bear

2   the cost when plaintiff has not shown what is missing.

3        And our position is that we've produced

4   everything that we have and everything is there.  That

5   we should not have to bear the cost.  But in light of

6   the fact that we want an independent person, we would

7   be willing to split the cost.

8        THE COURT:  Thank you.  You obviously can't

9   resolve it.  Let's proceed.

10       Ms. D'Onofrio.

11       (Audrey D'Onofrio, the plaintiff, having been

12   previously sworn, resumed the stand.)

13             DIRECT EXAMINATION (RESUMED)

14   BY MR. SCHREIBER:

15   Q   Before lunch, Ms. D'Onofrio, we were discussing

16   press releases.  I think we've completed that area.

17   Let me direct your attention to material on your hard

18   drive with respect to Clear Channel Corporate.

19       Was there anything on your hard drive with

20   respect to that topic?

21   A   Yes.

22   Q   What was that?

23   A   Every year, sometimes actually two times a year,

24   there would be a PR summit.  And there would be

25   information and a presentation related to that.  It

1 would be saved on my hard drive.

2 Q   How would that be relevant to any of your claims?

3 A   It also shows that I did work for the corporate

4 parent as well.

5 Q   As you compare yourself to Mr. Schacter, is that

6 an issue?

7 A   Pardon me?

8 Q   As you compare yourself in your job to Mr.

9 Schacter and the work that he did, would that factor

10 working for Clear Channel Corporate be an issue?

11 A   Actually, I don't think he ever attended a PR

12 summit.  So, that is something that I did that he did

13 not do.

14 Q   Let me direct your attention to the issue of the

15 Internet.  Did you do any work on that concept which

16 would have been stored on your hard drive?

17 A   In terms of Clear Channel stuff, I believe I did

18 store some e-mails related to that on my hard drive.

19 Q   How about just generally with respect to the work

20 or the Internet, a web site, things of that nature?

21 A   One of the mandates when I came back to the

22 company was to create an SFX website.  So the original

23 ideas and concepts behind that, I saved that aspect on

24 the hard drive.

25 Q   Would that have been saved on the server also?

1    A    There would be obviously documents also saved on

2    the server because I task out stuff.

3    Q    Would they be the same though?

4    A    No, they would be different.

5    Q    Going back to Clear Channel Corporate, would that

6    have been a sensitive type of thing that you would

7    have kept on your hard drive only?

8    A    Correct.

9    Q    You had a resume; is that correct?

10   A    Yes.

11   Q    Where did you keep that?

12   A    I kept that on my hard drive and I kept copies in

13   the office.

14   Q    Have you ever seen any resume of yours produced?

15   A    No.

16   Q    Press kits, things that you did for the press,

17   samples for instance, would any of that material have

18   been on your hard drive?

19   A    Yes.  The press kit evolved from the time I took

20   over public relations until I left.  So, I was

21   constantly working to update and change it.  So there

22   would be different examples kept on my hard drive so

23   as not to confuse.

24   Q    These press kits also would be on CDs?

25   A    That was the final version, I updated it.  That

1  would be on CD version and burned in the office.

2  Q    Have any of those CDs been produced?

3  A    No.

4  Q    Any information that you can recall from your hard

5  drive about these press kits?

6  A    On my hard drive, there was space on it that was

7  dedicated to press kits.  It would have all the

8  athletes that had the CD press kits.  And everything

9  that went into the press kit to make it a press kit

10 would be on the server.

11 Q    That would be on the server?

12 A    That would be on the server.

13 Q    Have you seen some of that material?

14 A    No.  Correction.  I have seen a version of the

15 press kit material, but I have not seen the CD press

16 kit that I created.

17 Q    That would have been on your hard drive and the

18 server?

19 A    That would have been on the server but a physical

20 copy, there are many copies in my office I never saw.

21 Q    Okay.  So just so I'm clear, hopefully the Court,

22 too, you have not seen a CD of any of this material?

23 A    No.

24 Q    And you have not seen any examples of the press

25 kit from the server?

1    A    No, I have.

2    Q    But all of them?

3    A    No.

4    Q    Again, this work that you did, is that something

5    that is important in your comparison to Mr. Schacter

6    and the job that he did?

7    A    It is very important because number one this was

8    not done when he was there.  And number two, the press

9    kits were in areas that the company testified they

10   didn't work in.

11   Q    So this would support your allegation that you did

12   this work?

13   A    Yes.

14   Q    How about general notes, let's say corporate

15   meetings, things of that sort.  Would that be on your

16   hard drive?

17   A    Sensitive materials would be kept on my hard

18   drive, correct.

19   Q    And would more mundane things be kept on your

20   server?

21   A    Yes.

22   Q    Have you seen notes, let's say from corporate

23   meetings about sports group operating area, have you

24   seen any of that from the server?

25   A    I have seen some e-mails, some general e-mails.

1   Q   Have you seen the totality of the material that

2   you believe should be there?

3   A   No.

4   Q   How about scheduling, have you seen any notes from

5   schedules?

6   A   I have seen some examples of things that are

7   upcoming for schedule.  But have I seen my schedule

8   area of my hard drive?  Well, no.

9   Q   That's not there.

10   A   No.

11   Q   But that would not necessarily be on the server?

12   A   You know, I can't answer that.  I'm not sure on

13   that one.

14   Q   But you have not seen what you thought you would

15   see?

16   A   No.

17   Q   Let me direct your attention to media lists and

18   contacts.  Did you keep that type of material on your

19   hard drive?

20   A   I kept important press contacts on my hard drive.

21   Q   Would you keep that on the server also?

22   A   I would keep, big media lists would be on the

23   server.

24   Q   Have you seen from the server, those media lists?

25   A   I have seen a media list.  I have not seen all of

1   the media list.

2   Q   Just to reiterate, the types of things that would

3   have been on the server in addition to your hard drive

4   or press kits which you've seen some of, correct?

5   A   Correct.

6   Q   And press releases, you've seen some of?

7   A   I have seen some.

8   Q   Okay, but not the totality?

9   A   Yes.

10   Q   Let me go down a list of things and tell the Court if

11   you have seen everything that you believe should have been

12   produced at least off of the server, SFX corporate and

13   releases for individual operating groups?

14   A   No.

15   Q   SFX Internet documents including the web page?

16   A   No.

17   Q   Notes on SFX employees in the public relations

18   area who are tasked with certain projects, for

19   instance?

20   A   No.

21   Q   You indicated you've seen some press kit examples

22   but certainly not all?

23   A   I have not seen all.

24   Q   Have you seen from the server folders on SFX

25   owned, managed events?

1  A   I have seen some materials.

2  Q   But not the totality?

3  A   Not even a fraction.

4  Q   How about the SFX sports group newsletter, was

5  that kept on the server?

6  A   That was kept on the server.  An example that

7  would also be kept on my hard drive, I believe I

8  turned over an example of the newsletter.

9  Q   In the documents that you've produced?

10  A   I think so.

11  Q   Have you seen one back from the defendants?

12  A   No, I can't remember.

13  Q   You did a newsletter for Andy Roddick, I believe?

14  A   Correct.

15  Q   Have you seen any of that information?

16  A   I believe I turned over something on that.

17  Q   Has anything come back that you didn't turn over?

18  A   I might have seen an example of that.  I can't

19  remember.

20  Q   Again, the totality of the information?

21  A   Oh, no, no.

22  Q   Now, you've told us before that there was written

23  material in the office itself?

24  A   Yes.

25  Q   I want you to briefly describe for Judge Facciola

1   how your office was set up, and what kind of material

2   would have been there that should have been produced?

3   A   In my office, you want the physical set up?

4   Q   I don't need feet and inches, just a general set

5   up?

6   A   Almost every document that I worked on, I would

7   generally print out a copy of.  Anybody who had been

8   in my office would be familiar with it because I had a

9   ton of documents.  I also printed out sensitive

10  e-mails.  I had disks of back ups.  I had a ton of, a

11  video library which actually it was so large that

12  there was space outside my office to put the videos

13  in.  A ton of different information.

14  Q   Ms. D'Onofrio, could ask you, the word "ton" is

15  not a legal word of art.  Possibly a little more

16  description would help.

17  A   Several hundred files.

18  Q   Okay.  A significant amount?

19  A   A significant amount.

20  Q   Tons suggests otherwise.  Thank you.  Go ahead.

21  A   Do you, do you --

22  Q   Tell us about your office again.

23  A   So there were also videos that I worked on, videos

24  that I produced, press kits, folders.  The folders

25  that came out of the public relations group were

1   actually used for the entire company.  They would come

2   to us and ask for more folders.

3        I also vividly remember that when I came to

4   leave the office, in the presence of, my husband was

5   there, I indicated to Aleka Williams where everything

6   was kept because I knew this information would

7   continue to be needed.

8   Q   Did you also keep hard copies of any of your

9   e-mails?

10  A   Yes, yes.

11  Q   What kind of hard copies would they be?  What

12  types of e-mails would you necessarily have?

13  A   I kept e-mails that were related to my title and

14  salary, that ongoing dialogue.

15  Q   So, the material that was also on the hard drive

16  would have been in a paper form somewhere in the

17  office?

18  A   Yes, it would, uh-huh.

19  Q   When you came back to pick up your things, were

20  you permitted to go through any of these files?

21  A   No.

22  Q   When you picked up material out of the office,

23  what was the nature of what they allowed you to take?

24  A   I was told I was allowed to take my personal

25  effects.

14

1    Q    This is after you had been notified that you were

2    terminated?

3    A    Correct.

4    Q    Just so I'm clear, I think this was covered

5    before.   There were also computer disks that you

6    stored?

7    A    Yes.

8    Q    That related to some of the other material that

9    you have discussed previously?

10   A    Yes.   As well as some press documents as well.

11   Q    Again, this material has not been produced as far

12   as discovery is concerned in this case?

13   A    To my knowledge, I have not received anything from

14   my office.

15   Q    Let me just direct your attention to the issue of

16   your health at the time in August and September of

17   2005.

18        Did you indicate your health status to

19   anybody in the office physically, SFX office on

20   Wisconsin Avenue?

21   A    Yes.

22   Q    Who was that?

23   A    I told Aleka Williams, I had a meeting with her,

24   we had several conversations.   I told Julie Kennedy.

25   Q    This was about your pregnancy, right?

1    A    Correct.

2    Q    How would you characterize your pregnancy at that

3    time?

4    A    I was having a troubled pregnancy.

5    Q    Did you make a request of SFX with respect to that

6    troubled pregnancy?

7    A    I asked to go on disability.

8    Q    When did you do that?

9    A    I did that shortly before I was fired.

10   Q    Okay.  Did they ever, did you request paperwork?

11   A    I did.

12   Q    What did they say if anything about giving you

13   paperwork?

14   A    It was on its way.

15   Q    Did you ever receive it?

16   A    No.

17   Q    Have you ever seen it since?

18   A    No.

19   Q    Has anybody produced any paperwork with respect to

20   your disability request to your knowledge?

21   A    No.

22   Q    You were present for all the depositions that were

23   taken in this matter except for the ones in California

24   and Texas; is that correct?

25   A    I believe so, yeah.

1    Q    But you read the transcripts.

2            During the course of your employment, did you

3    ever know of anybody scrapping computers, just

4    throwing them away as described in this case?

5    A    No.

6    Q    To your knowledge, it never had occurred before?

7    A    No.

8    Q    Had you ever been told by anybody at SFX that any

9    portion of their server had been wiped or deleted?

10   Did you ever hear that of anybody else?

11   A    No.

12            MR. SCHREIBER:  Thank you.

13            THE COURT:  Your witness.

14                         CROSS EXAMINATION

15   BY MS. BARNES:

16   Q    Ms. D'Onofrio, you testified that during your

17   employment with SFX you only had one computer,

18   correct?

19   A    That I'm aware of, well, I also had a laptop.

20   Q    When did you obtain the laptop?

21   A    When I was first at the company.

22   Q    Then after you, did you maintain a laptop?

23   A    No, not, no, I turned the laptop in.

24   Q    Did your computer ever crash where it had to be

25   restored by Gene Mason?

1   A   I had times where, it never crashed, but I had

2   various computer issues.

3   Q   So Gene Mason never gave you a new computer

4   because your computer was non-functional?

5   A   Not that I'm aware of.

6   Q   You testified that you print out sensitive copies

7   of your e-mails?

8   A   Yes.

9   Q   And have you given those printed copies to your

10   counsel for production to defendants in this case?

11   A   I actually couldn't because they were in my office

12   and you didn't turn them over.

13   Q   You were afforded an opportunity to enter your

14   office prior to your last exit from SFX, correct?

15   A   That was corporate information, I was not allowed

16   to go through that.

17   Q   I'm sorry, I'm talking about the sensitive

18   personal information that you testified to regarding

19   your salary, your e-mails with Mr. Hughes that you

20   testified to.

21   A   I was under the understanding that that is work

22   product that you did on the computer, you couldn't

23   take.  I was told I could take personal effects,

24   pictures, that sort of thing.

25   Q   You didn't take any hard copies when you left,

1   correct?

2   A    No.

3   Q    Any copies of any documents?

4   A    Not that I'm aware of.

5   Q    You didn't make any copies of your resume from

6   your computer, correct?

7   A    No, I was not allowed on my computer.

8   Q    You were not afforded the opportunity to retrieve

9   documents from your computer upon your exit from SFX?

10  A    No.  And my husband was there.

11  Q    You indicated that you did see some e-mails to and

12  from your husband regarding your salary, correct?

13  A    I don't think it was to my salary, it was

14  regarding my title change.  It might have been salary.

15  I don't have the, if you have the e-mail, you can --

16  Q    I'm asking what you testified to?

17  A    I testified that there is an e-mail with my

18  husband where I had a meeting, where I was discussing

19  my position, yes.

20  Q    Did you also discuss your salary?

21  A    I believe I did discuss my salary in the meeting.

22  Q    Not in the meeting, I'm saying in the e-mail?

23  A    If you give me that e-mail, I can look at it and

24  I'll verify it if it's on that.  I can do that.

25       (Witness peruses the document.)

1          THE WITNESS:  This is my e-mail, I have seen

2    this.

3    BY MS. BARNES:

4     Q   Okay.  This e-mail was included in the

5    documentation that was provided to you by defendants,

6    correct?

7     A   Yes, I believe so, yes.

8          MR. SCHREIBER:  Point of clarification, can we

9    get the exhibit number that has been identified?

10          MS. BARNES:  Defendant's Exhibit 3.

11          THE COURT:  It is Defendant's Exhibit 3.

12          MR. SCHREIBER:  I'm sorry, thank you.

13    BY MS. BARNES:

14     Q   Ms. D'Onofrio, I've handed you a document that is

15    titled SFX Sports Group Public Relations: Promoting

16    the Live Experience.  Is this the type of PR kit that

17    you were referring to?

18     A   Yes.

19     Q   This is the type of PR kit that you were referring

20    to that you said you did not receive?

21     A   No, I never said that.  If you recall, I said I

22    received some documents that could be useful.  And

23    this is one of them.  And it's very useful because it

24    discusses if you look through it, it basically

25    discusses that I oversee all the public relations and

1  the competencies.  So this would definitely be a

2  document that we're going to use.

3  Q   This was produced to you by defendants, correct?

4  A   Yes.  As I said, there were some helpful

5  documents.

6  Q   I don't have a question.

7      I'm handing you what's been marked as

8  Defendant's Exhibit five.  Do you recognize that

9  document?

10  A   I do.

11  Q   Would that document be the type of press release

12  that you described that you --

13  A   I believe this press release, but I'm not a

14  hundred percent sure, I think I turned this over.

15  This was something that I had had, just happened to

16  have around my house.  I turned that in.  So, yes.

17  Q   If I tell you that it was something that was

18  actually produced by defendants, that would be

19  correct, correct?

20  A   I wouldn't say correct because I can't tell you

21  definitively.  I noticed that this is dated 2001.  And

22  according to you, with the Legato hold, you wouldn't

23  be producing anything before 2004.  And this was 2001.

24  In fact, this is from the first time that I worked at

25  SFX.

1   Q   But if you reviewed the documentation that was

2   produced to you by defendants, that would be included

3   in that?

4   A   The thing you have to keep in mind, counselor, is

5   how you turned over 60,000 some odd documents.  I did

6   the best to go through everything that I can, but it

7   was in such a difficult format.  Could something have

8   slipped my mind?  Possibly.  That's why I don't want

9   to say definitively.  What I can tell you definitely

10  is I absolutely know this document, I feel comfortable

11  saying that.

12  Q   So you concede that we produced to you some 60,000

13  odd documents, correct?

14  A   In the documents that you produced, some of them,

15  a lot of them were e-mails.  A lot of them were not

16  helpful e-mails.  There were some e-mails.  There were

17  some Power Point presentations.  But they were a

18  fraction of what I did and they were a fraction of my

19  e-mails.

20  Q   So your testimony is that some 60,000 some odd

21  documents were a fraction of the documents you

22  created?

23  A   No, no, I didn't say that.  I said it included

24  e-mails.  Remember what I did, you would get a ton of

25  e-mails every day.  This goes back for a period of

1   five years.  I think in the documents you produced,

2   there are a couple hundred Power Point presentations.

3   And put together with press releases and some PR

4   material, well, that's a fraction of what I did.

5   Q   Okay.

6           MR. SCHREIBER:  My point was that, everybody

7   is saying 60,000 documents.  I think the testimony has

8   been 60,000 pages.  And Mr. Bond had testified there

9   were 30,000 documents so that we don't have a record

10  that is --

11          THE WITNESS:  I'm sorry if I was confusing.

12  BY MS. BARNES:

13  Q   So, if the 60,000 some odd documents are a

14  fraction, how many are you saying are missing?

15  A   You know, I'm really excited at the idea that Doug

16  could go into the server and potentially find the

17  other documents to try to help supplement.

18  Unfortunately, with the scrapping of my computer,

19  that's a problem because that's a huge component of

20  what I did.

21          But when you say 30,000 documents, it sounds so

22  impressive.  But if it wasn't a lot of documents that

23  were super substantive, you know, you have all kinds

24  of different e-mails.  That kind of stuff that comes

25  in with it, it does not really, it doesn't tell the

1    story.

2    Q   I would like to direct your attention to

3    Defendant's Exhibit two.  Can you identify this

4    document please?

5    A   It looks to me to be an e-mail.

6    Q   Okay.  Do you recognize this as an e-mail from you

7    to you?

8    A   I'm looking at it.  It says from me to me.  So, I

9    am going to assume that it is.  And it looks to be an

10   e-mail that discusses University of Pittsburg, Tim

11   Simpson, a player, Masters.

12   Q   It says "per conversation I outline some of my

13   pictures," correct?

14   A   Correct, yes, it does say that.

15   Q   So it discusses some of your job duties and

16   responsibilities, correct?

17   A   Yes, that's correct.

18   Q   Behind that is also a document that was attached

19   to this e-mail that was from you to you, so it never

20   went to anyone else that says "SFX Sports Group,

21   a general services and capabilities presentation for

22   Audrey D'Onofrio, correct?

23   A   Correct.

24   Q   Is that a presentation that you put together for

25   SFX Sports Group?

1   A    Probably within our team.  I had a team.  I don't

2   want to say I wrote every single word of this.  I

3   oversaw this for sure.

4   Q    So if you didn't write everything, then everything

5   may not be on your computer, correct?

6   A    No, because I oversaw people.  So, I worked on the

7   final products of things.  This is an important

8   document if it is a capabilities presentation.  This

9   is not something, you know, that wouldn't be looked

10  at.

11  Q    This would be something that you would probably

12  keep on your hard drive, correct, if it is important?

13  A    Yeah, for sure, I would absolutely keep a copy of

14  this.  But this kind of presentation would be used for

15  some of the other groups so it would also be on the

16  server, which is probably why you found this.

17  Q    Okay.  It would be on the server as an e-mail from

18  you to another person?

19  A    You have to understand we're not just talking

20  e-mails we're talking about photos on the server.

21  Q    I asked you a question.

22          THE COURT:  Don't talk over each other.

23          MS. BARNES:  I'll rephrase it.

24          THE COURT:  Ms. D'Onofrio, if she is talking,

25  you can't.  If you're talking, she can't.  You're

1  going to drive the reporter crazy and you're going to

2  drive me nuts.  Pause, wait, there is plenty of time.

3  Thank you.

4  BY MS. BARNES:

5  Q   So an e-mail from you to you would be on someone

6  else's server or in box or hard drive?

7  A   What I'm assuming with this is probably if it was

8  from me to me, I was probably printing out a copy to

9  save in the office.  And this was obviously a copy in

10 the office that was not turned over.

11 Q   If this was produced to you pursuant to

12 defendant's electronic communications, then it would

13 have been turned over to you in electronic form,

14 correct?

15 A   I'm sorry, I didn't understand.

16 Q   Just so you know, this was produced to you in

17 defendant's electronic communication?

18 A   I won't dispute that.

19 Q   This is the type of document that you said would

20 have been on your hard drive or printed and left in

21 your office, correct?

22 A   It would have been on my hard drive, it would have

23 been printed. I think this would have been on the

24 server too, which is why you found this.

25 Q   Ms. D'Onofrio, you indicated that you sent e-mails

1   for instance to and from Mr. Hughes regarding your

2   salary and other issues that are at issue in this

3   lawsuit, correct?

4   A   Yes.

5   Q   Has Mr. Hughes been deposed in this case?

6   A   No, not yet.

7   Q   Has Bud Martin been deposed in this case?

8   A   Not yet.

9   Q   Has Ken Myerson been deposed in this case?

10  A   Not yet.

11  Q   Michael Principe?

12  A   Not yet.

13  Q   You may not know this, this is a legal question.

14  Do you know when these persons are going to be

15  deposed?

16  A   I think you have to talk to my attorney about

17  that.

18        MR. SCHREIBER:  I certainly object to any

19  discussions with counsel.

20        THE COURT:  Sure.

21        Move on.

22  BY MS. BARNES:

23  Q   You indicated that you were not given a copy of

24  the paperwork regarding your request for disability

25  leave, correct?

1    A    Would you say that again? I'm sorry.

2    Q    You indicated that you were not provided any

3    evidence regarding your request for disability leave?

4    A    I believe I testified that I received no

5    disability paperwork.  I believe that was what I

6    testified.

7    Q    So just so I'm clear then.  You are not contending

8    that there is any paperwork regarding your request for

9    disability leave?

10   A    I believe there is.  I'm just saying I didn't

11   receive it unless you didn't, your client never got

12   disability paperwork which would be --

13   Q    What written request did you make for disability

14   paperwork?

15   A    I met with Aleka Williams.  I discussed with her.

16   I also called her on the telephone because remember, I

17   was extremely sick.  And my conversation was regarding

18   that.

19   Q    So there were no e-mail communications or hard

20   documents regarding this, they were all oral

21   communications?

22   A     No, I believe that there were e-mails.  I have

23   seen some e-mails from Aleka and myself.

24   Q    So they were produced to you?

25   A     No, I didn't say all, because she turned over an

1   e-mail or two is not the whole thing and it does not

2   take a snapshot of the substantive discussion which

3   was on the telephone.

4   Q   Which would not be produced in any --

5   A   That, I'm not going to say definitively because I

6   was extremely sick, but that conversation was on the

7   telephone.  I believe Aleka testified to our

8   conversation on the phone.

9   Q   My point is there would be no paperwork from that

10  conversation?

11  A   I'm aware of, I believe I did see an e-mail but I

12  don't remember an e-mail from that particular phone

13  conversation.

14  Q   You are not aware of any paperwork from that

15  conversation?

16  A   I was told there would be paperwork.  So I am

17  going to take that she was doing her job and getting

18  the paperwork.

19  Q   I'm sorry.  Maybe I'm not being clear.  You are

20  not aware that there was any paperwork created from

21  the conversation?

22  A   I am going to again say that I was told that there

23  was paperwork.  And that I am going to believe that as

24  a professional HR person she wouldn't lie to me.  I'm

25  going take her on her word.

1          MS. BARNES:  No further questions, Your

2     Honor.

3          THE COURT:  You may stand down.

4          (Witness excused)

5          THE COURT:  Call your next witness.

6          MR. SCHREIBER:  We have nothing further, Your

7     Honor.

8          THE COURT:  You rest?

9          MR. SCHREIBER:  We rest.

10         THE COURT:  Plaintiff rests.

11         Defendants, do you have a case?

12         MS. BARNES:  I need to go get my witness.

13         THE COURT:  Okay.  Send one of your

14    associates.

15         Who is your first witness, please?

16         MS. BARNES:  John Cavender

17         (John Cavender, witness for the defendant,

18    sworn)

19                    DIRECT EXAMINATION

20    BY MS. BARNES:

21    Q   Mr. Cavender, can you please state your full name

22    for the record.

23    A   John Edward Cavender.

24    Q   What position do you hold, Mr. Cavender?

25    A   My official title is security principle.

1    Q     For whom to you work?

2    A     Clear Channel Communications.

3    Q     In the role of security officer, what duties are

4    entailed in the role as security officer?

5    A     There are many.  Specifically, I investigate legal

6    and HR claims, or I assist our Legal Department or HR

7    Department in investigating issues.  And that may

8    entail searching for documents, e-mails, any

9    electronic data that may be relevant to the case.  I'm

10   also involved in policy creation, security policy

11   creation and modification and also enforcement.

12   Q     When you said searching for documents, can you

13   just sort of outline for us exactly what would be

14   entailed in the searching for documents?

15   A     Certainly.  Depending on what our Legal

16   Department asks for, it may include e-mail, it may

17   include documents that are in Word formats,

18   spreadsheet format, Power Point format, PDF documents.

19   And there are many locations that we would search,

20   e-mail servers, the file servers in the local markets

21   of the employees.  Also, PN the local PCs that the

22   employees would use.

23        As far as e-mail goes, also we have a software

24   solution by the name of Legato, which helps us archive

25   e-mails for selective employees.

1   Q   Can you define for us exactly what the Legato

2   system is?

3   A   Legato is a software application that helps

4   companies create an archive of e-mail for specific

5   mailboxes in the events that they need to keep a

6   historical record of e-mail.

7           It's a software solution that is no longer

8   officially called Legato.  It's now called E-mail

9   extender.  And it is owned by a company named EMC.

10  But we refer to it in its legacy name of Legato.  It

11  interfaces with our e-mail system and the people who

12  we place on specific e-mail servers would also be

13  captured into the Legato database.

14  Q   Did you have the opportunity to search for

15  electronic communications for Ms. Audrey D'Onofrio?

16  A   I did search for e-mails for Ms. D'Onofrio.

17  Q   What was entailed in your search?

18  A   I utilized the normal methods within Legato.  I

19  utilized a key word or a key string search within

20  Legato which produced numerous hits.  I also looked to

21  see if her e-mail mailbox was still available at the

22  time and it was not.

23          THE COURT:  It was no longer available?

24          THE WITNESS:  That is correct, yes, sir.

25  BY MS. BARNES:

1    Q    Can you identify the types of key string searches

2    that you performed in searching for Ms. D'Onofrio's

3    e-mail?

4    A    I can.  Each e-mail address in our e-mail system

5    would have a corresponding key string associated with

6    it.  Those key strings are, I forget the length, but I

7    want to say 16 characters in length.  Those key

8    strings are what we would use to search in Legato for

9    e-mail where the e-mail mailbox no longer exists.  We

10   have to type in those specific strings for each

11   address to extract that information out of the Legato

12   system.

13   Q    When you say her mailbox no longer exists, what

14   effect if any did that have on your search?

15   A    Well, since the mailbox did not exist, I was not

16   able to select within the Legato application her

17   mailbox, her profile.  So I had to resort to the key

18   string search which is a little bit more difficult.

19   We have to extract the key strings and type those in,

20   in a certain format that Legato understands.  So it

21   made it a little bit more complex and most likely a

22   little bit more time consuming the search itself.  But

23   outside of that, it was no different than a normal

24   search.

25   Q    So would a search of a mailbox result in the same

1  output as a search by key strokes?

2  A   Yes.  Key strings.

3  Q   I'm sorry, key strings.

4       What is your understanding of Ms. D'Onofrio's

5  placement on the Legato system?

6  A   She was placed on the Legato system as a part of a

7  larger placement of roughly 11,000 employees during a

8  prior lawsuit that Clear Channel was involved with in

9  the mid-2004 timeframe.  She was not involved in that

10 lawsuit.  But it was easier for us to move her on to

11 Legato because of where she was on our e-mail server.

12 It was easier for us to place the entire group of

13 people on the servers rather than go through and

14 specifically pick out who we needed to be on Legato.

15 Q   Now, we've heard testimony that, and there has

16 been evidence introduced, that there are documents

17 predating '04, which is when you just testified

18 Ms. D'Onofrio was placed on Legato.  Can you explain

19 for the Court how that information is found even

20 though she was put on Legato in '04?

21 A   When we placed the approximate 11,000 people on

22 Legato in August of '04, we also imported all of their

23 current mailboxes into Legato.  So, any e-mail that

24 was in the mailbox at that time, whether it was from a

25 day prior to them being placed on Legato or a year,

1  even before that, in 2003, or it can go back as far as

2  the mailbox existed, that was imported into Legato

3  also.  So that would explain why we would see some

4  historical e-mail within Legato.

5  Q   The historical e-mail that is in Legato, is that

6  maintained say even if that e-mail was deleted from

7  the actual mailbox?

8  A    Absolutely.  Once it is in Legato there is nothing

9  that the employee can do in their mailbox that will

10  affect Legato.  That message instance will remain in

11  Legato even if it is deleted from the mailbox, the

12  employee's mailbox.

13  Q   We used this chart earlier today.  I can't really

14  recall what A. was.

15         THE COURT:  Mr., A. is the local server.

16  Look at the left-hand of the chart is Ms. D'Onofrio's

17  hard drive.  She sends an e-mail which is a little box

18  to Joe Jones.  As we understand the situation, it goes

19  to the server which is A., the e-mail server, right?

20  That server in turn is copied into Legato

21  automatically.  There is the possibility that Legato

22  itself was backed up on back up tapes.  Is that a fair

23  representation of how the system operates?

24         THE WITNESS:  I am going to differ slightly.

25  There is never an e-mail that actually exists on the

1    hard drive.  It is always going to be on the server.

2    That's where it's created and that's where it resides.

3    Once it is sent to Legato, and Legato does not have a

4    back up tape although the e-mail server may have a

5    back up tape that is used for disaster recovery

6    purposes.

7            THE COURT:  When you say, if she types an

8    e-mail to Joe Jones, can't she, it is going to go into

9    her sent folder, right?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  She has a sent folder.  Where

12   does the sent folder reside on the hard drive or the

13   server?

14           THE WITNESS:  That is going to be in her

15   mailbox and the mailbox resides on the e-mail server.

16           THE COURT:  Now if she wants to save that

17   e-mail, she must archive it, that is, she must cause

18   it to come up and save it as an independent file.  For

19   example, she could convert it into PDF and put it in a

20   file, right?

21           THE WITNESS:  I don't believe there is a

22   native way to save it is a PDF format but there are

23   tools.

24           THE COURT:  She could dump it into a Word

25   file and save it in a PDF file, right?

1          THE WITNESS:  Yes.

2          THE COURT:  But if she wants to save it, she

3   has to take some, if she wants to save it on her hard

4   drive she has to take some action?

5          THE WITNESS:  Yes.

6          THE COURT:  What would be the most typical

7   action that a person who wanted an e-mail on his or

8   her hard drive would do?

9          THE WITNESS:  Within the application, mostly

10  like would use file, and save as, select your

11  destination and select your format and title it the

12  way you wanted.

13         THE COURT:  I understand. But merely because

14  it's gone automatically to her sent file, it's not

15  going to be on her hard drive, it's going to stay on

16  the server?

17         THE WITNESS:  Exactly.

18         THE COURT:  Suppose she creates folders, she

19  suppose she creates one called press relations, she

20  takes that e-mail and puts it in the folder.  Were you

21  using Outlook, or she has an Outlook folder that is

22  called press relations.  When the e-mail message goes

23  in there, once again, is it on the hard drive or on

24  the server?

25         THE WITNESS:  Well, it depends on where the

1    folder is.  Is the folder in her mailbox?

2         THE COURT:  Yes.

3         THE WITNESS:  It's still going to be on the

4    server, then.

5         THE COURT:  Mr. Cavender, looking at my

6    computer, here is my e-mail.  I have some folders

7    here.  If I take one of these messages and put it over

8    here in the folder, it's still going to be on the e-

9    mail server if we're using your system, right?

10        THE WITNESS:  I can't really tell where your

11   folders are.

12        THE COURT:  Does this help you?

13        THE WITNESS:  Yes.  I don't know where your

14   in box resides.  In our system, if you save it into a

15   folder underneath the in box, it would definitely be

16   on the server.

17        THE COURT:  On the server.  If I want it on

18   the hard drive I have to do something else?

19        THE WITNESS:  Yes.

20        THE COURT:  One of those things I could do is

21   invoke save as?

22        THE WITNESS:  That's right.

23        THE COURT:  Could I give it an extension and

24   that would denominate the kind of file, so I save it

25   as .doc, it would be a Word file?

1        You can sit down.

2        THE WITNESS:  I want to say yes to that.

3   However, there may be formats that Microsoft doesn't

4   understand.

5        THE COURT:  I understand. I think I get the

6   point.

7   BY MS. BARNES:

8   Q   Just to follow up on that question, even if she

9   does not, if an employee does not take the extra

10  action to save an e-mail to her hard drive, it will

11  always be captured on the server?  Meaning that it is

12  not going to, she doesn't have to do anything for it

13  to be on the server, but she has to do something to

14  save it on the hard drive?

15  A   That is correct.  When an e-mail is composed you

16  are working off of the server at that point.  When you

17  send it, it's going to stay on the server; it's going

18  to be in your sent items by default.  If you are on

19  Legato, Legato will also have a copy of that e-mail.

20  Q   So in the instance of Ms. D'Onofrio, since she was

21  on Legato, any e-mail that would have been on her

22  computer would also have been in Legato?

23       THE COURT:  No.  That's his point.  It is

24  never on her computer.

25       MS. BARNES:  I'm sorry.

1   BY MS. BARNES:

2    Q   Any e-mail that she would save on her computer,

3   any e-mail she would physically take acts to save on

4   her computer would also be captured on Legato?

5    A   If that e-mail was in her mailbox at the time that

6   we imported it into Legato or after the point that we

7   put her on Legato, then yes.

8    Q   Now, I want to go back to your searches for

9   Ms. D'Onofrio.  After you did the searches, what

10   exactly did you find?

11   A   I don't recall the amounts, the quantity, but I do

12   remember there were numerous hits.  I believe I

13   exported the e-mail that was found into one file, into

14   a PST format file, and then handed that over to our

15   Legal Department.

16   Q   There was testimony today that there was an MSG

17   file created. Did you create a MSG file or is that

18   different than a PST?

19   A   MSG files are message files.  That is the default

20   native format if you did a file and saved that as

21   within Outlook, it would want to save it as an MSG

22   file.  It's just a format of the message itself.  I

23   never produced any e-mail in that format.

24   Q   And so, in the e-mail that was produced, you

25   exported the e-mail, can you just explain the process?

1  You exported the e-mail and then what did you do after

2  you exported the e-mail?

3   A   From within Legato we have, you know, there may be

4  thousands of hits, e-mails that were found. I told the

5  system to export all of the hits to a specific PST

6  file.  That's going to be on the machine, the client

7  that I'm working on.  Once that export is complete,

8  then I took that PST file and burned it to disks,

9  either CD or DVD and sent that off to our Legal

10  Department.

11   Q   Did you do anything else after you exported the

12  e-mails from Ms. D'Onofrio?

13   A   Not to my knowledge.

14   Q   I want to get back to the searches.  When you did

15  the searches and you said you did the keystroke

16  searches --

17   A   Key string.

18   Q   Key string, I'm sorry.  Would that also pick up

19  any e-mails regarding Ms. D'Onofrio, or would it only

20  be the e-mails in Ms. D'Onofrio's mailbox, or what

21  would have been in her mailbox?

22   A   It would have been anything that was sent to her

23  or anything that was sent from her in Legato.  So, we

24  took her current e-mail mailbox and imported that into

25  Legato in August of '04.  And then, from that point

1   on, we were also capturing anything she sent and

2   anything she received. So, the key string searches

3   were looking for anything that she sent and anything

4   she received from that range of data that we imported

5   or since she was on Legato.

6   Q    So, is it a fair statement to say that whether

7   or not her computer exists has no bearing on whether

8   e-mail could be recovered regarding Ms. D'Onofrio in

9   this case?

10              MR. SCHREIBER:  Objection.

11              THE COURT:  Say it again please?

12   BY MS. BARNES:

13   Q    Is it a fair statement to say that the existence

14   of Ms. D'Onofrio's computer has no bearing on the

15   retrieval of electronic communication e-mails by her?

16   A    I would say that we have the majority of her

17   e-mail captured in Legato.

18              MS. BARNES:  No further questions at this

19   time, Your Honor.

20                        CROSS EXAMINATION

21   BY MR. SCHREIBER:

22   Q    Good afternoon, sir.  I'm David Schreiber we just

23   met today; didn't we?

24   A    Yes.

25   Q    You were not offered by defendants in this case to

1  testify pursuant to a rule 30(B) 6 deposition, were

2  you?

3   A   Not to my knowledge.

4   Q   If you were deposed by me, you might have

5  remembered that, sir?

6   A   Not to my knowledge.  I have no recollection of

7  that.

8   Q   Okay.  You've worked for Clear Channel for how

9  long, sir?

10  A   Eleven years.

11  Q   You were the security principle; is that what you

12  told us?

13  A   That's correct.

14  Q   We don't know much about your background or your

15  training.  I'll pass by that for the moment.  What I'm

16  interested in is that you evidently were the person

17  that actually did the search on the Legato system.  Is

18  that true?

19  A   That's correct.

20  Q   You are not the person that ever searched the

21  local server here in the District of Columbia are you?

22  A   That is correct, I'm not.

23  Q   You are not the person that threw out her

24  computer; is that correct?

25  A   That is correct.

1   Q    You told the Court that you were instructed by

2   Legal or asked by Legal to do this search; is that

3   true?

4   A    Yes.

5   Q    How did they ask you to do this?

6   A    I believe it was actually through --

7           MS. BARNES:  Objection.

8           THE COURT:  You had to speak to counsel and

9   they told you how to do it?  They told you what they

10  wanted, right?

11          THE WITNESS:  Yes, through my manager, it was

12  relayed to me that this was requested.

13          MR. SCHREIBER:  I don't think this is

14  privileged, Your Honor.

15          THE COURT:  I don't think it is either.

16  Objection, overruled go ahead.

17          THE WITNESS:  I believe I received an e-mail

18  from my manager.

19  BY MR. SCHREIBER:

20  Q    Who is your manager?

21  A    His name is Joe Shannon.

22  Q    He is here today?

23  A    No, he is not.

24  Q    He is not.  I'm sorry.

25          So, Shannon told you what Legal told him?

1    A    Yes, I believe so.

2    Q    What specifically did Mr. Shannon tell you that

3    Legal told him?

4    A    I believe it was just a request to find all e-mail

5    from Ms. D'Onofrio.

6    Q    Now, according to the declaration that was filed,

7    you didn't do that until some time in October of 2006;

8    is that correct?

9    A    That's when I was first made aware of it, yes.

10    Q    Now, I can represent, we haven't seen the e-mail

11    from Shannon to you.  Do you still have that e-mail?

12    A    I'm not sure.

13    Q    When you prepared this declaration that was filed

14    by counsel, did you refer to the e-mail for purposes

15    of paragraph five, when you said "In or about October

16    of 2006, I was directed to search for the archived

17    e-mail for Ms. D'Onofrio."

18         Did you use that supposed e-mail in order to

19    make that statement?

20    A    I would probably say that's a fair statement, yes.

21    Q    Did you keep a record of the search that you did?

22    A    Well, I'm not sure what you mean by record. In my

23    affidavit I have the actual search turns that I used.

24    Would that be considered a record?

25    Q    I don't answer questions in these proceedings.

1    I'm just asking you, sir, what if any record did you

2    keep of your search in October of 2006?

3    A    I don't recall I have any record other than the

4    information that is in my affidavit.

5    Q    What does that say?  What did you retrieve in

6    October of 2006?

7    A    I'm not sure I understand the question.

8    Q    What did you find when you searched in October of

9    2006 for Ms. D'Onofrio's e-mail?

10   A    The first search in Legato revealed no e-mail.

11   Q    So that's paragraph five.  October you found

12   nothing.  True?

13   A    Yes.

14   Q    You described what you did which was looking on

15   the Live Nation server of the Legato system; do you

16   recall that statement?

17   A    Yes.

18   Q    Now, are there different portions of this Legato

19   between Clear Channel and Live Nation?

20   A    There were, yes.

21   Q    There were but there are not now?

22   A    That's correct.

23   Q    Because they have separated, these companies, I

24   gather.

25          So, you looked on the Live Nation server in

1  October of 2006 for her e-mails; is that true?

2  A   That's correct.

3  Q   You only used what you said was her display name

4  in

5  Clear Channel's e-mail system, true?

6  A   That's correct.

7  Q   Interestingly, at the end of that paragraph, you

8  said: "This process produced results for previous

9  searches, meaning the string D'Onofrio, Audrey."

10        What did you refer to?  What search did you

11  do with her name previously?

12  A   Not her name specifically, but the format last

13  name comma, space, first name for other searches, has

14  produced results.

15  Q   Now, when you didn't find anything, who did you

16  communicate this to?

17  A   Most likely my manager.

18  Q   Mr. Shannon.  So can you tell us when if at all

19  you have ever talked to Legal about the efforts that

20  you invested in trying to determine what e-mails still

21  existed?

22  A   I'm sure there have been numerous conversations

23  since October of '06.

24  Q   Well, did you report the efforts that you

25  invested?

1   A   I don't recall, but I'm quite confident that I

2   probably mentioned that I did not find anything on

3   that first attempt.

4   Q   Who were you talking to in Legal when you did

5   this?

6   A   I do not recall.

7   Q   Can you tell us at any time who you talked to in

8   Legal about this search?

9   A   Regarding the October 2006 search, I do not recall

10  who I spoke with on that, other than my manager.

11  Q   How about when you were directed once again in

12  February of 2007 to do additional searches, did you

13  talk to anybody in Legal at that point?

14  A   I'm sure I did. Again, I don't recall the names

15  other than my manager.

16  Q   Do you keep a record of any of these conferences,

17  or communications or correspondence?

18  A   I don't keep a log but I do have e-mail history.

19  Q   You have e-mail history.  Do you have notes?

20  A   Probably notes that are not kept on a permanent

21  basis.

22  Q   Not on a permanent basis?

23  A   Not on a permanent basis.

24  Q   Let's say from February 2006, excuse me, 2007,

25  those notes would no longer be in existence?

1    A    I wouldn't think so.

2    Q    You are familiar with what is called a litigation

3    hold?

4    A    Yes.

5    Q    And for our purposes, that means if there is

6    litigation happening or anticipated, you are

7    instructed by Legal to make sure that there is a

8    retention policy in place for electronic documentation

9    while you work, correct?

10   A    That's correct.

11   Q    Are you familiar with when this case got filed?

12   A    I don't think I am.

13   Q    Do you know when Ms. D'Onofrio was terminated?

14   A    I believe it was some time in 2005.  I don't know

15   the exact time.

16   Q    The first I gather you knew about this matter was

17   October of 2006, some 13 months after she was

18   terminated, correct?

19   A    I believe that's true, yes.

20   Q    You would have been the person who would have been

21   in charge of the search for electronic documents or

22   data.  Is that not true?

23   A    I would have been one of a handful of people that

24   may have been asked to do so.

25   Q    Who else is in that handful?

1    A    There are some other gentlemen down in San

2    Antonio.   Names are Sam Penley, Robert Eckerly, Jerry

3    McCain.

4    Q    To your knowledge, did any of those people do any

5    searches or data mining or whatever people call it

6    these days, to look for anything having to do with

7    this case?

8    A    Yes.

9    Q    Who?

10   A    Sam Penley.

11   Q    Now, we've not heard Mr. Finley's (sic) name.   Why

12   don't you tell me when Mr. Finley actually did a

13   search for Ms. D'Onofrio's material?

14   A    I'm not aware of any searches for Ms. D'Onofrio's

15   material by Mr. Penley.

16   Q    What did he do then with respect to this matter?

17   A    I believe he looked for other e-mail for people

18   related to this case.

19   Q    What did he find?

20   A    He found e-mail.

21   Q    He did?

22        Who were those people that he found e-mails

23   for?

24   A    That, I don't recall.

25   Q    Will you have to talk to Mr. Finley about that?

1   A   Mr. Penley and yes.

2   Q   Does he work for you?

3   A   No, he does not.

4   Q   Does he work for Mr. Shannon?

5   A   Yes.

6   Q   Did he ever tell you, this Mr. Finley, what he

7   found in particular?  Was it an e-mail from certain

8   individuals or documents; did he tell you anything?

9   A   No, he did not.

10   Q   Don't stand around, have coffee and say guess what

11   I found, nothing like that?

12   A   Not in this case, no.

13   Q   So, in February, according to your declaration,

14   you did a second search and you utilized a different

15   search method than that previously used. How did you

16   come up with that new search method?

17   A   It was communicated to me that that was an

18   additional way to look for e-mail in the event that

19   the exchange e-mail mailbox was no longer available.

20   Q   Who communicated that information?

21   A   I believe that was actually Mr. Penley.

22   Q   Mr. Finley knew that, okay.

23       So you describe here some other information

24   that you inserted into your search which allowed you

25   to retrieve e-mails sent to or from Audrey D'Onofrio,

1   correct?

2   A   That's correct.

3        At any time did anybody ask you to search for

4   e-mails, not to or from her but about her?

5   A   No.

6   Q   Did Mr. Finley tell you that that is the

7   instruction he received, to find out other e-mails

8   about Audrey D'Onofrio?

9   A   He did not mention that to me.

10  Q   How did you come to found out that he made this

11  other search then?

12  A   By speaking with my manager who reminded me that

13  he also did searches relating to this case but not for

14  Ms. D'Onofrio.

15  Q   He then, Shannon is telling you this and he told

16  you --

17  A   Yes.

18  Q   That he had Finley look for other people's e-mails

19  about Ms. D'Onofrio?

20  A   Yes.

21  Q   You are telling the Court that the files that you

22  burned, to use your phrase were PST files, correct?

23  A   Yes.

24  Q   So, if they turned up in a different format for

25  instance, PDF, you don't know anything about that?

1    A    I do not.

2    Q    So, when you take it off of the Legato system, you

3    are taking it off as a PST file?

4    A    Yes, sir.

5    Q    Legato does not maintain it as a PDF file, does

6    it?

7    A    No, sir.

8    Q    I didn't think so.

9         Now, when you got to look at the e-mails from

10   Ms. D'Onofrio in October of 2006, you told us that her

11   mailbox no longer existed. True?

12   A    That's true.

13   Q    Do you know why it didn't exist any more?

14   A    Yes, I do.  At the time, we implemented an

15   automated process that would automatically purge our

16   active directory system.  And it would purge the user

17   account and the associated mailbox after six months.

18   Q    After six months of what?

19   A    Of when the account was disabled.

20   Q    And when would an account be disabled?

21   A    Most likely when the employee leaves the company.

22   Q    So, if she left the company September 26, 2005,

23   somewhere around March 26, 2006, your system would

24   have supposedly purged her mailbox.  Is that your

25   testimony?

1    A    That is.

2    Q    Has anybody told you that the company was on

3    notice as of October 6, 2005, that there was a

4    proposed claim against Clear Channel, SFX, Live

5    Nation?  Did you know that?

6    A    I was not aware of that.

7    Q    If you had known that, if Clear Channel, the

8    defendants, had known that, would they not have

9    exercised some form of discretion and not purged her

10   mailbox?

11   A    I'm not sure if I'm able to answer that, I really

12   don't -

13   Q    That's the litigation hold; isn't it?  That's what

14   it's all about, true?

15   A    I'm not really sure I understand the question.

16   Q    Well, what is a litigation hold?

17   A    To me, it is a request from our Legal Department

18   to preserve electronic information.

19   Q    So, if the Legal Department was on notice as of

20   October, let's say 2005, that there was a claim on

21   Ms. D'Onofrio's behalf, to your understanding, that

22   would trigger a litigation hold; wouldn't it?

23   A    Quite possibly.

24   Q    But you are telling us that at some point after

25   six months from her termination, they purged her

1  mailbox.  True?

2   A   It was purged due to an automated process, yes.

3   Q   But that automated process, if it was at least

4  noticed, could have been obviated, could have been

5  stopped, true?

6   A   It could have been, yes, sir.

7   Q   The Legato system does not archive documents,

8  does it?

9   A   It will archive documents that are attached to

10  e-mails.

11   Q   But not documents that are unattached to e-mails?

12   A   That's correct.

13   Q   So if I save a Word document on the server, it is

14  not going to go pass on to Legato necessarily,

15  correct?

16   A   What server are you referring to?

17   Q   Let's say the D.C. server, where Ms. D'Onofrio was

18  working?

19   A   That would be a correct statement.

20   Q   Do you have available for the Court, should the

21  Court wish to read this or look at it, the parameters

22  of what the Department of Justice and Clear Channel

23  directed Clear Channel to do with respect to setting

24  up the Legato system and how it was to be implemented?

25  Is that available?

1    A    If it is, I'm not aware of it myself.

2    Q    That would be somebody from Legal who might be

3    able to produce that document or that information,

4    true?

5    A    If I'm understanding the question correctly, I'd

6    say yes.

7    Q    Because Clear Channel didn't do this on its own,

8    they had a matter pending with the Department of

9    Justice.  As a result of whatever was happening there,

10   this is what they were told to do, correct?

11   A    It is my understanding that we implemented the

12   Legato system to help with the previous lawsuit.

13   Q    Now, did you have an opportunity to review copies

14   of any of the disks that were turned over by defense

15   counsel in this matter beginning in February 2007?

16   A    Yes.

17   Q    When did you do that?

18   A    I don't recall the exact dates, but I want to say

19   it was later in the year of 2007.

20   Q    Your declaration is signed July 20, 2007.  I

21   assume that it was some time prior to that, that you

22   have indicated that you reviewed the three additional

23   DVDs.  Yes, sir?

24   A    Yes.

25   Q    Are you telling the Court that all of those DVDs

1  were PST files?

2   A   I'm not telling the Court that.  I don't recall if

3  they were entirely PST files.  I do know that there

4  were message files on there.  There were individual

5  document files on there.  There were DAT files on

6  there.

7   Q   Was this all the material that you had compiled?

8   A   No, it's not.

9   Q   This was, I gather, a combination of what you did

10  and maybe Mr. Finley and maybe what Mr. Shannon did?

11   A   No, any information that we would have handed over

12  would have been in PST formats.

13   Q   But you didn't create this, these disks that you

14  reviewed some time prior to July 20, true?

15   A   That's correct.

16   Q   And do you know what happened to the material

17  after it was turned over to the Legal Department, the

18  material that you compiled?

19   A   I do not.

20   Q   Did anybody there tell you what they did with this

21  material?

22   A   No, sir.

23   Q   Did anybody discuss with you how to possibly

24  transform this material into a different format?

25   A   No, sir.

1   Q   At any point has anybody told you that this

2   material was changed or transformed from a PST file to

3   something else?

4   A   I do believe I've been privy to a conversation

5   where outside counsel --

6           MS. BARNES:  I am going to object.  The

7   conversation would be --

8           THE COURT:  I'm going hear the conversation.

9   Go ahead.

10          THE WITNESS:  I believe I was a part of the

11   conversation where I learned that outside counsel had

12   converted PSTs or individual messages to PDFs.  I'm

13   not sure why.  Of course, I know that someone other

14   than Clear Channel converted the messages into, or the

15   PST files into individual message files.  I'm not sure

16   who did that.

17          THE COURT:  Paragraph eight of your

18   declaration reads as follows:  "I've reviewed the DVD

19   identified as .DAT file, native files with a number."

20   Is that the exhibit that is in front of you?  Those,

21   there are three DVDs that are in plastic bags.  Are

22   they in front of you?

23          THE WITNESS:  I can't really tell from this.

24          MR. SCHREIBER:  This is the material that was

25   turned over to me which went directly to Kroll.  So, I

1    can't speak to it.

2              THE COURT:  Can you see on those objects?

3              THE WITNESS:  I can't really make it out.

4              MR. SCHREIBER:  I have no problem with him

5    opening it.  It is in evidence and the Court can

6    review it.

7              MS. BARNES:  I have no problem with him

8    opening it.

9    BY MR. SCHREIBER:

10   Q    Sir, could you tell us which exhibit you are

11   opening there just so we know?  It would have a number

12   on it.

13   A    Matter number?

14   Q    Let me approach.

15             MR. SCHREIBER:  It is exhibit four, Your

16   Honor.

17             THE WITNESS:  I do not recognize this disk

18   although it could be one that I've reviewed.

19             THE COURT:  You've got a number in paragraph

20   nine.  You've got "28653.00017 D'Onofrio."

21             THE WITNESS:  Okay, that number matches.

22   There is not a D'Onofrio name on here.

23             THE COURT:  The number is the same?

24             THE WITNESS:  Yes.

25             THE COURT:  Look at the other ones.

1          MS. BARNES:  For the record, for the Court,

2    we produced more than three disks to plaintiff.  To

3    the extent that it may not be one of those, I don't

4    know which ones he brought, but we produced seven

5    disks to him.

6          THE WITNESS:  The second bag I opened is

7    three.

8          THE COURT:  Number three, does it have a

9    number on it any where, the DVD itself?

10          THE WITNESS:  Yes.  It's the same number.

11          THE COURT:  The same number as the one we

12    just saw?

13          THE WITNESS:  That's right.

14          THE COURT:  All right.  Now look back at your

15    declaration, in eight and nine.  Are those the DVDs

16    that you are talking about that you saw, the .dat

17    files?  Do you see paragraphs eight and nine?

18          THE WITNESS:  Well, the numbers match.  I

19    think the labels do not match.  So I am going to say

20    that they most likely are, but I'm not 100 percent

21    certain.

22          THE COURT:  But you didn't put the labels on?

23          THE WITNESS:  That is correct.

24          THE COURT:  So to cut to the chase, Mr.

25    Cavender, you reproduced these in, you burned these in

1   PST disks.  You gave that disk to Legal and you never,

2   you don't know what happened. There then came a time

3   where you were shown what appears to be those DVDs.

4   Those are the DVDs you talk about in eight and nine of

5   your --

6            THE WITNESS:  That is correct.

7            THE COURT:  You say you have reviewed them?

8            THE WITNESS:  Yes.

9            THE COURT:  What is most significant is they

10  are, according to you in paragraph eight, a .dat file,

11  native files.  Right?  That's what you said?

12           THE WITNESS:  There are .dat files on those

13  disks, yes.

14           THE COURT:  It is also true, Mr. Cavender, as

15  soon as you saw a .dat file you knew it couldn't

16  possibly be the same DVD that you had burned?

17           THE WITNESS:  That is correct, Your Honor.

18           THE COURT:  So then, we know, and we can draw

19  the inference that somebody else put something on that

20  DVD if that is in fact the DVD you gave to Legal?

21           THE WITNESS:  Well, I know it is not the same

22  disk that I gave to Legal.  It would have to be a

23  different disk.  The disks that I gave were not

24  rewritable.

25           THE COURT:  I got you.  They would be DVDR.

1          THE WITNESS:  You got it.  That's right.

2          THE COURT:  Does everybody understand what

3    that means?  There are two types of DVDs, DVDR and

4    DVDRW.  DVDR  you can't write over.  So once you

5    finish with DVDR, that's it.  DVDRW you can write

6    over.  As Mr. Cavender points out, since he used DVDR

7    the minute he saw it was not a DVDR but something

8    else, he knew it couldn't be the same disk.  So that's

9    clear, thank you.  .

10         THE WITNESS:  I'm not sure if you want me to

11   open up the other.

12         THE COURT:  We'll give that back to Mr. Bond

13   and he can put it back so we can keep a perfect chain

14   of custody.

15         MR. SCHREIBER:  That's fine, sir.

16

17         THE COURT:  When you burned it to the DVD,

18   the PST files, did you make another copy for yourself?

19         THE WITNESS:  Yes.

20         THE COURT:  So you have those?

21         THE WITNESS:  Yes.

22         THE COURT:  So if you gave those over to

23   plaintiff, the plaintiff would have exactly the same

24   thing that you have?

25         THE WITNESS:  That's correct.

1        THE COURT:  Isn't that the solution to the

2   problem?

3        MR. SCHREIBER:  Initially.

4   BY MR. SCHREIBER:

5    Q   Are they accessible, these particular disks?

6   There is nothing to prevent us opening these?

7    A   Absolutely not.  They're in native Outlook format,

8   PST.  There is not any encryption or password

9   protection whatsoever.

10       MS. BARNES:  Your Honor, it also says in the

11   affidavit that it was the same, it was a different disk

12   with the same contents because counsel will admit that

13   we put hash marks on the documents so that we can keep

14   record of what we've produced to plaintiff's counsel.

15   So --

16       THE COURT:  Yeah, but you have to remember

17   that Mr. Bond told us, I don't think Mr. Cavender was

18   in the room, that his confusion was that when he

19   opened them, they were PDF.  And he and Mr. Bond and

20   Mr. Cavender being professionals know that's not the

21   way you save e-mails.

22       MS. BARNES:  Your Honor, I brought

23   correspondence so the record is clear about this.  We

24   admittedly produced to plaintiff's counsel in PDF

25   format.  When we did not come up with any search terms

1   and we asked that from plaintiff's counsel, in no way

2   of agreeing in which form we would produce the

3   electronic information, we produced it from summation.

4   What has not been stated today is that we reproduced

5   the PDF information.  That's the .dat file that he is

6   talking about.  So the PDF file was actually

7   reproduced to plaintiff in the file that, in the form

8   that it was given from Mr. Cavender with the hash

9   marks on it for the notations so that we would know

10  what we produced to plaintiff's counsel.  So, the fact

11  that it was in PDF format really is of no relevance

12  because that information was reproduced as

13  Mr. Cavender stated in his affidavit.

14          THE COURT:  But now I understand the

15  situation.  The point is, why can't we cut to the

16  chase and have Mr. Cavender surrender to Mr. Bond the

17  PST DVDs.  We would eliminate Mr. Bond's problem with

18  this information and we're all in the exact same

19  place.

20          MS. BARNES:  We would have no problem with

21  that, Your Honor.

22          THE COURT:  Mr. Bond, does that make sense?

23          MR. BOND:  Yes, it does, sir.

24          THE COURT:  We're going to take a break.  And

25  maybe when I come back, somebody can explain to me why

1    it has taken nine months to do that.

2           Five minutes.

3           (A brief recess was taken.)

4    BY MR. SCHREIBER:

5    Q   Can I just ask you something, sir.  In your

6    affidavit, which is Defendant's Exhibit one.  Do you

7    have it in front of you?

8    A   I do.

9    Q   On the first page, paragraph three, you state: "In

10   the matter involving Department of Justice, Clear

11   Channel moved over 11,000 people into the Legato

12   system in less than five days.  The directive was to

13   preserve e-mail for entertainment employees, radio,

14   senior management, general managers, business

15   managers, programming personnel, promotion personnel

16   and on-air talent." Is that correct?  Did I read that

17   right?

18   A   Yes.

19   Q   Where did that information come from, how did you

20   know that?

21   A   That was conveyed to me by Mr. Shannon.

22   Q   You go on to say, however, "This directive did not

23   include the preservation of e-mail from employees of

24   SFX Sports Group, (SFX Sports).  It is my

25   understanding that Audrey D'Onofrio was employed with

1   SFX Sports."

2          So, what he told you was that SFX Sports was

3   not included in the Legato system.  Is that what you

4   said there or did I misunderstand?

5   A   I think you may have misunderstood it.  The

6   directive was to move specific individuals over to the

7   Legato system.  It just so happened, it was easier for

8   us to move the people that were a part of the

9   entertainment group over to the Legato system with the

10  people that were in the Sports Group rather than going

11  through and individually moving selected mailboxes.

12  Q   I see.  So the way it was phrased maybe was a

13  problem?

14  A   Possibly.

15  Q   I've been wondering for nine months.  Okay.

16         Besides yourself, are there other security

17  principles, those three people that you named are they

18  also security principles?

19  A   No, sir.

20  Q   What are they?

21  A   Ones official title is security engineer.  The

22  other two I'm not really sure what their official

23  title is.

24  Q   Are they below you in a sense?

25  A   Either below me or lateral to me.

1   Q   Okay.  Let me just be clear so that the Court

2   understands hopefully better than I.

3          When the purge automatically happens within

4   six months, the purge is just PST files on the server

5   or is it everything?

6   A   Well, I presume you are referring to the purge of

7   the accounts after an employee has been terminated; is

8   that correct?

9   Q   Correct.

10  A   Okay.  That would mean the purge of their account,

11  their account and their password that they use to

12  authenticate to our systems and their associated

13  mailbox, which houses all of their e-mail that is

14  located on the e-mail server.  It does not include PST

15  files.

16  Q   PST files so I'm clear are not the e-mail files,

17  they're something else, they could be Word documents

18  or whatever?

19  A   Your e-mail mailbox is not kept in a PST format.

20  You can create PST files which hold e-mail.  And there

21  are many ways to do that.  But your e-mail mailbox is

22  not in a PST file.  So the automatic deletion deletes

23  the user accounts and the e-mail mailbox.  It does not

24  delete any PST files.

25  Q   So, the PST files outside the mailbox would still

1   exist?

2   A   That's correct.

3   Q   Would they be e-mails or other types of files or

4   both?

5   A   Well, PST is e-mail.  Now there may be attachments

6   to e-mail that are other types.

7   Q   Okay.  So, what you are saying is that although

8   the mailbox got purged on the server, the PST files

9   remain?

10   A   That's correct.

11   Q   Are you aware that Mr. Mason has testified that

12   when he looked on the server, all of her e-mails had

13   been deleted?

14   A   I'm aware that a PST file was found but within

15   that PST file there were not any mail items.

16   Q   Could that have happened automatically or

17   manually, so to speak?

18   A   That would be a manual process.

19   Q   Somebody had to deliberately do that, right?

20   A   Correct.

21   Q   That wasn't you, was it?

22   A   No, sir.

23   Q   Do you know who did that?

24   A   I do not.

25   Q   Has anybody told you that they heard that it was

1   anybody in particular?

2   A    No.

3   Q    That's not standard operating procedure at Clear

4   Channel, is it?

5   A    No, not at all.

6   Q    I didn't think so.

7        MR. SCHREIBER:  Thank you.

8        THE COURT:  Anything else?

9             REDIRECT EXAMINATION

10  BY MS. BARNES:

11  Q    Plaintiff's counsel made note of the letter that

12  he said in October of 2005.  If you would have done a

13  search for plaintiff's e-mails in October of 2005

14  would the results be the same as the e-mails that you

15  found in February of 2007?

16       MR. SCHREIBER:  Objection as to speculation.

17       THE COURT:  No, I think it falls within his

18  expertise.  Overruled.

19       THE WITNESS:  I believe it would be very,

20  very close.  I don't know if it would be an exact

21  copy, but I think that a very high majority of the

22  e-mails would be the same.

23  BY MS. BARNES:

24  Q    Why do you say a very high majority?

25  A    In the event there were e-mails deleted from her

1   mailbox before they were imported into Legato, those

2   would not be in the Legato system.

3   Q   This happened after she was put on Legato.  I'm

4   saying in October of 2005.  After she is put on

5   Legato, if you do a search in October of 2005, is the

6   search the same if you do the search in February of--

7   A   I understand, I'm sorry.  Yes, it should be the

8   exact same results assuming that the data was all

9   imported into Legato, and we're searching Legato we

10  should have the same net results from our Legato

11  search than we would from a mailbox and a Legato

12  search if that mailbox was still in tact.

13  Q   So, the information is exactly the same?

14  A   Yes.

15        MS. BARNES:  I have no other questions, Your

16  Honor.

17        THE COURT:  You may stand down, sir.

18        MR. SCHREIBER:  May I have just one short

19  question?

20        THE COURT:  Yes.  Go ahead.

21                RECROSS EXAMINATION

22  BY MR. SCHREIBER:

23  Q   Just so I'm clear, you were talking about

24  deleting, possibly deleting files from the mailbox

25  before it got to the Legato.  You took that phrase

1  back or that statement.  True?

2  A   Yes.

3  Q   Let me ask you this.  In terms of the server and

4  documents that are on the server, that are saved

5  there, can those be deleted manually also?

6  A   I'm not sure which server you are referring to.

7  Q   The D.C. server or SFX let's say that's in their

8  office.

9  A   Of course, yes, they can.

10  Q   So somebody could physically go into the server

11  and delete documents?

12  A   You would have to have rights to delete the

13  documents.  The owner of those documents most likely

14  would have the rights.  The owner is usually the

15  employee who has access to that part of the server.

16  They have the ability to delete documents and of

17  course any administrator would most likely carry that

18  permission as well.

19  Q   So, it wouldn't have to be Ms. D'Onofrio to delete

20  the documents.  It could be an administrator?

21  A   Anyone who has administrative rights to those

22  documents could delete it; yes, it is possible.

23  Q   As of September 2006, who else had administrative

24  rights?

25  A   I have never known who has had administrative

1   rights to that file server.

2   Q   That would be an important thing to know in terms

3   of what happened on that server; isn't that correct?

4   A   It is probably very relevant in this case, yes.

5   But it is outside of my area of jurisdiction.

6   Q   Joe Shannon has not told you anything about that;

7   is that true?

8   A   Not regarding who has administrative rights.

9   Q   Other than the directions that he has given you,

10  he has not talked about administrative rights?

11  A   No, sir.

12  Q   Last question.  Did you ever talk to Gene Mason

13  about who had administrative rights?

14  A   No.

15  Q   Do you know who he is?

16  A   I do.

17  Q   He is the person who did the I.T. work in the SFX

18  office, correct?

19  A   That's correct.

20  Q   He is the one who threw away the computer?

21  A   I'm not sure if that is an accurate statement.  I

22  know the computer was disposed of and I'm not sure if

23  he was the one who --

24  Q   I'll use disposed. Thank you.

25          THE COURT:  You may stand down, sir.

1       Call your next witness.

2       (Witness excused)

3       MS. BARNES:  The next witness will be

4  Mr. Gene Mason.

5       (GENE MASON, witness for the defendant,

6  sworn)

7                    DIRECT EXAMINATION

8  BY MS. BARNES:

9  Q   Mr. Mason, can you please state your full name for

10 the record.

11 A   Eugene Simon Mason.

12 Q   Mr. Mason, where do you work?

13 A   At SFX Basketball.

14 Q   What position do you hold?

15 A   I'm the Vice President of Finance.

16 Q   What duties are entailed in Vice President of

17 Finance?

18 A   I'm responsible for the corporate financial

19 reporting.  I also represent professional athletes for

20 financial services.

21 Q   Do you also have any other duties at SFX?

22 A   I receive an office, I'm sort of the de facto I.T.

23 person in the office because I know more than anybody

24 else.

25 Q   When you're saying SFX Basketball, can you just

1   define what entity SFX Basketball is?

2   A   SFX Basketball is the entity that represents

3   professional basketball players.  Right now, the

4   Sports Group consists of SFX Basketball and SFX

5   Financial Services, both housed in D.C.

6   Q   When you say the Sports Group, what is the Sports

7   Group a part of?

8   A   The Sports Group is a part of Live Nation.

9   Q   I want to get back to your other duties that you

10  do outside of your day job.  Can you just in detail

11  explain exactly what is entailed with your management

12  of the technology within the office?

13  A   If people have trouble with their computers I try

14  to assist them to get them solved before they escalate

15  to call the help desk or to call on anybody else.  If

16  they have trouble using the software, I'll attempt to

17  help them.  If they need to copy files or burn a DVD

18  and they don't have a set up on their computers I'll

19  do that.

20  Q   How is it that you came to be the resident I.T.

21  person given your other job?

22  A   We used to have in-house I.T. people.  But they,

23  those positions ended up getting eliminated, and I

24  knew more than anybody else in the office.

25  Q   When you say you help people with their computers,

1  have you ever had the opportunity to help

2  Ms. D'Onofrio with her computer?

3   A   Yes.

4   Q   What exactly did you do with Ms. D'Onofrio and her

5  computer?

6   A   I have helped her copy files at some point.  At

7  one point she had a computer that was not working any

8  more.  So, I redeployed a new computer to her.  Not

9  new being new but one that was a newer model that

10  somebody else had been using and wasn't using any

11  more.

12   Q   When you say redeploy, what does that mean?

13   A   That means that if there were people that were

14  working there and they left the firm, their computers

15  would generally just sit until somebody else needed a

16  computer.  If it was a newer model than existed, then

17  if somebody's computer went down, we would redeploy

18  the newest model we could find that wasn't being used.

19   Q   In simple terms, her computer crashed and you gave

20  her a new one?

21   A   Yes.

22   Q   Do you recall when or about this occurred?

23   A   No, I couldn't even give you a year.

24   Q   As the person who handles technology in the

25  office, are you deemed an administrator with the

1  rights to have access to the server?

2   A   I have access to the server.  But only, I have

3  administrator access to my server which houses the

4  Basketball and Financial Services.  I have access to

5  the other server, but I don't have complete

6  administrator rights.  I can't make folders private or

7  anything on the other server.  And if there is a

8  folder private, I can't get into it.

9   Q   What does it mean for a folder to be private?

10  A   I can't limit access.  I can't make a folder so

11  that only that user can access the folder on the other

12  server.

13  Q   If there is information on the server, can that

14  information be altered by someone other than an

15  administrator?

16  A   Anybody who has access.

17  Q   How is it determined who has access to the server?

18  A   If they have an account on the system, unless

19  somebody requested Corporate I.T. to make the folder

20  inaccessible to anybody else, almost anybody would

21  have access as long as they could sign on to the

22  server.

23  Q   So, would it be fair to say a person who works in

24  accounting could have access to a file folder for

25  public relations?

1    A    Yes.

2    Q    And having access to that file folder would that

3    person be able to alter or modify that folder in any

4    way?

5    A    Yes.

6    Q    I want to bring you to what is at issue in this

7    case specifically the search for electronic

8    communications for Ms. D'Onofrio.  Were you ever

9    requested to search for any electronic communications

10   for Ms. D'Onofrio?

11   A    Yes.

12   Q    When was that request made?

13   A    Spring of '06.

14   Q    In spring of '06 when you made this search, did

15   you search Ms. D'Onofrio's computer for electronic

16   communications?

17   A    No.  I copied her PST file off the server.

18   Q    Why didn't you search her computer?

19   A    Her computer wasn't in the office.  It didn't

20   exist any more.

21   Q    Can you tell the Court the circumstances behind

22   the non-existence of Ms. D'Onofrio's computer at this

23   time?

24   A    Sure.  Some time prior to the end of 2005, Russell

25   Wallach's computer had to go out for service and he

1    needed to access his e-mail.  So, I pulled the newest

2    computer that we had to try to redeploy and give him

3    access to his e-mail until his computer came back or

4    he got a new computer.  That happened to be Audrey's

5    computer.  We tried to upgrade to the most recent

6    version of Outlook because the version of Outlook on

7    there was not compatible with what Russell was using.

8    The machine crashed. We made several tries to reformat

9    the machine and reinstall the system and reinstall

10   Outlook so that he could use it.  After two or three

11   tries with that, and it wouldn't boot and it wouldn't

12   reinstall the system, we scrapped the computer.

13   Q    When you say it was the newest, strike that.  How

14   did you know it was Ms. D'Onofrio's computer?

15   A    Generally, what Albert would do is when we pull a

16   computer out of somebody's office who was no longer

17   there, we would put their name on a piece of masking

18   tape and just stick it on the computer so that we

19   could identify what it was.

20   Q    How did you determine that Ms. D'Onofrio's

21   computer was the newest computer?

22   A    She had one of the grade Dell towers which were

23   newer than the desktops that we had. It was just the

24   newest model.

25   Q    Is there a reason why she would have a newer

1   model?

2   A   After her machine crashed, whatever computer got

3   redeployed to her would have been a newer machine.

4   Q   Okay.  So, when you picked a computer to assign to

5   Mr. Wallach, you just randomly picked a computer which

6   just happened to be Ms. D'Onofrio's?

7   A   Yes.

8         MR. SCHREIBER:  Objection, leading.

9         THE COURT:  Overruled.

10        Go ahead.

11  BY MS. BARNES:

12  Q   I want to get back to the search for electronic

13  communications for Ms. D'Onofrio.

14      Where exactly did you search for Ms. D'Onofrio's

15  electronic communications?

16  A   I looked in her folder, and the user's drive on

17  the server.

18  Q   Why did you look on her folders drive?

19  A   Because if she had had a PST file where she was

20  copying stuff, it would have been in her user's

21  folder.

22  Q   Would you have looked for anything on her computer

23  if it would have existed?

24  A   No.

25  Q   Why not?

1  A   Because when people copy e-mails off the server

2  because it is getting too big for the server to hold,

3  generally those files end up getting too big for the

4  local machine.  If anything happens to the local

5  machine, those machines are not backed up so it would

6  be lost.  So any PST files that I created for

7  individuals would all be created on the server.

8  Q   You said that you created. Do you create the PST

9  files?

10  A   Generally, if people don't know how to do it

11  themselves.  If they want to do it themselves, I would

12  have told them to create but put them on the server

13  because you know the machine doesn't get that done.

14  Q   When you say you would have told them.  Why would

15  you have told them to save their information on the

16  server?

17  A   Because we have machines that go down because of

18  the age of the machines.  We've never had the newest

19  machines.  Anything saved on a local machine what I

20  tell people is, if the cleaning people hit it with

21  their vacuum cleaner or anything else happens to it,

22  it doesn't get back up.  So whatever was on there

23  would be lost.  So anything you want to keep, save on

24  the server.

25  Q   So is that standard policy that you would tell all

1   of the employees to save it on the server?

2   A   Yes.

3        MR. SCHREIBER:  I have an objection, Your

4   Honor, this is very general.

5        THE COURT:  Overruled.

6   BY MS. BARNES:

7   Q   With regard to the PST files again that would be

8   you that would create the PST files?

9   A   Unless the individuals themselves knew how to do

10  it, in most cases I created the PST files.

11  Q   The creation of the PST files is in conjunction

12  with the advice to save information not on the

13  individual computer but to servers?

14  A   Correct.

15  Q   So when you went to look for Ms. D'Onofrio's

16  information on the server, what did you find?

17  A   I found a PST file on the server that was roughly

18  567 megabytes.  I burned it to a CD and sent it to Dan

19  Rosier in L.A.

20  Q   I'm handing you what is marked as Defendant's

21  Exhibit six.  Can you identify this document for the

22  Court please?

23  A   Yes.  This is a screen shot I took this morning of

24  the Outlook PST folder in Audrey D'Onofrio's folder on

25  the user's drive

1   Q   Can you just identify on this screen shot where

2   Audrey D'Onofrio's PST folder would be located?

3   A   The file or the folder?

4   Q   On the screen shot.  The folder, I'm sorry.  Where

5   is it of these --

6   A   This is the screen shot of the contents of her

7   Outlook folder.  If you look at the very top it says

8   h:/, that's the user's drive.  It says A. D'Onofrio,

9   that's her individual folder.  It says Outlook PST,

10  that's the folder that held the Outlook PST file.  The

11  actual file itself is the one that is labeled A.D.

12  Q   When you see the file labeled A.D., can you just

13  note for the Court what is denoted, last date modified

14  for that file folder?

15  A   The last date modified is September 21, 2005.

16  Q   Do you know whether or not this date was before or

17  after Ms. D'Onofrio was terminated from SFX Sports?

18  A   It was before.

19         MS. BARNES:  Your Honor, at this time I think

20  this is the last of my exhibits.  I would like to move

21  to have my exhibits admitted into evidence.

22         (Defendant's exhibits 1, 2, 3, 4, 5, and 6 were

23  admitted into evidence.)

24         THE COURT:  Granted.

25

1          MR. SCHREIBER:  Your Honor, as to this last

2     exhibit.  May I have the opportunity during cross

3     examination to address it?

4          THE COURT:  You certainly may.  You may move

5     to strike it if cross examination establishes it

6     should be stricken.

7     BY MS. BARNES:

8     Q    How did you come to learn that Ms. D'Onofrio's was

9     PST folder was empty?

10    A    Dan Rosier called me back and told me that the

11    file I sent him didn't have anything in it.

12    Q    So when you copied the file, you never looked to

13    see what the contents of the file were?

14    A    No, I just copied it straight to a CD and sent it

15    off.

16    Q    Did you retrieve any other documentation from

17    Ms. D'Onofrio during your search?

18    A    During the search for Dan Rosier?

19    Q    No, during the search for Dan Rosier, yes?

20    A    No, subsequent to that, I think I copied stuff to

21    give to you.

22    Q    Okay.  Where did you copy that information from?

23    A    I copied the Audrey D'Onofrio's user's folder.

24    And probably the public drive, I think it was PR print

25    and PR temp maybe was another folder.

1   Q   Okay.  Those are not user folders that are

2   specific to Audrey D'Onofrio, correct?

3   A   No, those were on the public drive that anybody

4   who thought that they should have files in there,

5   would save them on.

6   Q   Those may have included documents that were not

7   created by Ms. D'Onofrio?

8   A   Yes.

9            MS. BARNES:  I have no further questions at

10   this time.

11            THE COURT:  Cross examine?

12            Just before you do.

13            Mr. Mason, if the file is empty, why does it

14   show 567,000 kilobytes?

15            THE WITNESS:  Because if you delete e-mails,

16   when the PST file appears in your Outlook it just

17   appears as folders that hold e-mail.  If you delete

18   the e-mail out of those folders but don't compress the

19   file again, the file takes up the same space as it

20   always did. It looks like there is something in it.

21            THE COURT:  Got you.  Thank you.

22            Cross examine.

23            MR. SCHREIBER:  Thank you.

24                      CROSS EXAMINATION

25   BY MR. SCHREIBER:

1   Q   Mr. Mason, you are not trained as an I.T. person I

2   gather, you are a finance person?

3   A   Correct.

4   Q   This is something you sort of picked up along the

5   way?

6   A   Yes.

7   Q   Now Dan Rosier is the person that asked you in the

8   spring or summer of 2006 to look for Audrey

9   D'Onofrio's e-mails?

10   A   Yes.

11   Q   Did he ask you to also look for documents at that

12   time?

13   A   No.

14   Q   Did anybody from Clear Channel, Live Nation, legal

15   counsel's office ever speak to you about Audrey

16   D'Onofrio's computer or data or anything left there

17   before Dan Rosier called you?

18   A   No.

19   Q   To your knowledge, did anybody from legal counsel

20   contact anybody at the SFX office in D.C. regarding

21   Audrey D'Onofrio's computer or e-mails or documents?

22   A   I don't know.

23   Q   You've never been told that in other words?

24   Nobody at the office ever said somebody from Legal

25   just called and they want this or they want that?

1   A   Correct.

2   Q   I gather, nobody ever he gave you what we have

3   come to call a litigation hold notification that there

4   was pending litigation or a pending claim such that

5   there should be a retention of any material,

6   electronic or otherwise, relevant to Ms. D'Onofrio?

7   A   Correct.

8   Q   You know Mr. Cavender, do you not?

9   A   Yes.

10   Q   You've spoken to him about this case, have you

11   not?

12   A   Yes.

13   Q   So, you know that he subsequently did some

14   searching on a Legato system, looking for some

15   e-mails; is that correct, of Audrey D'Onofrio?

16   A   Yes.

17   Q   He told you that?

18   A   Yes.

19   Q   When did you have these conversations?

20   A   We probably had a conversation some time in the

21   summer of '06, and recently in the last couple of

22   weeks.

23   Q   Did you ever have a conversation with Mr. Cavender

24   some time in February of '07 about material that had

25   been retrieved from any source regarding Audrey

1    D'Onofrio?

2    A    It's possible, I don't remember any conversations.

3    Q    Do you remember a conference call, were you part

4    of the conference call in early February when some of

5    this material suddenly appeared?

6    A    I don't think I was.  I don't remember.

7    Q    You told us originally that the computer was

8    scrapped by you some time in the winter of '05; is

9    that correct?

10   A    Yes.

11   Q    Would you agree with me that winter begins some

12   time around December 21; is that correct?

13   A    I would class winter from November through

14   January.

15   Q    November.  Okay.  You can't tell Judge Facciola

16   when you threw away this computer, can you?

17   A    No.

18   Q    You made no record of that, did you?

19   A    No, I never would.

20   Q    Nobody ever told you not to, correct?

21   A    Correct.

22   Q    Anybody from Legal ever call you after you threw

23   this computer away and said words to the effect of,

24   "not a great idea?"

25   A    No.

1   Q    Nobody has ever chastised you even for throwing

2   away this computer?

3   A    Absolutely not.

4   Q    Did you get a commendation for it?

5   A    No.

6   Q    I didn't think so?

7        THE COURT:  Mr. Mason, before we leave that,

8   Ms. D'Onofrio has explained to us that obviously many

9   of the people you represent are in the public eye.

10       THE WITNESS:  Yes.

11       THE COURT:  Obviously, the kind of thing

12  where it would be fun for the tabloids to find out all

13  kinds of interesting things about them.  Aren't you

14  concerned that when you dispose of the hard drive that

15  somebody can find it and find stuff that they have no

16  business seeing?

17       I know from my other cases involving, for

18  example, companies like government contractors,

19  they're required by DOD, and have regulations to wipe

20  the drives before they dispose of them.  So just that

21  thing can't happen.

22       THE WITNESS:  But when we determine that a

23  computer is going to be scrapped, it is because we've

24  tried several low level formats of the hard drive to

25  reinstall the system and it has failed. So, the

1  chances of anything still existing on that are not

2  great.

3          THE COURT:  Thank you.

4          THE WITNESS:  You are welcome.

5          MR. SCHREIBER:  Thank you, Your Honor.

6  BY MR. SCHREIBER:

7  Q   You don't know what the general retention policy

8  for documents is at Clear Channel or SFX, do you?

9  A   I think it's five years, seven years, I'm not

10  sure.

11  Q   That's current.  But when I had your deposition

12  about a year ago, you at that time didn't know what

13  the retention policy was; do you remember that?

14  A   Yes.

15  Q   So you've since learned that there is currently a

16  retention policy, correct?

17  A   Yes.

18  Q   But as of September 2005 there was no retention

19  policy at least that you knew of?

20  A   Correct.

21  Q   Now this snapshot, D-6, that you have taken for us

22  today, shows that there is a blank file called office

23  data file still resident on somebody's server?

24  A   What is office data file?

25  Q   Even my eyes can read this.  If you go across from

1   A.D., you have the 567,000 plus kilobytes --

2   A    The type, yes.

3   Q    The type, that's the type of file.

4        That is still showing up on the server?

5   A    Yes.

6   Q    And that's what you made the copy of and sent off

7   to Dan Rosier at his request?

8   A    Yes.

9   Q    Then you were told by Mr. Rosier that it was an

10  empty file?

11  A    Correct.

12  Q    Or was it somebody else that told you that it was

13  empty?

14  A    Dan Rosier called me back and said it was empty.

15  Q    Was he upset?

16  A    I don't think he had any special emotion.

17  Q    So, sometime later somebody else asked you for

18  documents; is that correct?  Was that Dan Rosier also?

19  A    Dan Rosier asked me if there were documents.   I

20  don't think he had me copy and send.

21  Q    Were there documents?

22  A    Are there documents?

23  Q    He asked you if there were documents.

24  A    Yes.

25  Q    Did you search and find documents?

1   A   I told him that her employee file was still there,

2   her employee folder on the server.

3   Q   So did you take that employee file and determine

4   if there were documents in it?

5   A   I had already done that to drill down to the

6   Outlook PST folder.  You have to go through the other

7   folders, you can see there are documents in them.

8   Q   So there were documents but not e-mails.  Is that

9   what you're trying to tell us?

10   A   There are documents.  The only thing that would

11   have had e-mails was the PST folder.

12   Q   So the documents, did you reproduce that for

13   counsel in this case?

14   A   Yes.

15   Q   When did you do that?

16   A   Most recently, two weeks ago, three weeks ago.

17   Q   Let me get this straight.  They asked you two or

18   three weeks ago to go back and get some more

19   documents?

20   A   They asked me to copy Audrey's folder from the

21   user's drive and PR folders from the public drive.

22   Q   So, the PR folder is still in existence on that

23   server?

24   A   Yes.

25   Q   This is the first time that you have made a copy

1   of it?

2   A   I'm pretty sure, yes.

3   Q   How many documents were there that you copied, do

4   you know?

5   A   No.

6   Q   How big was the file that you copied, do you know?

7   A   It was under 765 mgs for everything I copied

8   because it fit on the CD.

9   Q   But you can't tell us how much under, just less

10  than a CD?

11  A   No, I didn't --

12  Q   Now, you were telling us what you generally tell

13  people about retention or saving files or however you

14  were phrasing it, because if you save it to the hard

15  drive you can't be sure that it's not going to be get

16  bumped by the cleaning lady.  Do you remember that

17  testimony?

18  A   Yes, I remember that testimony.

19  Q   You are aware that Audrey saved a lot of material

20  on diskettes in her office; aren't you?

21  A   No.

22  Q   You didn't know that?

23  A   No.

24  Q   You know that she kept a PR file on the server,

25  correct?

1   A   I know she saved documents to the server.  I don't

2   know every folder she kept.

3          You didn't go in as you were doing the

4   search, two or three weeks ago, to determine what the

5   folders were?

6   A   I didn't go in and determine who created the

7   documents in the folder, no.

8   Q   But this was something within her portion of the

9   server or the area on the server?

10   A   I copied everything that was in her employee

11   folder on the user's drive.  And I copied things that

12   were in the public side that were PR folders.  But I

13   didn't go in and determine whether she created those

14   documents in the PR folders.

15   Q   Were there any other folders associated with her

16   that you are aware of on that server?

17   A   I wouldn't know which folder she used.

18   Q   So it is conceivable that there are other folders

19   on that server that may have documents in them that

20   relate to Ms. D'Onofrio.  You just don't know?

21   A   Correct.

22   Q   You have not made an effort in some fashion to go

23   search that server to find out if there are such types

24   of documents, true?

25   A   True, I have not.

1    Q    Nobody asked you to do that?

2    A    No.

3    Q    Nobody from legal counsel or outside counsel has

4    ever called you about that, correct?

5    A    No, they just asked me to copy her user's folder

6    and the PR folders.

7    Q    You don't have any written records of your

8    correspondence or communications with Mr. Rosier, do

9    you?

10   A    No.

11   Q    So it was just pick up the phone, Dan Rosier says

12   go do this and you did that.  Correct?

13   A    He called me and asked me to copy the PST file.

14   Q    You sent that file back to him by certified or

15   registered mail?

16   A    No.

17   Q    How did you send it?

18   A    I sent it Federal Express.

19   Q    Do you recall in the deposition, I asked you if

20   you had a receipt for sending that Fed Ex to Mr.

21   Rosier so we could determine when you did this?

22   A    Yes.

23   Q    Did you ever find that receipt?

24   A    I never looked for that receipt.

25   Q    Do you recall my asking you to look for that

1   receipt?

2   A   Yes.

3   Q   Thank you.

4        You evidently figured out that Audrey had

5   been fired when you saw that her office was empty.  Is

6   that true?

7   A   Yes.

8   Q   You told me earlier that a person by the name of

9   Eric Wold, W. O. L. D., later occupied her office

10  after she was fired, true?

11  A   I think so.

12  Q   You have specific recollection of this Mr. Wold

13  actually occupying that office after she was fired.

14  True?

15  A   I think so, yes.

16  Q   If I told you that the records produced by the

17  defendants in this case indicate that Mr. Wold was

18  terminated at almost exactly the same time as

19  Ms. D'Onofrio would that somehow impact on your

20  recollection, sir?

21  A   I don't think so.  No, because people generally,

22  once people were terminated, wanted to move to the

23  nicer offices.

24  Q   So he couldn't have been terminated irrespective

25  of what has been produced here, correct?

1    A    So he couldn't have what?

2    Q    If he was occupying her office after she was

3    terminated on September 26, thereabouts, no way could

4    Mr. Wold have occupied that office if he had actually

5    been terminated at the same time.  Correct?  He

6    couldn't have moved in there because he is gone?

7    A    Correct.

8    Q    You remember him being there, right?

9    A    Yes.

10   Q    So if the records that were produced for us show

11   that he was terminated as of the September 26 time

12   period, are those records wrong?

13   A    No, I was wrong.

14   Q    Then you could be wrong?

15   A    Yes.

16   Q    Is your recollection of all the other events as

17   good as your recollection is of Mr. Wold still being

18   there after he was terminated?

19   A    Better.

20   Q    It's better.  You had a problem with Mr. Wold an

21   actually physical human being, being present but you

22   do remember all these other things.  Is that your

23   testimony today?

24   A    No.  My testimony is if I was wrong about Eric

25   Wold moving into her office does not effect whether I

1  was right about sending Dan Rosier the PST file or

2  anything else.

3  Q   When we took your deposition almost a year ago,

4  you were pretty certain that he was still there.

5  Today, you just told me that you were pretty certain

6  he was still there.

7  A   Yes.

8  Q   I'm representing to you that the information we

9  received said he was gone as of that time period. So,

10  you don't think that means anything in the scheme of

11  things?

12  A   Not for the other testimony.  People changed

13  offices quite a bit there.

14  Q   I see.  You said to me, quite some time ago in

15  that deposition, that her computer is in a landfill.

16  How do you know that?

17  A   Because I assume that when we put it down in the

18  dumpster to go out, it goes to a landfill.

19  Q   How many computers have you thrown out during the

20  course of 2005?

21  A   I have no idea.

22  Q   Was it just Ms. D'Onofrio's or was it more?

23  A   No, it would have been more.

24  Q   But you don't know anything, was it at the same

25  time or different times?

1   A   It would have been over the entire course of the

2   year.  Any time that we ran into a machine that we

3   couldn't format the drive, install a system on, that

4   wouldn't hold the system, or wouldn't operate

5   properly, we would have thrown it away.

6   Q   Did Mr. Rosier tell you in that conversation after

7   you had sent him this, what turned out to be a blank

8   disk, that he had given that disk to Mr. Muniestery.

9   Did he inform you of that?

10   A   I don't know that he had told me that he had given

11   the disk to anybody.  He had just called me back after

12   he got it to say it was empty.

13   Q   Just to confirm, when you looked at that server

14   you determined that somebody intentionally went

15   through and deleted those e-mails; is that correct?

16   A   Once Dan called me and told me the file was empty,

17   I mounted it to make sure that it was empty, that I

18   didn't copy a bad file and send it to him.  And there

19   were no e-mails in there.

20   Q   So that was intentional?

21   A   Yes.

22   Q   You've never determined since we last talked at

23   your deposition who that person was that deleted all

24   these e-mails?

25   A   No.   Other than Audrey, there would have been

1   nobody that used the PST file.  Prior to her

2   termination, it would have been attached to her

3   Outlook.

4   Q   Let me just back up a bit.  You spoke earlier

5   about being, so to speak, the administrator in the

6   office.  Is that a correct title for you, the I.T.

7   administrator?

8   A   No.

9   Q   Okay.  Is it just the administrator who has access

10  to these files or anybody can get on that server who

11  is part of the office?

12  A   As I've stated before, unless Corporate I.T. made

13  the folders private, anybody who had access to that

14  server could get into those files.

15  Q   You indicated scaled back SFX Sports at this

16  point, basketball and some other stuff.  In 2005, they

17  had, my term, more a robust business at that time?

18  They represented a lot of athletes didn't they?

19  A   There were more entities involved at that time.

20  Q   You were aware that Ms. D'Onofrio kept press kits

21  on the various athletes in the office, didn't you?

22  A   No.

23  Q   You didn't know it was either on the server, on

24  the hard drive or physically in her office?

25  A   I didn't know where press kits were kept.

1   Q   But you know she created press kits at least?

2   A   I know she worked in PR  I didn't work with her.

3   Q   You never did anything with her?

4   A   Other than to help her with her computer.  She

5   didn't work on any of the basketball efforts.

6   Q   How about the web site?  You knew that she worked

7   on the web site, correct?

8   A   I don't know anything about the web site.  We

9   didn't use it.

10   Q   I'm sorry.

11   A   Basketball and Financial Services did not use the

12   web site.

13   Q   Even back in 2005?

14   A   Even back in 2005.

15   Q   Were you present when she was allowed back in the

16   office to remove her personal effects?

17   A   No.

18   Q   Did Mr. Wallach at the time that this was going on

19   when you scrapped Ms. D'Onofrio's computer, have use

20   of a Blackberry?

21   A   I don't know.

22   Q   Do you know if Mr. Yowpa, Y. O. W. P. A., whether

23   his computer is still in existence?

24   A   I assume it is still in existence because it was a

25   new computer.

1   Q   Is he still there?

2   A   No.

3   Q   He worked with Ms. D'Onofrio or for Ms. D'Onofrio?

4   A   He worked for Ms. D'Onofrio.

5        MR. SCHREIBER:  Thank you.

6        THE COURT:  Call your next witness please.

7        MS. BARNES:  I have a few more questions.

8                    REDIRECT EXAMINATION

9   BY MS. BARNES:

10  Q   Mr. Mason, you testified that you did not search

11  Ms. D'Onofrio's personal folder until recently,

12  correct?

13  A   I've never searched through the folder.  The only

14  thing that I've gone through is notice there were

15  files in there when I went to look for the PST.  Then

16  I copied the entire folder.

17  Q   That's what I want to clarify because I don't

18  think it was clear because I know from your deposition

19  back in --

20       MR. SCHREIBER:  Objection.

21       THE COURT:  Don't testify, counsel.  Just ask

22  a question.

23  BY MS. BARNES:

24  Q   Can you clarify when you say you didn't go

25  through, what do you mean go through?

1    A    I didn't open every single folder and look at

2    every single file and open every single file to

3    determine who the creator of the file was.  I just

4    noticed when I went down through to get to the PST

5    that there were files in those folders.

6    Q    Those files would have been copied when you copied

7    the PST file as well, correct?

8    A    No, when I first copied the PST file for Dan all

9    he asked for was the PST file.

10   Q    When did you copy the folder?

11   A    I copied the folder, I gave it to you three weeks

12   ago.

13   Q    I'm talking about her personal folder that is on

14   the server.

15   A    Right.  The personal folder that's on the server

16   which has everything else inside it.

17   Q    Were you deposed in this case?

18   A    Yes.

19   Q    At your deposition, were you asked by plaintiff's

20   counsel if you retrieved any information from

21   plaintiff's PST folder? I'm sorry, the plaintiff's

22   personal folder?

23   A    I was asked if I retrieved anything for Dan in the

24   PST file.

25   Q    Were you asked if you retrieved any spreadsheets,

1   memos, or Word documents or Power Point at that time?

2   A   I think when I looked over the deposition that he

3   had had asked me if I retrieved those.

4   Q   Did you respond that you did retrieve them?

5   A   I don't remember what I responded in the

6   deposition.  If somebody had asked me for them, I

7   would have retrieved them but not searched them.  I

8   would have just done a straight copy.

9   Q   What I'm trying to clarify for the Court is, the

10  best that you can recollect when you straight copied

11  any personal folders of the Audrey D'Onofrio.  Can you

12  tell us best when you can recollect when you copied

13  personal folders for Audrey D'Onofrio?

14  A   Look I said, I know that I copied the entire

15  folder for you three weeks ago.  If somebody

16  subsequent to the, if Dan had subsequently to the PST

17  file being empty asked me to copy anything, I would

18  have done the same thing that I did for you which is

19  just do a straight copy of whatever was in existence

20  there.  I wouldn't have opened the files to see who

21  created them or, I wouldn't have done anything with

22  the files themselves.  I would have just dragged it

23  right over to the CD and copied it to a CD and sent it

24  out.

25  Q   When you say you don't recall, that does not mean

1  that up didn't do it?

2  A   Correct.

3       MR. SCHREIBER:  Your Honor.

4  BY MS. BARNES:

5  Q   You made note of Mr. Yowpa working under

6  Ms. D'Onofrio, correct?

7  A   Yes.

8  Q   Do you know when Mr. Yowpa was terminated?

9  A   No.

10       MS. BARNES:  No other questions.

11       THE COURT:  You may call your next witness.

12       (Witness excused).

13       MR. SCHREIBER:  Can we have a short break?

14       THE COURT:  Five minutes.  We're finishing at

15  5:00.

16       (A brief recess was taken.)

17       (ALBERT C. DOBY, JR, witness for the

18  defendant, sworn)

19                 DIRECT EXAMINATION

20  BY MS. BARNES:

21  Q   Mr. Doby, would you please state your full name

22  for the record.

23  A   My name is Albert C. Doby, Jr.

24  Q   Mr. Doby, where do you work?

25  A   I work for Live Nation.

1   Q   And what position do you hold?

2   A   I'm the office manager, I.T. coordinator.

3   Q   In 2005, did you hold that position?

4   A   Yes.

5   Q   In your position of office manager, I.T.

6  coordinator, what duties do you perform?

7   A   In the office management, I take and manage the

8  office from the front desk coverage all the way down

9  to keeping supplies ordered. On the I.T. side, I'm the

10  coordinator for anybody having any computer issues

11  they contact me.  I try to resolve them.  If I can't

12  resolve them then I go to my manager which is Gene

13  Mason.  We try to resolve it together.  If it can't be

14  resolved then we have a regional office.

15   Q   As the I.T. coordinator, did you ever have the

16  opportunity to work with Ms. D'Onofrio while she was

17  employed with SFX Sports Group?

18   A   Not directly.  I worked on her computer on a few

19  occasions.

20   Q   What work did you do on Ms. D'Onofrio's computer?

21   A   I replaced one computer.  Then the other computer,

22  after her employment, we used that computer as a

23  replacement while another computer was being ordered.

24  When we did that, we tried to update the programs on

25  it, the Outlook and the computer crashed.

1    Q    I want to go back to, you said you replaced her

2    computer.  Do you recall the circumstances behind your

3    replacing Ms. D'Onofrio's computer?

4    A    It was just an old computer.  Basically, the

5    computer was upgraded to a new computer.

6    Q    Do you recall when that occurred?

7    A    Not off hand. It must have been a couple of

8    months, way before she left.

9         THE COURT:    A couple of months before when,

10   Mr. Doby?

11        THE WITNESS:  A couple of months before she

12   left.

13        THE COURT:  Before she left.  That's the --

14        THE WITNESS:  That's the first computer.

15        THE COURT:  That was replaced?

16        THE WITNESS:  Yes, that was replaced.

17        THE COURT:  The second one was put online and

18   it crashes.

19        THE WITNESS:  Yes.

20        THE COURT:  When it crashes, is she gone?

21        THE WITNESS:  Yes, she had been gone a couple

22   of months.

23   BY MS. BARNES:

24   Q    Can you explain for us the circumstances behind

25   Mr. D'Onofrio's computer crashing, the second

1   computer?

2   A   The Outlook on it that wasn't compatible with the

3   Outlook for the employee that we were trying to let

4   use the computer.  So we tried to upgrade the Outlook

5   program.  When we did that, two programs crashed,

6   collided and it crashed the computer.

7   Q   When you say that it crashed, how do you know it

8   was Ms. D'Onofrio's computer that crashed and not

9   someone else's computer that crashed?

10   A   When we take the computers that we aren't using

11   out of the office, we just basically put a name tag on

12   the front of it, and tape it to it so we know who

13   previously had the computer.

14   Q   Why did you select Ms. D'Onofrio's computer as a

15   computer to replace the other employee's computer?

16   A   Generally, we try to use the newest computer

17   that's available.  And the one that is most

18   convenient.

19   Q   After the computer crashed, what did you do with

20   the computer?

21   A   Well we tried to, we installed operating systems.

22   We couldn't do that.  We couldn't get it to turn, any

23   of the programs to run.  So we basically just threw

24   the computer away.

25   Q   Prior to throwing the computer away, do you take

1  any steps to prevent any retrieval of documentations

2  from the computer?

3   A   No, didn't see it necessary.

4   Q   Did you have any other occasion to work with or be

5  involved with Ms. D'Onofrio during her employment with

6  SFX Sports?

7   A   Outside of my office manager responsibilities, no.

8   Q   Were you present when Ms. D'Onofrio returned to

9  SFX to collect her personal belongings?

10   A   That's correct, I was.

11   Q   What was your involvement?

12   A   Basically, the office was kept locked. So I

13  unlocked the office for Ms. D'Onofrio and Aleka

14  Williams who is the director of HR

15   Q   When you say you unlocked the office for her, why

16  would you unlock the office and let her in?

17   A   They wanted access to the office.

18   Q   Do you know why they wanted access to the office?

19   A   No, I don't.

20   Q   Is it standard for employees to come back into the

21  office after they had been terminated?

22   A   If they have a reason to come in and they are with

23  the HR director, we don't have a problem with it.

24  Never been a problem before.

25   Q   Would you allow them to come back in and retrieve

1   their personal belongings?

2   A   Of course.

3   Q   Would that include any information --

4           MR. SCHREIBER:  Objection.

5           THE COURT:  Finish the question please.

6           MS. BARNES:  Would that include any

7   information stored in any drawers or on any desks in

8   the office?

9           MR. SCHREIBER:  The objection is, would he

10  have allowed as opposed to, does he know what actually

11  occurred. There is no, I don't believe --

12          THE COURT:  Mr. Doby, have you been present

13  when other people have come back after they were fired

14  or retired or anything like that?

15          THE WITNESS:  Yes, I have.

16          THE COURT:  Tell us what you did in those

17  cases.

18          THE WITNESS:  In those cases, the same

19  procedure.  They were taken to HR.  HR accompanied

20  them to the office.  They removed whatever deemed

21  necessary that was of a personal nature or whatever

22  that they said that HR said that they could move.

23          THE COURT:  Were you ever present when that

24  occurred?

25          THE WITNESS:  With Ms. D'Onofrio?  No.

1           THE COURT:  With anyone?

2           THE WITNESS:  Yes.

3           THE COURT:  Were you present when it happened

4      to Ms. D'Onofrio?

5           THE WITNESS:  No.

6           THE COURT:  So as you sit there, you don't

7      know what she took from her office.

8           THE WITNESS:  No, I don't.

9           THE COURT:  Did you go back into her office

10     after she left?

11          THE WITNESS:  Did I go back in?

12          THE COURT:  Yes.

13          THE WITNESS:  Yes, I did.

14          THE COURT:  What did you notice was gone?

15          THE WITNESS:  I didn't notice anything

16     particularly.  I mean, because I don't know --

17          THE COURT:  She must have had pictures of her

18     kids, right?

19          THE WITNESS:  Well, the office was empty.

20          THE COURT:  The office was empty?

21          THE WITNESS:  Right.  I can't say what she

22     did or did not take because I don't know what, I never

23     paid attention to what was there.

24          THE COURT:  But it did not occur in your

25     presence that she sat down at the computer and down

1   loaded any files?

2          THE WITNESS:  No.

3          THE COURT:  Did it occur in your presence

4   that she went into the desk drawers and pulled out

5   paper folders and any other paper?

6          THE WITNESS:  No.

7          THE COURT:  So you just don't know?

8          THE WITNESS:  I don't know.

9          MR. SCHREIBER:  For the record, Your Honor,

10  she was pregnant at the time, no children yet.

11         THE COURT:  Thank you.

12  BY MS. BARNES:

13   Q   For the record, Mr. Doby, can you just state

14  whether or not Ms. D'Onofrio was denied access to her

15  office?

16   A   To my knowledge, she wasn't.

17         THE COURT:  She wasn't?

18         THE WITNESS:  She wasn't.

19         THE COURT:  Of course, you unlocked it.

20         THE WITNESS:  Right.

21  BY MS. BARNES:

22   Q   To your knowledge, do you know if she was denied

23  retrieving any information from her office?

24   A   To my knowledge, no, she wasn't.

25         MS. BARNES:  No other questions.

1       THE COURT:  Any questions?

2                   CROSS EXAMINATION

3   BY MR. SCHREIBER:

4   Q   Mr. Yowpa did he continue to work after

5   Ms. D'Onofrio was fired?

6   A   Tim Yowpa?

7   Q   Yowpa, excuse me?

8   A   I think he might have been there for a little

9   while after that.

10  Q   He was let go about the same time, wasn't he?

11  A   That's correct.

12  Q   And Mr. Wold, Eric Wold, W. O. L. D., he was

13  terminated about the same time' wasn't he?

14  A   That is correct also.

15  Q   When you had to supposedly replace her computer,

16  you copied material on to the new hard drive; didn't

17  you?

18  A   When I replaced her computer?

19  Q   You said that at some point, you had to replace

20  her computer?

21  A   She was given a newer computer.

22  Q   So all the material would have been transported or

23  whatever the word is from the old computer to the new

24  computer, correct?

25  A   That's correct.

1   Q    So nothing was lost to your knowledge?

2   A    Not to my knowledge, no.

3          MR. SCHREIBER:  Thank you.

4          MS. BARNES:  I have one.

5          THE COURT:  Please.

6                        REDIRECT EXAMINATION

7   BY MS. BARNES:

8   Q    To your knowledge, Mr. Doby, do you know whether

9   or not Ms. D'Onofrio was denied access to her computer

10  when she returned to the office?

11  A    To my knowledge, I don't think she was denied, no.

12         MS. BARNES:  No other questions.

13         MR. SCHREIBER:  I'm sorry.  May I?

14                        RECROSS EXAMINATION

15  BY MR. SCHREIBER:

16  Q    Is it not policy that when somebody is terminated,

17  their password is eliminated, they can't access their

18  computer?

19  A    Yeah, but they still can generically access the

20  computer.

21  Q    Generically?

22  A    Right.

23  Q    If they walk into the office and physically do

24  that.  But they can't remotely get in, can they?

25  A    Remotely, no, I don't think so.  I'm not that

1    computer versed. That's why I am the coordinator.

2            THE COURT:  Mr. Doby, when I don't come in

3    here in the morning and I open this computer, it asks

4    for my password.  And there is no way I can get around

5    that.  Now we have, I'm hooked up to a server, all

6    right?  But suppose I just want to come here and I

7    don't care about a server, and I just want to use it

8    as a work station and not access the server, Mr. Doby,

9    I don't know about your computers put this one still

10   asks me for a password.

11           THE WITNESS:  All the computers have an

12   administrator password.

13           THE COURT:  I see.

14           THE WITNESS:  That you can use.  I can get

15   her on her computer after she is gone.

16           THE COURT:  But she can't.

17           THE WITNESS:  But she can't, no.

18           THE COURT:  That's even if she is going to

19   use the computer as an individualized work station and

20   not try to get access to the server.  Is that right?

21           THE WITNESS:  She can get on the computer.

22   She can't get to the files as far as I'm, as my

23   knowledge go.

24           THE COURT:  I understand.

25   BY MR. SCHREIBER:

1   Q   You used the word administrator.  Are you the so

2   called administrator for the server?

3   A   No.

4           MR. SCHREIBER:  Thank you.

5           THE COURT:  Thank you, very much, Mr. Doby

6   very much.  You may stand down.

7           Any additional evidence?  Both sides rest I

8   take it.

9           MR. SCHREIBER:  Yes, Your Honor.

10          MS. BARNES:  Yes, Your Honor.

11          THE COURT:  I would like to first of all

12  summarize where we are.  As I understand it, we've

13  reached an agreement that Mr. Cavender will make

14  available to Mr. Bond the PST DVDs that he created.

15          Mr. Bond, I am going to impose upon you the

16  responsibility of establishing the chain of custody

17  when that transfer is made.  We'll see how that goes.

18          We have some time so I would appreciate a

19  brief closing argument by each counsel as to what

20  happened today and where you think it takes us, and

21  what you think you established and where we should go

22  from here.

23          MR. SCHREIBER:  Your Honor, I had wanted to

24  ask the Court for a very brief rebuttal with Mr. Bond

25  because he heard something.

1          THE COURT:  I didn't mean to cut you off.

2          Mr. Bond, come forward please.

3          (DOUGLAS BOND, having been previously sworn,

4     witness for the plaintiff.)

5               DIRECT EXAMINATION (rebuttal)

6     BY MR. SCHREIBER:

7     Q    In listening to Mr. Mason's testimony, I believe,

8     you heard him describe an exhibit, it was a snapshot

9     of the computer from this morning, 567,000

10    approximately megabytes in a data file?

11    A    Yes, in the PST file.

12    Q    You have it up there.  It is D-6.  I don't think

13    you really need it.

14         Do you have an understanding of whether or not

15    that file has been deleted because of the way this is

16    shown on this exhibit or whether there still may be

17    information in there?

18    A    Well, we work with PST files quite extensively and

19    most investigations require recovery of e-mail data.

20    And from that, I know that an empty PST file is 257

21    megabytes.  So that this file is significantly larger

22    than that.  The way a PST file is set up, it's

23    basically a database.  What happens when you delete a

24    message basically the point of the message is deleted

25    and the information itself is still retained inside

1    the file.  That's why it stays the same size.  When

2    you compact, as he mentioned, then it deletes the

3    other messages and moves the file back to the 257

4    megabyte size.  So, what that indicates to me is that,

5    there could still be data on there that a normal user

6    opening it up would see nothing because all the data

7    has been deleted. But using forensic techniques, there

8    is a possibility to recover whatever e-mail messages

9    were contained in there.

10          THE COURT:  So if we got you that file, you

11   could examine it and see what is in it?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Any objection to getting that

14   file?

15          That file will be made available to you as

16   well.

17          MR. SCHREIBER:  That was my point, thank you.

18          THE COURT:  Any final thoughts?  I think

19   there are two distinct questions here.

20          Question number one is whether you have made

21   your case under rule 34 and rule 37, I supposed, to

22   authorize over the defendant's objection a forensic

23   search of, to be conducted in the manner which

24   Mr. Bond indicated he intends to conduct it, which I

25   take it means that he physically goes on the premises.

1   Does he not and does the search?

2          MR. SCHREIBER:  It would appear so, at least

3   locally and potentially in Texas, although in

4   conversations during lunch we were told it can be done

5   at a distance.

6          THE COURT:  The first question is, I take it

7   Ms. Barnes, it is still your view that you do not want

8   to cooperate in that process because you don't think

9   that Mr. Schreiber has made his case.  Is that right?

10         MS. BARNES:  Your Honor, as we've stated

11  earlier, we would be willing to cooperate under

12  certain parameters.

13         THE COURT:  Tell me what the parameters are.

14         MS. BARNES:  That it is a neutral person.

15         THE COURT:  Then it is not Mr. Bond?

16         MS. BARNES:  Yes.

17         THE COURT:  So then you don't agree?

18         Okay.  Thank you very much.

19         Mr. Schreiber, the question is whether you've

20  made your case for that sort of access on the, in your

21  terms as opposed to the terms Ms. Barnes wants to

22  impose upon you.  You still can't secure her

23  cooperation.

24         MR. SCHREIBER:  That seems to have been an

25  ongoing problem which I don't need to readdress once

1  again.

2          My original motion and reply addressed that.

3  I don't need to go through any of the case law.  The

4  Court knows it far better than I do.  I just, since

5  that time, Your Honor's opinion in the disability

6  rights case is very helpful to us, I believe.  And I

7  think the litigation holds language obtains here.

8          I was going to give to the Court, I prepared

9  my own declarations so that I could give a copy of the

10  letter that we mailed on October 6, 2005 to the

11  defendants.  I know this is somewhere in the many

12  files that are now online or physically here.  But I

13  can make this available to you.  I would indicate

14  counsel has seen it.

15          This is the notice, October 6, 2005, by a

16  facsimile, a second document that I would also show to

17  the Court. I had a conversation with a general counsel

18  at Clear Channel or corporate counsel, Vanessa

19  Dillaneua, D. I. L. L. A. N. E. U. A.  And to

20  commemorate the fact that we did speak based upon her

21  having seen this October 6 letter she sent me back an

22  e-mail with contact information.  And I would make

23  that available to the Court.

24          THE COURT:  Thank you very much.

25          MR. SCHREIBER:  Thank you.  I have copies for

1   everybody.

2          We can make these exhibits.

3          THE COURT:  Why don't you make them

4   plaintiffs, whatever the next number is.

5          MR. SCHREIBER:  Thank you.

6          I also brought along a copy of the amended

7   Rule 30 B. 6 notice of deposition that gave us

8   Mr. Shannon because I laid out in as great a detail as

9   possible, having plagiarized better sources than mine,

10  things that needed to be reviewed. And I told them up

11  front, almost down to the period what my questions

12  were going to be.  And it was about five, six pages.

13  I have that here.  But it is attached somewhere.  I

14  don't need to burden the Court with that.  But I would

15  represent to the Court that while I may not be that

16  conversant in computer language, much less asking

17  questions, I felt that I had covered fairly and

18  adequately that which we needed to know on relatively

19  short notice.

20         My point very simply is, and I don't know

21  that I need to speak at length here, this matter has

22  gone on for over two plus years.  It is almost to the

23  day when we filed two years ago, originally at

24  Superior Court.  It was removed. We have gotten very

25  little as time progressed. It is only by the force of

1   pushing that things seem to be produced.

2          The electronic material came some, give or

3   take, 15, 16 months after her termination.  She was

4   terminated in September of 2005.  We first saw

5   something in February of 2007.  What we saw was not

6   terribly helpful as the Court realizes.

7          It is obvious, I believe, from the record

8   that the defendants had adequate notice of this case.

9   Adequate notice of what we needed down to my letter

10  saying -- and it was not a great letter probably, but

11  it was decent enough.  Put you on notice, there are

12  claims, preserve your media and electronic data, et

13  cetera.  This is kind of a standard one.  I have since

14  learned to be much, much more detailed. But this was

15  adequate notice.

16         Because it was said to me at some point, I'm

17  not remembering who, maybe it was Judge Bates, did you

18  actually tell them not to throw away the computer?

19  Well in fairness, my letter never said that.  You

20  know, stupid me, who would have thought?  Because I

21  didn't know and even somebody at my level of knowledge

22  of computers would know a little bit better.  You have

23  heard adequate testimony to alert you as to what

24  happened here, what shouldn't have happened here.

25         What the involvement of the legal counsel's

office is for Clear Channel and Live Nation, I can't speculate.

But it went through them, even down to the material that we have received. Just the fact that a PST file is created and sent to them. And at some point, we get back something that is unusable.

There is a pattern here, Your Honor, I don't know that you have to go look at this whole file because you just got into it relatively recently, but you can tell from the amount of time we spent with Judge Bates, the amount of time that I've met with Ms. Barnes, even down to this very moment of we can't quite agree on what I think would not be a difficult issue because I have Mr. Bond and, yes, he has been hired by us, but we had to hire him. It's been a year. We have made our case I think more than adequately.

We have tried our best to accommodate the defendants in some ways. But still we need this information. As Ms. D'Onofrio has said, what was thrown away can't be reproduced. What was saved may in some fashion help us. But we have no assurances based upon the conduct of the defendants, that what we have received is really what is there. And we have no assurances as to how things got deleted.

1          I'm not that experienced, I would admit, in

2     computer matters.  But I don't know that I've ever

3     personally been involved in a situation of the extent

4     of spoilation as in this case.  From my standpoint,

5     maybe I'm just not that experienced. I read the cases.

6     I've read Your Honor's cases.  It seems to happen

7     more, NASCAR seems to be a case that talks about that,

8     if I recall.

9          So, I am going to say to you quite honestly

10    that Your Honor's experience in this area exceeds mine

11    considerably.  So I'm not about to suggest how to

12    resolve this so easily.  I think what you've done in

13    some of the other cases probably should be done here.

14         We have asked for among other things the

15    access to this information to try to cure the problem.

16    But we're not going to make it perfect.  So what is

17    left for us is the adverse inference that may be drawn

18    from all of this.

19         I don't need to recite the Zubalake cases;

20    you know that.

21         THE COURT:  Yes.

22         MR. SCHREIBER:  There are financial issues

23    here which we ask the Court to address.  When the

24    Court decides this and if the Court wishes, I can

25    prepare and have submitted affidavits, time and

1  expenses.  Mr. Bond's exact expenses.  Those things if

2  the Court wishes to entertain that.  I asked for that,

3  I leave it to the Court's discretion and experience to

4  decide that issue.

5        THE COURT:  Fine.

6        MR. SCHREIBER:  But those are the things that

7  are still out there.

8        THE COURT:  I appreciate that.

9        MR. SCHREIBER:  I appreciate the Court's time

10  taking this today.

11        Thank you, sir.

12        THE COURT:  Ms. Barnes.

13        Ms. Barnes, I'm going to give it to you

14  straight.  A disability rights counsel, I said under

15  the advisory comment rule 34, to rule 37, what is now

16  37 F. that while the destruction of electronically

17  stored information in the ordinary course of business

18  may not be under the rules grounds for sanction, the

19  advisory comment indicates that the rules are entirely

20  different when there is a litigation hold. Now, in

21  disability rights counsel, I required the search of

22  the back up tapes merely because somebody didn't turn

23  off the janitor program.  Here, the whole bloody

24  computer went to a garbage dump.  Doesn't that strike

25  you that if I was right in disability rights counsel,

1   a fortiari, that I've got to permit the search to try

2   to get people at least on an even playing field.

3          MS. BARNES:  With respect to her e-mail, Your

4   Honor, it's clear that nothing, the computer had no

5   bearing on any loss of e-mail.

6          THE COURT:  I'm not so sure I agree with you.

7   I'll go back over my notes and think about this.  But

8   we have also heard from her.  And you have not

9   rebutted her testimony, that like any human being on

10  the face of the Earth, she created documents.  And

11  where she may have created Power Point presentations,

12  she may have dictated notes elsewhere in her computer,

13  that information is not backed up using the Legato

14  system.  And it is, according to Mr. Mason, somewhere

15  in a landfill in Atlanta.

16         MS. BARNES:  Your Honor, I would say that it

17  definitely would not be an adverse inference --

18         THE COURT:  Don't worry about adverse

19  inference.  Let's take step one.  I just want to know

20  how you can justify or not at least initially trying

21  to find every scrap of information we can in that

22  system that's on that board?

23         MS. BARNES:  To that extent, I did bring

24  correspondence of the numerous productions that have

25  been made to plaintiff's counsel that the

1   accommodations that the defendants have done in trying

2   to search and we have searched. We produced, we

3   reproduced. I have the documentation that I would like

4   to have admitted into evidence as well, of the

5   forwarding of information to plaintiff's counsel.

6         With respect to the computer, Your Honor, the

7   time proximity between the alleged litigation hold

8   that plaintiff's counsel sent to Texas and not to

9   Washington, D.C. where the computer was actually

10   housed is close in proximity.  That amount, that

11   little bit amount of timeframe in between with respect

12   to the Word documents, the Excell documents, may not

13   have even prevented the destruction of the computer

14   even if there had been any communications because of

15   the fact the letter was sent to Houston, Texas and not

16   to Washington, D.C. where plaintiff was employed and

17   worked.

18         Mr. Mason has testified that that occurred

19   within months after plaintiff's dismissal.  And it was

20   not done in any bad faith.  It's clear from Mr. Doby's

21   testimony --

22         THE COURT:  Well, obviously, nobody is

23   complaining that there was some sort of conspiracy.

24   But I think the cases teach even well before the

25   Federal Rules, particularly, in a case called

1   residential funding in the Second Circuit, in a paper

2   context that negligent action can be the premise of

3   sanction still in adverse inference.  And the

4   residential funding case is crucial and is cited a lot

5   in the authorities.

6          You have a lawsuit pending.  You have the

7   computer used by the woman who brought the lawsuit.

8   And it never occurs to anybody that there might be

9   information on the computer.  And it would take a

10  minor amount of money and time to do a mirror image of

11  that computer and put it to one side.

12         And that is not done.  And in the world in

13  which we live, that is strange as I point out.

14         There is an interesting article and I commend

15  it to your attention.  There are two software

16  engineers at M. I.T. took $20,000, and went to pawn

17  shops, Goodwill stores and places like that, and

18  bought old computers and then, downloaded their

19  contents.  They found attorney client privilege

20  matter, they found propriety matter.  They found a

21  mountain of pornography. So that is just very strange.

22         When you sit here and you realize, you know,

23  you've got the financial planning for some hot shot

24  athlete, and all of his information just is on a hard

25  drive somewhere, it just goes out the door and nobody

1    wipes the disks.

2          Ms. Barnes, I'll be blunt with you.  I wiped

3    the disk in my computer before I gave it to my

4    cleaning lady for her son.

5          You've got to take a look at those DOD

6    regulations, they're really very illuminating.

7          MS. BARNES: Mr. Mason already testified that he

8    actually did swipe it with a magnet. And that is in his

9    testimony that was over almost a year ago.

10         THE COURT:  When did he say that?

11         MS. BARNES:  It's in his deposition

12   testimony.

13         THE COURT:  He didn't say it here?

14         MS. BARNES:  He did not say it here.

15         THE COURT:  He waived a magnet over it?

16         MS. BARNES:  In his deposition testimony, he

17   testified that he attached the magnet to the hard

18   drive which prevents any retrieval of information.

19   And that is in his deposition testimony.

20         THE COURT:  You see that's the problem.  It

21   is the inability to retrieve the information that

22   brought us here today.

23         MS. BARNES:  If I might say, the computer was

24   actually destroyed before the lawsuit was filed. The

25   lawsuit was not filed until 2006.  The computer was

1   actually destroyed in 2005.

2        THE COURT:  Mr. Schreiber's point was that on

3   October 6, 2005, he sent you a specific request to

4   hold on to, to try to restore the information.

5        MS. BARNES:  Which did not include the

6   computer.  Which according to Mr. Mason and according

7   to the deposition of Joe Shannon, they may not have

8   even looked on the computer because of the fact that

9   it is the policy of the company for employees to store

10  their information on the servers.  So essentially,

11  that almost begs the question of whether or not even

12  this letter that was sent to Texas and not to D.C.,

13  where the computer was destroyed, would have actually

14  prompted any looking on the computer because the

15  company would not think it would have a duty to look

16  on the computer.  I think that Mr. Mason testified to

17  this because it was not their policy.

18       THE COURT:  Let's get something straight.

19  Requiring under rule 37 entry upon premises to do this

20  search, that's not a sanction.  That's a legitimate

21  power that any litigant has.  So, as you can go on

22  premises for example in a case involving landlord

23  tenant, you can also go on premises which in this case

24  would be your client's headquarters and examine the,

25  the showing there has nothing to do with the sanction,

1    it is not punishable.

2          It is a way of thinking about these issues.

3    It is simply another means to accomplish the end of

4    discovery.  It is not to punish anybody for doing

5    anything wrong.  But my point, so that would be point

6    number one.

7          The reason why the loss of the computer is so

8    important is that a source of information we have that

9    might have precluded the necessity of Mr. Bond doing

10   what he has got to do is now gone.  So now we look

11   starkly at rule 37 and the balancing I must do, and

12   the simple truth of the matter, unless Mr. Bond goes

13   in there, he cannot examine the only potential source

14   of information that is left to him.

15         MS. BARNES:  Your Honor, I would say two

16   things to that.  The defendants have not objected to

17   there being a review of the server.  Defendant's only

18   position is with respect to how it is.  And it being

19   because Mr. Bond has presented what defendants have

20   taken the position is not a totally clear or accurate

21   and fully telling statement with respect to the

22   production that was made.

23         That, because of the fact that defendants

24   perceive that there may be some bias that they would

25   like an independent person to go on the premises.

1          Now, also I would like to say that plaintiff

2     still has, other than her own testimony, has not

3     shown, at least with respect to her e-mail that any

4     e-mail is missing.  There is no, there has been no

5     showing from, even from Kroll the basis that any

6     e-mail is missing.  The only thing that was said was

7     that there was not an understanding of how the

8     information was retrieved. That information could have

9     been received from Mr. Shannon, who's deposed by

10    plaintiff's counsel.  We flew him up from Texas.  That

11    information could have been, Mr. Bond was present at

12    that deposition testimony.

13         So with respect to the e-mail, there has been

14    no showing by plaintiffs other than her testimony that

15    there is e-mail out there that there is something

16    missing.  Additionally there has been no showing that

17    --

18         THE COURT:  When you say there is no showing

19    other than her testimony, why isn't her testimony

20    sufficient as to what she recalled she did when she

21    was employed there?  What other showing could possibly

22    be made?  She said, she told us this was a fraction of

23    what she did. I don't know whether she is right or

24    wrong.  But I don't think you can dismiss the

25    testimony under oath as not being sufficient.

1          MS. BARNES:  Well, Your Honor, to make

2    defendants incur a cost just simply because a

3    plaintiff makes an allegation, where --

4          THE COURT:  It is not just an allegation.  It

5    is testimony under oath that you had an opportunity to

6    cross examine.

7          MS. BARNES:  I asked her, did you depose any

8    of these other persons whom you are saying you had

9    these communications with.  This case as Mr. Schreiber

10   keeps saying, has been going on for two years.  At no

11   point, during these two years have there been any

12   depositions of anyone who received these e-mails from

13   plaintiffs, who sent these e-mails to plaintiff.

14         There has been no declaration, there has been

15   no affidavit, there has been no other corroborating

16   evidence to say other than plaintiffs saying, which

17   is, the defendants say, plaintiff said that the

18   defendants have said in their pleadings throughout

19   this, we've said it in depositions for persons who we

20   produced, that this is not true.

21         We produced over 60,000 pieces of documents

22   to plaintiff.  So we're not talking about a small

23   amount of documents for a single plaintiff employment

24   case.  We've produced a lot of documents and just as

25   plaintiff is saying that there is a document out

1  there, we've had people who have been deposed and we

2  had testimony that there are no other documents out

3  there, other than the 60,000 that we produced. In

4  addition to the fact that we have the Legato system,

5  which I think that once it is explained to Mr. Bond, I

6  think that he did say correct when we were down there

7  talking with Mr. Cavender, that there would be no

8  e-mail or very little if any, e-mail loss from the

9  Legato system.  So there has been no showing and she

10  has had ample opportunity hat know showing, ample

11  opportunity to do something other than complain, but

12  what we are not going to prove her case.  She has done

13  nothing.

14        THE COURT:  Thank you.  Take the matter under

15  advisement and try to get you an order very quickly.

16  Thank you.  Good day.

17        4:55.

18

19

20

21

22

23

24

25

C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (Plaintiff) | | | | |
| AUDREY D'ONOFRIO | | | | |
| By Mr. Schreiber | 5 | | | |
| By Ms. Barnes | | 17 | | |
| (Defendants) | | | | |
| JOHN CAVENDER | | | | |
| By Mr. Barnes | 30 | | 69 | |
| By Mr. Schreiber | | 42 | | 70 |
| EUGENE MASON | | | | |
| By Ms. Barnes | 73 | | 101 | |
| By Mr. Schreiber | | 84 | | |
| ALBERT C. DOBY | | | | |
| By Ms. Barnes | 104 | | 113 | |
| By Mr. Schreiber | | 112 | | 113 |
| (Plaintiff Rebuttal) | | | | |
| DOUGLAS BOND | | | | |
| By Mr. Schreiber | 115 | | | |

EXHIBITS

PAGE:

DEFENDANT'S

1-6                                82

### <u>CERTIFICATE OF REPORTER</u>

I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Lisa Walker Griffith, RPR          Date