1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA
------------------------X
3   AUDREY (SHEBBY) D'ONOFRIO,        Docket No. 00-953 (RWR)
                    Plaintiff,
4
                v.                    Washington, D.C.
5                                     **April 4, 2008**
                                      10:02 a.m.
6
    SFX SPORTS GROUP, INC., ET AL,
7                    Defendant.
------------------------X
8
            **EVIDENTIARY HEARING - MORNING SESSION**
9        BEFORE THE HONORABLE DEBORAH A. ROBINSON
            UNITED STATES MAGISTRATE JUDGE
10

11  APPEARANCES:

12  For the Plaintiff:    David E. Schreiber, Attorney at Law
                          By:  Mr. David E. Schreiber
13                        4550 Montgomery Avenue, Suite 760N
                          Bethesda, MD  20814
14                        301.951.1530

15  For the Defendant:    Baker & Hostetler, L.L.P.
                          By:  Ms. Johnine P. Barnes
16                             Ms. Adrienne King
                          1050 Connecticut Avenue, N.W.
17                        Suite 1100
                          Washington, D.C.  20036
18                        202.861.1633

19
    Court Reporter:       Catalina Kerr, RPR
20                        U.S. District Courthouse
                          Room 6716
21                        Washington, D.C.  20001
                          202.354.3258
22

23  Proceedings recorded by mechanical stenography, transcript

24  produced by computer.

25

```
 1                          C O N T E N T S

 2    COURT REPORTER'S CERTIFICATE......................... 94

 3    WITNESSES:              DIRECT  CROSS   REDIRECT   RECROSS

 4    Douglas Bond
        By Mr. Schreiber         4                62
 5      By Ms. Barnes                   47

 6    Audrey D'Onofrio
        By Mr. Schreiber        67
 7
      EXHIBITS:   DESCRIPTION                 OFFERED   ADMITTED
 8    PLF. 1      Bond's CV                     65        66

 9    PLF. 2      CD labeled "AO1"              65        66

10    PLF. 3      CD labeled "BO1"              65        66

11    PLF. 4      CD labeled "CO1"              65        66

12    PLF. 5      E-mail Messages Before Aug. 2004  65    66

13    DEF. 1      Affidavit of J. Cavender

14    DEF. 2      E-mail Dated 4/4/02

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2          (10:02 A.M.; OPEN COURT.)

 3          THE DEPUTY CLERK:  This is Civil Case 06-687, Audrey

 4   Shebby D'Onofrio versus SFX Sports Group, Inc.

 5          David Schreiber for the Plaintiff.

 6          Johnine Barnes and Adrienne King for the Defendant.

 7          If I mispronounced your names, I apologize.

 8          THE COURT:  You at least get mine right.  All right.

 9   We are assembled today to hold an evidentiary hearing pursuant

10   to the Court's order.  More specifically, to pages 11 and 12

11   of my memorandum opinion, which catalogs the allegations that

12   have been made that there are still e-mails and documents that

13   were not produced as well as the circumstances pertaining to

14   the, quote, scraping of the Plaintiff's computer.

15          I didn't know how you wish to proceed this morning,

16   who will call the first witness, but since somebody has to go

17   first, I'd appreciate it if someone would call a witness with

18   the understanding that we'll have nothing to do with the

19   allegation or the burden of proof.

20          Is the Kroll representative here?  The Kroll

21   representative, is he here?  Is there a representative from

22   Kroll Ontrack here?

23          MR. SCHRIEBER:  Would you like him first, then?

24          THE COURT:  Please.  All other witnesses must step

25   out.
```

```
 1              Is there a witness room?

 2              THE DEPUTY CLERK:  They are remodeling all the

 3    rooms.  I don't know whether -- we have no place for the

 4    witnesses right now.

 5              THE COURT:  All right.  So be it.  Await the

 6    directions of the clerk, sir.

 7              THE DEPUTY CLERK:  Raise your right hand, please,

 8    sir.

 9              (WITNESS SWORN BY THE DEPUTY CLERK.)

10              THE DEPUTY CLERK:  Please be seated.

11                        DOUGLAS BOND,

12    having been duly sworn, testified as follows:

13                      DIRECT EXAMINATION

14    BY MR. SCHRIEBER:

15    Q   Good morning, Mr. Bond.  For the record, would you tell

16    Judge Facciola your full name and business address.

17    A   My name is Douglas Bond, B-o-n-d.  I work for Kroll

18    Ontrack at 11411 Isaac Newton Square South, Reston, Virginia.

19    Q   And, sir, can you tell us what Kroll Ontrack is?

20    A   Kroll Ontrack is a security consulting corporation.

21    Q   And what is your position with Kroll, specifically?

22    A   I'm a senior computer forensic engineer.

23    Q   Okay.  And at my request, have you become involved in

24    this matter?

25    A   Yes, I have.
```

1    Q    Okay.  Approximately when did you begin your involvement

2    in this matter?

3    A    In early 2007.

4    Q    Okay. (Indicating to Deputy Clerk.)

5              THE COURT:  Of course, you should mark them.  You

6    don't have to worry about an additional copy for me.  I'll

7    just share the copy with Ms. Coln.

8              MR. SCHRIEBER:  May I approach?

9              THE COURT:  Certainly.

10   Q    (BY MR. SCHRIEBER)  Mr. Bond, for ease of reference --

11             (CELL PHONE RINGING.)

12             MR. SCHRIEBER:  My apologies, Your Honor, I thought

13   this was turned off.

14             THE COURT:  You have a bird in your pocket.  Please

15   remove it.

16             MR. SCHRIEBER:  I told everybody else, then, of

17   course, you know shoemakers -- Anyway...

18   Q    (BY MR. SCHRIEBER)  Mr. Bond, my apologies.  I placed in

19   front of you what we'll call, at the moment, Plaintiff's Exhibit

20   1 for identification.

21             Can you tell the Court what exactly that document

22   is?

23   A    Yes, it's a CV resume of myself.

24   Q    And what does it contain, specifically?

25   A    It contains my employment and record and training and

1    certifications as far as being a computer forensic analyst.

2    Q    Can you briefly describe for Judge Facciola what you mean

3    by a computer forensic analyst?

4    A    A computer forensic analyst is a person who examines

5    evidence or media related to computers electronically stored

6    and to determine if there's any kind of evidentiary relevance

7    to it.

8    Q    And do you indicate to the Court that you have an

9    expertise in this matter?

10   A    Yes.

11   Q    How did you come by your expertise?  Could you briefly

12   tell the Court how you came to be involved in this particular

13   type of fashion?

14   A    Yes.  I had a 22-year career in law enforcement, and

15   during the last few years of that time, I worked as a computer

16   crime investigator with the El Paso County Sheriff's office in

17   Colorado Springs, Colorado.

18         Subsequent to that, I was a private computer

19   forensic investigator, and then I became employed with Kroll

20   Ontrack as a senior computer forensic engineer

21         MR. SCHRIEBER:  Your Honor, may I interject at this

22   point.  I'm prepared to go through the background of the

23   gentleman.  We have designated him previously as an expert.  I

24   can dispense with that if counsel for the Defendant doesn't

25   have any objection.

1             THE COURT:  Any objections, Counsel?

2             MS. BARNES:  No objection.

3             THE COURT:  Okay.

4             MR. SCHRIEBER:  May we have him considered, then, as

5    an expert in the area of computer forensics investigations.

6    Q    (BY MR. SCHRIEBER)  Thank you, sir.  We will not continue

7    to go through your CV.

8             Have you previously, though, testified in court on

9    this type of matter?

10   A    Yes, I have.

11   Q    Okay.  And you've listed that prior testimony in your CV,

12   have you not?

13   A    Yes, I did.

14   Q    Okay.  Let me direct your attention, then, sir, after

15   being contacted to become involved in this matter, what was

16   the first thing that you did?

17   A    I had discussions with you as far as what our involvement

18   would be; then I attended a deposition with you; and then I

19   received some CD disks with data on them from you.

20   Q    Okay.  Do you remember whose deposition you sat through?

21   A    I can't remember his name at this second.

22   Q    May I suggest it was Mr. Shannon?

23   A    Yes.

24   Q    And after sitting through Mr. Shannon's deposition with

25   me, you said you received some disks; is that correct?

1    A    Yes, that's correct.

2    Q    Okay.  When you receive a disk -- first of all, did you

3    receive it from me?

4    A    Yes.

5    Q    Okay.  Once you receive a piece of evidence, if you will,

6    a disk, what is your standard procedure upon receipt?

7    A    We initiate a chain of custody procedure so that we can

8    tell exactly where the item is at all times, as long as it's

9    in our custody.

10   Q    Okay.  And did you do that in this matter?

11   A    Yes, I did.

12   Q    Okay.

13        MR. SCHRIEBER:  Your Honor, I'm going to be handing

14   to this gentleman evidence that has been sealed, and these

15   should be marked.

16        THE COURT:  Thank you.

17        MR. SCHRIEBER:  We do not have, obviously,

18   additional copies of this because we have it sealed.  May I

19   approach?

20        THE COURT:  Certainly.

21   Q    (BY MR. SCHRIEBER)  Mr. Bond, I am handing you what has

22   now been marked for identification as Exhibit No. 2.  Would you

23   tell the Court what that is.

24   A    Yes, this is a CD that is labeled as "A01" from Matter

25   No. DS2247424, which is the internal designation that we gave

1   to your job.

2   Q    Okay.  And can you tell the Court, as a result of receipt

3   of Exhibit No. 2, what you did, if anything?

4   A    What I did with this was to make a forensic copy of the

5   contents of the disk and then to an attempt to analyze the

6   contents to provide some value to you.

7   Q    Okay.  As a result of your attempt to analyze the

8   material to be of assistance to me, can you tell the Court

9   exactly what you did and what you found?

10  A    On looking at the contents of the disk, I found that

11  there was over 9,000 documents on the disk and that each one

12  of them appeared to be, when viewed, an e-mail message, but

13  they were delivered to us in a format called a PDF file, and

14  specifically, the format of the PDF was such that it was just

15  an image of the message as opposed to the text of the message,

16  and the result of that was that none of the standard forensic

17  processing tools could either read, index or search any of the

18  messages.

19  Q    As a result of what you did, were you able to categorize

20  or catalog any of the information on these various 9,000

21  documents?

22  A    No.  The documents themselves, you could pull it up and

23  it's just like viewing a picture.  You could see the

24  information there, but as I said, none of the processing tools

25  would work on it.  Also, there was no index or catalog

1    received with the e-mails, so I couldn't tell where they were.

2           Really, the only way those could have been processed

3    would have been to individually print each 9,000 document and

4    then scan it and use OCR, Optical Character Recognition, on

5    it, and then put that into some kind of data format, and that

6    would have taken an extreme amount of time.

7    Q    Okay.  The way these PDF documents were presented on this

8    disk, could you determine anything about where these documents

9    came from, the source?

10   A    No, not with the information that was contained on the

11   disk.  As I said, there was no index.  Nothing arrived with

12   the disks to indicate where it had been retrieved from, what

13   kind of e-mail server it was from.

14          And also, the -- because of the way they were

15   presented, the metadata from the files was not maintained, so

16   I couldn't even -- other than text that was again viewable as

17   a picture, could not tell any much more about the e-mails

18   themselves.

19   Q    And just lastly, as far as this Exhibit 2, was there any

20   way, at that point, that you could search these documents for

21   any specific information, if I gave you the name Schreiber,

22   for example?

23   A    No, no way at all.

24   Q    Okay.

25          MR. SCHRIEBER:  May I approach, Your Honor?

1    Q    (BY MR. SCHRIEBER)  Mr. Bond, let me show you what has

2    been marked for identification as Plaintiff's Exhibit No. 3.

3    Could you tell the Court what that is.

4    A    Yes, it's a CD disk labeled "B01," also with Matter No.

5    DS2247424 from Kroll Ontrack.

6    Q    Okay.  And at my request, did you examine this disk?

7    A    Yes, I did.

8    Q    Tell the Court how you went about doing this.

9    A    I started the examination the same way as with the first

10   one.  I made a forensic copy of the contents of the disk and

11   then attempted to view the contents to -- I think our final

12   result was to do a keyword search for relevant terms.

13          On viewing this disk, I found that there was

14   approximately 30,000 e-mail messages on it and they were in a

15   different format than we had originally received.  They were

16   in a dot MSG format, a message, and that's a format that you

17   can get from exporting a document from a PST Microsoft

18   personal store file to -- if you wanted to present them as

19   individual messages.

20          So it's -- it was message in an e-mail format, but

21   again, as discreet mail messages as opposed to one database,

22   which a PST file is, which contains all the messages.

23          So -- now, that -- those messages actually were

24   searchable.  They are not in the -- a native mail format in

25   that some -- somebody did something to a mailbox to -- to pull

1   these messages out and produce them to us.

2            Also, there was an index contained with that data,

3   and so there was some attempt done to kind of categorize and

4   catalog the data so that it could be told where it had been

5   produced from.

6            But since this mail had been received in -- in a

7   format that could be processed, I was able to load all of the

8   messages into a separate database file and then use that

9   database file to do a keyword search, and I searched the --

10  all those messages for keywords and then produced the

11  documents that were found from the keywords.

12  Q    Okay.  How did you determine keywords?

13  A    You provided me with a list of words to search for.

14  Q    Okay.  And did you also have discussions, at any point,

15  with the Plaintiff about this?

16  A    Yes.

17  Q    And as a result of those keywords, were you able to

18  prepare or construct a disk that contained various documents,

19  if you will, that corresponded with the keyword search?

20  A    Yes.  What I did was I searched the entire contents of

21  the disk, and every e-mail message that contained the word

22  that was searched for, I was able to copy out and then write

23  each of those hits onto a disk and then provide it to you.

24  Q    Okay.  Can you approximate for Judge Facciola, as far as

25  this Exhibit No. 3, how much time you had to spend in order to

1   do this?

2   A    It took probably six to eight hours of processing to get,

3   one, this -- the data into a format that could be searched,

4   and then, two, to search the data.

5   Q    If you had received this material in its native format,

6   which we're assuming is a PST file; is that correct?

7   A    Yes.

8   Q    Can you approximate for Judge Facciola how much time you

9   may have spent trying to do the processing and the search?

10                  MS. BARNES:   Your Honor, I want to object to that --

11                  THE COURT:   Why don't you stand.

12                  MS. BARNES:   I appreciate the nature of this hearing

13   and want the information to come out, but if Plaintiff's

14   counsel could allow the expert witness to actually testify as

15   opposed to leading him in testifying form, we would greatly

16   appreciate it.

17                  THE COURT:   The objection is overruled.   Do you

18   understand the question?

19                  THE WITNESS:   Could you repeat it, please.

20                  THE COURT:   Had it been in native format --

21                  THE WITNESS:   Okay.

22                  THE COURT:   -- how long would this process have

23   taken?

24                  THE WITNESS:   One to two hours, because we have

25   tools and that's -- these are -- this is a standard type job

1    for computer forensics.  We have tools that we use to search

2    PST and EDB, which is a bigger type file, and basically you

3    get the list of keywords, enter it into the tool, point it at

4    the database and get the results, so that having received

5    this -- the e-mail and these discreet format made it

6    considerably more difficult to complete the search.

7    Q    (BY MS. BARNES)  I don't know if I asked you this

8    question, and I apologize if I did already, but going back to

9    Exhibit 2, the first disk, do you have an estimate of how much

10   time you had to spend on that disk trying to extract

11   information?

12   A    It's approximately two hours, because once I saw that --

13   the format it was in, it was foreign, I had never seen e-mails

14   produced in that format, and then I had to do some research to

15   see if, in fact, that there was a method of processing these

16   e-mails.

17   Q    Okay.

18            MR. SCHRIEBER:  Again, may I approach, Your Honor?

19            THE COURT:  Certainly.

20   Q    (BY MR. SCHRIEBER)  Let me show you what has been marked

21   for identification as Plaintiff's Exhibit No. 4.  Would you tell

22   the judge exactly what that exhibit is.

23   A    It's a CD disk labeled "C01," also with Matter No.

24   DS2247424, and it is the third disk in the set that was

25   provided to me for analysis for this job.

1    Q    Okay.  And at my request, did you analyze this --

2    A    Yes, I did.

3    Q    -- disk.  Can you tell us what you did and what you

4    found.

5    A    The data on this disk was in the same format, excuse me,

6    as the second disk, so it was a searchable format.   There was

7    approximately 9,000 messages on it, and so I processed it in

8    the same fashion as the first, and I did a keyword search with

9    the same list of keywords and then presented the results from

10   that search.

11   Q    Okay.  Again, do you know how much time, approximately,

12   you spent on this disk?

13   A    Yes.  Since there were a fewer number of files, it didn't

14   take as long but it was probably three or four hours still

15   because there's a front end kind of processing to load all

16   these files into a database that can actually be searched.

17   Q    Okay.  You indicated that you thought there were 9,000

18   messages total on this third disk --

19   A    Right.

20   Q    -- C01.  Were those messages and files or just messages?

21   A    Well, the -- on both of the disks, there were --

22   Q    When you say "both disks," which one is that?

23   A    Both, B01 and C01.

24   Q    Exhibits 3 and 4, for the record.

25   A    Right.  They were both received in the same format, and

1   on there there was files with a dot MSG, a message file, and

2   then also the attachments to the e-mail, whether it was a Word

3   document, a Power Point file, Excel spreadsheet, those were

4   also included so that the number I gave you includes those

5   other files also.

6   Q   Okay.  You prepared and signed a declaration in this case

7   eight, ten months ago; do you recall that?

8   A   Yes.

9   Q   And have you reviewed that declaration today in

10  preparation for your testimony?

11  A   Yes.

12          MR. SCHRIEBER:  Your Honor, I'm not going to redo

13  the declaration.  There's more information there.  I'm

14  assuming the Court is satisfied and has read that and I don't

15  have to belabor the issue.

16          THE COURT:  Okay.

17  Q   (BY MR. SCHRIEBER)  As I had asked you earlier, with

18  respect to Exhibits 3 and 4, this is B01 and C01, could you

19  determine the source of the information on either one of these

20  disks, where they came from?

21  A   Both disks have a index that was produced probably by

22  some type of a processing program, and in the index, it has a

23  folder structure, directory where these files were produced

24  from, so that's as far back as I can go with it.

25          I can't tell what e-mail server it came from, where

1   it was collected, when it was collected, who collected it,

2   from the information that's provided on the disks.

3   Q    In your forensic capacity, other cases that you've worked

4   on, is that information important as you evaluate the

5   information that you receive?

6   A    Oh, yes, it is, and that's why we --

7           MS. BARNES:  Objection.

8           THE COURT:  There's an objection.  It's overruled.

9   Go ahead.

10  A    That's why we record all the information when we make

11  copies of either hard drives or e-mail servers so that if

12  someone else wants to ask, "Well, where did this come from;

13  where did you get," we can provide exactly the information,

14  and so that if we found, say, even other e-mails, we could

15  tell if they were copies of the same ones or new versions of

16  the same document.

17          And so by the fact that I couldn't tell exactly

18  where it came from, that would be -- make it difficult to try

19  to, you know, determine the relevance sometimes.

20          THE COURT:  Before you go on.

21          MR. SCHRIEBER:  Yes, sir.

22          THE COURT:  Let's talk about what I'm doing now.

23  Okay.  Obviously, I have my e-mail open.

24          THE WITNESS:  Right.

25          THE COURT:  So if I go to my e-mail and I send my

1   law clerk an e-mail.

2           THE WITNESS:  Yes, sir.

3           THE COURT:  And a year goes by.

4           THE WITNESS:  Right.

5           THE COURT:  If somebody were to download the PST

6   files onto a disk and give them to you.

7           THE WITNESS:  Right.

8           THE COURT:  You use the term "not know where they

9   came from," what do you mean?

10          THE WITNESS:  Okay.  Well, if -- if you gave me

11  that -- your PST file off of your computer, and I said, "Okay,

12  this computer, this PST file comes off this person's

13  computer," then I would say, "Okay, that -- that's where it

14  came from."

15          THE COURT:  How do you know that?

16          THE WITNESS:  Well, one, if I collected it myself,

17  which is, that's our normal process, and so if I'm involved in

18  a job and I was going to be examining your computer.

19          THE COURT:  I see.

20          THE WITNESS:  I would come in and create a

21  chain-of-custody form.

22          THE COURT:  I see.  So you would come on to the

23  premises here, and you would probably go down to the network

24  server and you would say, "There is now an issue in a loss of

25  all of Facciola's PST for a two-year period.  I am going to go

1    into this system and get them."

2              THE WITNESS:  Right.

3              THE COURT:  And you would, therefore, know from that

4    operation that they came from Facciola's laptop in Courtroom

5    No. 6.

6              THE WITNESS:  Right.

7              THE COURT:  Plus the server would tell you that?

8              THE WITNESS:  Well, the -- yes, the server and then

9    also we would document on a chain-of-custody form where we got

10   it, who released it to us, the IT person there, and so that

11   if -- if there was a question in the future, well, exactly

12   where did this come from, I can say that I went to the server

13   room, this person on this date and time gave me access and

14   pointed me to the direction because I -- you know, if we need

15   assistance because of the complexity of these things, and

16   said, "This is Facciola's PST files," and then I would copy

17   that and then do the processing from there.

18             THE COURT:  But I'm sure, in your work, you also get

19   disks from other people, right?

20             THE WITNESS:  Yes, correct.

21             THE COURT:  As occurred in this case?

22             THE WITNESS:  Yes.

23             THE COURT:  Is it possible that if you do it there,

24   you're not on premises, you're back in your office, can you

25   still ascertain the computer which generated that?

1          In other words, assume someone gave you a disk and

2    said, "This is the disk of Facciola's PST files from 206 to

3    208," could you, by searching, say, "Oh, because that has a

4    hash value and we know it's a unique file, I know it came from

5    Facciola's computer, which is 003448903"?

6          THE WITNESS:  Okay, I see.  The files themselves do

7    not contain information related to the computer that it's

8    generated on.

9          THE COURT:  I see.

10          THE WITNESS:  And they can be moved around.  So you

11    might be able to, say, "Look at your computer now and see what

12    message is there and compare it to it" -- excuse me -- do it

13    that way, but actually in a PST file itself, it doesn't

14    contain information that would tie it to a specific computer.

15          THE COURT:  So if I go to my chambers, even though I

16    have the same location on the network server, and if I do the

17    e-mail from there, unless you were on premises and retrieved

18    it from the server itself, if someone gave you a disk of

19    e-mails, you couldn't possibly say, "Facciola did that from a

20    laptop" or "Facciola did that from chambers."

21          THE WITNESS:  That's correct, because it won't --

22    the server doesn't know you're connected.  When you send an

23    e-mail, it comes from whatever computer on the network you've

24    got, goes to the server, gets processed and then goes out.

25    And so as long as -- now, you can say that you were on the

 1  network and that you were authorized or else you wouldn't have

 2  got it -- gotten into the e-mail server itself.

 3           So, you can take it back that far, but as far as if

 4  you were in this computer or that computer, it won't normally

 5  show up in a PST file.

 6           THE COURT:  Thank you very much.  Thank you.

 7           MR. SCHRIEBER:  You are almost beyond my level of

 8  knowledge, Judge.

 9           THE COURT:  All right.  Well, just one other

10  question.

11           MR. SCHRIEBER:  Go ahead, please.

12           THE COURT:  We use PDF in chambers all the time.

13           THE WITNESS:  Right.

14           THE COURT:  Indeed, as you know, the ECF system is

15  based on the PDF.

16           THE WITNESS:  Right, right.

17           THE COURT:  Is it possible to take a series of,

18  let's say, a thousand PDA files, combine them into a single

19  PDF file and use the PDF facility to search them?

20           THE WITNESS:  I think that there is a possibility,

21  and I think that one of the things that occurred here is there

22  is different means of producing PDF files.  Most of the time,

23  when you get a PDF file or say we download from the Internet,

24  you can actually highlight text on the -- in the PDF file,

25  search through it, but -- and so that's a PDF file that's

1   created a certain way.

2           THE COURT:  I understand.

3           THE WITNESS:  These files were not created that way.

4   Basically, it was a photograph of them, and so since it was

5   produced in that format, there was no searching possible

6   without further, like I said, printing it and then OCR'ing it

7   or something like that.

8           THE COURT:  So this would be typical of creating,

9   going into the message, hitting the button where it said

10  "print" and then instead sending it to a PDF file.

11          THE WITNESS:  Yeah.

12          THE COURT:  Which is opposed to creating it from a

13  program like Acrobat or something like that.

14          THE WITNESS:  Right, right.

15          THE COURT:  So from what you can tell, these looked

16  like these were PDF files produced in the first way rather

17  than the second.

18          THE WITNESS:  Right, right.

19          THE COURT:  Thank you.

20  Q    (BY MR. SCHRIEBER)  When you attended Mr. Shannon's

21  deposition, you heard him speak of something called Legato.

22  A    Right.

23  Q    Are you familiar with that system?

24  A    Yes.  It's a backup system used with e-mail servers.

25  Q    And can you be a little more specific, certainly for

1   Judge Facciola and for me, because I may not understand it

2   anyway, but I think the judge is a little more converse in it,

3   can you go into some detail as to what you understand Legato,

4   the system does or doesn't do?

5   A   Well, you know, all large corporations have e-mail

6   servers where they keep their e-mail.  There is several

7   commercial providers that provide software that you can use to

8   backup e-mails and for -- in various formats.

9        Legato is one of these software packages, and I'm --

10  I've never actually run it or administered an account with it

11  on there, so I can't speak specifically to how it works other

12  than generally is that you would set it up, associate it with

13  a e-mail server and then tell it to store or copy e-mails from

14  certain users' accounts, groups of users, and then it would

15  retrieve this information and copy it onto backup tapes or

16  other storage that you have.

17  Q   Okay.  In this matter, it was represented to us, and I

18  believe you were present when Mr. Shannon addressed this, that

19  the Legato system for the Defendants began collecting e-mails

20  or documents, I'm not sure at this point, but in any event,

21  e-mails in August of 2004.  Do you remember --

22  A   Yes, I remember --

23  Q   -- that fact?

24  A   -- him saying that.

25  Q   If we assume that that is the case, vis-a-vis,

1    Ms. D'Onofrio, and that's when the Legato system began, could

2    that system produce for us now any e-mails prior to August of

3    2004?

4    A    Well, again, I don't know how it is specifically set up,

5    but if you -- it's a program and if you turned it on and said,

6    "Starting this date copy these users' files out," it wouldn't

7    make -- I couldn't see that it would retrieve information from

8    an earlier date unless they were, say, attachments, or say,

9    forwarded e-mails.

10          Now, some e-mail -- someone had forwarded from

11   July 2004 and then was in an e-mail in August 2004, it might

12   be captured in there, but if -- if you turn it on August 2004,

13   it's going to start collecting from that date and move on.

14          MR. SCHRIEBER:  Excuse me, Court's indulgence.

15          THE COURT:  Well, let's -- wouldn't a more typical

16   scenario in the corporate world be when you buy Legato, the

17   vendor would at least have to consider migrating the data from

18   the pre-existing system to the new one?  Isn't there a concern

19   in the corporate world that the new vendor starts fresh and

20   then material --

21          THE WITNESS:  Oh, yeah, I think --

22          THE COURT:  Just let me finish the question.  And

23   therefore, he would have some -- again, going to the Court, if

24   you went to a new backup system and they say, "All right,

25   we're going to back up from this day," well, all of our cases

1   have a history to that point.  That system would be useless

2   because in the D'Onofrio case I would -- I would not be

3   getting back -- we would not have backed up in a secure

4   setting all of the pleadings that came in before we bought the

5   new system.

6            THE WITNESS:  Right.

7            THE COURT:  Is that a concern in the corporate

8   world?

9            THE WITNESS:  Yes, it is, and that's why knowing how

10  the system is set up and why -- and in the deposition, I

11  recall hearing that this was set up for a specific legal

12  reason and to record e-mails from that point on as opposed to

13  a general backup of the entire e-mail system.

14           THE COURT:  I see.

15           THE WITNESS:  So I think that -- so it made sense

16  how they had set it up because of what they had said.

17           THE COURT:  Uh-huh.

18  Q    (BY MR. SCHRIEBER)  And at the request of the Plaintiff,

19  given that August 2004 date, did you search in the data or the

20  material that was produced for any either e-mails or attachments

21  to e-mails produced prior to August of 2004?

22  A    Yes, I did.

23  Q    Did you find some?

24  A    Yes, I did.

25  Q    Mr. Bond, let me show you what we've had marked as

1   Exhibit 5 for identification.  Could you tell Judge Facciola

2   what this exhibit encompasses.

3   A    This exhibit contains e-mail messages that were found

4   during a search of the provided e-mails that had creation

5   dates of before August 2004.

6   Q    And were these documents the ones that were represented

7   as coming off of the Legato system?

8   A    They were -- the data that was provided to me, and again,

9   like I said, it goes back to the fact that I'm not sure

10  exactly where the data came from, so I can't say that if it

11  was retrieved from the Legato system or from some other --

12  some other format.

13  Q    Okay.  But they do pre-date August 2004?

14  A    Yes, they do.  The information in the headers all

15  indicate that they were e-mails that were created before that

16  date.

17  Q    Now, if you were permitted by the Court to do further

18  forensic investigation in this matter, would you address for

19  Judge Facciola what you would envision you or Kroll, because

20  some of this is in Texas and Kroll is a national company, but

21  what would Kroll propose would be appropriate under these

22  circumstances to search for documents, e-mails, et cetera?

23  Can you outline for the judge, that?

24  A    Yes.  With my understanding of the ITS specs of this

25  case, I believe that there is a server system in the DC area

1   that at one time, or even perhaps still, contains data related

2   to this case and a -- imaging that server and then doing

3   analysis on the contents of the server, could find files

4   related to the case, e-mails, other information that could be

5   of value to the case.

6        Also, the -- there are e-mail servers in the, I

7   guess in the San Antonio from -- at the corporate level that

8   could perhaps contain other information or e-mails related to

9   this case, and again, that goes back to the fact that since we

10  don't know exactly where this mail came from, that to be

11  complete you would have to go there and look for yourself to

12  see what was there.

13  Q   From a forensic standpoint, would this have value for the

14  Court in determining what exactly happened in this situation?

15  A   Oh, surely, because even the -- say the local server, I

16  could say whether or not there was information related to this

17  case on that server from doing an analysis.  So that -- that

18  would be just a point of fact is, yes, there are files

19  related, or no, there are not files and then we would know for

20  sure whether or not that was of any relevance.

21  Q   A witness on behalf of the Defendants, a Mr. Mason has

22  testified that he looked at the local DC server and found that

23  somebody had deleted, that's my phrase or my word,

24  Ms. D'Onofrio's e-mails, possibly documents.  I don't have the

25  right question, but I know the e-mails, at least.

1    Could you look at that server and make any findings

2  as to whether or not that occurred and when it occurred?

3  A    There's a possibility that I could, and that's standard

4  forensic practice to determine if files have been deleted and

5  then to go -- if, in fact, files have been deleted, to try to

6  determine when, where and even who, perhaps, could have

7  deleted them, and again, standard forensic practice to look in

8  an allocated space, areas of a server or computer that aren't

9  used by the operating system that -- and many times contain

10 valuable information that would be lost otherwise, or that a

11 normal IT person, system administrator, while looking at the

12 system, wouldn't be able to see, and through using special

13 forensic techniques, we would be able to view.

14 Q    You're talking about the server now --

15 A    Right.

16 Q    -- correct?  Would there appear, what I understand is the

17 term called "links" on the server, if I'm using that phrase

18 correctly?

19 A    Yes.

20 Q    And maybe tell Judge Facciola a little bit more, what I

21 meant by that, since I may have misused the term.

22 A    Well, I think we had a discussion about this, and a link

23 file is a file that is created when data is accessed remotely

24 from a computer, and what can happen is that say if you were,

25 say, accessing a file on your -- your desktop computer

1    remotely, a link could be created for that and then you could

2    delete the file from your computer.

3          The link could still be there, and that's a --

4    again, the standard forensic technique to look for links, and

5    then they can provide valuable information as far as even

6    files that have been deleted, wiped, erased, but you can still

7    see that the file at one time was there.

8          And that's part of the standard forensic processing,

9    something that you would do and could be of value even in this

10   case if there was a particular file of interest that we found

11   the file name for and -- but we can't find the file itself.

12   So that would be an indication that at one time the file was

13   on the system but had been deleted, erased or wiped.

14   Q    So if Ms. D'Onofrio's e-mails, et cetera, had been erased

15   from the local DC server, you could, possibly, given access to

16   this server, make that determination for the Court?

17   A    Yes.  And again, the keyword there is "possibly."  There

18   is a lot of things involved with when data gets overwritten,

19   and unfortunately, the more time that passes between when an

20   event occurs and when an image of a computer or a server is

21   made, the less likely that there's data going to be recovered,

22   but I have personally worked on cases several years old where

23   I found internet histories, all kinds of information that was

24   thought to have been lost forever, and by looking at the

25   unallocated areas, looking at the machine itself, was able to

1   recover that.

2   Q    Let me turn your attention to the computer that Ms.

3   D'Onofrio had used for some five years.  You were present for

4   the testimony of Mr. Shannon where he indicated that a

5   Mr. Mason had scrapped that computer.

6   A    Yes, I was.

7   Q    Do you recall the circumstances, as Mr. Shannon described

8   Mr. Mason's statements to him, as to why Mr. Mason supposedly

9   decided to scrap the computer?

10  A    I believe that he stated that it was -- that they had

11  tried to turn it on or to boot it up and that it wouldn't

12  work, and because of that, they determined that it was useless

13  and then scrapped it.

14  Q    In your experience as a computer forensic analyst, if a

15  computer did not start or boot up, would that be an impediment

16  to doing anything forensically with that computer?

17  A    No, not at all.

18  Q    What would you have done, had you had the opportunity to

19  look at that computer, assuming it wouldn't boot up?

20  A    Well, first of all, not booting up and the data stored on

21  the hard drive could be two different matters.  The data on

22  the hard drive could have been fine and it could have been

23  power supply or any other kind of electronic problem that

24  wouldn't cause it to start.

25          In our process, is to actually go to the disk at the

1   disk level and try to read the information off of it, and

2   normally, we would even remove that from the computer itself.

3          And so if the computer was not operational

4   whatsoever, the data on the hard drive could still be, in

5   fact, intact, and so that's -- and that's a common process we

6   do, would be to try -- attempt to read the hard drive to

7   remove it from the computer, attempt to read it.  And then,

8   even if in fact there were problems with the hard drive, which

9   is -- occasionally happens, our company also has a clean room

10   that can recover data from broken, let's say, hard drives.

11   Q    Okay.   That works fine for me.  I don't know if the judge

12   wants something a little more sophisticated, but "broken"

13   works for me.

14          Would you, for the record, briefly just explain what

15   clean room is or does?

16   A    Okay.   A clean room is a facility.  It's called "clean"

17   because the air is filtered inside of it where -- and in this

18   particular instance we're talking about where computer hard

19   drives are actually -- are, I say, triaged and then the data

20   on them is recovered, and what we can do there is actually

21   physically open up the hard drives and get to the platters

22   inside of them and the technicians in there -- we have a clean

23   room here in Virginia.  I've been in there.  They -- there is

24   numerous proprietary techniques they use, but they can change

25   parts.  I don't even understand everything they do there but

1   that they are very adept at recovering data from a hard drive

2   that if you or me were to plug it into a computer wouldn't

3   work whatsoever.

4   Q   Going back to approximately this time last year.

5          THE COURT:  Just giving my clerk directions.  Go

6   forward.

7   Q   (BY MR. SCHRIEBER)  Just to confirm, you were available,

8   sir, to forensically investigate this matter, be it the server

9   or the hard drive, had it been available?

10  A   Oh, yes, I was.

11  Q   Okay.  And in fact, were your originally retained to do

12  that?

13  A   Yes.  Actually, I was.

14         MR. SCHRIEBER:  Court's indulgence, please.

15         (PAUSE.)

16  Q   (BY MR. SCHRIEBER)  Met me lastly ask you one other set of

17  questions.

18         Are you familiar with the concept of a retention

19  policy?

20  A   Yes, I am.

21  Q   Okay.  Just for our record -- and I think I should have

22  it in here.  I know the judge is well familiar with it.  For

23  the record, what is a retention policy as it would apply to a

24  large company such as Clear Channel?

25  A   Well, as -- I think I understand what you're asking.

1   Retention of e-mail, every corporation can determine what kind

2   of a policy they have as far as what e-mail is retained and of

3   what users and for what period of time that's retained.   I

4   think, is that what you're asking for?

5   Q    Right.   Have you, on behalf of Kroll, ever been retained

6   to investigate forensically on behalf of an employer or a

7   defendant in this type of case?

8   A    Yes.   This is a fairly common type of case that we work

9   on.

10  Q    Do you have a knowledge of what the common time period

11  might be for large corporations currently, at least, with

12  respect to retention policies?

13  A    No, I actually can't speak to that.   The -- there's -- in

14  the IT world, there's some different thoughts about that, and

15  I've seen everything from a really short retention period to

16  longer ones, depending on legal aspects and operational

17  aspects, and I don't think that there is, even in the IT

18  realm, specific guidelines that all e-mails should be retained

19  for this amount of time.

20          I have seen really short retention periods, I've

21  seen longer ones, and it's -- I guess it's a corporate

22  decision they have to make as far as when they retain it and

23  how that's going to fit into their operations and legal

24  policies.

25          THE COURT:   Were you able to ascertain or do you

1   know whether this particular system had a software program

2   like Janitor, which automatically deleted e-mails after a

3   particular period of time?

4          THE WITNESS:  I haven't looked -- have no

5   information and haven't looked at it at that level.

6          THE COURT:  Okay.

7   Q   (BY MR. SCHRIEBER)  If you were to visit locally or in

8   Texas the facilities that store this type of information, could

9   you answer the judge's question?

10  A   Yes, I could, because that's one of the questions that we

11  ask if we go in to look at an e-mail server is what is your

12  retention policy, do you have backup tapes, you know, to try

13  to determine what could be there.  And by finding out what the

14  backup policy is, then you can tell whether or not, you know,

15  the data that you're looking for could even be there at all.

16  Q   Do you recall, having attended Mr. Shannon's deposition,

17  what his response was to my question as to whether there was

18  any retention policy for SFX, Live Nation or Clear Channel

19  that he was aware of?

20  A   I can't recall specifically, other than at one time they

21  hadn't had one at all, but I think perhaps that they had

22  instituted something at a subsequent time.

23  Q   Subsequent to Ms. D'Onofrio's termination?

24  A   I can't recall the exact time or date.

25  Q   Okay.

1    MR. SCHRIEBER:  Excuse me.

2    (PAUSE.)

3    MR. SCHRIEBER:  Thank you, Your Honor.  Apparently,

4    I'm the person with the least amount of knowledge about

5    computers in this room.

6    Q   (BY MR. SCHRIEBER)  Let me ask you, are you familiar with

7    the phrase "litigation hold"?

8    A   Yes, I am.

9    Q   And could you explain, for the record, what that means.

10   A   My understanding of that, and we are involved with that,

11   because that's -- a lot of times we get called in once

12   litigation is started -- my understanding is that that that's

13   a notification to a company that -- that e-mails, other files

14   or items related to a specific incident or person should be

15   retained because litigation is either eminent or proceeding

16   related to that.

17   Q   Okay.  Let me just back up one point I wanted to make

18   sure it was clear.  Aside from just e-mails on the server, if

19   you had access, would you be able to determine documents that

20   are currently on the server or had been on the server?

21   A   Yes.

22   Q   Okay.  So it's not just e-mails; could be documents of a

23   variety of types of documents?

24   A   Right.  When you process a computer or even a server, you

25   don't just look for e-mail.  You look for any files that were

1    present and then look for evidence of them -- of files that

2    had been present and/or gone because generally those are the

3    files that are of importance.  Because if the file is just

4    there, then everybody sees it, but if it's gone, you know, how

5    it was gone, when it might have been there, who might have

6    deleted it are always matters that could be relevant to any

7    case.

8    Q    This would apply also to the hard drives?

9    A    Oh, yeah, especially the hard drives.  And I think, like

10   a computer, your -- or say your desktop computer, it contains

11   a lot of information in it that say a server might not, and

12   also, because you're the only person using it, it might retain

13   the information a lot longer than on a server.

14           Say if there is 10,000 people accessing a server,

15   information gets overwritten more quickly, but if it's your

16   assigned computer, then if you've e-mailed somebody and

17   deleted it, fragments of that are going to stay on that

18   computer for a long time, and I've seen sometimes years, four

19   or five, probably -- I think six years is the longest -- I

20   found fragments of an e-mail.

21           And so when we're doing a forensic investigation,

22   the first thing we do is go out, make copies, images of the

23   hard drive, and then once we've got that snapshot, we can go

24   forward and do other processing.

25   Q    A couple more questions.  Would you, based upon what

1   you've been given from me, which I received from Defendants,

2   could you correlate e-mails and attachments based upon the way

3   it was presented to you?

4   A    I did that for several selected attachments, and what I

5   found was that it was -- it took me probably an

6   hour-and-a-half to correlate, I think, nine attachments to

7   nine e-mails just because of the format the mail was sent to

8   me.  Whereas, if I had received the e-mail as in a PDF file,

9   the attachment is with the message, so you know immediately

10   where the message and the e-mail are.  So the format we

11   received it in caused me to have to do extra work to try to

12   just figure out where everything was at.

13   Q    You said a PDF file.  As the judge had posited earlier,

14   if they had taken all the PDF's and put it into one large

15   file, is that what you mean about being able to correlate it?

16   A    Okay.  I'm sorry, PST.

17   Q    I thought that's what --

18   A    PST.  That's -- as we discussed earlier, that's kind of a

19   native format, so if you go into an e-mail server, the e-mail

20   here and say, "I want all of my e-mails."  How it's exported

21   is into a -- called PST -- is a dot PST, which is Microsoft

22   for personal store, and they're exported along with

23   attachments, metadata and put into this PST, which is

24   basically just a database file.

25        And so those files are really kind of the bread and

1   butter of an e-mail investigation because you can search, you

2   can sort by dates, sort by -- and we actually have some tools

3   that you can sort by who sent it in between dates and times,

4   do all this pretty much natively inside the PST file; whereas,

5   the -- the discreet messages that we received had to be

6   processed significantly before we could do anything to them at

7   all.

8          THE COURT:  Excuse me.  Counsel, as far as -- did I

9   get it wrong?  If you look at page 10 and 11 of my opinion,

10  Ms. Barnes, haven't you assured Mr. Schreiber that you would

11  produce all the e-mails in a PST format?

12         Your letter of February 27th says, quote, she told

13  Mr. Schreiber, Plaintiff's counsel, the supplemental

14  reproduction on February 28, 207.  Defendant's have also

15  proffered an affidavit from John Cavender,  attached as

16  Exhibit 1 to the surreply.  Cavender states he reviewed the

17  DVDs that were produced to Plaintiff and can confirm that they

18  contain Defendant's e-mail production in PST format and that

19  the production can be searched by many criteria, as Mr. Bond

20  just said.

21         Did I miss something?  I thought you had now

22  supplemented your original production and given Mr. Schreiber,

23  and therefore, Mr. Bond, everything in a PST format?

24         MS. BARNES:  We did supplement.  We did this.  John

25  Cavender is actually here and can testify to it.

1              THE COURT:  Okay.  Fine.  But I thought --

2              MR. SCHRIEBER:  I have what I have, Your Honor.

3              THE COURT:  All right.  Well, we'll talk to

4    Mr. Cavender.

5              MR. SCHRIEBER:  Okay.  We'll hear what he has to

6    say.  I will just alert the Court that apparently what we got

7    was created in-house at Baker & Hostetler, not by the IT

8    people at Clear Channel, at least that's my understanding.

9              MS. BARNES:  No, that's not --

10             THE COURT:  Let's move on.  That's fine.

11   Q    (BY MR. SCHRIEBER)  Now, given the way the material was

12   produced on these three occasions, could Mrs. -- or

13   Ms. D'Onofrio have searched this material herself?

14   A    Oh, no.  There's no way.

15   Q    And knowing me as you do, would I have had any chance?

16   A    Probably not, I'd say.

17   Q    Less of a chance probably.  In terms of forensically

18   analyzing what we've been given, does it allow you to

19   determine what we haven't been given in this case?

20   A    No, it doesn't.  And as I mentioned before, it doesn't

21   even allow me to determine where, what I received, came from.

22   Q    Thank you.

23             THE COURT:  Mr. Bond, if I may.

24             THE WITNESS:  Yes.

25             THE COURT:  Could I direct your attention to my own

1    opinion.  Maybe I, again, I didn't get this completely

2    correct, so let me see.  In my opinion I say, quote, she,

3    being Ms. D'Onofrio, alleges that her consultant, Kroll

4    Ontrack, conducted an exhaustive review of the searchable

5    database of archived Department of Justice material produced

6    by Defendants and discovered that pertinent e-mails and

7    documents were not among the materials produced.

8         So you examined another database that had been

9    produced in other litigation between the Department of Justice

10   and the Defendant?

11        THE WITNESS:  No, I -- as I understood it, this --

12   the data I received, was the data produced from that search.

13        THE COURT:  You got to help me then, Mr. Bond.  I'm

14   sorry.  I wasn't aware of an earlier search, please.

15        MR. SCHRIEBER:  The Legato system, based upon what

16   counsel has told us, we have not been allowed to inquire

17   specifically about this.  The Department of Justice,

18   evidently, instructed Clear Channel to set up a Legato, or at

19   least archive e-mails for some 11,000 people.  According to

20   the representation, SFX, which is the affiliate company that

21   Plaintiff worked for, was part of that archiving of 11- out of

22   approximately 33,000 people, and Ms. D'Onofrio, being a

23   employee as of 2004, was included.

24        Now, that was as of August 2004.  She was fired in

25   September 2005.  They were notified two weeks later by me, and

1   it wasn't until -- well, we filed suit in Superior Court in

2   the spring of 2006.  It wasn't until almost a year after

3   filing suit that we were told there was this system, Legato,

4   in Texas, they had found that.

5           So the representations that we have been told are

6   that the material doesn't originate off of any particular

7   server other than the Legato storage facility.  It's not

8   really an archive.  It's not a backup.

9           THE COURT:  A system.

10          MR. SCHRIEBER:  It's a system.  I don't want to go

11  beyond that because I just don't -- I'm not that conversant,

12  but this is the representation as to what we were given and

13  what Mr. Bond was able to look at.

14          It wasn't what I would call original source

15  material, didn't come right off of the server.  It was

16  something that was extracted from the server, went to Texas to

17  the Legato system, and then after a year they determined that,

18  oh, we have a system, maybe we can find something.

19          This is what we've been told.  I don't know that

20  that accurately is the case, but this is what the

21  representation was.

22          THE COURT:  All right.  Let me see if I understand

23  this.  Maybe, Mr. Bond, you can help me.

24          Ms. Bond [sic] is working at her computer, right.

25  She's got a server over here, okay.  She does an e-mail to

1    this person over here.

2            THE WITNESS:  All right.

3            THE COURT:  There would be a copy here on the -- on

4    her hard drive.

5            THE WITNESS:  Okay.

6            THE COURT:  There will also be a copy on the server;

7    would you agree?

8            THE WITNESS:  Right.

9            THE COURT:  Now, this system is being backed up by

10   something called "Legato"?

11           THE WITNESS:  Yes, that's how I understand it.

12           THE COURT:  So Legato is backing this up, so this is

13   "A," and this is "B," and if Legato is working correctly, "B"

14   is a perfect copy of "A."

15           THE WITNESS:  It's a copy of what they set the

16   Legato system up to record, and that's as -- as he stated,

17   that if there was some kind of a litigation hold and they set

18   it up to record information relating to certain number of

19   employees, then it's going to cherrypick and pick the mails

20   related to them and then pull it over to the Legato system.

21           THE COURT:  But the purpose of Legato is, counsel

22   just explained to us, the Department of Justice with reference

23   to Clear Channel -- I don't know why they would be involved,

24   but who cares -- they have insisted that this system be

25   created.

1          THE WITNESS:  Right.

2          THE COURT:  So if it's working perfectly, from

3    D'Onofrio to Ms. X to the server and to backup, right?

4          THE WITNESS:  Uh-huh.

5          THE COURT:  Now, when the litigation starts,

6    Mr. Bond, what do you get?  You get the objects that have been

7    placed into evidence.

8          THE WITNESS:  Right.

9          THE COURT:  And where do you understand they come

10   from?

11         THE WITNESS:  I understood that they came from

12   the -- from recovery from the Legato server here.  And

13   again --

14         THE COURT:  So someone went into Legato and said,

15   "Give me all of D'Onofrio's e-mails from X to Y"?

16         THE WITNESS:  That's my understanding, right.

17         THE COURT:  And then that was put on this and given

18   to you.

19         THE WITNESS:  Yes.

20         THE COURT:  All right.  And do you know the

21   methodology?  Was it every e-mail in which the word

22   "D'Onofrio" appears, D'Onofrio's -- any word, any e-mail in

23   which her names appears, anyone from her desk, anyone from her

24   allocated portion of the server?

25         THE WITNESS:  Those could be the criteria, but I

1    have not been given the criteria, so I don't know where they

2    were from.

3              THE COURT:  Okay.  Now, what you're saying now is

4    you believe that you have to, in effect, make two searches.

5    The first search you would make -- or one of the searches you

6    would make is of her hard drive.

7              THE WITNESS:  Okay.

8              THE COURT:  Because there is a possibility, as you

9    just explained to me, that it's no longer on the server,

10   right?

11             THE WITNESS:  Right.

12             THE COURT:  Because other information has come out

13   and it's gone into this black space and gotten rid of it,

14   right?

15             THE WITNESS:  Right, right.

16             THE COURT:  But it still may be here?

17             THE WITNESS:  Yes.

18             THE COURT:  Question.  Is it still on Legato?

19             THE WITNESS:  If it had been set up to be recorded,

20   then it would still be there.

21             THE COURT:  So there is at least a possibility it's

22   on Legato?

23             THE WITNESS:  Right.

24             THE COURT:  So what do you want to do?

25             THE WITNESS:  Okay.  Well, first of all, I would

1    have to determine exactly how the Legato is set up, and I

2    haven't been able to do that.  When -- specifically, when it

3    was started; specifically, what the terms were of which type

4    of e-mail and whose e-mail it was recording so then I could

5    make a determination whether or not the information would be

6    on the Legato system.  If, in fact, I determine it was,

7    then -- and I think this is mostly a tape backup type of a

8    situation, we would have to restore some of the backups from

9    the specific times and then recover the information from

10   there.

11            THE COURT:  So there is also a possibility Legato

12   was backed up to backup tapes?

13            THE WITNESS:  Yes.

14            THE COURT:  And you would have to search them, too?

15            THE WITNESS:  Well, the -- the system kind of works

16   with backup tapes.  So if -- you wouldn't go to the Legato

17   server and say, "I want a particular backup."  It kind of

18   automatically, at a lower level, would go to the tapes and

19   then restore the data there, so you perhaps would not directly

20   go the tapes, just access the Legato and say, "I want this

21   information," and it would, you know, at a lower level, okay,

22   yeah, we need these tapes and do that, so...

23            THE COURT:  So the first thing you want to do -- and

24   the next question I have is, despite getting this production,

25   are you going to do this and do an initial retrieval of all of

1   the e-mails you believe counsel wants?

2              THE WITNESS:  That's what we would like to do.

3              THE COURT:  And in effect, you would disregard this

4   and start all over again?

5              THE WITNESS:  Well, no, not necessarily.  I mean,

6   the information on here is relevant and to determine whether

7   it would be present on any other search we did, and if it's

8   present or not present, that's going to be significant.  If

9   it's not there, well, where was it?  If it is there, then we

10  would know that we were getting the same information.

11             So I wouldn't disregard this.  I would have to use

12  that and compare that to what other -- other information we

13  receive just to tell what -- you know, how significant it was.

14             THE COURT:  Now, I used an expression, hash value,

15  okay.  What that means, you tell me, Mr. Bond, that means that

16  every computer file that exists on the face of the earth has a

17  distinct hash value, right?  It is mathematically impossible

18  for any file -- other file on the face of the earth to have

19  that hash value and not be a duplicate.  So we know from the

20  hash value what we -- what we have is what we need.

21             Can you do that here and ascertain whether the files

22  you've got have the same hash value of these?  Or is the fact

23  that they've been downloaded onto these CDs change your

24  answer?

25             THE WITNESS:  Yes, that's going to have changed it,

1  and that's -- I think that's our whole point here.

2         THE COURT:  I understand.  Thank you.

3         MR. SCHRIEBER:  Thank you, Judge.  I learned

4  something.  Thank you.

5         THE COURT:  You're welcome.

6         Ms. Barnes, cross-examine.

7                    CROSS-EXAMINATION

8  BY MS. BARNES:

9   Q   Mr. Bond, you made reference to native format.

10  A   Right.

11  Q   And native format is actually the format in which the

12  file a document is kept in the normal course of business,

13  correct?

14  A   I guess that could be one definition for it.

15  Q   So native is determined by the actual document or file.

16  It's fact specific to the file.  So say, for instance, if I

17  have a PDF document and I give it to you and it's in PDF and

18  that's the way it was kept in its normal course, I produced it

19  to you in its native file, correct?

20  A   Okay, right.

21  Q   So to say that you didn't receive e-mail in its native

22  format is not to imply it was not kept in the course -- the

23  way it was kept in the normal course of business, correct?

24         THE COURT:  That sentence has too many negatives in

25  it.  I don't understand it.

1   Q    (BY MS. BARNES)  To say that you did not receive

2   information in its native format, that does not mean that it was

3   not prepared and given to you in the way that it's kept in its

4   normal course of business.

5            MR. SCHRIEBER:  Objection, this asks for the witness

6   to speculate.

7            THE COURT:  Well, it also -- I don't understand it.

8   Rule 34(a) talks of documents in the ordinary course of

9   business and that they may be -- must be produced.  34(b)

10  talked about electronically stored information, and it must be

11  produced either in native format or reasonably usable format.

12  So when you say "document" --

13           MS. BARNES:  I shouldn't say "document" maybe.

14           THE COURT:  I think the better thing is use the word

15  "electronically stored information."

16  Q    (BY MS. BARNES)  When the ESI is produced to you, and for

17  you to say that it's not produced in its native format, that

18  doesn't mean -- Let me strike it.  I'll do it as an example

19  again.

20           I produce -- I have a PDF, okay.  I have a PDF of an

21  e-mail.  I produce that e-mail to you as a PDF.  I've produced

22  that e-mail to you in its native file, correct?

23  A    No, because of -- PDF is not a native format for e-mail,

24  and so if you converted it from e-mail to a PDF file, then it

25  is in PDF format, the native PDF format but it's not in the

1  native male format, so there was a conversion in between there

2  and so there's kind of a disconnect there.

3  Q   Well, if I have a PDF of a document that's an e-mail.

4  A   Right.

5  Q   I don't have the electronic form of the e-mail.  I have a

6  PDF of a document of an e-mail.

7  A   Okay.

8  Q   I produce it to you as a PDF.  It's produced in its

9  native format, correct?

10  A   No, because mail is not stored natively in PDF formats.

11  Q   I'm not talking about the original.  Maybe I just do

12  "document" because I'm going to go back.  I was trying to use

13  "electronic storage."  If I produce a document to you as a

14  PDF.

15  A   Right.

16  Q   I produced it to you in the its normal course of business

17  kept mail, correct?

18  A   Well, if you give me a PDF file, yes, it is a PDF file.

19  Q   So if I produce to you electronic stored information in

20  the way that it's kept, in the normal course of business, is

21  it always in a PST file?

22  A   Yes.

23       MR. SCHRIEBER:  Same objection.

24       THE COURT:  Again, 34(a) talks about documents in

25  the ordinary course business.  34(b) talks about

1   electronically stored information.  The concept of ordinary

2   course of business doesn't have to do with electronically

3   stored information.  There, the choices are native or

4   reasonably searchable.

5   Q   (BY MS. BARNES)  Well, the reason I -- and John Cavender

6   will testify to this, is the difference between pulling an

7   e-mail off of Legato and pulling it from a PST file, someone's

8   actual mailbox.  So say, for instance, if we produce to you, we

9   pull Plaintiff's e-mails off of the Legato server where it's

10  kept in its regular ordinary course of business, would that be

11  the native file for the Legato server?

12  A   Well, I don't know exactly how you have your Legato set

13  up and haven't seen that, so I can't -- but if it's produced

14  from the Legato system, I guess that would be.

15  Q   So if we pulled Ms. D'Onofrio's e-mails from the Legato

16  system and produced them to you, they would be in its native

17  format and that may not be the format that you described as

18  not being in native format earlier?

19  A   Well, it's not in a native e-mail format.  I can say

20  that, but I can't say whether or not it's in the native Legato

21  format.

22  Q   Okay.  Were you present at John Shannon's deposition?

23  A   Yes, I was.

24  Q   Were you retained by Plaintiff's counsel during that

25  time?

1  A   Yes, I was.

2  Q   Did you -- do you recall any questions being asked of

3  Mr. Shannon regarding the Legato system?

4  A   Yes, I think there was some discussion of that.

5  Q   Were there any questions regarding how the Legato system

6  was set up?

7  A   I think there was some discussion of that, yes.

8  Q   Okay.  Did -- were there questions asked of Mr. Shannon

9  regarding how the e-mail was pulled from -- how

10  Ms. D'Onofrio's e-mail was pulled from the Legato system?

11  A   I don't recall getting that, if we got that specific in

12  the details.

13  Q   But you were there when Plaintiff had an opportunity to

14  actually ask how the e-mail was pulled from the Legato system,

15  correct?

16  A   I was there.

17  Q   Okay.  And did he ask, do you recall, whether or not

18  Mr. Shannon testified as to how the e-mails were pulled from

19  the Legato system?

20  A   I don't recall discussion of that.

21       MS. BARNES:  If I might approach, Your Honor.

22  Q   (BY MS. BARNES)  I've handed you what's been marked as --

23  well, what is the affidavit of John Cavender.

24       MR. SCHRIEBER:  Excuse me, is there a copy?

25       THE DEPUTY CLERK:  Did you want that exhibit marked?

1          MS. BARNES:  Yes, please.

2          THE DEPUTY CLERK:  The one that the witness has?

3          MS. BARNES:  Yes, please.

4     Q    (BY MS. BARNES)  Mr. Bond, did you have an opportunity to

5     review Mr. Cavender's affidavit prior to doing your declaration?

6     A    Yes, I did.

7          MR. SCHRIEBER:  Excuse me, Your Honor.  I think

8     counsel misperceives the dates of these declarations.

9     Mr. Bond filed one declaration.  This was filed in response to

10    it, so I'm not sure that he could have reviewed this before he

11    filed his.

12         THE COURT:  But did there come a time when you saw

13    Cavender's declaration?

14         THE WITNESS:  Yes.

15         MR. SCHRIEBER:  Subsequent.

16         THE WITNESS:  Actually, I was just reviewing the

17    time there and that had occurred to me that this probably was

18    subsequent to my affidavit.

19    Q    (BY MS. BARNES)  Well, did you have opportunity to review

20    it prior to testifying today?

21    A    Yes.

22         MS. BARNES:  And just so I'm clear, the declaration

23    then that you were referring to is not a new declaration?

24         MR. SCHRIEBER:  I'm sorry?

25         MS. BARNES:  When you were --

1          MR. SCHRIEBER:  Excuse me.

2          THE COURT:  Why don't you consult with counsel off

3    the record for a moment.

4          (PAUSE.)

5    Q    (BY MS. BARNES)  Mr. Bond, did you have opportunity to

6    review Mr. Cavender's affidavit prior to testifying today?

7    A    Yes, I did.

8    Q    Did you have an opportunity to review his indication of

9    how the searches were done on the Legato system?

10   A    Right.  And it's indicated in the -- and there's an

11   affidavit.

12   Q    Okay.  When did you first review this affidavit?

13   A    I don't know.  I think I received it several months ago.

14   Q    Okay.  Based upon his information of the searches that

15   he's done, can you ascertain from where the e-mail produced to

16   you came from on the disks that were provided to you by

17   Mr. Schreiber?

18   A    Well, the problem with the affidavit is it that says that

19   it -- when I reviewed this, the DVDs that were mentioned here

20   didn't appear to be the same ones that I had received, and so

21   that was why it was -- there was some question in my mind as

22   far as, you know, what -- which the data -- which data was

23   where and how.

24   Q    But based upon the information provided on this searches

25   and the information that you received on the disk, can you

1    ascertain the date sent, date received on the electronic

2    information that you received on a disk from Mr. Schreiber?

3    A    The -- the second and third set of data contained a -- an

4    index, which had dates that were associated with particular

5    discreet files on them, and so that was how I had gone back

6    and determined where some of the attachments came from.

7         Now, I don't know how that was created, or you know,

8    obviously it was processed by some type of a program to do

9    that, but the -- I guess if that's what you're talking about.

10   So there was information on the disk itself related to say an

11   index or data file for that.

12   Q    And are those indexes consistent with the searches that

13   were performed by Mr. Cavender?

14        MR. SCHRIEBER:  Objection.

15        THE COURT:  State it again, please.

16   Q    (BY MS. BARNES)  Are the indexes that you referenced

17   consistent with the searches that were performed as noted in

18   Mr. Cavender's deposition -- I mean, I'm sorry, affidavit?

19        MR. SCHRIEBER:  Objection as to speculation, Your

20   Honor.

21        THE COURT:  Overruled.

22   A    I -- really, there's not enough information to say that.

23   It says, you know, terms that were used and so -- and areas

24   that were searched, but I can't -- I can't say for sure.  I

25   mean, I can't independently verify that the information on the

1   disks was the information retained from that.

2   Q    (BY MS. BARNES)   So you can't look at these searches

3   performed by Mr. Cavender and look at the indexes on the disk

4   provided and determine if that information came from those

5   searches?

6   A    I can't -- again, I said I can't independently verify.   I

7   can say that the file itself says that the data came from

8   there, but that's -- that's, you know, all I can say.

9   Q    When were you retained by Plaintiff's counsel?

10   A    In early 2007.

11   Q    Were you aware that there were electronic information

12   that was going to be produced to Plaintiff's counsel before

13   you were retained, or were you retained to search for

14   electronic information?

15   A    Actually, I was retained to image Ms. D'Onofrio's hard

16   drive.

17   Q    Did you ever come to know that there was electronic

18   information available and was going to be produced to

19   Plaintiff?

20   A    I think subsequent to that.

21   Q    And when did you learn of that?

22   A    When or --

23   Q    When, yes.

24   A    Early --

25   Q    Was it prior to Mr. Shannon's deposition?

1    A    No, no, it wasn't.

2    Q    So were you ever involved with trying to identify search

3    terms that could be used to search this electronic

4    information?

5    A    No, no, I wasn't.

6    Q    And you were not aware that this information was

7    available?

8            THE COURT:  What information is that, Counsel?

9    Q    (BY MS. BARNES)  The electronic stored information was

10   available prior to production?

11   A    No, I guess not.

12           MS. BARNES:  If I can approach, Your Honor.

13           THE COURT:  Sure.

14           THE DEPUTY CLERK:  Is that one being marked?  This

15   is for the judge.  That one that -- what you should do is give

16   them to me first and I'll mark them and then you can give them

17   to the witness.

18           MR. SCHRIEBER:  Ms. Barnes, can I have an extra one?

19           THE DEPUTY CLERK:  There you go.

20           THE WITNESS:  Thank you.

21   Q    (BY MS. BARNES)  Mr. Bond, I handed you what's an e-mail

22   dated April 4, 2002.  You said that you did a search on the disk

23   for electronic stored information for Ms. D'Onofrio.  Did you

24   look at this document?

25   A    I found numerous documents.  I can't say if I -- without

1   having to look back, you know, I don't remember -- recall

2   every specific document, though I know some of them had

3   attachments.  I see this one does.  So I can't -- I can't say

4   at this time.

5   Q   So when you did the search for a document, say, from

6   August 2004 and you said that there were documents that dated

7   past August 2004?

8   A   Yeah, earlier than that, yes.

9   Q   This would be a sample of that?

10  A   Yes.

11  Q   And this wasn't included in the sample that was provided

12  by Plaintiff, correct, today?

13  A   No, I don't think -- I don't believe it was.

14  Q   Of the e-mail that's retrieved?

15  A   It doesn't look like one of them that I printed, no.

16  Q   Okay.  So there are e-mails dating back to 2002, correct,

17  that you found on the disk?

18  A   Yes, and this could be one of them.  I think there

19  were -- there were numerous e-mails, so I don't recall every

20  single one, so I can't recall this one specifically.

21  Q   Okay.  You talked about deleted e-mails.  I want to go

22  back to the diagram on the board.  If an e-mail -- if there is

23  an e-mail on Plaintiff's computer --

24          THE COURT:  You better take with you a hand mic,

25  okay.  Please give counsel the hand mic.  There's a button on

```
 1  top.  Just turn it on.

 2          MS. BARNES:  It's on.  I'll just talk louder.  I'll

 3  talk louder.

 4          THE COURT:  No, I want you to use that.

 5          MR. SCHRIEBER:  It's wireless, okay.

 6          MS. BARNES:  I'll talk louder.

 7  Q   (BY MS. BARNES)  So if there is e-mail on Plaintiff's

 8  computer and she's on the Legato system.

 9  A   Right.

10  Q   And Plaintiff deletes e-mail off of her computer.

11  A   Yes.

12  Q   That e-mail is still in the Legato system, correct?

13  A   It could be, yes.

14  Q   Doesn't the Legato system, once you're set up on the

15  Legato system, capture everything that goes in and out of the

16  mailbox?

17  A   It can be set up that way, yes.

18  Q   Were you present at Joe --

19          COURT REPORTER:  I'm sorry, I couldn't hear that.

20          THE COURT:  See, we're losing you.  Keep your voice

21  up, please.

22  Q   (BY MS. BARNES)  Were you present at Joe Shannon's

23  deposition?

24  A   Yes, I was.

25  Q   And do you recall whether or not there were any questions
```

1   asked as how the Legato system was set up?

2   A    Yes, there were.

3   Q    Was it asked whether or not the Legato system would

4   capture any e-mail that was sent in and out of the mailbox?

5   A    I don't recall specifically.

6   Q    Okay.   Do you recall whether or not it was asked of

7   Mr. Shannon whether or not there was any deleted e-mail would

8   be captured by the Legato system?

9   A    I can't recall right at this second.

10   Q    Do you recall whether or not at the deposition, whether

11   or not it was asked of Mr. Shannon how the importation of

12   Plaintiff's mailbox was put on the Legato system?

13   A    I think there was discussion of that.

14   Q    Okay.   And what is your understanding of how it was put

15   on?

16   A    I think there was -- she was in a list of people involved

17   in another investigation, and because of that, her name was

18   included with the -- on the Legato system.

19   Q    Are you aware that when Plaintiff was put on the Legato

20   system, her entire mailbox was imported in?

21   A    No, I'm not.   Since I didn't set up the Legato system

22   or -- and haven't had a chance to view it, I'm not -- I can't

23   speak specifically to how it was set up, what the criteria

24   were specifically for the whole system, so I can't really talk

25   about that.

1    Q    But you were present at the deposition of a person who

2    could answer those questions for you, right?

3               MR. SCHRIEBER:  Objection.

4               THE COURT:  Sustained.

5    Q    (BY MS. BARNES)  Do you know if it was asked at

6    Mr. Shannon's deposition how the Legato system was set up?

7    A    I think there was discussion of it.

8    Q    Was it asked specifically whether or not the Legato

9    system imported Plaintiff's entire mailbox?

10   A    I can't recall specifically.

11   Q    If those questions had been asked, would that -- or if

12   you had that information, would that be helpful to you in

13   ascertaining where the e-mail came from?

14   A    Yes, it would.

15   Q    Okay.  And so that would give you the answer as to

16   exactly where the electronic information came from?

17   A    Well, that -- it's more information.  I'm not sure if

18   that would state -- answer all the questions, but yeah, any

19   information you have is important to determining it.

20   Q    So, basically, if you had that information, you would

21   know where the e-mail came from?

22   A    There would be -- more likely to know, yes.

23   Q    Okay.  You made reference to a Janitor search engine that

24   may be used to delete e-mail automatically after a time.  You

25   were asked about it and you defined what it was.

1    A   Yes, yes.

2    Q   Do you recall whether or not it was asked of Mr. Shannon

3    whether or not the e-mail system from where Plaintiff's

4    electronic stored information was recovered or where it was

5    stored, whether or not there was that type of system?

6    A   I believe there was some discussion of that, yes.

7    Q   And do you recall what the answer was or what the

8    discussed result of the discussions were?

9          MR. SCHRIEBER:   Your Honor, I think it's not helpful

10   to the Court to review somebody else's deposition of this

11   witness.

12         MS. BARNES:   Well, but he brought it up and he

13   wanted to testify as -- he wanted to -- state what Joe Shannon

14   testified to, and if he's going to say what Joe Shannon

15   testified to and point out what wasn't done or what could be

16   done by Mr. Bond, then Mr. Bond should have said at the

17   deposition, in which he was present, and asked those

18   questions.

19         A lot of the things that Mr. Bond is saying he

20   doesn't have, Plaintiff has had the opportunity to recover

21   that information from Defendant.   We flew someone up from

22   Texas for a deposition.

23         THE COURT:   I got your point.   Move on, please.

24         MS. BARNES:   Just one second, Your Honor.

25         (PAUSE.)

1          MR. SCHRIEBER:  Your Honor, could we ask for about a

2     two-minute break?  Plaintiff needs it.

3          THE COURT:  Yeah, we'll take five.  How much more do

4     you have?

5          MS. BARNES:  I'm done.

6          THE COURT:  She's done.

7          MR. SCHRIEBER:  Okay.  I have brief redirect.

8          THE COURT:  All right.  You want to do that after

9     the break briefly?

10         MR. SCHRIEBER:  Yes, please.

11         THE COURT:  Thank you.  We'll take five minutes.

12    Mr. Bond, you're under oath, so don't discuss your testimony

13    with anyone while you are off the stand.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Thank you.  Five minutes, please.

16         (A BRIEF RECESS WAS TAKEN.)

17         THE DEPUTY CLERK:  Please remain seated.

18         THE COURT:  Proceed, Counsel.

19         MR. SCHRIEBER:  Thank you.

20                        REDIRECT EXAMINATION

21    BY MR. SCHRIEBER:

22    Q   Mr. Bond, since the deposition of Mr. Shannon seems to

23    have been in issue.  Let me ask you if you recall the fact

24    that the initial disks in this case were produced the morning

25    of Mr. Shannon's deposition.  Do you remember that fact?

1    A    Yes, I remember that.

2    Q    Okay.  So you had not had an opportunity to look at this

3    material at all?

4    A    No.

5    Q    As of Mr. Shannon's deposition?

6    A    That's correct.  I had not even talked to you before that

7    time frame.

8    Q    Just so that we're clear, do you recall the fact that Ms.

9    Barnes asked no questions at that deposition?

10   A    Possibly.  I don't know if I paid attention to that.

11   Q    Okay.  Let me use the judge's chart.  In the left-hand

12   quadrant is Ms. D'Onofrio's computer with a hard drive on it,

13   correct?

14   A    That's right.

15   Q    And over here in the right quadrant, "A," is the server

16   in DC, correct?

17   A    Well, he discussed an e-mail server.

18   Q    Right.

19   A    In a general sense, right.

20   Q    Right.  And you're aware that a server was located in the

21   District of Columbia?

22   A    Yes.

23   Q    Okay.  And then "B" is the Legato machine, correct?

24   A    Yes.

25   Q    Now, would you state that on a one-to-one basis,

1  everything that was on the hard drive would necessarily be

2  saved to a server?

3   A    To the e-mail server specifically or any server

4  whatsoever?

5   Q    E-mail or anything.

6   A    No, not -- because the only things that gets saved to the

7  server are information that's -- excuse me -- specifically set

8  up and designed to be saved there, such as e-mail messages or

9  files that the user would say it would indicate should be

10  saved on the server, so there is lots of activity that go on

11  in a -- on a PC that aren't saved on the server.

12   Q    So if Ms. D'Onofrio was to indicate that she saved on her

13  hard drive certain types of sensitive documents, for instance,

14  that were not necessarily saved on the server, that would not

15  be unusual?

16   A    No, that's fairly common.

17   Q    Based upon that fact, that the hard drive and the server

18  are not co-extensive, is it of the utmost importance, from a

19  forensic analyst standpoint, someone such as yourself, to

20  actually have that computer and that hard drive?

21          MS. BARNES:   Objection.

22          THE COURT:   Overruled.

23   A    Yes, yes, it is, and that's the first thing that we

24  normally image in any kind of a -- any kind of a case is the

25  hard drive.

1    Q    (BY MR. SCHRIEBER)  Without that hard drive, you can't

2    tell the full extent of the data that may or may not be relevant

3    in this case, can you?

4    A    That would have been -- existed on her hard drive, and

5    the -- the reason is that there is fragments of e-mails,

6    deleted documents, numerous types of activity that could be

7    found on a user's hard drive that really aren't stored

8    anyplace else.

9          Also, that can be used, I think, as we talked

10   earlier, to corroborate e-mail messages.  If we find fragments

11   of an e-mail message on a user's hard drive and then also find

12   that actual e-mail message in the produced e-mail, we can be

13   assured that we're getting right information or that there is

14   information that we didn't have if we find an e-mail on the

15   user's hard drive that wasn't produced.

16         So it's kind of a check and balance when you can

17   compare two of them together to make sure that you're getting

18   all the information that is accurate.

19         MR. SCHRIEBER:  Okay.  Nothing further.

20         THE COURT:  Thank you.  You want to call your next

21   witness?

22         MR. SCHRIEBER:  Yes.  Before I forget, and as is my

23   custom, may I move my exhibits into evidence?

24         THE COURT:  They're moved; they're admitted.

25         (PLAINTIFF'S EXHIBITS 1 THROUGH 5 ADMITTED.)

1            MS. BARNES:  Your Honor, one objection because --

2            THE COURT:  Come to the podium, ma'am.

3            MS. BARNES:  We requested of Plaintiffs counsel that

4   we exchange exhibits and witness lists, and while I would --

5   I'm not implying anything by this.  We have not seen the disk

6   that Plaintiff has actually seen came from us and he's moving

7   to admit into evidence as --

8            THE COURT:  Well, I'll take it subject to your

9   objection.  I don't know what else I can do.  Thank you.

10           MS. BARNES:  Thank you.

11           MR. SCHRIEBER:  May I, just for the record, reflect,

12  Your Honor, first as an officer of this court, I went through

13  a chain of custody to make sure if this issue arose that these

14  things were packaged and preserved just as Mr. Bond has

15  indicated, and they're available to the Court who can look at

16  this, you know, as you wish, obviously, but that's my

17  representation.  Thank you.

18           THE COURT:  Thank you for your representation.

19  Thank you, Mr. Bond.  You may stand down.

20           You may call your next witness.  We'll go to 12:30.

21           MR. SCHRIEBER:  May Mr. Bond remain?

22           THE COURT:  Certainly.  Mr. Bond, you may remain in

23  the courtroom.

24           THE DEPUTY CLERK:  Raise your right hand, ma'am.

25           (WITNESS SWORN BY THE DEPUTY CLERK.)

```
 1                       AUDREY D'ONOFRIO,

 2   having been duly sworn, testified as follows:

 3                     DIRECT EXAMINATION

 4   BY MR. SCHRIEBER:

 5   Q   Good morning.  Ms. D'Onofrio, would you tell, for the

 6   record, your -- state, for the record, your full name.

 7   A   Audrey --

 8   Q   I'm sorry, go ahead.

 9   A   Audrey D'Onofrio Shebby.

10   Q   Shebby is your married name?

11   A   It is.

12   Q   When you were employed -- well, let me strike that.

13           Where do you live?

14   A   I live at 2085 Grace Manor Court in McLean, Virginia.

15   Q   Who do you live with?

16   A   I live with my husband and our daughter.

17   Q   And you are the Plaintiff in this matter, are you not?

18   A   I am.

19   Q   Okay.  Let me briefly ask you, just by way of background,

20   when did you first start working for SFX?

21   A   Originally, I started in the year 2000.

22   Q   Okay.  Did there come a time when you left SFX?

23   A   I did.  I briefly left in two -- I believe it was some

24   point in 2001 for a period of months.

25   Q   Okay.  And we don't need to get into the details of that,
```

1   but did there come a time when you returned?

2   A   I did.  I returned -- God, I can't remember the date

3   offhand.

4   Q   Was it sometime in 2002?

5   A   Right, correct, correct.

6   Q   Would you tell the Court whether or not when you first

7   were employed there you had a computer?

8   A   I did have a computer.

9   Q   Okay.  And when you left and then returned, did you use

10  the same -- same computer or a different computer?

11  A   I used the same computer.  Everything was the same.

12  Q   Well, that's my next question.  Okay.  Let me earn my

13  money here.

14          Did you have occasion, when you returned, to look at

15  the hard drive?

16  A   I did.

17  Q   Okay.  Did you look to see what was still there?

18  A   It was like I never left.

19  Q   Okay.  So, as you recommenced your employment, you were

20  using the same computer; is that correct?

21  A   I was.

22  Q   Throughout your tenure through September of 2005, is that

23  the computer that you used?

24  A   It was.

25  Q   Okay.  And your last day was on or about September 26,

1    2005.  Was your computer operational at that time?

2    A    It was.

3    Q    What was your job at SFX?  We don't need a lot of detail

4    but just so the record is clear.

5    A    I oversaw public relations for the SFX Sports Group.

6    Q    And just by way of background, part of your claim is

7    about title and salary; is that correct?

8    A    That is correct.

9         THE COURT:  Excuse me, I can't see you.  Thank you.

10   Q    (BY MR. SCHRIEBER)  So, you were married during the course

11   of your period of time at SFX?

12   A    I did get married.

13   Q    Okay.  And there came a time when you became pregnant?

14   A    Yes.

15   Q    Okay.  And one of your claims has to do with the fact of

16   your pregnancy and the job termination; is that correct?

17   A    It is correct.

18   Q    Okay.  And those sort of generally are the issues that

19   your case, at least, is directed at, correct?

20   A    Correct.

21   Q    So let me ask you, going back to how you performed your

22   job with respect to the use of the computer.  Did you use

23   e-mail?

24   A    I did.

25   Q    And when you used your e-mail, would you have occasion to

1   save it?

2   A    Yes.

3   Q    Okay.  Tell Judge Facciola what you would do in order to

4   save your e-mail?

5   A    Well, you could either leave it on your hard drive, you

6   could make a copy of it, cut and paste, make a separate file

7   of it on your hard drive.  You could leave it on the server.

8   It would depend on the e-mail and its sensitivity.

9   Q    Were there certain e-mails that you considered more

10  sensitive than others?

11  A    Yes.

12  Q    Okay.  And if you made that consideration, what would you

13  do with those particular e-mails?

14  A    I would make a copy and leave it on my hard drive and I

15  would also print out a copy.

16  Q    Did you have a special place that you would place e-mails

17  that you considered sensitive on your hard drive?

18  A    Yes, I did.

19  Q    Did it have a letter or number or some designation?

20  A    I would usually put it under the person's name.

21  Q    Now, with respect to documents that you would create --

22  during the course of your employment, I would gather you

23  created documents?

24  A    Oh, yes.

25  Q    And with respect to documents, would there be a manner in

1  which you might save those documents?

2  A   You have to be more specific.

3  Q   Well, depending upon -- you used the word "sensitivity."

4  Would you make a determination, based upon the sensitivity of

5  a document, how you might save it?

6  A   Well, I guess if I can help, it's confusing me, there is

7  a variety of documents that I might work on.  There might be a

8  presentation, there might be a memo, there might be a press

9  release, there might be a media list, there might be notes

10 from a proprietary discussion, so there's a variety of

11 documents.

12          And depending on the sensitivity of those documents,

13 some might be on my hard drive, some might be on my hard drive

14 as well as on the server, or some might be on the server.

15 Q   Okay.  What would be, in your mind, at least, the

16 difference between saving it only to the hard drive and saving

17 it to the server?

18 A   Saving something to the hard drive would be something I

19 would be more concerned about someone viewing that probably

20 shouldn't have viewed it or it could be taken out of context

21 or accidentally sent out.

22 Q   Okay.  So those are the sensitive documents, and am I

23 correct to say the less sensitive documents would go on the

24 server?

25 A   By and large.

1    Q    Okay.   Just so that we're clear, as the public relations

2    person there, what was the nature of the clientele at SFX?

3    A    Clientele for SFX Sports Group was primarily sports

4    figures in a variety of different competencies as well as you

5    might have some corporations that do business related to

6    sports.

7    Q    Okay.

8    A    Or actually as well as corporations that might not be in

9    the sports business but are interested in associating

10   themselves with the enthusiasm of athleticism.

11   Q    Is it fair to say that the clientele, the athletes that

12   SFX represented were well known professional athletes, by and

13   large?

14   A    A lot of them, yeah, sure.

15   Q    Okay.

16   A    Sure.

17   Q    And they also represented other types of athletes,

18   Olympic athletes, things like that?

19   A    Yes.

20   Q    We don't need for the public record to use anybody's

21   name, but well known people.

22   A    Well known people.

23   Q    Okay.

24   A    Yes.

25   Q    And given their stature, would that have affected in any

1   way the sensitivity that you associated with certain

2   documents?

3   A    Yes.   There would be certain documents that would be okay

4   that would be sent out to everyone, but there would be other

5   documents that would be more sensitive that I would keep on my

6   hard drive.

7   Q    Okay.   Now, let's direct our attention, if we can, to the

8   types of material that you, as the Plaintiff in this case, are

9   interested in retrieving, which you have yet to retrieve.

10        Let me first direct your attention to personal

11  e-mails.   We have heard, through Mr. Bond, that many thousands

12  of copies of variety of documents, e-mails included, have been

13  produced.

14        Can you tell the Court whether or not the material

15  that has been produced is all of the material you believe is

16  relevant to this case in your claims?

17  A    Not all of the material has been delivered, not even a

18  fraction of it.

19  Q    Now, let me be more specific.   What types of e-mails are

20  you still hopeful of retrieving in some fashion which would be

21  relevant to your claims of pay, the salary claim, the title

22  claim, the pregnancy claim, the fair -- excuse me, the

23  disability claim under the family medical leave, things of

24  that nature, and the gender issue; can you direct the Court's

25  attention to, for instance, the names of people who you had

1   e-mail correspondence with regarding those types of issues

2   which you have not seen?

3   A   Okay.   To clarify, the e-mails that I have from the

4   Legato system, by and large, come from the date of 2004.   When

5   I originally started with the company, it was 2000.   We have

6   captured some e-mails prior to that date for sure, as well as

7   I turned over some e-mails that I found prior to that date,

8   and I have found some e-mails that could be helpful.

9            However, there is some specific e-mails that I saved

10   that I have been unable to find, which I have sat down with

11   Doug Bond to try and do everything I could to try and find

12   these e-mails.   E-mails would be to people, my former -- my

13   former boss, Harold Schacter, another boss, Rob Urbach, Bud

14   Martin, Barbara Bisett, who is Rob Urbach's assistant.   Mike

15   Principe, Ken Myerson, and the nature of these e-mails

16   included a variety of topics.

17            One, there was some e-mails from when I was

18   originally at the company where I was bringing up the issue of

19   why wasn't my title changed.   There was --

20   Q   Okay.   This is the period 2000 to 2001?

21   A   Correct, correct.

22   Q   Just so that the Court is clear, Mr. Schacter was the

23   person who you worked for initially?

24   A   And then him and Bill Allard.

25   Q   Mr. Schacter left at some point?

1    A    He did.

2    Q    Okay.  And part of your claim is the allegation that you

3    took over his job?

4    A    Correct, correct.

5    Q    Okay.  So, did you have correspondence with Mr. Schacter

6    about that type of thing?

7    A    Yes, yes.

8    Q    As well as other people?

9    A    As well as other people, correct.

10   Q    Please continue.

11   A    So that there would be e-mails there.  There were e-mails

12   discussing the --

13            COURT REPORTER:  Please move closer to the

14   microphone.

15            THE COURT:  You don't have to look at me.  Just

16   look --

17            THE WITNESS:  Okay.

18   A    There were e-mails of a variety of topics.  Specifically,

19   when we were talking about my job title, there was issues with

20   job title going back to 2000 which continued until I left.  So

21   there would be discussions with some of the people back from

22   2000.  Moving forward, there was a lot of discussion, as I was

23   coming back, because I was hesitant on coming back without

24   having the title situation taken care of, and so there was

25   e-mails talking about that, talking about the time frame,

1   discussing why I could not have the title right then and how

2   it would be taken care of.

3          There were e-mails discussing, we're working on it.

4   There were some e-mails saying --

5   Q   (BY MR. SCHRIEBER)   I want you to slow down.

6   A   Sorry.

7   Q   Take a breath, okay.

8   A   This is very sensitive to me, so yeah.

9   Q   I realize that, but I just want you to slow down,

10  certainly for this lady's --

11  A   I'm sorry.

12  Q   She is typing as fast as she can.

13  A   Okay.

14  Q   So there were e-mails about your job title, and you're

15  talking about the first -- we'll call it this first time

16  period before you left.

17  A   Correct.

18  Q   Okay.  I don't need you to go in specifically because of

19  the sensitivity of this situation.

20  A   Okay.

21  Q   But you did leave at some point in 2001 because of some

22  difficulties, and we don't have to go talk about that today.

23  A   Let's clarify; not a difficulty with me doing my job or

24  my job performance.

25  Q   No, no.

1   A   Or being asked to do something.

2   Q   Okay.  We're not going to put that on the record right

3   now.  That's not a necessary item for this hearing.

4   A   Okay, sure.

5   Q   Okay?

6   A   Sure.

7   Q   But the time period that you're talking about is

8   2000-2001?

9   A   Okay.

10   Q   You leave for a number of months.

11   A   Sure.

12   Q   And then you come back, and at some point, as you're

13   coming back, there are e-mail traffic?

14   A   Yes, yes.

15   Q   And that traffic has to do with, as you were saying?

16   A   My coming back.

17   Q   Okay.  And that bears upon salary, title --

18   A   Correct.

19   Q   -- job, et cetera?

20   A   Correct.

21   Q   Okay.  Now, once you return.

22   A   Yes.

23   Q   Okay.  And do you continue to have this communication, if

24   you will, e-mail or otherwise, even verbal?

25   A   Yeah, I also had a lot of verbal discussions as well.

1    Q    Okay.

2    A    Along...

3    Q    When you would have conversations with people, would you

4    keep notes of that?

5    A    Yes, sometimes I would.

6    Q    Okay.  How would you keep those notes?

7    A    I would keep them on my hard drive.

8    Q    Okay.  Would they go on the server?

9    A    No.  God, no.  No.

10   Q    So you haven't seen those notes, I gather?

11   A    No, nor have I seen anything that was in my office, any

12   of the files, the thousands of files, the disks on CD, the

13   disks for the computer, as well as any of the videotapes that

14   I produced.

15   Q    Okay.

16   A    Nothing.

17   Q    Let me stop you there.  You said disks for the computer.

18   A    Well, because --

19   Q    What were you referring to?

20   A    Well, you can also save things on the computer on a disk.

21   Q    Okay.  So some of the things you saved were on what we

22   used to call floppies?

23   A    Right.

24   Q    Even I knew that one.

25   A    Right.

1   Q    And so you had left those in the office?

2   A    Yes.

3   Q    Okay.  You have not seen or heard anything about those?

4   A    No.

5   Q    Okay.  So you've named the people that you've had the

6   e-mail correspondence with?

7   A    I'm named some of the people.

8   Q    Some of them.  Okay.  We're not going to do the full

9   universe.

10  A    Okay.

11  Q    And have you seen -- this is my phrase -- any key e-mails

12  which you recall having sent or received having to do with the

13  topics that we just discussed?

14  A    I have seen some e-mails.

15  Q    Okay.

16  A    I've seen a couple.  Not the most substantive ones, but

17  to say I didn't see any e-mails, well...

18  Q    There was one e-mail in particular, if you can tell the

19  Court, that had some relevance to your situation, about your

20  job -- the things that you would do in your job, remember

21  that?

22  A    Right.  Peter Hughes -- after Robert Urbach left, I

23  immediately talked to Peter Hughes.  Robert Urbach, before he

24  left, said, "Audry, your paperwork is in, your title is taken

25  care of," and so immediately I'm thinking this will be taken

1    care of; nothing happens.

2            I believe around the same time -- I'm really trying

3    with dates -- our bonus came in, and I got a bonus every year

4    and no one even told me I didn't get a bonus.  And there was

5    no reason for it.  It was just kind of like, "Oh, you know,

6    whoops."  And I talked to Peter Hughes and I asked him about

7    my title, and he said, "You know what, Audrey, if you can just

8    put through a list of everything that you do, I'm going to

9    look into this in your behalf," and I have seen that e-mail.

10   Q    That e-mail actually did show up?

11   A    I did see that e-mail, yeah.

12   Q    Any of the other e-mails surrounding that particular back

13   and forth communication that you can recall seeing?

14   A    I saw an e-mail that I had sent my husband where I

15   discussed a discussion I had with Mike Principe.

16   Q    Okay.  That was a meeting that you were involved in?

17   A    Yeah, correct.  Yeah.

18   Q    Okay.  And that talked about what?

19   A    Well, what happened out of the meeting -- of course, I'm

20   trying to remember, going back in my memory without having

21   notes in front of me -- where, you know, it was said, kind of,

22   if you keep asking for things, you know, we might have to get

23   a PR agency.  You know, I don't want to say it was a threat

24   but it was kind of --

25   Q    That was the reference in the e-mail?

1   A    Yes.

2   Q    Okay.

3        THE COURT:   And that's one you have seen or haven't

4   seen?

5        THE WITNESS:   I have seen that one, yeah.

6   Q    (BY MR. SCHRIEBER)   That's another one that's shown up?

7   A    Right.

8   Q    So we're not saying that nothing showed up?

9   A    No, huh-uh.

10  Q    What are you saying?

11  A    I'm saying that the most important ones have not shown

12  up, and not just the e-mails.  We're talking about thousands

13  of documents.  I mean, I worked at this company for over five

14  years.  In the PR field, your work is the spoken word and it

15  is the written word.

16       I oversaw competencies in baseball, in football, in

17  golf, in Olympics, in tennis.  I oversaw all corporate.  I

18  oversaw positioning of various executives.  The athletes alone

19  at SFX were in the hundreds, and I had press kits for all of

20  them and I had CD kits for at least, oh, gosh, 75 of them,

21  specific CD kits.  This is ton of stuff.

22  Q    Okay.  Well, let me stop you there.  Okay.  Why is that

23  information important to you in this case?

24  A    This information demonstrates the depth and the breadth

25  of what I did, what I accomplished and the value that I

1   brought to this company.  And remember, I had to look at an

2   interrogatory that said I only worked in two small areas and

3   was not in a substantive manner of the company, and so I

4   feel -- I know I know that these documents substantiate what I

5   did, and they're important.

6   Q   What specifically then are you referring to is the

7   Defendant's position with respect to the job that you did?

8   A   Can you say that again?

9   Q   I'm sorry, let me slow down.  What was -- what is your

10  understanding of the Defendant's position with respect to the

11  job that you actually did as opposed to what you believe you

12  did?

13  A   The Defendant's position was that I was a minimal player

14  in public relations.  I worked on two areas.  I believe it

15  said, oh, gosh, was it golfing events?  It was so small, I was

16  in shock.

17        And then there was a deposition where the person who

18  gave the information for the interrogatory testified under

19  oath that this is the only thing I did, and luckily, we had a

20  couple of documents that when presented, this person backed

21  off from a great deal of her testimony, and I thought at that

22  time, "Gosh, if I had everything here, how different this

23  situation would be," you know.  This is now two -- two years

24  into this process.  If we had this information from the very

25  beginning, and it was there...

1   Q   Well, let me just stop you there, just so the Court is

2   clear.  The comparison that is being made with respect to your

3   job is with your predecessor?

4   A   Correct, yes.

5   Q   And that's Mr. Schacter?

6   A   Yes.

7   Q   Okay.  And so why is the information that you're just

8   talking about important as you compare yourself to

9   Mr. Schacter?

10   A   Well, in terms of Mr. Schacter, it demonstrates that not

11   only did I do his job, but I did -- I had more areas of my job

12   than he did.

13   Q   Okay.  So, from your position, just so the record is

14   clear, this information, these documents is relevant and

15   material to the comparison of you and your predecessor?

16   A   Absolutely, absolutely.

17   Q   Let's move just from the personal -- or the e-mails of --

18   you talked about presentations.  Explain to the Court what

19   presentations are.

20   A   Well, presentations can be done on a variety of topics,

21   and I'm sure Your Honor's familiar with presentations.  In my

22   world you could do presentations for a variety of things.  You

23   could do a presentation to a potential client, an athlete,

24   where you put together everything that SFX Sports Group could

25   bring to the table.

1        A lot of times when agents were marketing a

2    particular athlete, almost all the time, actually, they had a

3    PR component.  Why?  Because athletes care about public

4    relations; they care about their image; it enables them to

5    make more money.

6        Thank you.  It helps extend their career because

7    maybe an athlete who has a positive image -- maybe when he or

8    she is finished, they'll go into broadcasting, they'll go into

9    business, there is lots of precedent there.  There is also

10   presentations that would be corporate presentations.

11       Every year I put together a presentation on the PR

12   plan for the company, which would include the overall SFX

13   Sports Group brand as well as the various competencies within

14   the Sports Group brand and how PR could add value, not for

15   just the sake of feeling good about the SFX brand but how does

16   it actually help in dollar figures, you know.

17       PR is one of those intangibles that can make or

18   break a company.  And we've seen that in the news today,

19   haven't we, where PR can really assist or be a detriment to a

20   company.

21   Q   Where would this type of material have been kept by you?

22   A   It would be -- depending on the sort of presentation that

23   we were talking about, a corporate presentation would be kept

24   on a hard drive because that's proprietary business

25   information, and so, by and large, that would be stored on my

1   hard drive.

2        For athletic presentations, it would depend on the

3   athlete.  Sometimes they were stored on the server, and I

4   certainly, you know, two weeks ago some presentations were

5   handed over to us that were presentations that were part of my

6   group.  I've seen some presentations, but there is certain

7   times that there is a specific presentation on an athlete that

8   is proprietary that the agents don't necessarily want

9   everybody to know that we're pitching.  Something like that,

10  I'd store on my hard drive.

11  Q    Okay.  Now, you use the word "pitch."

12  A    Correct.

13  Q    Okay.  And what is "pitch," exactly?

14  A    Pitch is when you're trying to sign an athlete.

15  Q    Okay.

16  A    But there's also presentations to corporations.  Remember

17  before I discussed that sometimes a corporation wants to be a

18  sponsor for an athlete or maybe we want to go to a corporation

19  and get them to sponsor an athlete.  Well, there is a whole

20  presentation on that.

21        And PR, a lot of times, is part of that because the

22  corporation is also looking for some value added.  Why should

23  they spend a million dollars on this athlete?  What are they

24  going to get out of it for their company?  So that was also

25  something that would be included.

1   Q   Okay.  You've asked --

2   A   I'm sure I'm missing some things, but I'm trying.

3   Q   We've got a little time and you can slow down --

4   A   Okay.

5   Q   -- and breathe.

6   A   That's fine.

7   Q   When you refer to pitches, a request was made in your

8   behalf for production of these types of things?

9   A   Yeah, uh-huh.

10   Q   And did you want to see just pitches that you made or

11   pitches that were made supposedly subsequent to your

12   termination?

13   A   I wanted to see ones that were done after my termination

14   as well.

15   Q   Why was that important?

16   A   Well, to see what was going on after I left and to

17   demonstrate that they were still signing athletes after I

18   left, or trying.

19   Q   Okay.  And how did that become relevant?  What did

20   they -- the HR person tell you when you were terminated in

21   September 2005?

22   A   That there was no longer a need for a PR function.

23   Q   I see.  Based upon discovery, have you come to learn that

24   that may not, in fact, be the case?

25   A   Oh, yes.

1    Q    And so the pitches that you asked for are relevant to

2    whatever activity, from a public relations standpoint, at

3    least, occurred subsequent to your termination?

4    A    Correct.

5    Q    Okay.  You told us about specialized corporate pitches,

6    et cetera.  I'm not sure, did you -- have you addressed media

7    training?  Did you do that?

8    A    Yes, I did.  I did media training both for executives as

9    well as for some of the athletes, and I put together an actual

10   media training manual --

11   Q    Okay.

12   A    -- that I stored on my hard drive.

13   Q    What does that do for the people who are seeing it?

14   A    Well, what happens, media training is usually

15   individualized for either the executive or an athlete and it

16   can go in a variety levels.  It could be preparing an athlete,

17   in general, to, this is what you're going to face now that you

18   are X, Y or Z person, or maybe an important interview that

19   I've set up is about to take place and I know some things

20   about the reporter and maybe it could be a hostile interview

21   for a variety of reasons.

22   Q    Okay.

23   A    And they need extra preparation.  Same thing for an

24   executive.

25   Q    Okay.  And these are the types of things that you did?

1    A    Oh, yes, yes.

2    Q    Do you know if Mr. Schacter did these things?

3    A    I know that he got extra training because he was having

4    problems with that.

5    Q    Okay.

6    A    He would be the first to say that media wasn't his forte.

7    Q    Okay.  Well, we don't want to speak for him.

8    A    You're right.  I can't.  Maybe he wouldn't admit that in

9    court, though.

10   Q    Well, we won't speculate as to what he would say.

11   A    Sure.

12   Q    Let me turn your attention to press releases.

13   A    Yes.

14   Q    Were there press releasees that you would have created?

15   A    Yes.

16   Q    Can you describe briefly for the Court?

17   A    Oh, gosh.

18   Q    I know there is a ton of them, but just, you know, try

19   and give a general idea for Judge Facciola what you did and if

20   you can relate it to how it was saved.

21   A    Okay.  Hundreds upon hundreds upon hundreds of press

22   releases were done.  Keep in mind how many athletes there

23   were, keep in mind the amount of events there were.  To give

24   an example, we, SFX manages the Legg Mason Tennis Classic.  In

25   that one event alone there could be over a hundred press

 1   releases, just in that event alone, that would come out.

 2          So you take the various events that were either

 3   owned or operated by SFX, or the several hundred some

 4   athletes, or you know, executive press releases that need to

 5   be going out, statements that need to be going out.  I mean,

 6   it's amazing how much information goes out on a daily basis.

 7   Q    Did you, in the production that we have reviewed,

 8   either -- with Doug Bond, for instance, have you seen any of

 9   those types of things?

10   A    I did see some press releases, but I mean, a fraction.  I

11   mean, scratching the surface of...

12   Q    Okay.  Was some paper documents produced that were press

13   releases?

14   A    I think I had some and I turned over some.

15   Q    You had some?

16   A    Yes, yes.

17   Q    But they haven't turned over any to you?

18   A    Not that I recall.

19   Q    Okay.  How did you store the press releases?  Where would

20   you have kept them, electronically, first of all?

21   A    Two different areas.  I kept a lot of press releases on

22   the server, but I also kept some press releases, that were

23   very sensitive, on my hard drive, and I can explain why, if --

24   do you want to know?

25   Q    Go ahead.

1   A   Certain types of press releases could go out to the

2   world, and that's okay, or you can have a press release that's

3   called embargo that you have to hold for a certain date, and

4   then after that goes out, that's okay, too.  But sometimes you

5   write a press release that you only want to go to maybe one or

6   two reporters because it's that sensitive because maybe it's

7   not a great thing, so you save that on your hard drive.

8           THE COURT:  Okay.  Ms. D'Onofrio, could you stand

9   down for a minute.  We're going to take our lunch recess.  I

10  had a -- I had -- Mr. Bond, you are going to stay, aren't you,

11  for awhile?

12          MR. BOND:  Yes.

13          THE COURT:  Fine.  I just wondered if there is

14  really a dispute here.  Would you be willing to let Mr. Bond

15  do the search he feels he has to do, provided it was pursuant

16  to a protocol?  Mr. Bond, you have such protocols, I'm sure.

17          MR. BOND:  Yes.  Yes, sir.

18          MR. SCHRIEBER:  Would you like him to come up so

19  he's closer?

20          THE COURT:  Yes.  In other words, you may stand

21  down, Ms. D'Onofrio.

22          If you would do it pursuant to a protocol in which,

23  of course, he would be duty-bound by his oath to me to only

24  search for what he's supposed to.  If he came across anything

25  that was propriety that was attorney/client privilege, he

1  would be duty-bound not to disclose it, and I would supervise

2  his compliance with that, sir.

3      Is that -- it just seems to me, given Mr. Bond's

4  technical skills, to be blunt, he's probably cheaper than you,

5  and the more time you spend litigating and money of your

6  client you spend litigating, it might be cheaper to just get

7  this done, and I would also commend to your attention the

8  possibility that he may find some stuff that helps you.

9      I'm not asking you to make your decision now, but

10 over lunch, would you give it some thought?

11     MS. BARNES:  I will address it with my client.

12     THE COURT:  For Ms. Barnes' information, explain to

13 me the protocol.  What is it?  She obviously has a concern, as

14 with any business, that you're -- you're a stranger here, what

15 if you come over something, as Ms. D'Onofrio just said, a very

16 sensitive bit of information that's about a very famous

17 athlete that tabloids would love to have or you come across an

18 attorney/client communication because an athlete communicated

19 with a lawyer or you come across something that's frankly

20 might be salacious, that's nobody's business, what do you do

21 in those situations or how do you handle it?

22     MR. BOND:  That's a situation that comes up quite

23 often, and how we handle it is normally -- after the

24 information is -- the hard drive or server is obtained an

25 image of, then search terms are determined, and the search

1    terms could be, again, mutually agreeable from both sides, so

2    that, from that standpoint, then everybody's agreed.

3           And what I've done in the past is then, once I

4    complete the search, then the results would be turned over to

5    the other side.  They would review it for privilege or other

6    activities, and once they return to us and say, these, these

7    results of the search term are not privilege or not documents

8    that -- unrelated, then I could produce that and then give it

9    to this side.  And I've done that.

10          THE COURT:  So Ms. Barnes actually sees the result

11   of your search before Mr. Schreiber?

12          MR. BOND:  Yes, yes, exactly.

13          MR. SCHRIEBER:  The Court makes the call ultimately

14   as to whether or not there is privilege.  I mean, it's kind of

15   hard to do.

16          THE COURT:  Well, we're lucky, in fact,

17   Ms. D'Onofrio, you didn't -- obviously, you're not a lawyer

18   but there might be some other privileges, and like I say, we

19   are dealing with famous people and you know...

20          MR. SCHRIEBER:  Just so the Court recalls, the hard

21   drive of Ms. D'Onofrio is gone.  It's in a landfill, according

22   to the Defendants.

23          THE COURT:  All right.

24          MR. SCHRIEBER:  And so we will never know what's on

25   there.

1          THE COURT:  All right.

2          MR. SCHRIEBER:  So while we're willing to go through

3     this, and this can be food for discussion over lunch, no pun

4     intended, but in any event, we're still concerned about what's

5     not there.

6          THE COURT:  I understand.

7          MR. SCHRIEBER:  And so by doing this, we're not

8     waiving anything.

9          THE COURT:  No, no, nobody's waiving anything.

10         MR. SCHRIEBER:  But I think the Court's approach is

11    very sensible.

12         THE COURT:  And what I would also urge is I found

13    that technicians talk about each other, talk to each other,

14    and in a way that lawyers can't.  So if it's okay with you,

15    maybe Mr. Bond can spend some time with Mr. Cavender in the

16    presence of counsel and go over these issues, and they could

17    understand each other's systems and each other's concern.

18         MS. BARNES:  Your Honor, that's what I was going to

19    ask that we at least have an opportunity for Mr. Cavender to

20    be heard because I think that once it's understood exactly the

21    extensive search that was done, maybe --

22         THE COURT:  No one is quarreling.  At this point,

23    Ms. Barnes, I would urge that maybe a better use of

24    Mr. Cavender is to meet with Mr. Bond in your presence and Mr.

25    Schreiber's presence to see if you can work something out.  No

1    one is quarreling with, you know -- let's not talk about good

2    and evil here.  Let's talk about how we can save some money,

3    and as I say, simply and bluntly put, they're cheaper than

4    you, all right?

5              MS. BARNES:  Well, but I have to review it again.

6              THE COURT:  All right.  Well, concededly, but that's

7    nothing anybody -- you can run away from.  That's just an

8    issue, at least, and I think you're fairly lucky enough that

9    it seems unlikely it's privileged information, but in the

10   world of electronically stored information, nobody has figured

11   out how to not do a review of which is found.  The problem is

12   hard driver servers, as Mr. Bond and Mr. Cavender will tell

13   you, the problem is we are all junk collectors in our society,

14   we keep too much.

15             But Mr. Bond, you also will de-duplicate, right?

16             MR. BOND:  Yes.

17             THE COURT:  That is, he can, as I told you, by use

18   of the hash value, reduce down.  In an e-mail string, you're

19   not going to have to worry about going over the string again

20   and again, because each of those e-mails has a hash value.

21             He'll tell you about the process of de-duplication

22   that will reduce that.  He has no interest in making your job

23   harder because it's the same job that Mr. Schreiber has.  Why

24   would anybody make your job harder?  That's silly.

25             MS. BARNES:  Just so Your Honor does have a

1  background, we actually did request search terms before.

2          THE COURT:  I understand.  A lot has happened to

3  this point.

4          MS. BARNES:  We went through all --

5          THE COURT:  Now, let's go put that together and in

6  the spirit of cooperation.  I have learned nothing else about

7  electronic discovery information.  I have learned that

8  conscientious counsel with conscientious technicians can get

9  more done more quickly and more cheaply than all the judges on

10 the face of the earth, okay.  1:45.

11         THE DEPUTY CLERK:  All rise.  Court stands in recess

12 until 1:45.

13         (END OF MORNING SESSION AT 12:23 P.M.)

14                      *-*-*-*

15

16                **CERTIFICATE OF REPORTER**

17         I, Catalina Kerr, certify that the foregoing is a

18 correct transcript from the record of proceedings in the

19 above-entitled matter.

20

21

22

23 _____    _____

   Catalina Kerr                     Date
24

25