UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

AUDREY (SHEBBY) D'ONOFRIO,     .    Case No. 1:06-CV-00687
                              .    (JDB)
               Plaintiff,     .
                              .    Washington, D.C.
       v.                     .    March 10, 2009
                              .
SFX Sports Group, Inc.        .
                              .
               Defendant.     .
. . . . . . . . . . . . . .    .


STATUS CONFERENCE
BEFORE THE HONORABLE JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      Law Offices
                        By:  DAVID SCHREIBER, ESQ.
                        4550 Montgomery Avenue
                        Suite 760N
                        Bethesda, MD 20814

For the Defendant:      Baker & Hostetler, LLP
                        By:  JOHNINE BARNES, ESQ.
                        1050 Connecticut Avenue, N.W.
                        Washington, D.C. 20036

_____

1          (Proceedings commenced at 10:08 a.m.)

2               THE CLERK:  This is the civil case of 06-687,

3     Audrey D'Onofrio v. SFX Sorts Group, Inc..

4               David Schreiber for the plaintiff.

5               Johnine Barnes for the defendant.

6               It's a status conference.

7               Will the parties please introduce yourselves

8     to the Court, beginning with the plaintiff?

9               MR. SCHREIBER:  Good morning, Your Honor.

10               David Schreiber on behalf of Audrey

11     D'Onofrio, who is here.

12               My law clerk is also attending, if that's

13     okay, that he may sit at counsel table.

14               And we asked Mr. Bond, our expert to be here.

15     We weren't sure where the Court's inquiry was going to

16     go, but we brought him with --

17               THE COURT:  Thank you, Mr. Bond, for coming.

18               Good morning.

19               MS. BARNES:  Good morning, Your Honor.

20     Johnine Barnes for the defendants, and I also have with

21     me Andy (unintelligible) from Baker & Hostetler

22     (unintelligible).

23               THE COURT:  Where were you, Ms. Barnes?  We

24     waited for you.

25               MS. BARNES:  I was running a little late,

1    Your Honor.  I apologize.

2           THE COURT:  I think an apology would be in

3    order.  You kept everybody waiting.

4           An apology would be in order.  You kept

5    everyone waiting.

6           MS. BARNES:  I'm sorry.  You didn't hear me.

7    I said I'm sorry, Your Honor.

8           THE COURT:  You're welcome.

9           All right.  Well, I wanted to intercept this

10   process before it goes any further, to see if by

11   availing ourselves of the new Federal Rule 702 and the

12   clorback (phonetic) provision of the 207 amendments,

13   there might be some alternative to slogging through

14   this privilege question, bits of information at a time,

15   and I'm glad Mr. Bond is here.

16          Now, Ms. Barnes, in terms of the privileged

17   log, was that produced by the use of a particular

18   software program designed to produce logs from raw

19   data?

20          MS. BARNES:  Yes, it was.

21          THE COURT:  What is the name of that program?

22          MS. BARNES:  Review ESI.

23          THE COURT:  Review ESI.

24          So basically, as I understood it, I

25   understand it, or you tell me, were they scanned in and

1    then the ESI program did a key word search to ascertain

2    whether it was likely the document was privileged and,

3    if it was, it put it on a privileged log?

4              MS. BARNES:  No, that's not what happened.

5    What happened --

6              THE COURT:  What happened?  Please come to

7    the podium and explain to me what occurred.

8              MS. BARNES:  After we received the disk from

9    Mr. Cavender, on or about January 26, we then forward

10   the information to a outside vendor to have the

11   information uploaded into a review on-line process, so

12   that the reviewers can actually review each and every

13   document.

14             We initially did a culling of the documents

15   in Clearview so that we could then pull the documents

16   that had some of the buzz words for possible privileged

17   information.

18             We then had the reviewers review each and

19   every document, just simply because the documents need

20   to be reviewed because of the potential privileged

21   information there.

22             A privileged log was then created from the

23   documents that were viewed and marked "Privileged" by

24   the reviewers.  We had approximately 18 associates that

25   had to review the documents because there were over

1   98,000 documents that were pulled.  That's not pages,

2   that's documents, and I actually brought, so the Court

3   can actually understand what we had to go through, this

4   is one document right here, and so the reviewers went

5   through it and -- actually, not all the document

6   because I had to leave some of it off because it was

7   still printing when we left.

8          The reviewers then had to go through each and

9   every document to determine whether or not the document

10  was privileged.

11         The priv log is actually produced off of the

12  fields for the documents that had been reviewed and

13  marked as privileged, and for the Court's edification,

14  we actually do have a password, if you would like to go

15  on-line to go into the privilege log and review those

16  documents as well, for yourself, as opposed to looking

17  at hard copies.

18         THE COURT:  All right.  Thank you.

19         Now, I now understand how it was done and how

20  it was produced, and can we now fashion an agreement

21  that would relieve a -- any question of the accuracy of

22  the log from having to be resolved by the Court,

23  litigated by the parties, and could draw us closer to

24  what I hope would be the end of this matter, and that

25  is, is it possible for the parties to agree, pursuant

1  to the new rule, on some means of narrowing the issues

2  presented?

3           More specifically, would you be willing to

4  enter into an agreement, for example, that defendant

5  would permit plaintiff's counsel to see, on an "Eyes

6  Only" basis, certain of the documents?  That

7  observation would not constitute a waiver of any

8  privilege because it would be pursuant to a court order

9  that I would issue.

10          On the basis of that limited review, for want

11  of a better word, I think the literature, it's called a

12  "sneak and peek," counsel would then determine whether

13  to object to the assertion of privilege or not.

14          In that case, there would be a limited review

15  of some of the documents, whether electronically or

16  otherwise, and an understanding would be reached by the

17  parties, from that observation, that what was being

18  examined was to (unintelligible) and therefore, would

19  be the basis under which the parties would operate, in

20  terms of the -- not really the adequacy of the log, but

21  the legitimacy of the assertion of privilege.

22          The other alternative, of course, is to again

23  review hundreds of thousands of documents by the

24  plaintiff, to end this matter, and I don't understand

25  how that can be done.

1          Now, Mr. Bond, I'm glad you're here because

2    you probably are more familiar with the software that

3    is out there that might permit us to do that more

4    efficaciously.  I frequently lecture at these

5    conferences and cannot walk through the hallway without

6    people offering me tee-shirts and God knows what else,

7    vendors or -- gather like ants at a Fourth of July

8    picnic, and they're all hawking this program and that

9    program, with this bell and that whistle, but now you

10   understand how it was done.

11          If I were to tell you, you had X amount of

12   dollars and X amount of time to do it, how would you do

13   it?

14          MR. BOND:  Well, --

15          THE COURT:  Come up to the podium.

16          MR. BOND:  Actually, this job has kind of

17   grown beyond the standard forensic job that we normally

18   do, which doesn't entail this amount of data, but

19   that's -- and this is kind of at the edge of the

20   electronic discovery type, excuse me, realm, but it is

21   something that we are capable of.

22          We have software that can index large amounts

23   of data, large amounts of documents, and then provide a

24   searchable index from that, and that's what's normally

25   done from the electronic discovery side, and that would

1    be probably what I -- because of -- you know, I'm

2    actually kind of surprised at the large amount of data

3    involved here and, you know, that would be the most

4    efficient way to handle that.

5            I can't speak to the cost --

6            THE COURT:  I don't understand.

7            Isn't that just doing again, what Ms. Barnes

8    has already done?

9            MR. BOND:  Basically, yes.

10           THE COURT:  Well, what you have to do is to

11   put Mr. Schreiber into a position where he could say

12   what is typical of the sample is typical of the whole,

13   and therefore, he could say that Ms. Barnes' assertion

14   of privilege is in good faith, and he will content

15   himself with no further litigation on that issue.

16           MR. BOND:  Okay.

17           Yes, I think if a representative sample of

18   the data was viewed, I think that, you know, there's a

19   possibility we could do that.

20           There is a possibility of if we're allowed

21   access to their data in the database in the form that

22   it's now maintained, that we could view it from there,

23   and then that would save the expense and the trouble of

24   trying to reprocess it again.

25           That -- I guess that's beyond our realm to do

1   that but if, in fact, that -- I mean, to authorize

2   that, but if, in fact, that was done, that would

3   definitely save time and the expense because the data

4   is already indexed, and that's -- I'm familiar with

5   that product.  That's a standard electronic discovery-

6   type software, and then, you know, we could move on

7   from there.

8           THE COURT:  But the methodology I am

9   proposing is a statistical sample; that is, you would

10  take a representative sample and then you would say

11  what is true of the sample is therefore statistically

12  true of the whole, and therefore, there would be no

13  further litigation of the issue of whether the

14  privilege has been properly claimed, or conversely,

15  that you would take the opposite point of view.

16          MR. BOND:  All right.

17          That would be -- Mr. Schreiber could, but as

18  far as that being doable, I would say yes, that that

19  is.

20          THE COURT:  All right.

21          Mr. Schreiber?

22          MR. SCHREIBER:   Thank you, Your Honor.

23          The Court should realize I'm not terribly

24  conversant --

25          THE COURT:  I'm not asking you to make a

1  decision today.

2           MR. SCHREIBER:  I --

3           THE COURT:   I'm just asking you to think

4  about this --

5           MR. SCHREIBER:  Well, I'm certainly open to

6  the idea --

7           THE COURT:  -- because we're all agreed,

8  you --

9           MR. SCHREIBER:  Can't physically do this.

10          THE COURT:  It's impossible.

11          MR. SCHREIBER:  I got the privileged log

12  yesterday.  It was mailed on Thursday, so I certainly

13  can't begin to tell you what is in there.  I selected a

14  couple of pages, just the first two pages, and my

15  understanding was that it was going to be culled for

16  attorney/client or work product privilege, and I'm

17  looking at privilege claims which are proprietary or

18  private information.

19          So there's a different criteria than what I

20  expected, although there are some -- I notice later on

21  there's some attorney/client privileged material.

22          I did a quick look to see as to the adequacy

23  of the log, because in your opinions in London and

24  O'Keefe, and then the Stanley opinion from Judge Grimm,

25  we have to look at the adequacy of what they tell us so

1  that we can make a decent judgment on whether or not,

2  just at face value, this makes sense.  I have my

3  concerns there.

4        I don't know about the Court, and I'm not

5  looking to litigate or create the issue this moment,

6  but that's where I began, with the Court's cases, and

7  then frankly, I looked at a -- Judge Grimm's book,

8  because he has a small passage on privilege logs and

9  the way he describes it and the way he uses an example,

10  we needed to know more just from the privilege log to

11  even begin to figure out if this is a meaningful plan

12  -- a meaningful claim.

13        Getting past that concern that I have, and I

14  don't mean to dwell on it, obviously, if the Court

15  thought this was adequate, or we're going to move to

16  the next step of actually taking the -- a look, then I

17  would have to defer to somebody like Mr. Bond.

18        I don't know what a representative sample

19  would be, how we would select it.  Do I get to select

20  certain items of the 9400 --

21        THE COURT:  Well, that's where Mr. Bond would

22  help us.  We're not statisticians, so I don't know.

23        MR. SCHREIBER:  Well, you know, I --

24        THE COURT:  We'd have to figure that out

25  but --

1          MR. SCHREIBER:  -- I took it in college but

2     things have changed, I'm sure, since then.

3          So, I would certainly --

4          THE COURT:  Well, you could -- you would

5     agree with me that when a shipment of 100,000 widgets

6     shows up at the warehouse, people do not examine

7     100,000 widgets, --

8          MR. SCHREIBER:  Right.

9          THE COURT:  -- they examine a representative

10    sample and deduce from the sample, something universal

11    about the entire shipment.

12         MR. SCHREIBER:  Absolutely, and --

13         THE COURT:  That doesn't guarantee that one

14    of the widgets isn't broken, but it is the way we --

15         MR. SCHREIBER:  It's within limits.

16         THE COURT:  -- deal with the world in which

17    the numbers overwhelm us.

18         MR. SCHREIBER:  I think we can do that.

19         One of the things that I'm concerned about

20    is, beyond just the privileged material, this is now

21    three years into this case and there was nothing there,

22    and now there's a lot there, and when the Court issued

23    its order, I wanted to address that, maybe later in

24    this proceeding, we're given like a few weeks to do

25    certain things.  It looks like this is a Herculean

1    endeavor, and I'm gonna probably need more time and

2    more law clerks, et cetera, to look at this, but I did

3    have Mr. Bond prepared to tell the Court, because he

4    hasn't expressed it in any detail to me, generally what

5    he was able to find on, let's say, the D.C. server,

6    which had evidently, we were told, been erased.  He

7    found some significant material, and I can't tell you

8    the specifics by files, and things like that.  He did a

9    little list and then the Legato search obviously took a

10   while, but we were able to get some information off of

11   that.

12           So we had some success.  I don't know that it

13   obviates my concern as to what is still missing, but I

14   don't want to put that cart before this horse.

15           So, to go back to the original concerns that

16   the Court expressed, I think I'm constrained, that we

17   certainly couldn't do this item-by-item, so what we're

18   going to have to do, what the Court is suggesting, and

19   -- this is an expensive endeavor, obviously, and as the

20   Court suggested, I don't know where the Court was

21   leading.

22           From an expense standpoint, we've been

23   reimbursed $10,000 for doing what we think the

24   defendant should have done three years ago.  This is

25   going to be another expense that we're going to ask the

1  Court to consider.

2         THE COURT:  What expense it that?

3         MR. SCHREIBER:  Because Mr. Bond is going to

4  have to do whatever he has to do in order to determine

5  whether this privilege log is appropriate.

6         I -- I'm just concerned, and I don't know if

7  the Court wants to address it today, whether a claim of

8  privilege based upon proprietary/private information is

9  appropriate.  I don't think we're talking about trade

10 secrets here, we're just talking attorney/client and

11 work product material.  That's my understanding of what

12 the privilege log is about.  It doesn't get into the

13 business side, so to speak.  You know, we can have a --

14 some sort of protective order if they think we're going

15 to go out and compete with Clear Channel.

16        All I want to do is sort of narrow this down

17 because I took a quick look here yesterday, and it's

18 580 pages.  Most of it seems to be about proprietary

19 private material which I don't think we should even

20 worry about.  I'd like to know what's just the

21 attorney/client material that they're concerned about,

22 and focus on that.  That will save us a lot of time.

23 The rest of it can just go by the boards and, you know,

24 God forbid we learn the secret of Coca-Cola, we're not

25 going to go out and do anything, and we'll, you know,

1    we'll swear to that, but I want to focus this down

2    because this is a huge undertaking even, you know, the

3    way the Court described it.  I think we can do it a lot

4    better with just the attorney/client material.  If we

5    can get the software to tell us what's just

6    attorney/client work product, then we have a lot less

7    to do here.  The rest of it, I believe --

8           THE COURT:  I don't know that.  That's just a

9    guess based on a few pages.

10          Who knows?

11          MR. SCHREIBER:  Well, I mean, I --

12          THE COURT:  Thank you, Mr. Bond.  You may

13   have a seat.

14          MR. BOND:  Sure.

15          THE COURT:  Ms. Barnes?

16          MS. BARNES:  Your Honor, I just wanted to

17   clarify a couple of things that Mr. Schreiber raised.

18          With respect to the proprietary information,

19   unfortunately, although we had requested to run the

20   searches before they were done, just to see what they

21   would pull up, the searches were not run before the

22   examination actually commenced, and therefore, if you

23   look at the first page of the privilege log, there is

24   absolutely nothing.

25          I mean, a lot of this stuff is sales

1   commissions for radio, which have nothing to do with

2   Ms. D'Onofrio.

3           I mean, if you look at "November Commissions,

4   sales compensation analysis," this deals with a lot of

5   information, literally, that has nothing to do with Ms.

6   D'Onofrio.  It has persons' social security number

7   information, it has telephone numbers, it has salary

8   information in it, and for that -- for us just to

9   release that information without there being some type

10  of protective order, we could not do that, and that's

11  why it's fallen under the law.

12          I would gander to say, I mean, we

13  unfortunately had the endeavor of reviewing each and

14  every page of this because we did not want to let

15  anything go through that we could be liable for.  I

16  mean, and defendants have run to the tune of a three

17  figure -- without disclosing any attorney/client

18  privileges, a three-figure fee for this month, in just

19  reviewing a lot of these documents that have absolutely

20  nothing to do with this case and, quite frankly, having

21  had people go through the documents, we're not

22  convinced that there's anything that hasn't been turned

23  over, and again, as I say, there were spam in the

24  searches that were done.

25          I mean, so there were a lot of things that we

1    had to go through, many of which does not have any

2    information.

3           If we could get some type of agreement with

4    Mr. Schreiber, I would not mind releasing a log to him

5    that has attorney notes on it, which may give a better

6    description for him, as far as what documents are, but

7    I would guess that if Mr. Barnes were -- did sort of

8    kind of what we did in sort of going back through our

9    second review, that he can eliminate at least nine-

10   tenths, if not more, of this information from the

11   privileged log because it has absolutely nothing to do

12   with Ms. D'Onofrio or this case.

13           THE COURT:  So you -- Ms. Barnes, please come

14   back.

15           So you see it as a two-stage process.

16           Process Number 1 is go through the privilege

17   log using whatever software is available, and you

18   eliminate everything that can't possibly have anything

19   to do with Ms. D'Onofrio.  That gives you X.

20           And then you look only at the X material for

21   attorney/client privilege or other privileges.

22           Is that what you're saying?

23           MS. BARNES:  That's what I would do if I was

24   Mr. Schreiber going through it, that's --

25           THE COURT:  Yes.

1          MS. BARNES:  I mean, because he can tell from

2     the log, and like I said, if we can come to an

3     agreement that there is no waiver of attorney work

4     product, I would be more than happy to give him our

5     comments, attorney comments that may give -- if he

6     would like a better description of the information,

7     that that's the process that I would do.

8          THE COURT:  So you would be willing now, to

9     enter into an agreement where you would give him a more

10    detailed description of why the document falls within

11    attorney/client or work product privilege?

12         MS. BARNES:  Or proprietary information.

13         THE COURT:  Or proprietary information.  We

14    do that pursuant to a protective order.  That

15    protective order would say -- first of all, would be

16    "Eyes Only," can only be used for the purposes of this

17    case, but it would also incorporate Rule 702, and it

18    would not be a waiver of any privilege, --

19         MS. BARNES:  Yes.

20         THE COURT:  -- whether in this case or any

21    other case ever brought?

22         MS. BARNES:  Yes.

23         THE COURT:  You're willing to do that?

24         MS. BARNES:  I'm willing to do it.

25         THE COURT:  Mr. Schreiber, you willing to do

1   that?

2           MR. SCHREIBER:  Yes, that sounds reasonable.

3           In terms of 702, which is the expert witness

4   rule --

5           THE COURT:  I'm sorry, 502 not 702.

6           MR. SCHREIBER:  I'm --

7           THE COURT:  It's 502 --

8           MR. SCHREIBER:  -- kept hearing this --

9           THE COURT:  It's 502.  It's not in the most

10  recent of Westlaw -- of West, it's in Westlaw though,

11  but it says --

12          MR. SCHREIBER:  I'm --

13          THE COURT:  -- it follows the <u>Hobson</u> case,

14  and stands for the proposition that if the party -- if

15  the parties reach an agreement with reference to

16  privilege, and the Court incorporates it into an order,

17  that agreement is good not only between the parties,

18  but against all the world, so --

19          MR. SCHREIBER:  Right.  That's --

20          THE COURT:  -- Ms. Barnes is protected so

21  someone -- some third party doesn't come in and say,

22  "Well, you let Schreiber see this stuff, you got to let

23  me see it."  That --

24          MR. SCHREIBER:  I think you read it --

25          THE COURT:  That's gone.

1              MR. SCHREIBER:  I think that was written

2    about in one of these cases that I was --

3              THE COURT:  That's right.  Well, so --

4              MR. SCHREIBER:  -- looking at, I -- maybe

5    Stanley, but I think we can have two logs here.

6              Now, the privileged material, or the

7    proprietary, we'll call it the "proprietary material,"

8    now that may well be an adequate or accurate

9    description, but I can't tell just based upon that, so

10   we may want to run a sample of that material just to be

11   safe, but if we narrow everything down to what really

12   is supposed to be in the privileged log, as opposed to

13   trade secrets or privacy stuff, then I think that makes

14   more sense.

15             We've been at this now three years.  It's not

16   in our interest to belabor or delay this, obviously.  I

17   mean, I've not been in a position often, where I had to

18   really do the work to, you know, find this material

19   when it was said that there was nothing there, and now

20   we find all of this material.  This has certainly been

21   something that has been extraordinary, at least in my

22   practice.

23             So, I think that we can come up with that

24   solution.

25             One of the things that I just wanted to alert

1     the Court to, in the first run-through that we had with

2     the Legato system, and it was done remotely, if the

3     Court might recall, we got some error messages which

4     indicated that some documents were either erased or

5     missing.

6              I had Mr. Bond speak with people from the

7     Legato company to try and figure out what that was all

8     about.  He can tell you in a little more detail, but it

9     may have been just oversight, or a glitch, or may have

10    been intentional.

11             Now, we only have -- I brought three little

12    pictures to show the Court, if you want to see it.  It

13    raised some concern to me because of the time passage

14    here, whether there was any corruption of any of the

15    data in the Legato system.

16             We can find out, Mr. Bond can explain to you

17    a little bit better than I can, from the Legato system

18    itself, whether or not anybody went in and changed or

19    did anything, and we may need to do that here, just to

20    be absolutely safe, and I have the little photos that I

21    took of the first run, which indicate what I just said.

22    So that's of a concern to me, that we make sure that

23    what we have is everything that we should have.

24             The second point that I would remind the

25    Court, is that it's now three years, and while we were

1   able to image the local D.C. server, in speaking with

2   Mr. Bond again, we can't be certain that what's on

3   there is what was on there three years ago, or three

4   and a half years ago.

5           THE COURT:  Nobody could ever be certain of

6   that.

7           MR. SCHREIBER:  So because of the delay in

8   time, and the loss of her computer, which she

9   maintained -- Ms. D'Onofrio maintained things on her

10  computer that didn't get onto the server, we're still

11  in a situation, let's put it that way, where we're not

12  about to say that, you know, we've cured the problem,

13  and I wanted just to --

14          THE COURT:  Right.

15          If that --

16          MR. SCHREIBER:  -- alert the Court to that.

17          THE COURT:  -- that problem is not cured,

18  where is this heading, to a spoliation motion?

19          MR. SCHREIBER:  Well, it may well be.  I

20  mean, I'm not about to press that at the moment, but I

21  don't want to suggest to the Court that all is just

22  fine here.  There is that concern, and as we -- and

23  we're gonna have to look to see what's there.

24          As the Court instructed, and we followed

25  this, we haven't looked at any of the documents that

1    have been retrieved, e-mails, whatever.  We know

2    there's a fair amount there.

3            I had Mr. Bond --

4            THE COURT:  I'm sorry, why can't you do that?

5            MR. SCHREIBER:  Because we we're not allowed

6    to look until the privilege has been reviewed.  That's

7    the way you wrote the order, Your Honor.

8            THE COURT:  Maybe that was an error.  Maybe

9    we should, given in light of what's been produced here,

10   you should --

11           MR. SCHREIBER:  Well, I mean, I --

12           THE COURT:  -- you should begin looking.

13           MR. SCHREIBER:  -- I would like to because,

14   you know, not that time is of the essence, but --

15           THE COURT:  Oh, it is of the essence.

16   You've --

17           MR. SCHREIBER:  -- it's --

18           THE COURT:  -- you've got a judge named

19   "Bates" who's --

20           MR. SCHREIBER:  I bet you're getting phone

21   calls.

22           THE COURT:  Yeah, or going to.

23           MR. SCHREIBER:  You know, again, I want to do

24   justice, literally and figuratively, to this case.  I

25   mean, this is not of our own doing.  I've been asking

1   for three years --

2            THE COURT:  Okay, but the point I'm trying to

3   make --

4            MR. SCHREIBER:  -- and so -- Yeah.

5            THE COURT:  Well, I'm looking at my order and

6   I'm afraid I -- maybe I misunderstood my own order, but

7   does it specifically bar a production, or your review

8   of the non-privileged material, whether mechanically or

9   otherwise?

10           MR. SCHREIBER:  Well, we -- I think -- Let me

11  get it here.

12           Ms. Barnes and I had informally understood

13  this to be the case, --

14           THE COURT:  Well, then maybe I'm --

15           MR. SCHREIBER:  -- that we --

16           THE COURT:  -- it was my mistake.

17           MR. SCHREIBER:  -- I -- I'm not allowed to go

18  look at anything until, one, we get a privileged log,

19  and I just got it yesterday, so I couldn't look at

20  anything, and if the Court's telling me that -- and I

21  have the order here, but -- Well, I'm not going to

22  belabor this.

23           THE COURT:  Well, can I see the order,

24  please?  I'm looking at my order of February 5th.

25           Isn't that what you mean?  Is there an

1    earlier order?

2         MR. SCHREIBER:  This is the 10-29 order.

3    (Unintelligible) that one.

4         THE COURT:  Yes.

5         MR. SCHREIBER:  Okay.

6         I have also --

7         THE COURT:  All right.

8         Could I see it?

9         MR. SCHREIBER:  Oh, sure.

10        THE COURT:  Thank you.

11        (Pause.)

12        THE COURT:  Yeah, that's the one I'm looking

13   at, 2-6-09.  That's the one I already have.

14        You said there's an earlier one?

15        MR. SCHREIBER:  Well, you have written in --

16   it's the order from 10-29-08.  It's docket entry --

17   Document 86.  It's your memorandum opinion, and 85 is

18   the order.  This has to do with how to go about our

19   search.  This is what you've determined, and as I read

20   it, it was my understanding we couldn't begin to look

21   at anything until we got a privileged log, which is

22   yesterday, for me, and --

23        THE COURT:  Okay.  Well, --

24        MR. SCHREIBER:  So I -- I've told Mr. Bond,

25   and I want him to explain a little more about, you

1   know, the search he did, what he was able to find which

2   was not supposed to be there, and more importantly,

3   what kind of time frame, because I've got to revisit

4   with Your Honor, the time that we're going to have to

5   go through a lot of material that was never produced.

6           So, you know, I'm going to work, and I've got

7   law clerks lined up, once they finish their exams and

8   all that sort of stuff.  I've got a troop of young

9   people who have better eyes and computer savvy that

10  will be looking at this, and certainly this --

11          THE COURT:  Mr. Schreiber I'll tell you, if

12  you even attempt to do this on a document by document

13  basis, without using some sort of sampling technique,

14  unless you can narrow down what you want to look at,

15  you'll (unintelligible).

16          MR. SCHREIBER:  Oh, I realize that, but --

17          THE COURT:  It's impossible, physically

18  impossible.

19          That's not in the cards.  That's not going to

20  happen.  Judge Bates is not going to permit that.

21          MR. SCHREIBER:  Well, Your Honor, just to

22  give you an idea, I had Mr. Bond -- Let me show this to

23  you.  I can -- We gave an extra copy for Ms. Barnes.

24          MS. BARNES:  If you could provide

25  (unintelligible).

1    (Pause.)

2         MR. SCHREIBER:  I mean, this is just two

3    pages, and one is the D.C. search -- service search

4    results.  I just wanted to give the Court an idea of

5    what we were able to come up with, because the

6    testimony was from defendant's IT people.  There was

7    nothing there.  They had searched it, they couldn't

8    find anything.  The drive had been -- or the server had

9    been erased.  Those were the issues before the Court,

10   and Mr. Bond was able to retrieve this material.

11        Now, this is not necessarily coextensive with

12   everything that Ms. D'Onofrio had because she had

13   things on her computer, and other materials, but I just

14   wanted to give you an idea of what we were able to do,

15   and then we have the Legato, which also harvested

16   information.

17        So, I mean, we've been working at this, but

18   again, I have told Mr. Bond, because it was my

19   understanding, not to reveal any of the contents to me

20   until you have made your decision as to where we're

21   going to go with this, so that, I guess, is sum and

22   substance of where we are.

23        But I think going back to what you were

24   suggesting, yeah, we can't sit down and go through

25   200,000 pages of documents.  We're going to do a

1   sampling.

2         Ms. D'Onofrio is going to be looking for

3   certain things because we know what's supposed to be

4   there, and so we'll be able to at least come up with

5   some search terms that will help her to look at things

6   but, you know, I think at this point we can have an

7   understanding that whatever gets turned over here would

8   be subject to a protective order, a Hobson order, if

9   you want, to protect the --

10        THE COURT:  Well no, it's going to be subject

11  to two protective orders.  Protective Order Number 1

12  will be with reference to its dissemination, and

13  obviously it's  --

14        MR. SCHREIBER:  Right.

15        THE COURT:  -- attorney's eyes only.

16        MR. SCHREIBER:  Right.

17        THE COURT:  Or the second thing will be the

18  more --  the so-called Hobson order, or 502 order which

19  deals with it, but what I want to do first of all is

20  put the parties in a place to, as Ms. Barnes say,

21  eliminate, as quickly as possible, those portions of it

22  that can't possibly have anything to do with this case,

23  so that the focus, or the -- is as narrow as it can

24  possibly be on the privilege question, as to documents

25  which are relevant, or likely to lead to relevant

1    evidence.  That's what's got to be done, --

2              MR. SCHREIBER:  Right.

3              THE COURT:  -- first of all, --

4              MR. SCHREIBER:  I --

5              THE COURT:  -- before we hire law clerks

6    and --

7              MR. SCHREIBER:  Right.

8              THE COURT:  -- they take their exams or

9    anything else.  We've --

10             MR. SCHREIBER:  I have that --

11             THE COURT:  -- got to get this down to some

12   manageable level.

13             MR. SCHREIBER:  I think that's a good idea.

14   I just want to reserve to us on this 90 percent that we

15   don't think is relevant, for whatever reason, the

16   privacy things, that we can selectively, you know, do a

17   sampling to make sure that what was represented is, in

18   fact, correct, because if you look at the log, there's

19   just no way to tell.

20             I mean, it's -- all it picks up is to -- the

21   subject of the document is what is on the "Reference"

22   line, which doesn't always tell us anything,

23   specifically as to whether or not is -- I mean, that's

24   all we think we want to do, and if we're, you know, all

25   in the same page, literally or figuratively, yes, this

1    is a realistic designation of unrelated material,

2    that's fine, but we do reserve the right to be able to

3    look at it, just to be comfortable, so that we don't

4    come back later and say, "Judge, we made a terrible

5    mistake and look what showed up" and, you know, so I

6    think that that's a reasonable approach.

7           But the next step certainly is to look at the

8    attorney/client information, get the list out of the

9    9400 items, and then, if I recall from Your Honor's

10   opinions, and that of Judge Grimm, we get this in there

11   and talk about this counsel to counsel, because the

12   last thing you want to do is sit in chambers.  I know I

13   delivered to you --

14           THE COURT:  The hard drive, yes.

15           MR. SCHREIBER:  Yeah, the whole thing.  I

16   mean, it's -- I got to tell you, it was an interesting

17   experience, trying to bring it into the courthouse

18   sealed.  They won't let you do it.  They think that

19   there's some sort of powder in there, and so I had to

20   open it and you know what happened when you got a phone

21   call.

22           So, you know, I think we can work through

23   this because I don't want Your Honor having to sit

24   there, and this young lady to your left and, you know,

25   have to plow through this material.  That's not the way

1   it should be done and, you know, I recall some comments

2   in O'Keefe about lawyers, and things like that, so I'm

3   not going to belabor the subject.

4            THE COURT:  Okay.

5            Ms. Barnes?

6            MS. BARNES:  I just wanted to clarify a

7   couple of things that Mr. Schreiber noted.

8            With respect to the searches that were done

9   on Legato, and I have not heard anything about anything

10  being raised.  There were corrupted files that came out

11  and they reran the searches and the searches came

12  through.  I brought with me, a copy of the printout

13  that was done by Mr. Cavender and Mr. Bond, so I do

14  want to clarify that for the Court.

15           And the other thing, as well, is to clarify

16  also that plaintiff has had, for some years now, two

17  years, information that we did receive off of the local

18  server, and so as plaintiff will find out, although she

19  alleges that things should be there, of these documents

20  that she's gone through, many of them have already been

21  produced to plaintiff in the same, almost thousand

22  documents that we've already produced.

23           I just want the Court to be clear that I have

24  not heard any issue with respect to anything being

25  erased, and I understand that Mr. Schreiber is talking

1   about costs, trust me, because we've unfortunately had

2   the endeavor to go through each and every one of these

3   documents, but there's not a lot of new information in

4   this case, and as the Court will find out, and as

5   plaintiff goes through, there's just a lot of

6   information that's not -- I just want to make so I

7   don't --

8           THE COURT:  I understand.  I understand.  I

9   appreciate it.  Thank you, Ms. Barnes, very much.

10          All right.

11          MR. SCHREIBER:  Your Honor, can I just show

12  you what we're talking about so that --

13          THE COURT:  Yes.  Okay.

14          The issue of spoliation and all of that is

15  going to be left to another day, okay, so let's not

16  spend a lot of time on that.  Let's try to figure out

17  what we have in front of us.

18          MR. SCHREIBER:  Well, let me just pass up to

19  the Court, this is the sort of snapshot, first day, of

20  why we're a little concerned.

21          THE COURT:  Okay.

22          And why is this significant?

23          MR. SCHREIBER:  Well, if you read through it

24  you see error processing message, unable to find

25  message on server, message could have been removed.

1          Again, I had Mr. Bond try and contact the

2    Legato people.  He can tell you what his conversation

3    was about.  They can't tell us that it was just a

4    glitch, so to speak, my term, or whether it was

5    intentional, --

6          THE COURT:  Okay, but --

7          MR. SCHREIBER:  -- and my point is that what

8    the defendants can produce through the Legato system is

9    a list, or index, or whatever, that tells us who's been

10   into the Legato system to either change, or remove, or

11   do something to it, and that would confirm either that

12   it was just a mistake, in a technical sense, or

13   somebody intentionally was removing something.

14          I mean, we've had three years of this, not of

15   our own doing, and to get a message like this at this

16   point, this is why we're concerned.  I -- If the Court

17   recalls the history of this, which I'm not going to

18   belabor, I think we have an adequate basis to feel

19   concerned.

20          THE COURT:  All right.  So be it.

21          Here's what I'd like to do.  It's now a

22   quarter to eleven.  I'd like you to remain here and

23   I'll return at 11:30.  At that -- I'd like you to spend

24   the next 45 minutes coming up with the outlines of an

25   agreement which contains all of the elements we've just

1   discussed, to wit: the following:

2          One.  Some methodology to reduce the

3   documents that are listed in the privileged log, to a

4   more workable group that are truly relevant, or likely

5   to lead to relevant evidence in this case.

6          Second, a protective order, in the

7   traditional sense, that protects the parties from any

8   dissemination of the information, besides a selected

9   group of people, attorneys and any expert witnesses,

10  the traditional protective order.

11         Second order would be an order pursuant to

12  Rule 502 and Rule 26(b), which deals with the

13  possibility of counsel making available -- counsel for

14  the defendant making available to counsel to the

15  plaintiff, selected information, with the understanding

16  that the production of that information is not a waiver

17  in this or any other case, of any privilege that

18  pertains to that document -- that's claimed in that

19  document.

20         Okay?  So why don't you take some time and

21  I'll be back at 11:45 and we can discuss it then.

22  Hopefully I'll be able to have an order from you, or

23  draft my own.

24         Thank you.

25         MR. SCHREIBER:  Eleven-thirty or 11:45?

1          THE COURT:  Eleven-thirty.  If you need more

2   time, just tell me (unintelligible).

3       (Recess at 10 :47 a.m. until 11:42 a.m.)

4                       AFTER RECESS

5          THE COURT:  Good morning again.

6          Have you reached any understanding?

7          Why don't you come up?

8          MS. BARNES:  I think we have, with the

9   exception of two items, --

10          THE COURT:  Sure.

11          MS. BARNES:  -- one being defendants have

12   proposed that the protective order be attorney's eyes

13   only, with the exception of Mr. Bond or whoever Mr.

14   Schreiber needs for a forensic examination, and any law

15   clerks or any assistants they would need from

16   contacting attorneys.

17          Plaintiff would like to have -- plaintiff's

18   counsel would like to have plaintiff be able to view

19   the log and the documents, and defendants would like

20   for it to be attorney's eyes only.

21          The other issue remaining is with respect to

22   the privileged documents that were retrieved that are

23   dated post the lawsuit being filed in this case.  There

24   were approximately a thousand documents, many of which

25   are clearly privileged, and when a document says "Joint

```
 1    defense discussion amongst attorneys," and we would

 2    like to have those documents which are actually six

 3    months after the date upon which the plaintiff was

 4    terminated, excluded from the sample.

 5              THE COURT:  Mr. Schreiber?

 6              MR. SCHREIBER:  Thank you, Your Honor.

 7              THE COURT:  But otherwise, you would, if I

 8    left you -- gave you a day or so, you could get me a

 9    proposed agreement between the two of you?

10              MS. BARNES:  Yes.

11              THE COURT:  All right.

12              MR. SCHREIBER:  (Unintelligible) at this

13    point is to put pen to paper initially.

14              THE COURT:  All right.  Thank you.

15              On the two issues she raised, --

16              MR. SCHREIBER:  All right.

17              THE COURT:  -- let me hear you.

18              MR. SCHREIBER:  Well, first of all, as to Ms.

19    D'Onofrio looking at this information, or discussing it

20    with me, I need her input on some of this information.

21    I was reminded, as we were thinking about this, there

22    is already a protective order in this case, --

23              THE COURT:  Perhaps.

24              MR. SCHREIBER:  -- going back --

25              THE COURT:  But I'll look at that and see.
```

1            MR. SCHREIBER:  -- it's -- and I have it up

2     on my computer, and it allows for confidential

3     documents, et cetera.  It's kind of standard, and Ms.

4     D'Onofrio, as the plaintiff, is allowed to certainly

5     look at these things.

6            I think it makes sense that I have the

7     assistance of Ms. D'Onofrio as we evaluate some of this

8     material, not just from a legal standpoint, but from a

9     practical standpoint, because there are occasionally

10    nuances with documents that I won't necessarily catch,

11    and I'm sure without knowing anything that Ms. Barnes

12    has spoken with her people to try to evaluate context

13    for documents, and we're under that prior order, we

14    would be under another order, if necessary, not to do

15    anything with this information, and certainly we, as

16    officers of the court, and Ms. D'Onofrio, who has

17    followed the letter and spirit of this litigation for

18    some three years, has done nothing to publicize or do

19    anything with this information, other than to try to

20    obtain it.

21           The second point as to why we would be

22    looking after the date of filing of -- we discussed

23    this with the Court some time ago, and the Court had

24    looked at this issue, what happened post her

25    termination, and even post filing of the lawsuit in

1  superior court, unfortunately is still germane.

2        Two points.

3        From the work that was performed by either

4  Ms. D'Onofrio on behalf of the defendant, SFX, which

5  they asked her to do afterwards, that's relevant to

6  whether or not the public relations function was

7  disposed of --

8        THE COURT:  Ms. Barnes is not quarreling with

9  that.

10        What she's saying is that she can identify a

11  thousand documents that came into existence after the

12  lawsuit was filed, --

13        MR. SCHREIBER:  Which --

14        THE COURT:  -- which dealt with her work on

15  the case, Ms. Barnes' work and the work of her

16  colleagues, --

17        MR. SCHREIBER:  And that --

18        THE COURT:  -- which are clearly privileged,

19  and she's saying if they are so clearly privileged, why

20  are we fussing about them?

21        MR. SCHREIBER:  But that's not what I

22  understood her to say.  I asked her --

23        THE COURT:  I'm sorry.

24        Ms. Barnes, did I misinterpret you?

25        MS. BARNES:  No, the Court understood me

1    correct.

2              THE COURT:  Okay.

3              MR. SCHREIBER:  My discussion with her

4    indicated, because I asked her which were

5    attorney/client privilege and which were the private,

6    personal material, and she could not say what --

7              MS. BARNES:  (Unintelligible.)

8              THE COURT:  All right.  Go ahead, Mr.

9    Schreiber.  You finish, then we'll hear from Ms.

10   Barnes.

11             MR. SCHREIBER:  Well, I'm not, but I'll let

12   Ms. Barnes go.

13             MS. BARNES:  Your Honor, your interpretation

14   was correct, and specifically, I'm looking at the

15   document that's dated 9-20-06, and it's, "Attorney

16   discussions re: joint defense," which is clearly after

17   the date of the lawsuit, in addition to the fact that

18   with the proprietary information, after the date of the

19   lawsuit, and the Court is not privy to this but it has

20   been discussed in this case, part of the issue is that

21   the -- one of the defendants was spun off from the

22   other defendant, so any -- and that happened at the end

23   of 2005, which is defendant's defense, that Ms.

24   D'Onofrio, along with 22 other people, were let go as

25   part of a restructuring for a spinoff.

1          So there are a lot of documents that don't

2    even relate to, and that are clearly noted as having

3    executive stock option discussions with counsel, which

4    is by a defendant who has nothing to do with it,

5    because the defendants were then spun off and not even

6    interrelated at the time.

7          So post the date of --

8          THE COURT:  So that falls into two

9    categories, correspondence between Ms. Barnes and her

10   colleagues with co-counsel, or with the client itself

11   would seem to fall clearly within attorney/client and

12   work product.

13         MS. BARNES:  And also with respect to --

14         THE COURT:  So those documents, you're

15   saying, "Let's not even both with those because you and

16   I were working on the case."

17         MS. BARNES:  Right.

18         In addition, there are documents that were

19   being either forwarded or sent, that were requested by

20   counsel, so those -- I just wanted to be clear that

21   those count --

22         THE COURT:  Okay.

23         MS. BARNES:  -- documents --

24         THE COURT:  All right.

25         Now, you say that there was a period of time

1    after Ms. D'Onofrio was let go, where you want to test

2    the truthfulness of the representations that she was

3    let go because of a restructuring, right?

4              MS. BARNES:  And I'm -- just so I can

5    clarify.

6              There are documents that are still post-3-17-

7    06 that are included in this stack that are either

8    deemed relevant, not responsive, that are not the

9    privileged documents.  So any assertions that plaintiff

10   has, that there was continued PR work, that would not

11   fall under a privilege and would not be in a privileged

12   log, and she can still retrieve that document.

13             THE COURT:  Why is that not sufficient, Mr.

14   Schreiber?

15             MR. SCHREIBER:  Because we don't know how

16   they culled out the last batch of, "Well, we think it's

17   relevant," and this batch, which somehow is called

18   "Private" or "Personal," we don't know how they

19   analyzed that to put it into the privileged log because

20   privileged log doesn't tell us anything.

21             The Legato search, and the information I gave

22   you from Mr. Bond, has the search terms, how we did it.

23             We have about ten of them, strings, and what

24   we did specifically was to take out Ms. Barnes or Ms.

25   King, who used to be in this case, because we were

1    afraid of picking up something from there.

2             Now, there may be something in there, and

3    again, I just saw this yesterday.  I can't begin to

4    tell you how much information we're really talking

5    about, that might have in-house counsel, but what we're

6    trying not to do is just a wholesale buy into, "Well,

7    there was a thousand pieces of paper," whatever.

8    afterwards.  It's very hard to cull this out.

9             What we're concerned about is that the cutoff

10   arbitrarily, of March 17th, will be insufficient for us

11   to test the pretext in this case.

12            It also turns up in the issue of the

13   spoliation.  We were talking, "Well, what happens if

14   there's an e-mail from somebody saying, 'Get rid of

15   that computer?'" and I said to somebody, "In my wildest

16   dreams that doesn't happen but, you know, life is

17   strange."

18            I don't know that that's going to turn up,

19   but that's an issue that doesn't go away in this case

20   because spoliation may or may not control the future of

21   this litigation, so I don't want to give up something

22   like that, not knowing what I'm doing here.

23            I -- There was a problem going back in the

24   Victor Stanley case, when Judge Grimm wrote about the

25   attorneys dispense with the call back, why did they do

1   that?  Well, the whole case seemed to turn about what a

2   foolish move that was.  Well, I don't want to, in my

3   naivety, you know, do something that I'm going to be

4   concerned about later.

5           I think it's not an arbitrary -- Well, it's

6   somewhat arbitrary to say March 17th, '06, because

7   that's when I filed suit.  What I'm trying to say is

8   that there is relevant things afterwards, that we can

9   claw back (phonetic) or do whatever, if something

10  somehow came up.  We're just testing the good faith of

11  the defendants, and how they did this.

12          And again, without belaboring this point, the

13  history of this case, after three years of trying to

14  get this information, beginning with getting no

15  documents, throwing things away, it doesn't exist, you

16  know, it's a long list of stuff.

17          THE COURT:  All right, but --

18          MR. SCHREIBER:  We're not comfortable.

19          THE COURT:  -- in terms of the agreement, the

20  specific provision that Ms. Barnes wants in it is what?

21          MR. SCHREIBER:  That we can't see anything

22  after March 17th, 2006, and we -- for purposes of the

23  privilege.  We can see other things that they said

24  aren't privileged --

25          MS. BARNES:  (Unintelligible) on a privileged

1    log.

2         THE COURT:  Only on -- Yes.  So after the

3    seventeenth, she wants to cut off all documents that

4    appear on the privileged log to be privileged.

5         Is that --

6         MR. SCHREIBER:  With --

7         MS. BARNES:  Yes.

8         MR. SCHREIBER:  And we're not comfortable

9    with that because we don't know --

10        THE COURT:  How could you narrow it?

11        MR. SCHREIBER:  Well, certainly we're going

12   to --

13        THE COURT:  All of them?  None of them?  Some

14   of them?  How?

15        MR. SCHREIBER:  We're going to do a sample.

16   It's not like we're going to pick out everything and

17   say, "Give me everything after March 17th, '06."

18        We just want it to be part of the sample so

19   that we know that I can tell Ms. D'Onofrio when we go

20   home at the end of the day, "Yes, we did a credible job

21   and we made sure that the defendants were being candid

22   with us."

23        Again, without bespeaking the obvious, there

24   have been issues in this case, which made me have to

25   take that position, and I don't want to, you know, wave

1    that to the Court or to anybody else.  I think it's a

2    very important issue here.

3           MS. BARNES:  Your Honor, I just wanted to --

4    I can only speak to this --

5           THE COURT:  I get the feeling the two of you

6    are passing like ships in the night and I really am

7    having trouble with it.

8           You're saying, "Look, once you filed suit, I

9    was on this case and Ms. King was on this case.  We had

10   communications with each other.  We had communications

11   with our client."  Clearly, every lawyer worthy of the

12   name knows that's what attorney/client privilege and

13   work product is all about, so let's have an

14   understanding that once litigation starts, you have no

15   longer claim about that.

16          MS. BARNES:  Correct, in addition --

17          THE COURT:  He's saying, "I concede that, but

18   I don't want to give up my right to look at some of the

19   documents after the seventeenth, to test the accuracy

20   of" what representation, that it was attorney/client

21   privilege?

22          MS. BARNES:  Can I just interject --

23          THE COURT:  I'm asking him, before we go on.

24   What do you -- What are you testing?

25          MR. SCHREIBER:  I can't necessarily tell from

1   the couple pages I looked at, the adequacy of any of

2   this information.  I mean, as you've pointed out, Judge

3   Grimm's pointed out, they've got to tell us more in

4   order to know that.  I mean, I haven't gone through the

5   580 pages, so I want to test that because I'm standing

6   here without any knowledge.

7            Secondly, it's not just about Ms. Barnes.

8   There is evidently some in-house counsel which may or

9   may not be located in there.  I'm not aware of that

10  because I don't know the names of all these people,

11  other than I saw Mr. Monistery's (phonetic) name on one

12  of these documents, but what he's done is put, you

13  know, privileged, confidential, or whatever, on one tag

14  line, that was on page 17, I think, that was the only

15  one I looked at, so my point is --

16           THE COURT:  Well, you've got -- if you look

17  at it just here, if you're going to use that date, 3-

18  17-06, --

19           MR. SCHREIBER:  Yes.

20           THE COURT:  -- quite a bit would -- is after

21  that, just from the first ten or twelve pages.

22           MR. SCHREIBER:  May well be.  I just can't

23  tell you, Your Honor.  I just got it yesterday.

24           MS. BARNES:  Again, Your Honor, can I just

25  interject?  Also, the point that any allegation of

1   spoliation, destruction of computer, there's been

2   testimony in the case, and defendants have admitted

3   that it occurred in 2005, and so there are six months

4   after that period.  I mean, anything that deals with

5   after the lawsuit is filed, there's not going to be an

6   issue with respect to any alleged spoliation, and so

7   the six months after the case up, until the date

8   (phonetic) clearly covers that.

9          THE COURT:  But there may be a period of time

10  after the filing, in which documents were created, not

11  by you or Ms. King or your colleagues, that were

12  created in-house, that bear on whether -- on the

13  truthfulness of the defense in this case, that she was

14  let go because they decided to outsource her job to

15  other people.

16         MS. BARNES:  Right, and that's why I said "up

17  until the date of the lawsuit," --

18         THE COURT:  Yes.

19         MS. BARNES:  -- and that's six months up

20  until --

21         THE COURT:  All right.

22         How much time transpires between her being

23  let go and the lawsuit?

24         MS. BARNES:  Six months.

25         THE COURT:  Okay.

1          And you want to test after that six-month

2    period of time?

3          MR. SCHREIBER:  Yes, for the reasons that

4    I --

5          THE COURT:  All right.  I have your point.

6    Obviously you can't agree.  I'm going to have to

7    resolve it.

8          MS. BARNES:  Yes.

9          THE COURT:  All right.

10          What I'd like you to do, Mr. Schreiber, I'd

11    like -- Are you going to take the laboring oar?

12          MR. SCHREIBER:  She starts, I'm going to end.

13          THE COURT:  All right.

14          Could you both have something to me by close

15    of business Friday?

16          (No audible response.)

17          THE COURT:  All right.  Let's try that and

18    then we'll go from there.  Okay.  I look forward to

19    getting it.

20          Thank you.

21          Court will be in recess until call of the

22    criminal calendar (unintelligible).

23      (Proceedings concluded at 11:56 a.m.)

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____        March 14, 2009

STEPHEN C. BOWLES